# Exhibit 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 10-K

[X]  Annual Report Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934

For the fiscal year ended October 31, 2018

OR

[ ]  Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the Transition Period from to

Commission File No. 000-51128

# POLARITYTE, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **06-1529524** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**123 Wright Brothers Drive**
**Salt Lake City, Utah 84116**

(Address of principal executive office)

Registrant's telephone number, including area code (385) 237-2279

Securities registered pursuant to Section 12(b) of the Act: NONE

Securities registered pursuant to Section 12(g) of the Act:

| | |
|---|---|
| Common Stock, Par Value $0.001 | NASDAQ Capital Market |
| (Title of class) | (Name of exchange on which registered) |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and, (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein and, will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | [ ] | Accelerated filer | [X] |
| Non-accelerated filer | [ ] | Smaller reporting company | [X] |
| Emerging growth company | [ ] | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes [ ] No [X]

The aggregate market value of the common stock held by non-affiliates as of April 30, 2018, was $192 million.

The outstanding number of shares of common stock as of January 7, 2019, was 21,456,643.

Documents incorporated by reference: None.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 21 |
| Item 1B. | Unresolved Staff Comments | 41 |
| Item 2. | Properties | 41 |
| Item 3. | Legal Proceedings | 42 |
| Item 4. | Mine Safety Disclosures | 42 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 42 |
| Item 6. | Selected Financial Data | 43 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8. | Financial Statements and Supplementary Data | 48 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 48 |
| Item 9A. | Controls and Procedures | 49 |
| Item 9B. | Other Information | 53 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 53 |
| Item 11. | Executive Compensation | 57 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 62 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 63 |
| Item 14. | Principal Accounting Fees and Services | 64 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 65 |

As used in this annual report, the terms "we", "us", "our", "the Company", and "PolarityTE" mean PolarityTE, Inc., a Delaware corporation, and our wholly owned Nevada subsidiaries (direct and indirect), PolarityTE, Inc., PolarityTE MD, Inc., PolarityTE RD, Inc., Utah CRO Services, Inc., IBEX Preclinical Research, Inc., and IBEX Property LLC., unless otherwise indicated or required by the context.

PolarityTE, the PolarityTE Logo, POLARITYRD, POLARITYIS, POLARITYRX, "WELCOME TO THE SHIFT", WHERE SELF REGENERATES SELF, COMPLEX SIMPLICITY, IBEX, SkinTE, OsteoTE, CartTE, AdipoTE, MyoTE, NeuralTE, AngioTE, LiverTE, UroTE, and BowelTE are all trademarks or registered trademarks of PolarityTE. Solely for convenience, the trademarks and trade names in this report may be referred to without the ® and ™ symbols, but such references should not be construed as any indicator that we will not assert, to the fullest extent under applicable law, our rights thereto.

**Forward-looking Statements**

This Annual Report on Form 10-K contains forward-looking statements. Risks and uncertainties are inherent in forward-looking statements. Furthermore, such statements may be based on assumptions that fail to materialize or prove incorrect. Consequently, our business development, operations, and results could differ materially from those expressed in forward-looking statements made in this Annual Report. We make such forward-looking statements pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 and other federal securities laws. All statements other than statements of historical facts contained in this Annual Report are forward-looking statements. In some cases, you can identify forward-looking statements by words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "seek," "should," "target," "would," or the negative of these words or other comparable terminology. These forward-looking statements include, but are not limited to, statements about:

- the initiation, timing, progress, and results of our research and development programs;
- the timing or success of commercialization of our products;
- the pricing and reimbursement of our products;
- the initiation, timing, progress, and results of our preclinical and clinical studies;
- the scope of protection we can establish and maintain for intellectual property rights covering our product candidates and technology;
- estimates of our expenses, future revenues, and capital requirements;
- our need for, and ability to obtain, additional financing in the future;
- our ability to comply with regulations applicable to the manufacture, marketing, sale and distribution of our products;
- the potential benefits of strategic collaboration agreements and our ability to enter into strategic arrangements;
- developments relating to our competitors and industry; and
- other risks and uncertainties, including those listed under Part I, Item 1A. Risk Factors.

Given the known and unknown risks, uncertainties, and other factors that may cause our actual results, performance, or achievements to be materially different from any future results, performance, or achievements expressed or implied by our forward-looking statements, you should not place undue reliance on these forward-looking statements. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

This Annual Report on Form 10-K also contains estimates, projections and other information concerning our industry, our business, and the markets for certain diseases, including data regarding the estimated size of those markets, and the incidence and prevalence of certain medical conditions. Information that is based on estimates, forecasts, projections, market research, or similar methodologies is inherently subject to uncertainties, and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by market research firms and other third parties, industry, medical and general publications, government data and similar sources.

**Item 1. Business**

**PolarityTE - Welcome to the SHIFT**

PolarityTE Inc., headquartered in Salt Lake City, Utah, is a young and growing commercial-stage, biotechnology company founded in 2016 - and we believe the first of its kind. We are focused on the design and development of novel technology platforms that promote the regeneration of complex, cellular-derived tissue substrates and the propagation of self-organizing composite systems. We have developed, and will continue to evolve these technologies and platforms through uniquely targeted and yet comprehensive approaches to the interactome. The interactome is the complete set of physical interactions between molecules within a cell that underlies most genotype-to-phenotype relationships and modulates nearly all complex biological pathways and cellular networks seen in living systems. Understanding this, we believe that to effectively deliver our advanced technologies to patients we must not simply deliver products, but rather robust platform systems and evolving technology foundations that are intelligent, multi-functional, and able to adapt and evolve. Over the last year we have established and advanced three of our pipeline programs consisting of our core "TE" program, (which includes our first commercial product, SkinTE), our Related Technology Derivative program ("RTD"), and our Advanced Research Center program ("ARC").

A glossary is provided at the end of this Item 1, which you may find helpful in reading this report.

**Vision**

We aspire to be a global biotechnology company that provides superior, tangible, and pragmatic platform technologies that provide superior results to patients, while reducing costs and promoting improved health economics for patients, providers, and payors. We believe this can be accomplished through our pursuit of complex simplicity, which embodies the development of robust cell/tissue-derived therapies that can be efficiently produced and deployed. PolarityTE is committed to delivering transformative technology that positively impacts humanity.

PolarityTE was founded by a dedicated group of doctors and scientists from The Johns Hopkins University School of Medicine, who left to become part of something bigger. Something that could transform the future of medicine. We believe that living systems require more than a simple singular input (for example a growth factor, stem cell, or nano-particle), to produce a complex output. Therefore, we took a different direction and developed multi-tiered platform technologies that propagate the necessary complex substrate required for regenerating fully-functional tissue, such as skin, bone, cartilage, muscle, blood vessels, and neural elements, as well as solid and hollow organ composite tissue systems. We have engineered and developed our regenerative materials and core tissue substrate technology platforms to allow us to induce, maintain, and promote the integrated polarity, organized assembly, and interface development of cells and tissues, so that they replicate regenerative healing in the body and are not seen as foreign by the immune system.

The core technology of TE products is minimally polarized functional units ("MPFUs") consisting of self-complexing intelligent regenerative materials ("SCIRM"). SCIRM within an MPFU form polarizing, multi-cellular aggregates that act as an intrinsic, regenerative bio-reactor capable of expanding, proliferating, and synthesizing cells, materials, factors, or systems necessary for regenerating full-thickness, three-dimensional tissue. The TE products we develop begin with the patient's own tissue to produce SCIRM that address the specific tissue or system needed for the patient's care. Our product pipeline focuses on the development of regenerative products for a variety of tissue types and organ systems that are commonly altered, injured, or destroyed by a variety of diseases, pathologies, traumatic events, and medical interventions.

SkinTE, our first tissue product, was registered with the United States Food and Drug Administration (FDA) in August 2017, and is now commercially available for the repair, reconstruction, replacement, and regeneration of skin in patients who have a need for treatment of acute or chronic wounds, burns, surgical reconstruction events, scar revision, or removal of dysfunctional skin grafts. We are pursuing a regional plan for commercial rollout that began in late October 2018, and we now have 24 sales representatives in the field marketing SkinTE.

OsteoTE is designed to utilize the patient's bone to repair, reconstruct, replace, supplement, or regenerate bone damage or defects. We registered OsteoTE with the FDA in December 2018. We are preparing for the first application of the product in a clinical setting, which we are endeavoring to achieve in the first half of 2019.

1

Human cells, tissues and cellular and tissue-based products ("HCT/Ps") are governed by specific FDA regulations the provide for a registration pathway that is different than the pathway for traditional drug candidates. SkinTE and OsteoTE are both registered as HCT/Ps under Section 361 of the Public Health Service Act.

We have a number of additional TE products under development. The following table illustrates the status of our TE product pipeline.



RTD and ARC represent research and development of new science and product opportunities based on what we learned while developing the TE platform. RTD is focused on altered state analytes for the generation of composite materials that can be utilized for the augmentation, modulation, and regulation of cell and tissue-derived systems. ARC is focused on the design and development of gene transfer, small molecule synthesis, composite therapeutics, and alteration of self-propagating cell/tissue-derived bioreactors.

The following table shows the research projects we are pursuing through RTD and ARC programs.



We have significant research facilities and a well-educated and skilled team of scientists and researchers. These resources are highly beneficial to the work we are doing on our TE products and in RTD and ARC. We also offer research services to unrelated third parties on a contract basis, which we offer under the trademark POLARITYRD. Contract research services help us defray the costs of maintaining a first-rate research facility and allow us to meet companies pursuing new technologies that may be opportunities for collaborative or strategic relationships going forward.

**Limitations to Clinical Standards of Care, Regenerative Technologies and Tissue Substitutes**

*Clinical Standards of Care for Tissue Replacement*

While both the literature and current practice indicate that the clinical standard of care remains the replacement of "like with like" (i.e. skin for skin, bone for bone, cartilage for cartilage), to date, many regenerative technologies, tissue engineered products and wound care products, have focused on "large scale manufacturable materials" and "off the shelf" designs, as opposed to employing a more patient-specific approach. Many of these types of products are xenografts, allografts, or alloplasts in part to allow for abundant sources of raw materials for the products. We believe these products merely act as synthetic cell/tissue substitutes, which are incapable of delivering true regeneration or regenerative potential of complex tissue systems and, therefore, why such products continue to fail to deliver results that are comparable to an autologous tissue graft (i.e. skin graft, bone graft, cartilage grafts etc.).

We believe that historically the fields of regenerative medicine, tissue engineering, and, to some extent, cell-therapy have remained characterized by tremendous potential and promise for the future yet continue to remain limited by the pursuit of "artificial and/or synthetic" approaches that are overly reductionist, and thus fail to deliver "complete systems." Some current regenerative medicine approaches try to isolate a single cellular population to regenerate a tissue, such as adipose-derived stem cells. Others try to deliver a molecule to manipulate cell function, such as driving cell growth and expansion, or coax one cell type to become another. Another approach tries to create some form of a scaffold that resembles the target tissue with specific properties designed to mimic that tissue. We believe these approaches incorrectly focus on the synthesis or engineering of singularities (i.e., a type of cell, a type of molecule, or type of matrix) in an attempt to build a complex tissue from the ground up, which we believe creates an incomplete system without interactions, diverse cells and molecules, or a natural environment to direct organization.

*Real Limitations: Using Skin as an Example*

Current clinical standards and practice adhere to the concept that skin should be replaced with skin whenever possible in settings where patients have suffered the loss of such tissue. Understanding this, medical professionals are left with a decision to attempt to temporize a wound bed with an allograft, use the patient's own skin in a skin graft, or apply a variety of skin substitutes to provide a skin-like barrier while the margin of the wound heals through secondary intention and contraction. Presently, harvest and placement of autologous full-thickness skin results in the best outcome within wound beds because it most closely resembles the full-thickness skin that was lost. However, full-thickness harvest of skin inherently also results in a full-thickness skin defect at the donor site, which requires primary closure (skin edge approximation and suturing) so as not to leave a gaping wound behind. Because of this absolute limit on how much autologous full-thickness donor skin can be harvested without leaving behind a non-closable wound, medical professionals can only harvest small elliptically-shaped pieces of such skin from areas of redundancy which is termed full-thickness skin graft (FTSG).

It is because there remains only a finite supply of FTSG donor material and sites that medical professionals often rely on the harvest of split-thickness skin grafts (STSG) for coverage of voids of the integument to get better coverage and more skin. STSGs, however, do not represent the true anatomy or function of native skin because such graft harvest procedures only take the top 1/10,000th of an inch of the patient's own skin and therefore do not capture all the necessary cellular and tissue elements and structures required for the regeneration of normal skin (Figure I).



Figure I. Common Site Locations for Skin Graft Harvesting. The left figure depicts the process and common location of where a split-thickness skin graft (STSG) is harvested from with a vibrating razor that shaves off the very top 1/10,000th of an inch of skin as depicted in the skin cross section. STSGs are often then meshed (pocked with holes like a screen door) to allow for improved stretch over surfaces and to permit fluid drainage to pass through the graft and avoid build up under the graft like a bubble. The right figure depicts the common sites where full-thickness skin grafts are harvested from patients. Note that these areas are often hidden in anatomic locations where there are creases or folds to place the resulting scar from primary linear closure in aesthetically considerate places.

3

After the failure to harvest all the necessary structures, cellular elements and tissue interfaces from the STSG donor site, the patient is left with an incomplete top layer of skin covering the initial defect (recipient site) and a remaining bottom layer at the donor site. In this setting, both donor and recipient sites contain incomplete skin, which results in dysfunctional, painful scar tissues and lifelong morbidities.

Because of the limits of STSG and FTSG and the type of procedures required for such harvests, industry has continued to investigate skin substitutes and skin alternatives that can be used in place of native cutaneous substrate. Among these alternatives or options are a culture form of manipulated autograft, allograft, xenograft, and alloplast. None of these substitutes have been able to replicate the appearance of native skin or regenerate full-thickness skin or the cutaneous appendages (hair follicle, sweat gland, sebaceous glands, etc.), which are necessary for the development of full-thickness, functionally polarized, hierarchically organized skin.

The forgoing skin example shows that the traditional approach to regenerative medicine that competitors employ is anchored within tissue engineering algorithms that—while cost-effective because of mass production and scalability—are incongruent with living cells, dynamic tissues, and reactive systems, and, therefore, fail to produce outcomes that effectively heal and alleviate suffering.

**Our Solution**

We believe that our bio-generative SCIRM technology platforms are fundamentally new and inherently promote a drastically different approach to current conventional cell therapy efforts, regenerative technologies, and current products. Therapeutic singularities such as a single stem cell, a single growth factor, a single scaffold, or a combination of such singularities are unable to engineer a complex tissue in vitro for subsequent deployment into living systems. Recognizing the complexity of tissue regeneration as absolutely requiring cell-to-cell and cell-to-tissue polarity, interfaces, gradients, modulation, and multiplex system interactivity and real-time integration, we embrace a substantially more complete form of tissue regeneration that is biologically sound and evolutionarily cohesive with the dynamics of living systems.

We have designed and developed an entirely new form of regenerative cell/tissue therapy platform based on SCIRMs organized in complex MPFUs that when deployed into a wound or tissue defect undergo integrative regenerative healing within the system in which it was deployed by effectively acting as its own bioreactor and thus expanding, proliferating, and synthesizing those cells, materials, factors, and systems necessary for full-thickness generation and regeneration across a spectrum of tissue substrates and organ systems.

Our technology platform is based on complex living tissue systems and the interfaces that drive cell-tissue-matrix polarization events. We recognize there is something powerful, reactive, and dynamic controlling tissue generation, which is the interactome; the whole set of interactions a cell is impacted by, both intra and extra-cellularly. Cells rarely act on their own to create functional repair or regeneration, but rather tissues have functionally-organized cellular aggregates called appendages (almost like small organs), which run, and even regenerate, the composite tissues they are a part of when altered, stimulated, and processed in certain ways.

We believe each person's cells and tissues have vastly different and dynamic profiles (genes, RNA, proteins, metabolites, etc.) and, therefore, different requirements when it comes to the regenerative potential or healing capacity of tissue-based systems. With this in mind, we designed our core "TE" platform technology to focus not on singularities, but on regenerating complete tissue systems.

Our core "TE" platform and self-complexing intelligent regenerative materials technologies are based on our ability to create MPFUs, which contain polarizing multi-cellular aggregates capable of expanding, proliferating, and synthesizing those cells, materials, factors or systems we believe are necessary for integrative full-thickness three-dimensional tissue regeneration, not simply two-dimensional cell sheets. Instead of starting with artificial materials, synthetic factors, or altered cell suspensions, our platform begins with the patient's own (autologous) tissue and those components, appendages and substrates we believe are necessary for the development of an expandable and self-propagating complete system. The key attributes of our platform technology include the following:

- *Patient-Generated Cell Source:* The human body often identifies and rejects foreign cells, creating the potential for tissue rejection, additional surgery, and foreign or allogeneic body reactions like residual scarring. We address this by using healthy autologous tissue taken from the patient to regenerate cells and tissues that the body identifies as "self" rather than foreign. Our goal is to allow a recipient to receive our product and generate new tissue without triggering an allogeneic, or foreign tissue, rejection.

4

- *Stem Cell Niche Utilization for Self-Propagating and Self-Organizing Functional Tissues:* We utilize techniques for capturing the "stem cell niche," the microenvironment within a tissue that interacts with stem cells to signal cell growth, development, renewal, and differentiation. While the stem cell niche historically has often been left behind by the commonly used split-thickness autograft methodology, we believe that it is necessary for the regeneration of functional tissue. Without the stem cell niche, we believe new tissue will form a scar and lose the functionality of the original tissue from which it was regenerated. By including the stem cell niche within the autologous tissue that is harvested, we believe the natural function of the small piece of tissue is preserved as it regenerates into a larger piece that can fill the patient's targeted tissue. This is designed to minimize painful scarring, lesions, and other growth anomalies that often accompany autologous regeneration without the stem cell niche. This design approach also allows regeneration of the tissue's normal layers and appendages and provides full-tissue coverage without relying on secondary surgery or in-growth of the surrounding tissue. We believe inclusion of the stem cell niche allows us to regenerate tissue with its naturally complex layers intact.
- *Polarity Maintenance and Enhancement to Harness Stem Cell Niche Regeneration:* A cell's polarity refers to its interactive communication with neighboring cells, including the direction in which a cell should grow. This enables cells and tissues to carry out specialized functions. Our platform carefully maintains and enhances the polarity of the stem cell niche to harness its regenerative capacity by mirroring the way tissue develops in the human body. By maintaining and enhancing the polarity of regenerating tissue, our platform is designed to preserve the natural cell and three-dimensional tissue structure, and thereby the functionality of regenerated tissues and appendages.
- *The Person as the Bioreactor*: Instead of using a manufactured or engineered environment to support the regenerative process, our platform uses the human body as a bioreactor by applying our product to the patient and allowing regeneration to occur there. We believe this allows the patient's own body to provide the ideal nutrients and extracellular environment for controlled healing of the regenerative tissue. This approach also reduces turnaround time for delivering product to the patient, as our manufacturing process does not involve growing cells in an industrial, synthetic bioreactor. In addition, utilization of the patient as the bioreactor during cellular tissue propagation further reduces relative costs, which are passed onto patients, providers, and payor systems.
- *Reducing Barriers ~ Arming More Healthcare Providers with Tangible and Pragmatic Technologies:* We believe that novel technologies must thrive in the trenches of medicine and be easily utilized by a full spectrum of providers to truly deliver value and make an impact in patients' lives. We recognize that a technology that is limited by who can administer it or setting of care where it can be used creates barriers and limits access to those who need it. Our goal is to design and develop therapies, technologies and products which overcome these limits by delivering new standards of care, which are easily utilized by ALL providers, across ALL settings of care.

**Our Competitive Strengths**

We believe that our key competitive strengths include the following:

*Pursuing the Development of a Complete System that Rivals the Clinical Standard of Care:* We believe that we have designed and developed a technology platform that may displace the current clinical standard of care in complex tissue regeneration, reconstruction and/or replacement efforts. Currently, the clinical standard of care for the reconstruction of complex tissue voids relies on autologous tissue transplantation. For example, critical defects of the skin, bone, cartilage and other tissues are most appropriately treated through the autologous graft or flap coverage. While these efforts remain the clinical standard of care in most settings, such processes result simply in the transplantation of tissue from one area of the body to another region. Such movement of autologous tissue materials often provides "coverage" but does not result in significant expansion of the cellular entities or tissue substrates. After the limited ability to expand beyond 1:1 – 1:4 ratios, donor site size and morbidity must be taken into consideration when harvesting autologous tissues. Understanding these limitations that exist within the clinical standard of care, we have sought to design and develop an autologous tissue that requires minimal donor site and can be significantly expanded on the patients themselves.

*Novel Platform Technology*. Our technology platform deploys activated MPFUs into a wound or other tissue defect with the goal of regenerating fully-functional, polarized tissues and hierarchically organized tissue structures. We design the MPFUs to facilitate the expansion, proliferation, and synthesis of the cells, materials, factors, and systems that we believe are necessary for complete, full-thickness generation and regeneration across a spectrum of tissue substrates and organ systems. Rather than relying on a single stem cell, growth factor, or scaffold, we believe that complex tissue regeneration requires a dynamic composite cellular interface to engineer a complex tissue that is expected to integrate into living systems. We design our core tissue substrate materials to create complex functional living tissue systems in a way that mirrors natural healing in the body and is not seen as foreign by the immune system. We believe our platform technology will produce superior outcomes for providers and patients.

*Deep Pipeline of Additional Potential Applications*. We believe our platform's capabilities can be extended across many indications, including skin, bone, cartilage, muscle, blood vessels, and neural elements, as well as solid and hollow organ composite tissue systems. For example, we believe there are currently unmet medical needs that can be addressed by the regeneration of cartilage for the treatment of osteoarthritis and facial reconstruction, the regeneration of fat-for-fat transfers during plastic surgery procedures, the regeneration of nerves following traumatic loss, the regeneration of blood vessels for vascular grafts, the regeneration of the urogenital epithelium and submucosa for urethral strictures and bladder reconstruction following tumor removal, the regeneration of liver tissue for liver fibrosis or failure, and the regeneration of bowel tissue to prevent leaking where the bowel is reconnected or replaced due to excessive loss from trauma, surgery, or congenital defects. We believe the significant number of product opportunities afforded by our platform will generate sustainable growth opportunity.

*Shortened Product Development Timelines*. Since our core TE product candidates all stem from a common platform technology, we believe we can accelerate research and development, pre-clinical model prototyping, and product development in a manner that is efficient and optimized across tissue substrates.

*Scalable Manufacturing and Distribution Capability*. Because we believe our technology can be applied across a variety of tissue substrates, we believe we are able to prototype, model, and develop products for commercialization relatively quickly. We have developed flexible manufacturing processes, systems, and facilities that we believe can allow us to quickly respond to increases in demand and market forces. Because we believe we can apply our technology to many types of tissue and organ systems, we believe we can effectively scale and reproduce the manufacturing and distribution of multiple pipeline products at the same time. In addition, we believe we can leverage our platform technology to create a variety of substrate sub-platforms and related technology derivative arms, which can act either as additive technologies to core TE products, or as stand-alone products. We believe we may also be able to integrate our technology with other off-the-shelf products (e.g., to cellularize an acellular scaffold or function with existing dressings).

**Our Growth Strategy**

*Complete the full commercial launch of SkinTE and establish SkinTE as an improvement over the standard of care for skin tissue injuries, including wounds, burns, and scars*. We believe that SkinTE has the potential to supplant prevailing methods of wound and burn care because, unlike existing treatment options, it is designed to regenerate full-thickness skin using small samples of the patient's own tissue. Rather than being limited by dimensions of the tissue received, SkinTE is designed to regenerate significantly beyond the sample size. Our regional commercial rollout of SkinTE commenced in late October 2018, and is focused on severe wounds and burn patients at key regional centers as, in our experience, these patients are often in critical need of large areas of skin regrowth and may have limited available healthy skin to use for skin grafts. Along with the treatment of severe wounds and burns, we intend to market SkinTE for chronic wounds, surgical reconstruction events, including cosmetic and elective surgeries, and for scar revision or the removal of dysfunctional events.

Based on our internal analysis of annual patient volumes and relative wound sizes, we estimate the annual addressable markets within the United States for burn wounds, surgical reconstruction and traumatic wounds, and chronic wounds are $3 billion, $23 billion, and $24 billion, respectively. These markets are largely contained within the approximately 127 burn centers, 600 level I-III trauma centers, and greater than 2,000 wound care centers and clinics within the United States.

Capitalize on our scalable manufacturing capabilities and the 361 HCT/P regulatory pathway to commercialize additional pipeline products quickly and efficiently. In addition to SkinTE, we are actively preparing and advancing two additional TE core products, OsteoTE and CartTE, for FDA registration using the 361 HCT/P pathway that does not require FDA approval prior to market entry. Our current expectation is to rely on the versatility of our platform technology, the 361 HCT/P regulatory pathway, and our scalable manufacturing capability to develop and launch these two new products over the next two years.

*Explore partnership or collaboration opportunities for pipeline candidates, as well as potential acquisitions or in-licenses of complementary product candidates.* We are actively exploring the possibility of partnership or collaboration opportunities with third parties, which we believe could be used to facilitate the commercial adoption of our pipeline candidates worldwide or in certain territories. We are selectively evaluating the formation of collaborative alliances, product licensure and distribution agreements, and integrated product offerings, as well as opportunities to accelerate the commercialization and development of our products. In the future, we also expect to consider the acquisition or in-license of complementary product candidates.

**SkinTE**

*General*

Our first product, SkinTE, is registered with the FDA and is now commercially available for treatment of defects of the skin. SkinTE is created from a small piece of the patient's own tissue, which is extracted and then manufactured using our proprietary technology platform to expand and regenerate full-thickness, fully functional skin with what we believe to be the critical layers, including epidermis, dermis and hypodermis, and appendages including hair follicles and glands. Each application of SkinTE is patient-specific and designed for a single deployment. We believe SkinTE offers a compelling alternative to current standards of care for skin regeneration.

PolarityTE designed SkinTE for use by physicians and other healthcare professionals in the treatment of patients who have suffered from an event, disease, or process, or who have an acquired defect that has resulted in the functional loss or absence of the skin. Specifically, SkinTE is designed for the treatment of chronic wounds such as diabetic foot ulcers, acute wounds, chronic burn wounds or scars, acute burn wounds, scars of the integument, and defects from medical or surgical resection or reconstruction events that require skin coverage. According to a 2015 report from MedMarket Diligence, LLC, more than 250 million wounds are expected globally by 2020. And according to Statistics MRC's 2016 Global Regenerative Medicine Market Outlook, the global market for regenerative medicine and tissue engineering is expected to grow to $101.3 billion by 2020.

During the fiscal year ended October 31, 2018, we established the product logistics, interactions with hospitals, and our clinical operations and market access teams, so that we can handle all aspects of manufacturing and commercializing an autologous skin product. During this limited market release we serviced over 50 patients. We have no reported adverse reactions from any of the applications of SkinTE. We hired our first sales force and have been building out our first regional release since October 2018. The full national release of SkinTE is planned for 2019.

SkinTE is registered as a 361 HCT/P with the FDA pursuant to Section 361 of the Public Health Service Act and 21 CFR 1271. An HCT/P is defined as an article containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. Products that qualify as 361 HCT/Ps are not subject to the FDA's pre-market clearance or approval requirements, but rather can be immediately listed for commercial use with the FDA and are then subject to post-market regulatory requirements such as compliance with current good tissue practices (cGTP), adverse event and deviation reporting, and post-market inspections by the FDA. For more information on the 361 HCT/P regulatory pathway, please see "Government Regulation" and "Risk Factors – Risks Related to Registration or Regulatory Approval of Our Product Candidates and Other Government Regulations."

*Our Wound, Burn and Skin Reconstruction Treatment Solution – SkinTE*

We described in detail above the real limitations of the standard of care in tissue regeneration as applied to skin. We designed SkinTE to address the limitations from which current wound and burn treatment methods suffer. We designed SkinTE to combine the advantages of autologous STSGs with those of FTSGs. Notably, SkinTE is designed to provide not only the large surface area treatment capability of STSGs, but also the restoration and smaller, less morbid donor site associated with FTSGs. In essence, we believe our minimally manipulated SkinTE product can provide an expandable form of a FTSG.

To our knowledge, SkinTE is the only fully autologous, homologous skin regeneration product available for the treatment of wounds and functional losses of the skin of human patients. We face competition from providers of FTSGs and STSGs, as well as other companies developing and selling skin substitutes. We are aware of several companies focused on the wound market, including Avita Medical, Integra LifeSciences, Wright Medical Group, MiMedx, Osiris, Organogenesis, Allosource, MTF Biologics and Vericel. Any advances in regenerative medicine by a competitor may be used to develop therapies competing against SkinTE. However, to our knowledge SkinTE is the only fully autologous homologous skin regeneration product available for the treatment of wounds and functional losses of skin that enables the patient to regenerate his or her own skin with all the functions of full thickness skin, including hair, sweat glands, sebaceous glands, capillary beds, and all layers of skin, including epidermis, dermis, hypodermis, and subdermal fat. We believe SkinTE produces a superior result for patients that challenges the current standard of care and the therapies offered by other companies in the wound care market.

SkinTE is composed of small viable cellular and tissue-based units, which we call MPFUs, that retain all the components of skin that we believe are required to regenerate full-thickness skin. The initial processes underlying the function of SkinTE are analogous to those responsible for the healing of an autologous skin graft, namely imbibition, inosculation, and neo-vascularization. During imbibition, SkinTE, and the small cellular and tissue based units that comprise it, survive through the direct application of the SkinTE "paste" on the wound bed, exchanging nutrients and waste within the fluid of the wound bed. Inosculation is the stage in which the capillaries and blood vessels already present within the wound bed begin to align and connect with those present within the graft. Neovascularization marks the ingrowth of new blood vessels into the wound bed and out of the graft, with vasculogenesis describing the formation of new vessels from cellular precursors present within the wound and graft, and angiogenesis referring to the sprouting of new vessels from pre-existing ones. Due to their size and composition, we design the small cellular and tissue based units within SkinTE to have reduced metabolic demand and to be capable of surviving through diffusion, and to readily excrete metabolic waste, resulting in what we believe can be less ischemic damage when compared to FTSGs. Reduction in ischemic damage has the potential to decrease scar formation and provide a more functional result. Following completion of the initial stages of integrating and healing within the wound bed, the SkinTE product is designed to begin forming and organizing discrete areas of full-thickness skin. We have observed in preclinical animal testing that these regenerative centers of full-thickness skin then expand out radially across the wound, eventually coalescing with each other and the margins of the wound.

Unlike the currently marketed skin substitutes of which we are aware, each SkinTE tissue-product is derived entirely from the patient's own skin and is not combined with any other tissue-engineered substitutes. We believe these differences allow SkinTE to regenerate all the important layers of the skin as well as the necessary cutaneous appendages for the development of functionally-polarized, hierarchically organized autologous, homologous skin.

*The SkinTE Process*



SkinTE is designed as an all-in-one system to make the process as simple and efficient as possible for the user—whether that individual is a surgeon, medical doctor, physician assistant or nurse in an operating room, wound clinic, emergency department, doctor's office or forward operating military base. When a new clinical center or practice is activated to begin using our SkinTE product, we ship a supply of all-inclusive harvest boxes (see the image furthest to the left above) to the facility for convenient on-site, off-the-shelf storage for that user and facility. Each harvest box contains all the materials and instruments needed to perform the relatively standard skin excision procedure to obtain the tissue sample, and all the pre-paid/pre-completed shipping labels, and a one-touch, cool pack shipping box that maintains the temperature within the harvest box as it is delivered to a PolarityTE biomedical manufacturing facility.

At our manufacturing facility, we use proprietary techniques to create a paste-like product from the small piece of healthy patient tissue that preserves the original tissue's microenvironment and allows new cells to integrate into existing, healthy cells, with similarly organized assembly and interface development. Following manufacturing at our facility, the SkinTE product is shipped back to the provider at a time that best suits the patient and provider's scheduling and location needs (i.e., operating room, procedure clinic, in-patient bedside, out-patient doctor's office). Our goal is to be able to return the ready-to-use SkinTE product to physicians as early as the same day. We have observed, however, that most physician requests have been for return within 24-72 hours from tissue harvest. At application time, once the patient wound bed is prepared per clinical guidelines, SkinTE is dispensed onto the surface of the wound bed (see the image in the middle above). The wound is dressed using a non-adherent, occlusive, non-absorbent dressing placed directly over the SkinTE product (see the image furthest to the right above), with recommended dressings that we include in the deployment box.

    

To assist physicians and other medical providers in using SkinTE, we developed a web application called the PolarityTE 24-Hour Real-Time Assistant, or the RTA, which permits experienced and medically trained PolarityTE physicians and staff to provide real-time support through a customer's computer or smart phone. The RTA permits HIPAA-compliant direct calling, video chat, text, emails, and data sharing. Through the RTA, our customers can also track their packages and submit forms. We also use the RTA to gain advanced visibility into daily manufacturing requirements and product flow.

*Selling SkinTE*

In 2018, we completed the first two stages of our SkinTE commercial roll-out strategy. The first was the limited market release phase, which focused on generating trial/ utilization with the goal of securing real-world clinical data and experience to prepare the organization and product for a broader commercial release. The second stage was the regional market release that began in late October 2018 with the additional build out of our commercial organization to establish SkinTE with major burn and trauma centers across the United States. Each hospital targeted requires an assessment by their Value Analysis Committee (VAC) prior to commencing commercial SkinTE deployment. This is a formal process that can take approximately 4-6 months to complete. After VAC approval, terms of the SkinTE purchase agreement are finalized and patient identification and treatment initiates, which can take several months.

Once purchase agreements are in place, our sales team and clinical operations staff maintain close contact with the facility to support the initial therapeutic applications of SkinTE. Due to the transformational nature of the product, this relationship helps to ensure the facility's ability to effectively incorporate SkinTE into their existing burn or wound management protocols.

9

The selling process to achieve an initial sale averages between six and nine months. The sales process is affected by several factors, including the incidence and nature of burn and wound care cases at target accounts and the receptiveness of the health care providers to adopt a new therapeutic approach.

Once the first deployment of SkinTE has occurred, there is generally a delay before subsequent deployments at the same facility. The timeframe is typically between three and six months, as we have found physicians appear to pause until the clinical outcome of the first application can be fully appreciated. To help decrease the time between the first and second deployment, we are actively pursuing multiple randomized controlled clinical trials to further illustrate SkinTE clinical outcomes and overall value proposition. Furthermore, as SkinTE gains in utilization and acceptance by health care providers, the lead time to first sale should decrease as information on SkinTE and clinical results are more broadly disseminated in the medical community.

SkinTE is billed by the square centimeter size of the skin defect to be treated, as is standard for skin wound treatments. Because SkinTE is created from the patient's own tissue, we can price below other treatment options like skin substitutes. Unlike other treatment options, SkinTE can deliver permanent, functional full-thickness skin replacement with only one application, compared to the multiple procedure regimens common for split-thickness skin grafts, full-thickness skin grafts, autograft, allograft, and alloplast therapies.

*Payment and Reimbursement*

Inpatient Setting. In the inpatient setting, facility reimbursement is dictated by the associated bundled Medicare Severity-Diagnosis Related Group (MS-DRG) payment for the entire episode of care under the Medicare Inpatient Prospective Payment System (IPPS). The bundled DRG facility payment is determined by the DRG code applied, which factors in the primary diagnosis and patient characteristics, such as co-morbidities present on admission. In this scenario, all products and supplies utilized during the episode of care are paid for with the bundled DRG facility payment, including products like SkinTE. In addition, physician services are billed and reimbursed outside of the bundled DRG facility payment, including any procedures performed during that admission, which are billed for and reimbursed utilizing Current Procedural Terminology (CPT) codes associated with the respective procedures. SkinTE has been used within the inpatient setting and reimbursed underneath the applicable DRG bundled facility payments, and to our knowledge all associated procedures billed for outside the DRG as physician services with CPT codes have been reimbursed, as well.

Hospital Outpatient Department (HOPD) and Ambulatory Surgical Center (ASC) Setting. Like the inpatient setting, bundled Ambulatory Classification Payment (APC) facility payments are received under the Medicare Outpatient Prospective Payment System (OPPS) for services and supplies utilized during episodes of care within Hospital Outpatient Departments (HOPDs) and Ambulatory Surgical Centers (ASCs). In these settings, bundled APC facility payments are dictated by the procedure(s) performed and billed for through the appropriate CPT codes. SkinTE has been used in these settings and covered with the associated bundled APC facility payments and physician services have been paid for outside of the APC payment utilizing CPT codes to bill for the associated procedures. In addition, we are working towards applying for pass-through status, which would allow SkinTE to be billed for outside of the bundled APC facility payment.

Office or Clinic Setting. In contrast to the inpatient, HOPD, and ASC settings, care provided in a physician office or clinic is reimbursed based on individual Healthcare Common Procedure Coding System (HCPCS) and CPT codes, facilitating reimbursement for the specific products utilized and procedures performed during the clinic visit. The CPT codes used in the setting are the same or similar to the CPT codes used to bill for physician services in the other settings of care. In 2018, providers utilized HCPCS Q code 4100 (skin substitute not otherwise specified) to bill for the use of SkinTE in the office. Of the providers that used SkinTE in the office or clinic setting throughout 2018, to our knowledge all were reimbursed utilizing Q4100. Early in 2018 we filed an application with The Centers for Medicare and Medicaid Services ("CMS") for a unique HCPCS SkinTE Q code. We were successful and received Q code 4200, which was effective January 1, 2019. Therefore, beginning January 1, 2019, providers using SkinTE in the office or clinic setting can use Q4200, the unique SkinTE specific Q code, when billing for the product. Reimbursement rates in the Medicare Hospital Outpatient Payment System (HOPPS) vary based on whether the product is designated a low-cost product or high cost product. Assignment is based on average selling Price (ASP) as reported to CMS. New Q codes with limited ASP on file with CMS are automatically assigned to the low-cost product category. We reported our first ASP in October 2018, so SkinTE's Q code will initially be designated a low-cost product limiting the reimbursement to $483 for a single application in a clinic setting. We will continue to report ASP and work with CMS on this process because we believe that SkinTE can qualify as a high-cost product reimbursable at $1,548 for a single application in a clinic setting.

*Clinical Studies*

We initiated a head-to-head trial comparing SkinTE to the split-thickness skin graft, the clinical standard of care, in the first quarter of 2018. Enrollment is in progress and we expect it will be completed in 2019. In parallel with this clinical trial, we have been accumulating clinical results on non-trial patients from our market release for application of SkinTE for various indications, including acute burn, burn reconstruction, surgical reconstruction, scar revision, and chronic wounds, such as diabetic foot ulcers and venous stasis ulcers. Some of these cases have been presented independently by, or in collaboration with, providers at national conferences including the 2018 American Professional Wound Care Association Conference, the 2018 Diabetic Foot Global Conference; 2018 American Society of Plastic Surgery - The Meeting; 2018 Symposium on Advanced Wound Care; and, the 2018 Innovations in Wound Healing. We believe peer-reviewed publication of these results will occur in 2019. Following very encouraging pilot results, preparations are underway to list on clinicaltrials.gov and enroll patients in two separate randomized controlled trials in diabetic foot ulcers and venous stasis ulcers, which constitute the most common causes of chronic lower extremity wounds that affect over a million Americans. These trials will each treat over 100 patients, compare SkinTE to the standard of care, and evaluate the efficacy and cost benefit of a single application of SkinTE providing important reimbursement information for the Centers for Medicare & Medicaid Services and outpatient applications. These will be multi-center trials that will enroll throughout 2019.

**OsteoTE**

We applied our platform technology to develop OsteoTE, our autologous, homologous bone regeneration product. OsteoTE is designed to utilize the patient's own bone to target applications for bone repair, reconstruction, replacement, supplementation, and regeneration, including in the long bone (hard, dense bones that provide structure, strength and mobility such as the femur or humerus), craniomaxillofacial, spine, dental, hand, and foot/ankle markets. As with skin, we believe existing treatments for the repair of bone with autologous grafts suffer from significant limitations that we can address with OsteoTE. We have conducted several preclinical large animal studies using established bone treatment models, including critical-sized cranial bone defects and spinal fusion models. The preclinical results for OsteoTE are very encouraging and parallel the results seen with SkinTE – the ability to regenerate complex tissues recapitulating the structure and function of the native tissue from which it was created. Below are preliminary images of OsteoTE bone regeneration in a preclinical model of a cranial defect.



Comparative Imaging of OsteoTE in Critical Sized Cranial Defect Model System. (a.) Three-dimensional (3-D) micro computed tomography (micro-CT) native cranial bone displaying pre-defect left parietal and right parietal bones of *in vivo* model system at timepoint $T^{PDN}$. (b.) Gross image of surgically-created, complete, bi-parietal critical sized defects of both the left and right parietal bones within the *in vivo* model system at timepoint $T^0$. (c.) 3-D micro-CT of surgically-created, complete (full-thickness), bi-parietal critical sized defects of both the left and right parietal bones within the *in vivo* model system. ① Indicates the right parietal bone region with 8 mm diameter defect at timepoint $T^0$ which was un-treated and maintained as the defect control throughout study. ② Indicates the left parietal bone region with 8 mm defect which was treated with OsteoTE and maintained as the defect-treated control throughout the study. (d.) 3-D micro-CT of surgically-created, complete, bi-parietal critical sized defects of both the left and right parietal bones within the *in vivo* model system at 4 weeks post-procedure and intervention (timepoint $T^{PPI-4WK}$). ❶Indicates the un-treated right parietal bone region (defect control) at 4 weeks. ❷ Indicates the treated left parietal bone region (OsteoTE) at 4 weeks. (e.) Depicts the relative margins of the primary bi-parietal defects (dotted circles) at time point $T^0$; ROI (broken line box) indicates zoomed comparison of 4 weeks post-treatment defects of 3-D micro-CT and correlative 3-D thermal spectrum colored surface plot indicating relative surface depth and volumetric contour. Abbreviations: Pre-defect Native Timepoint ($T^{PDN}$): timepoint at which native skull was imaged prior to creation of defect; Defect Native Timepoint ($T^0$): timepoint at which complete (full-thickness) 8 mm critically sized defects were created in parietal skull regions; Post-procedure and intervention at 4 weeks timepoint ($T^{PPI-4WK}$): timepoint at which 4 weeks have passed since the defects were created +/- treated with intervention.

11

Based on our internal analysis of the Truven Health Analytics Market Scan Research Database, there were approximately 1.9 million addressable orthopedic cases in the United States, including patients suffering from pathology of the femur, radius, ulna, tibia, fibula, or humerus. We believe OsteoTE can be deployed in numerous indications in the Craniomaxillofacial, Foot and Ankle, Hand and Wrist, Hip and Pelvis, Spine, Long Bone and Dental markets. Each of these markets presents a potential multi-billion dollar market opportunity for OsteoTE. According to a report issued by the research firm MarketsandMarkets, the global spinal fusion and implant market is expected to reach $17.3 billion by 2021, the global craniomaxillofacial implants market is expected to reach $2.5 billion by 2021, and the dental market is expected to reach $35.4 billion by 2021. We registered OsteoTE with the FDA as a 361 HCT/P tissue-based product in December 2018, and our goal is to commercialize OsteoTE through a phased release starting in early 2019.

**CartTE**

With our CartTE product candidate, we are aiming to deliver on a long-imagined product—one that can tackle the highly prevalent and debilitating process of osteoarthritis to delay or prevent the need for more invasive procedures, such as prosthetic joint replacement and reconstruction. Furthermore, we believe the autologous cartilage construct delivered with CartTE can be utilized in a variety of other applications, including facial reconstruction, facial aesthetics, hand reconstruction, as well as wrist reconstruction. We have initiated the preclinical studies needed to evaluate cartilage replacement in critical-sized defects and will continue to evaluate CartTE's potential in various cartilage replacement indications.

Osteoarthritis of the hip or knee is estimated to affect 9% of the US population greater than 30 years of age, with costs of treatment totaling $28.6 billion in 2013, according to a review by Grande et al. Market projections by Krutz et al. in 2007 predict that the demand for primary (first-time) total hip and knee replacements will grow to 572,000 and 3.48 million procedures per year by 2030 in the US, respectively. In contrast to the staggering number of patients suffering from osteoarthritis and those pursuing joint replacement, the cartilage repair and regeneration market is only estimated to reach $6.7 billion by 2025, according to a Cartilage Repair/Regeneration Market Analysis report by Grand View Research. This lopsided market, in which cartilage repair and regeneration only captures a small fraction of the patient population that could benefit from articular cartilage regeneration, demonstrates a significant opportunity for our autologous cartilage regeneration product, CartTE, to displace the current trends and standards of care, delivering the regenerative medicine product that has remained elusive until now.

**Additional Core TE Product Candidates**

In addition, we intend to continue developing:

- AdipoTE to optimize the delivery of autologous fat beyond the capabilities of current fat transfer techniques utilized in procedures on, among others, the breast, buttocks, and face. In 2016, according to the American Society for Aesthetic Plastic Surgery, approximately 100,000 fat transfer procedures were performed when combining the breast, buttocks, and face, including a 41% increase in fat transfers to the breast (American Society for Aesthetic Plastic Surgery).
- AngioTE to address vascular regeneration including microscopic capillary networks all the way up to great vessel replacement. Approximately 400,000 coronary bypass grafts are performed per year in the US according to the CDC. In addition, 650,000 patients per year in the US and 2 million patients per year worldwide are affected by end stage renal disease (ESRD), who may benefit from placement of hemodialysis access, including arteriovenous fistula creation.

- NeuralTE for peripheral nerve injuries of the extremities, as well as for patients with neuromas or chronic compression due to joint replacements, migraines, craniofacial injuries, carpal tunnel syndrome, and those who have undergone hernia or abdominal-based procedures;
- UroTE targeting the delivery of autologous urogenital epithelium and submucosa across a spectrum of diseases and processes, including urethral strictures, urethral creation, bladder reconstruction, and ureter reconstruction;
- LiverTE to address numerous causes of liver failure, including NASH, fibrosis/cirrhosis, surgical resection of the liver. According to the CDC, 1.6% of US adults are diagnosed with liver disease, which fails to recognize the portion that are at risk of liver disease, or those with distant metastases within their liver that may undergo resection of a significant portion of the organ.
- BowelTE to deliver an optimized autologous construct to aid in the regeneration of bowel tissue. According to the CDC, approximately 10 million outpatient procedures and 6 million inpatient procedures were performed on the digestive system in 2010. Anyone undergoing surgical repair or anastomosis of the bowel could potentially benefit from a product delivering bowel regeneration.

We believe a number of the product candidates described above will be suitable for marketing via the 361 HCT/P regulatory pathway. If we successfully register and list a product with the FDA using the 361 HCT/P pathway, we plan to deploy a commercialization strategy that is like that for SkinTE. Any products not suitable for the 361 HCT/P regulatory pathway will need to go through the FDA pre-market approval process, which usually involves the filing, as applicable, of an Investigational New Drug Application or Biologics License Application that will require further preclinical and clinical testing and substantially extend the time of bringing the product to market.

**Manufacturing**

We do not separately engineer individual manufacturing processes around each individual tissue product. Rather, we design, develop, and adapt our core "TE" products and product candidates to a common manufacturing process that allows us to establish fast, effective, and cost-efficient systems. Adopting a common manufacturing process enhances our production capacity and expansion strategy, and at the same time potentially reduces our cost of goods sold.

We have designed and developed manufacturing processes and quality systems that allow us to receive a specimen, qualify the incoming tissue, process and manufacture the cell/tissue product, and perform outgoing quality control and quality assurance work prior to shipping. We believe that our ultra-clean dual-barrier system, which involves clean room structures containing fully-isolated and air-locked internal ISO 4 containment systems, allows us to move specimen and product in an efficient manner, while maintaining protective quality systems.

We have designed our scalable manufacturing process to allow us to be flexible and agile in real-time, while allowing us to shift resources daily to meet acute production needs as well as respond to larger factors, including market forces, multi-facility buildouts, and changes in rapidly evolving technology platforms. In designing our products and systems, we focused both on being able to meet market demand and to scale manufacturing. We believe that we have designed our manufacturing clean dual-barrier system to be efficient in flow processes, column production, and scalability. In compliance with ISO standards and cGTP, our repeating clean manufacturing column systems and fully-isolated and air-locked internal ISO 4 containment units are engineered and designed with scalable production in mind.

We currently operate a facility in Salt Lake City, Utah, consisting of approximately 178,528 square feet. We use this facility for product manufacturing and research and development work. We intend to establish over time remote manufacturing facilities we call "nodes" at locations close to health care providers we believe will be significant purchasers of our products. One of the significant benefits of nodes is the creation of manufacturing redundancy, so that production can be sustained if one of our manufacturing facilities is unable to produce due to natural disaster or other cause. We also believe nodes have the potential to lower shipping costs, which would improve our gross margin on products sold in the areas where the nodes are located.

13

**Suppliers**

As part of our strategy of ensuring timely delivery of our products, we have avoided relying on any third-party supplier as a sole source vendor for any element of our production process. In the past year, we have signed agreements with major suppliers to reduce costs, ensure faster fulfillment, and increase our bulk purchasing capability. We have identified alternate suppliers and, where appropriate, supply alternatives for any sourcing challenges.

**Intellectual Property**

As we advance our platform technology, our RTA, and our RTDs, we seek to apply a multilayered approach for protecting intellectual property relating to our innovation – with patents (utility and design), copyrights, trademarks, as well as know-how and trade secret protection.

We do not currently own any granted patents, but have a number of patent applications pending in the U.S. and around the world. We have four pending U.S. non-provisional utility patent applications relating to MPFUs – U.S. Serial Nos. 14/954,335; 15/650,656; 15/650,659; and 16/165,169. Each of these applications claims priority to a U.S. provisional application filed on December 2, 2014. We have one Patent Cooperation Treaty (PCT) International Patent Application (PCT International Publication No. WO 2016/089825) and national phase applications have been entered in OAIP, ARIPO, Australia, Brazil, Canada, China, Colombia, Costa Rica, Eurasia, Europe, Great Britain, Hong Kong, Israel, India, Indonesia, Japan, South Korea, Mexico, Malaysia, New Zealand, Philippines, Singapore, South Africa, Thailand, United Arab Emirates, Ukraine, Vietnam. These applications, as well as our pending non-public applications (which will only be identified after publication), are proceeding along the normal timeline of patent office examination in each respective country. The receipt of office actions from patent offices is part of the examination process, as is our response to such office actions. To date, no application has been abandoned or lapsed. Nor has any application been rejected in a manner that forecloses the possibility of receiving a granted patent from that same application. All our patent applications are currently alive and actively being pursued. We cannot predict when or where the first set of patent claims might be granted, nor can we speculate on the scope of claims in such a future patent.

We seek to complement the protection of our innovation with a portfolio of trademarks and service marks in the United States and around the world. The POLARITYTE trademark has been registered in the United States, Australia, Brazil, China, the European Union, Iceland, India, Israel, Japan, South Korea, Malaysia, Mexico, Norway, the Russian Federation, Singapore, Switzerland, Taiwan, and Turkey. Additional registered trademarks in the United States include our logo, WELCOME TO THE SHIFT, and WHERE SELF REGENERATES SELF.

In striving to protect and enhance proprietary technology, inventions, and improvements that are commercially important to the development of our business, we also rely heavily on trade secrets relating to our proprietary technology and on know-how. We enter into confidentiality agreements with our employees, consultants, scientific advisors, and contractors. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems.

**Competition**

The regenerative medicine industry is characterized by rapidly advancing technologies, intense competition, and a strong emphasis on intellectual property. We face substantial competition from companies developing and selling regenerative medicine products, as well as academic research institutions and governmental agencies and public and private research institutions.

Many of our current or potential competitors, either alone or with their collaboration partners, have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, and marketing approved products than we do. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These competitors also compete with us in recruiting and retaining qualified scientific and management personnel and establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs.

14

Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient, or are less expensive than any products that we may develop. Our competitors also may obtain FDA or other regulatory approval for their products more rapidly than we may obtain approval for ours (if required), which could result in our competitors establishing a strong market position before we are able to enter the market. The key competitive factors affecting the success of our programs are likely to be their efficacy, safety, convenience, price, and the availability of reimbursement from government and other third-party payers.

**RTD and ARC**

We believe our TE platform technology is a revolutionary approach to regenerative medicine in and of itself, but we also find that it suggests new areas of inquiry and potential innovation. To this end, we have active research we are pursuing through our Related Technology Derivatives (RTD) and Advanced Research Center (ARC) programs. RTDs can be designed to augment the application and regenerative outcomes of our pipeline products or be used as standalone products. ARC programs focus on the improvement of RTDs as well as augmentation of our pipeline products. We are excited about the recent advancements in the field of gene therapy and are interested in the possibility of genetically altering our products, including SkinTE, to better treat and possibly cure rare diseases, such as Epidermolysis Bullosa, a genetic condition that causes the skin to be very fragile and to blister easily.

**Contract Research Services**

In May 2018, we purchased the assets of a preclinical research sciences business and related real estate from Ibex Group, L.L.C., a Utah limited liability company, and Ibex Preclinical Research, Inc., a Utah corporation. We acquired these assets to accelerate research and development of our TE product candidates, and now operate the business as IBEX to advance our product development and deliver preclinical research services to third parties. The business consists of a "good laboratory practices" (GLP) compliant preclinical research facility that is USDA registered and includes vivarium, operating rooms, preparation rooms, storage facilities, and surgical and imaging equipment. The real property includes two parcels in Logan, Utah, consisting of approximately 1.75 combined gross acres of land, together with the buildings, structures, fixtures, and personal property located on the real property.

PolarityTE RD offers a complimentary array of research services to those offered through IBEX, providing access to experimental planning, histology, and in vivo and in vitro imaging, including micro-ct. The PolarityTE RD arm is well equipped with state of the art equipment and sophisticated research staff that provide a range of services including veterinary and preclinical services, advanced imaging, biomedical engineering and validation, molecular biology assays and proteomics analyses.

**Government Regulation**

Government authorities or laws and regulations in the United States and other countries regulate the manufacturing, approval, labeling, packaging, storage, record-keeping, and promotion of products such as those we have developed and are developing. Any product we are developing must comply with the standards required for the product category under which the product is classified by such government authorities or laws.

*FDA Regulation of Tissue-Based Products*

The FDA has specific regulations governing human cells, tissues and cellular and tissue-based products, or HCT/Ps. An HCT/P is a product containing or consisting of human cells or tissue intended for transplantation into a human patient. In the United States, HCT/Ps are subject to varying degrees of regulation by the FDA, depending on if they fall solely within the scope of Section 361 of the Public Health Service Act (the "PHS Act") (42 U.S.C. § 264) or if they are regulated as drugs, devices, or biological products under Section 351 of the PHS Act (42 U.S.C. § 262) or the FD&C Act.

If an HCT/P meets the criteria for regulation solely under Section 361 of the Public Health Service Act (so-called "361 HCT/Ps"), no premarket FDA review for safety and effectiveness under a drug, device, or biological product marketing application is required. However, the processor of the tissue is required to register and list its products with the FDA, comply with regulations regarding labeling, record keeping, donor eligibility and screening and testing, process the tissue in accordance with established current Good Tissue Practices (cGTP), and investigate and, in certain circumstances, report adverse events or deviations.

15

To be a 361 HCT/P, a product generally must meet all four of the following criteria:

- It must be minimally manipulated;
- It must be intended for homologous use;
- Its manufacture must not involve combination with another article, except for water, crystalloids or a sterilizing, preserving or storage agent, provided the addition of such article does not raise new clinical safety concerns; and
- It must not have a systemic effect and must not be dependent upon the metabolic activity of living cells for its primary function (unless the product is intended for reproductive use, autologous use, or use in a first- or second-degree blood relative).

We believe that SkinTE and OsteoTE qualify as 361 HCT/P tissue-based products, and believe that our core "TE" products in development (e.g., CartTE) will qualify as 361 HCT/Ps. Other products we are developing are being evaluated with respect to regulatory classification, and we will prepare for any pathway of manufacturing or regulation that is required.

All establishments that manufacture 361 HCT/Ps must register and list their HCT/Ps with the FDA's Center for Biologics Evaluation and Research ("CBER") within five days after commencing operations. In addition, establishments are required to update their registration annually in December or within 30 days of certain changes, and submit changes in HCT/P listing at the time of or within six months of such change. Establishments that manufacture 361 HCT/Ps will know that they are registered in compliance with 21 C.F.R. § 1271.10(a) when they receive a validated form with the registration number ("FEI#") after submitting the Form FDA 3356 (registration form). Current Good Tissue Practice ("cGTP") requirements govern, as may be applicable, the facilities, controls, and methods used in the manufacture of HCT/Ps, including without limitation, recovery, donor screening, donor testing, processing, storage, labeling, packaging, and distribution of 361 HCT/Ps. FDA inspection and enforcement with respect to establishments described in 21 C.F.R. § 1271 includes inspections conducted, as deemed necessary, to determine compliance with the applicable provisions and may include, but is not limited to, an assessment of the establishment's facilities, equipment, finished and unfinished materials, containers, processes, HCT/Ps, procedures, labeling, records, files, papers, and controls required to be maintained under 21 C.F.R. § 1271. Such inspections can occur at any time with or without written notice at such frequency as is determined by the FDA in its sole discretion. Our Salt Lake City manufacturing site was inspected in July 2018 and we received certain inspectional observations on Form FDA 483 following that inspection. We responded to those observations and are continuing a productive dialog with the FDA.

If we fail to comply with the FDA regulations and laws applicable to our operation or tissue products, the FDA could take enforcement action, including, without limitation, pursuing any of the following sanctions, among others:

- Untitled letters, warning letters, fines, injunctions, product seizures, and civil penalties;
- Orders for product retention, recall, or destruction;
- Operating restrictions, partial suspension or total shutdown of operations;
- Refusing any requests for product clearance or approval;
- Withdrawing or suspending any applications for approval or approvals already granted; or
- Criminal prosecution.

For more information on this regulatory risk, please see the discussion below, "Risk Factors," including but not limited to the information under the heading, "Risks Related to Registration or Regulatory Approval of Our Product Candidates and Other Government Regulations."

Interactome – the complete set of physical interactions between molecules within a cell that underlies most genotype-to-phenotype relationships and modulates nearly all complex biological pathways and cellular networks seen in living systems.

In Vitro - outside a living organism, for example laboratory vessel (e.g., a test tube) and under laboratory conditions.

In Vivo - in a living organism.

Ischemic damage - damage that causes a restriction in blood supply, thus causing diminished delivery of oxygen to the affected tissue.

MPFU - a minimally polarized functional unit.

Neovascularization - the formation of new vessels from pre-existing ones (angiogenesis) or from cellular precursors (vasculogenesis).

Osteoarthritis - a disease that occurs when the protective cartilage on the ends of bones wears down over time.

Parietal bone - a bone forming the central side and upper back part of each side of the skull.

Polarity – the asymmetric organization of cellular elements, which allows development of specialized tissue and downstream function.

Scaffold – a three dimensional material that has been engineered to cause desirable cellular interactions to contribute to the formation of new functional tissues.

Scar revision – minimizing a scar so that it is less conspicuous and blends in with the surrounding skin tone and texture.

SCIRM - self-complexing intelligent regenerative material.

Sebaceous glands – small glands in the skin that secrete lubricating oily matter (sebum) into the hair follicles to lubricate the skin and hair.

Skin graft - the transplantation of skin onto a damaged area of the body.

Split-thickness skin graft (STSG) – a skin graft that contains the epidermis and only part of the dermis.

Stem cell – an undifferentiated cell capable of renewing itself, and from which certain other kinds of cells arise by differentiation.

Stem cell niche - the microenvironment within a tissue that interacts with stem cells to signal cell growth, development, renewal, and differentiation.

Tissue engineering triad – the three components of tissue engineering, as historically taught, requiring the use of a scaffold, a signal such as a growth factor, and a cell component such as a stem cell.

Urethral stricture - the narrowing of the urethra caused by injury, infection etc.

Xenografts – a tissue graft or organ transplant from a donor of a different species from the recipient.

**Item 1A. Risk Factors.**

*Our business and operations are subject to many risks and uncertainties as described below. However, the risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we may currently deem immaterial, may become important factors that could harm our business, financial condition or results of operations. If any of the following risks occur, our financial condition or results of operations could suffer.*

21

**Risks Related to Our Business**

*If the clinical development and commercialization of our lead product candidate, SkinTE, is not successful, our ability to finance our operations may be adversely affected.*

Our near-term prospects depend upon our ability to effectively market our lead product candidate, SkinTE, and to demonstrate its safety and effectiveness in humans, as well as its superiority over existing therapies and standards of care. Our ability to finance our company and to generate revenues will depend in part on our ability to obtain favorable results in the planned clinical evaluations of SkinTE and to successfully develop and commercialize SkinTE.

SkinTE could be unsuccessful if it:

- does not demonstrate acceptable safety and efficacy in humans, or otherwise does not meet applicable regulatory standards;
- does not offer sufficient, clinically meaningful therapeutic or other improvements over existing or future therapies used to treat burns or other defects of skin tissues/integument for which it is being tested and evaluated;
- is not capable of being produced in commercial quantities at acceptable costs or acceptable timelines; or
- is not accepted as safe, efficacious, cost-effective, less costly, and preferable to current therapies in the medical community and by third-party payers.

If we are not successful in developing and commercializing SkinTE or are significantly delayed in doing so, our financial condition and prospects may be adversely affected and we may experience difficulties in raising the substantial additional capital required to fund our business.

*We are an early stage company. Our limited operating history makes it difficult to evaluate our current business and prospects, and our profitability in the future is uncertain.*

Our limited operating history hinders an evaluation of our prospects, which should be considered in light of the risks, expenses, and difficulties frequently encountered in the establishment of a new business in an industry with many market participants and intense competition, and in the shift from development to commercialization of new product candidates based on innovative technologies.

*We have a history of operating losses and may never achieve or sustain profitability.*

We have incurred significant operating losses, and may continue to incur significant operating losses over the next several years. We incurred a net loss of $65.4 million for the year ended October 31, 2018. Our ability to achieve profitable operations in the future will depend in large part upon the successful development and commercialization of our product candidates and technologies. Factors impacting our ability to successfully develop and commercialize our product candidates include:

- approvals by or registrations with the FDA and other US and foreign government agencies;
- our ability to educate and train physicians and hospitals on the benefits of our product candidates;
- the rate at which providers adopt our technology and product candidates;
- our ability to scale up our commercialization, including our selling and manufacturing activities;
- our ability to complete the development of our product candidates in a timely manner;
- our ability to obtain adequate reimbursement from third parties for our products and product candidates; and
- other activities generally necessary to introduce and bring new products and medical technologies to market.

22

The likelihood of the long-term success of our company must be considered in light of the expenses, difficulties, and delays frequently encountered in the development and commercialization of new and innovative medical techniques and technologies, unknown and uncertain regulatory hurdles for a new and novel technology or technique, competitive factors and competition, as well as the uncertain nature of new business development and ongoing capital requirements.

***We may have inadequate resources to complete the development and commercialization of our product candidates or to continue our development programs.***

We are a development stage company, and thus we expect to continue to spend a significant amount of cash on research and development of our product candidates. Until we can successfully commercialize our product candidates and achieve significant revenue, if any, we will be required to raise additional capital to fund our ongoing operations. We may not be able to raise capital on acceptable terms, or at all.

***The cost and timing of completion of our preclinical and clinical development programs is uncertain.***

We expect that a large percentage of our future research and development expenses will be incurred in support of current and future preclinical and clinical development programs. These expenditures are subject to numerous uncertainties in timing and cost of completion. We evaluate our objectives in preclinical models based upon our own development goals, but such evaluation may differ from requirements of regulatory authorities. We may conduct early stage clinical trials, which may differ for each of our targeted markets or markets we may target in the future (i.e., presently, skin, bone, muscle, cartilage, fat, blood vessels, and nerves). As we obtain results from investigations, preclinical studies, or clinical trials, we may elect to discontinue or delay further evaluations for certain product candidates or programs to focus resources on more promising product candidates or programs. Completion of clinical trials may take several years and the length of time generally varies according to the type, complexity, novelty, and intended use of a product candidate. The cost of clinical trials is uncertain and may vary significantly over the life of a product or development project because of unanticipated differences, regulatory requirements, or other obligations, or challenges arising during clinical development.

***Our product development programs are based on novel technologies. As a result, our product candidates are inherently risky.***

We cannot guarantee that the results we see in clinical applications will be comparable to the preclinical results we have observed in animals for all our product candidates. We also cannot at this stage be certain of the safety of all product candidates that may be developed from our platform technology in humans.

We are subject to the risks of failure inherent in the development of product candidates based on new technologies. The novel nature of our products creates significant challenges regarding product development and optimization, manufacturing, government regulation, third-party reimbursement, and market acceptance. For example, if regulatory agencies have limited experience or concerns in approving cellular and tissue-based therapies for commercialization, the development and commercialization pathway for our therapies may be subject to increased uncertainty, as compared to the pathway for new conventional drugs.

Further, when manufacturing autologous cell and tissue-based therapies, the number and the composition of the cell population varies from patient to patient, in part due to the age of the patient, since the therapy is dependent on patient-specific physiology. Such variability in the number and composition of these cells could adversely affect our ability to manufacture autologous cell and tissue-based therapies in a cost-effective manner and meet acceptable product release specifications for use in a clinical trial or, if approved or registered, for commercial sale. Consequently, the development and regulatory approval or registration process for autologous cell and tissue-based product candidates could be delayed or may never be completed.

***Our product candidates represent new classes of therapy that the marketplace may not understand or accept. Furthermore, the success of our product candidates is dependent on wider acceptance by the medical community.***

The market may not understand or accept our product candidates. Our product candidates represent new treatments or therapies and compete with a number of more conventional products and therapies manufactured and marketed by others. The new nature of our product candidates creates significant challenges regarding product development and optimization, manufacturing, government regulation, and third-party reimbursement.

As a result, the development pathway for our product candidates and the commercialization of our potential products may be subject to increased scrutiny, as compared to the pathway(s) for more conventional products.

The degree of market acceptance of any of our potential products will depend on a number of factors, including:

- The clinical safety and effectiveness of our products and their perceived advantage over alternative treatment methods;
- Our ability to convince healthcare providers that the use of our products in a procedure is more beneficial than the standard of care or other available methods;
- Our ability to explain clearly and educate others on the autologous use of patient-specific human cells and tissue-based products, and to avoid potential confusion with and differentiate ourselves from the ethical controversies associated with human fetal tissue and engineered human tissue;
- Adverse reactions involving our products or the products or product candidates of others that are cell- or tissue-based; and
- The cost of our products and the reimbursement policies of government and other third-party payers, including the amounts of reimbursement made for our products and the conditions for such reimbursement.

If patients or the medical community do not accept our potential products as safe and effective for any of the foregoing reasons, or for any other reason, it could affect our sales, having a material adverse effect on our business, financial condition and results of operations.

***Our revenues from our regenerative medicine business will depend upon adequate reimbursement from public and private insurers and health systems.***

Our success will depend on the extent to which reimbursement for the costs of our treatments will be available from third-party payers, such as public and private insurers and health systems, as well as the amounts that they will agree to reimburse. Government and other third-party payers attempt to contain healthcare costs by limiting both coverage and the level of reimbursement, and the amount of reimbursement for new treatments. Therefore, significant uncertainty usually exists as to the reimbursement status of new healthcare treatments. If we are not successful in obtaining adequate reimbursement for our treatments from these third-party payers, the market's acceptance of our treatments could be adversely affected. Inadequate reimbursement levels also likely would create downward price pressure on our treatments. Even if we succeed in obtaining widespread reimbursement for our treatments at adequate pricing, future changes in reimbursement policies could have a negative impact on our business, financial condition and results of operations.

Commercial third-party payers and government payers are increasingly attempting to contain healthcare costs by demanding price discounts, including by limiting coverage on which products they will pay for and the amounts that they will pay for new products, and by creating conditions to reimbursement, such as coverage eligibility requirements based upon clinical evidence development involving research studies and the collection of physician decision impact and patient outcomes data. Because of these cost-containment trends, commercial third-party payers and government payers that currently provide or in the future may provide reimbursement for one or more of our product candidates may reduce, suspend, revoke, or discontinue payments or coverage at any time, including those payers that designate one or more of our product candidates as experimental and investigational. Payers may also create conditions to coverage or contract with third-party vendors to manage laboratory benefit coverage, in both cases creating burdens for ordering by physicians and patients that may make our product candidates more difficult to sell. The percentage of submitted claims that are ultimately paid, the length of time to receive payment on claims, and the average reimbursement of those paid claims, is likely to vary from period to period. Finally, payers may demand discounts or offer reimbursement that minimizes our ability to sell our products profitably, or simply choose to not cover or reimburse our products at all.

As a result, there is significant uncertainty surrounding whether the use of products that incorporate new technology, such as our product candidates, will be eligible for coverage by commercial third-party payers and government payers or, if eligible for coverage, what the reimbursement rates will be for these product candidates. The fact that a product has been approved for reimbursement in the past, or has received FDA approval, for any particular indication or in any particular jurisdiction, does not guarantee that such product will remain approved for reimbursement or that similar or additional products will be approved in the future. Reimbursement of our existing and future products by commercial third-party payers and government payers may depend on a number of factors, including a payer's determination that our existing and future products are:

- not experimental or investigational;
- medically reasonable and necessary;
- appropriate for the specific patient;
- cost effective;
- supported by peer-reviewed publications;
- included in clinical practice guidelines and pathways; and
- supported by clinical utility and health economic studies demonstrating improved outcomes and cost effectiveness.

Market acceptance, sales of products based upon our platform technology, and our profitability may depend on reimbursement policies and healthcare reform measures. Several entities conduct technology assessments and provide the results of their assessments for informational purposes to other parties. These assessments may be used by third-party payers and healthcare providers as grounds to deny coverage for a product. The levels at which government authorities and third-party payers, such as private health insurers and health maintenance organizations, may reimburse the price patients pay for such products could affect whether we are able to commercialize our product candidates. Our product candidates may receive negative assessments that may impact our ability to receive reimbursement of the test. Since each payer makes its own decision as to whether to establish a policy to reimburse our test, seeking these approvals may be a time-consuming and costly process. We cannot be sure that reimbursement in the United States or elsewhere will be available for any of our product candidates in the future. If reimbursement is not available or is limited, we may not be able to commercialize our product candidates.

The United States and foreign governments continue to propose and pass legislation designed to reduce the cost of healthcare. We expect that there will continue to be federal and state proposals to implement governmental controls or impose healthcare requirements. In addition, the Medicare program and increasing emphasis on managed or accountable care in the United States will continue to put pressure on product utilization and pricing. Utilization and cost control initiatives could decrease the volume of orders and payment that we would receive for any products in the future, which would limit our revenue and profitability. If we are unable to obtain reimbursement approval from commercial third-party payers and Medicare and Medicaid programs for our product candidates, or if the amount reimbursed is inadequate, our ability to generate revenues could be limited.

*We are subject to numerous federal and state healthcare laws and regulations, and a failure to comply with such laws and regulations could have an adverse effect on our business and our ability to compete in the marketplace.*

There are numerous laws and regulations that govern the means by which companies in the healthcare industry may market their treatments to healthcare professionals and may compete by discounting the prices of their treatments, including for example, the federal Anti-Kickback Statute, the federal False Claims Act ("FCA"), and state law equivalents to these federal laws that are meant to protect against fraud and abuse and analogous laws in foreign countries. Violations of these laws are punishable by criminal and civil sanctions, including, but not limited to, in some instances civil and criminal penalties, damages, fines, and exclusion from participation in federal and state healthcare programs, including Medicare and Medicaid. In addition, federal and state laws are also sometimes open to interpretation. Accordingly, we could potentially face legal risks if our interpretation differs from those of enforcement authorities. Further, from time to time we may find ourselves at a competitive disadvantage if our interpretation differs from that of our competitors.

Specifically, anti-kickback laws and regulations prohibit any knowing and willful offer, payment, solicitation or receipt of any form of remuneration (direct or indirect, in cash or in kind) in return for the referral, use, ordering, or recommending of the use of a product or service for which payment may be made by Medicare, Medicaid or other Government-sponsored healthcare programs. We have entered into consulting agreements, research agreements and product development agreements with physicians, including some who may order our products or make decisions to use them. In addition, some of these physicians own our stock, which they purchased in arm's length transactions on terms identical to those offered to non-physicians, or received stock awards from us as consideration for services performed by them. While these transactions were structured with the intention of complying with all applicable laws, including state anti-referral laws and other applicable anti-kickback laws, it is possible that regulatory or enforcement agencies or courts may in the future view these transactions as prohibited arrangements that must be restructured or for which we would be subject to other significant civil or criminal penalties. There can be no assurance that regulatory or enforcement authorities will view these arrangements as following applicable laws or that one or more of our employees or agents will not disregard the rules we have established. Because our strategy relies on the involvement of physicians who consult with us on the design of our potential products, perform clinical research on our behalf, or educate the market about the efficacy and uses of our potential products, we could be materially impacted if regulatory or enforcement agencies or courts interpret our financial relationships with physicians who refer or order our potential products to be in violation of applicable laws and determine that we would be unable to achieve compliance with such applicable laws. This could harm our reputation and the reputations of the physicians we engage to provide services on our behalf. In addition, the cost of noncompliance with these laws could be substantial since we could be subject to monetary fines and civil or criminal penalties, and we could also be excluded from federally-funded healthcare programs, including Medicare and Medicaid, for non-compliance. Further, even the costs of defending investigations of noncompliance could be substantial.

Also, the FCA imposes civil liability on any person or entity that submits, or causes the submission of, a false or fraudulent claim to the federal government. Damages under the FCA can be significant and consist of the imposition of fines and penalties. The FCA also allows a private individual or entity (i.e., a whistleblower) with knowledge of past or present fraud against the federal government to sue on behalf of the government and to be paid a portion of the government's recovery, which can include both civil penalties and up to three times the amount of the government's damages (usually the amount reimbursed by federal healthcare programs). The U.S. Department of Justice on behalf of the government takes the position that the marketing and promotional practices of life sciences product manufacturers, including the off-label promotion of products, the provision of inaccurate or misleading reimbursement guidance, or the payment of prohibited kickbacks to doctors or other referral sources may cause the submission of improper claims to federal and state healthcare entitlement programs, such as Medicare and Medicaid, by health care providers that use the manufacturer's products, which results in a violation of the FCA. In certain cases, manufacturers have entered into criminal and civil settlements with the federal government under which they entered into plea agreements, paid substantial monetary amounts, and entered into corporate integrity agreements that require, among other things, substantial reporting and remedial actions going forward.

In addition, there has been a recent trend of increased federal and state regulation of payments made to physicians and other health care providers. In addition to federal laws, some states, such as California, Massachusetts, and Vermont, mandate implementation of commercial compliance programs, along with the tracking and reporting of gifts, compensation, and other remuneration to physicians. The shifting commercial compliance environment and the need to build and maintain robust and expandable systems to comply with different compliance or reporting requirements in multiple jurisdictions increase the possibility that a healthcare company may run afoul of one or more of the requirements.

The scope and enforcement of all these laws is uncertain and subject to rapid change, especially considering the lack of applicable precedent and regulations. There can be no assurance that federal or state regulatory or enforcement authorities will not investigate or challenge our current or future activities under these laws. Any investigation or challenge could have a material adverse effect on our business, financial condition, and results of operations. Any state or federal regulatory or enforcement review of us, regardless of the outcome, would be costly and time consuming. Additionally, we cannot predict the impact of any changes in these laws, whether these changes are retroactive or will have effect on a going-forward basis only.

*We operate in a highly competitive and evolving field and face competition from regenerative medicine, biotech, and pharmaceutical companies, tissue engineering entities, tissue processors and medical device manufacturers, as well as new market entrants.*

We operate in a very competitive and continually evolving field. Competition from other regenerative medicine, biotech, and pharmaceutical companies, tissue engineering entities, tissue processors, medical device companies and from research and academic institutions is intense, expected to increase, subject to rapid change, and could be significantly affected by new product introductions. Our failure to compete effectively would have a material and adverse effect on our business, results of operations, and financial condition.

Specifically, we face significant competition in both the regenerative medicine and wound care space from multiple products, including ReCell, Integra Bilayer Wound Matrix, EpiFix, Apligraf, Dermagraft, Grafix, Epicel, and others. The availability and price of our competitors' products could limit the demand and the price we are able to charge for our product candidates. We may not be able to implement our business plan if the acceptance of our product candidates is inhibited by price competition or the reluctance of physicians to switch from existing methods of treatment to our product candidates, or if physicians switch to other new drug or biologic products, or choose to reserve our product candidates for use in limited circumstances.

*Our access to sensitive patient information is subject to complex regulations at multiple levels and we would be adversely affected if we fail to adequately protect this information.*

We receive, maintain and utilize personal health and other confidential and sensitive data as part of the treatments we provide. We have developed a web and mobile application through which our customers can communicate with physicians and others, which may involve sharing patient identifiable health information. The use and disclosure of such information is regulated at the federal, state and international levels, and these laws, rules and regulations are subject to change and increased enforcement activity, such as the audit program implemented by HHS under HIPAA. International laws, rules and regulations governing the use and disclosure of such information are generally more stringent than in the United States, and they vary from jurisdiction to jurisdiction. Noncompliance with any privacy or security laws or regulations, or any security breach, cyber-attack or cybersecurity breach, and any incident involving the theft, misappropriation, loss, or other unauthorized disclosure of, or access to, sensitive or confidential information, whether by us or by a third party, could require us to expend significant resources to remediate any damage, interrupt our operations, and damage our brand and reputation, and could also result in investigations, regulatory enforcement actions, material fines and penalties, loss of customers, litigation, or other actions which could have a material adverse effect on our business, brand, reputation, cash flows, and operating results.

Our business depends on provider and patient willingness to entrust us with health related and other sensitive personal information. Events that negatively affect that trust, including incorrect or incomplete disclosure of our uses of their information, or failing to keep our information technology systems and sensitive information secure from significant attack, theft, damage, loss, or unauthorized disclosure or access, whether as a result of our action or inaction or that of third parties, could adversely affect our brand, reputation, and revenues, and also expose us to mandatory disclosure to the media, litigation (including class action litigation), and other enforcement proceedings, material fines, penalties or remediation costs, and compensatory, special, punitive, and statutory damages, consent orders, or injunctive relief, any of which could adversely affect our business, cash flows, operating results, or financial position. There can be no assurance that any such failure will not occur, or if any does occur, that we will detect it or that it can be sufficiently remediated.

*Many of our competitors have substantially greater resources than we do, and we expect that all our product candidates will face intense competition from existing or future products.*

All our product candidates face intense competition from existing and future products marketed by large, well-established companies (including but not limited to Avita Medical, Integra LifeSciences, Wright Medical Group, MiMedx, Osiris, Organogenesis, Allosource, MTF Biologics and Vericel). These competitors may successfully market products that compete with our product candidates, successfully identify product candidates or develop products earlier than we do, or develop products that are more effective or cost less than our products. These competitive factors could require us to conduct additional new research and development activities to establish new competitive product targets, which would be costly and time consuming. These activities would adversely affect our ability to effectively commercialize products and achieve revenue and profits.

***We depend heavily on our senior management and we may be unable to replace key executives if they leave.***

The loss of the services of one or more members of our senior management team or our inability to attract, retain and maintain additional senior management personnel could harm our business, financial condition, results of operations, and prospects. Our operations and prospects depend in large part on the performance of our senior management team, particularly Dr. Denver Lough, our Chief Executive Officer and Chief R&D Officer. In addition, we may not be able to find qualified replacements if his services are no longer available. We do not presently maintain "key-man" life insurance on any of our executives or key employees.

Many executive officers and employees in the regenerative medicine business are subject to strict non-compete or confidentiality agreements with their employers, which would limit our ability to recruit them to join our company. In addition, some of our existing and future employees are or may be subject to confidentiality agreements with previous employers. Our competitors may allege breaches of and seek to enforce such non-compete agreements or initiate litigation based on such confidentiality agreements. Such litigation, whether or not meritorious, may impede our ability to hire executive officers and other key employees who have been employed by our competitors and may result in intellectual property claims against us.

***If serious adverse or inappropriate side effects are identified during the development or use of our product candidates or with any procedures with which our product candidates are used, we may need to abandon or limit our development of those product candidates.***

If our product candidates are associated with undesirable side effects or have characteristics that are unexpected, we may need to abandon their use or development or limit them to certain uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective. In addition, if any of the procedures with which our product candidates are used is determined to be unsafe, we may be required to delay, alter, or abandon our product development or commercialization.

***We intend to, but may not be successful in, establishing and maintaining strategic partnerships.***

We intend to enter into strategic partnerships in the future to enhance and accelerate the development and commercialization of our proposed products. We may rely on such partnerships to assist in launching, marketing, and developing our product candidates. However, we may face significant competition in seeking appropriate strategic partners and the negotiation process is time-consuming and complex. Moreover, we may not be successful in our efforts to establish a strategic partnership or other alternative arrangements for any future proposed products and programs because our research and development pipeline may be insufficient, our proposed products and programs may be deemed to be at too early of a stage of development for collaborative effort, or third parties may not view our product candidates and programs as having the requisite potential to demonstrate safety and efficacy or other requirements or goals that potential strategic partners may seek. Even if we are successful in our efforts to establish strategic partnerships, the terms that we agree upon may not be favorable to us, and we may not be able to maintain such strategic partnerships if, for example, development or approval of a product candidate is delayed or sales of an approved or registered product are disappointing.

***Rapid technological change could cause our business to become obsolete.***

The technologies underlying our product candidates are subject to rapid and profound technological change. Competition intensifies as technical advances in each field are made and become more widely known. There is no assurance that others will not develop services, products, or processes with significant advantages over the products, services, and processes that we offer or are seeking to develop. Any such occurrence could have a material and adverse effect on our business, results of operations, and financial condition.

The success of any of our product candidates or enhancements to an existing product will depend on numerous factors, including our ability to:

- properly identify and anticipate physician and patient needs;
- develop and introduce enhancements in a timely manner;
- adequately protect our intellectual property and avoid infringing upon the intellectual property rights of third parties;
- demonstrate safety and efficacy in humans; and
- obtain the necessary regulatory clearances, registrations, or approvals.

28

If we do not develop and, when necessary, obtain regulatory clearance, registration, or approval for product candidates or product enhancements in time to meet market demand, or if there is insufficient demand for these products or enhancements, our results of operations will suffer. Our research and development efforts may require a substantial investment of time and resources before we are able to determine the commercial viability of a new product, technology, material, or other innovation. In addition, even if we can successfully develop enhancements or new generations of our product candidates, these enhancements or new generations of product candidates may not produce sales more than the costs of development, and they may be quickly rendered obsolete by changing customer preferences or the introduction by our competitors of product candidates embodying new technologies or features.

***To be commercially successful, we must convince physicians that our treatments are safe and effective alternatives to existing treatments and that our treatments should be accepted and used.***

We believe physicians will only adopt our treatment if they determine, based on experience, clinical data and published peer reviewed journal articles, that the use of our treatment is a favorable alternative to existing and conventional methods, such as adopting the use of SkinTE as a substitute for skin grafting. Physicians may be slow to change their medical treatment practices for the following reasons, among others:

- lack of evidence supporting additional patient benefits from our treatments over existing and conventional methods;
- perceived liability risks generally associated with the use of new procedures and general resistance to change; or
- limited availability or amounts of reimbursement from third-party payers.

In addition, while acceptance by the medical community may be fostered by broad evaluation via peer-reviewed literature, we may not have the resources to facilitate sufficient publication. We also believe that recommendations for, and support of our treatments by, influential physicians are essential for market acceptance and adoption. If we do not obtain this support or are unable to demonstrate favorable long-term clinical data, physicians and hospitals may not use our treatments, which would have a material and adverse effect on our result of operations and prospects.

***If we are unable to establish sales and marketing capabilities or enter into agreements with third parties to sell and market our product candidates, we may not be successful in commercializing them.***

We recently formed a sales and marketing team for SkinTE, which we intend to further develop. Nevertheless, our experience in the sale and marketing of SkinTE and other potential products is very limited, and we cannot predict whether or to what extent our internal sales effort may be successful. To achieve commercial success for any product candidate, we must either develop an effective internal sales and marketing team or outsource these functions to third parties.

There are risks involved both with establishing our own sales and marketing capabilities and entering into arrangements with third parties to perform these services. For example, recruiting and training a sales force is expensive and time consuming and could delay any product launch. If the commercial launch of SkinTE, OsteoTE, or another product candidate for which we recruit a sales force and establish marketing capabilities is delayed or does not occur for any reason, we would have prematurely or unnecessarily incurred these commercialization expenses. This may be costly, and our investment would be lost if we cannot retain or reposition our sales and marketing personnel.

If we enter into arrangements with third parties to perform sales, marketing and distribution services, our product revenues or the profitability of these product revenues to us are likely to be lower than if we were to market and sell any products ourselves. In addition, we may not be successful in entering into arrangements with third parties to sell and market our potential products or may be unable to do so on terms that are favorable to us. We likely will have limited control over such third parties, and any of them may fail to devote the necessary resources and attention to sell and market our potential products effectively and in compliance with applicable laws.

***Significant disruptions of information technology systems or breaches of information security could adversely affect our business.***

We rely to a large extent upon information technology systems to protect our intellectual property and to operate our business. In the ordinary course of business, we collect, store, and transmit large amounts of confidential information, including, but not limited to, our trade secrets and data, personal information, and intellectual property. The size and complexity of our information technology and information security systems make such systems potentially vulnerable to service interruptions or to security breaches from inadvertent or intentional actions by our employees or vendors, or from malicious attacks by third parties. Such attacks are of ever-increasing levels of sophistication and are made by groups and individuals with a wide range of motives (including, but not limited to, industrial espionage and market manipulation) and expertise. There can be no assurance that our efforts to protect our data and related information technology and intellectual property will prevent service interruptions or security breaches. Any interruption or breach in our systems could adversely affect our business operations or result in the loss of critical or sensitive confidential information or intellectual property, and could result in financial, legal, business, and reputational harm to us or allow third parties to gain material, inside information that they use to trade in our securities.

***We face the risk of product liability claims and may not be able to obtain or maintain adequate product liability insurance.***

Our business exposes us to the risk of product liability claims that are inherent in the manufacturing, processing, and marketing of human cellular and tissue-based products. We may be subject to such claims if our product candidates cause, or appear to have caused, an injury during clinical trials or after commercialization. Claims may be made by patients, healthcare providers, or others selling our product candidates. Defending a lawsuit, regardless of merit, could be costly, divert management attention, and result in adverse publicity, which could result in the withdrawal of, or reduced acceptance of, our product candidates in the market.

Although we have obtained product liability insurance, such insurance is subject to deductibles and coverage limitations and we may not be able to maintain this insurance. Also, it is possible that claims could exceed the limits of our coverage. If we are unable to obtain or maintain product liability insurance at an acceptable cost or on acceptable terms with adequate coverage, or otherwise protect ourselves against potential product liability claims or we underestimate the amount of insurance we need, we could be exposed to significant liabilities, which may harm our business. A product liability claim or other claim with respect to uninsured liabilities or for amounts in excess of insured liabilities could result in significant costs and significant harm to our business.

***We may implement a product recall or voluntary market withdrawal, which could significantly increase our costs, damage our reputation and disrupt our business.***

The manufacturing, marketing, and processing of our product candidates involves an inherent risk that our tissue products or processes do not meet applicable quality standards and requirements. In that event, we may voluntarily implement a recall or market withdrawal or may be required to do so by a regulatory authority. A recall or market withdrawal of one of our product candidates would be costly and would divert management resources. A recall or withdrawal of one of our product candidates, or a similar product processed by another entity, also could impair sales of our product candidates because of confusion concerning the scope of the recall or withdrawal, or because of the damage to our reputation for quality and safety.

***We may not be able to effectively control and manage our growth.***

Our strategy envisions a period of rapid growth. Our expected growth may impose a significant burden on our future planned administrative and operational resources. The growth of our business may require significant investments of capital and increased demands on our management, workforce, and facilities. We will be required to substantially expand our administrative and operational resources and attract, train, manage, and retain qualified management and other personnel. Failure to do so or to satisfy such increased demands would interrupt or would have a material adverse effect on our business and results of operations.

*We may increasingly become a target for public scrutiny, including complaints to regulatory agencies, negative media coverage, including social media and malicious reports, all of which could severely damage our reputation and materially and adversely affect our business and prospects.*

We focus on the research and development (including through preclinical, animal testing) of therapies used in the regenerative medicine and wound care space, and such therapies may be the subject of regulatory, watchdog, and media scrutiny and coverage, which also raise the possibility of heightened attention from the public, the media and other stakeholders. From time to time, these objections or allegations, regardless of their veracity, may result in public protests or negative publicity, which could result in government inquiry or harm our reputation. Corporate transactions we or related parties undertake may also subject us to increased media exposure and public scrutiny. There is no assurance that we would not become a target for public scrutiny in the future or such scrutiny and public exposure would not severely damage our reputation as well as our business and prospects.

### Risks Related to Our Intellectual Property

*We do not currently own any issued patents and our ability to protect our intellectual property and proprietary technology through patents and other means is uncertain and may be inadequate, which could have a material and adverse effect on us.*

Our success depends significantly on our ability to protect our proprietary rights in technologies that presently consist of trade secrets and patent applications. We currently have no issued patents relating to any of our product candidates. We intend to expand our patenting activities and rely on patent protection, as well as a combination of copyright, trade secret, and trademark laws and nondisclosure, confidentiality, and other contractual restrictions to protect our proprietary technology, and there can be no assurance these methods of protection will be effective. These legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep any competitive advantage. In addition, our presently pending patent applications include claims to material aspects of our activities that are not currently protected by issued patents. The patent application process can be time consuming and expensive. We cannot ensure that any of the pending patent applications we acquire, have acquired, or may file will result in issued patents. Competitors may be able to design around our patents or develop procedures that provide outcomes that are comparable or even superior to ours. There is no assurance that the inventors of the patents and applications that we expect to own or license were the first-to-invent or the first-inventor-to-file on the inventions, or that a third party will not claim ownership in one of our patents or patent applications. We cannot assure you that a third party does not have or will not obtain patents that could preclude us from practicing the patents we own or license now or in the future.

The failure to obtain and maintain patents or protect our intellectual property rights could have a material and adverse effect on our business, results of operations, and financial condition. We cannot be certain that, if challenged, any patents we ultimately obtain would be upheld because a determination of the validity and enforceability of a patent involves complex issues of fact and law. If one or more of any patents we obtain is invalidated or held unenforceable, such an outcome could reduce or eliminate any competitive advantage we might otherwise have had.

In the event a competitor infringes upon any patent we obtain, or a third party including but not limited to a university or other research institution, makes a claim of ownership over our patents or other intellectual property rights, confirming, defending, or enforcing those rights may be costly, uncertain, difficult, and time consuming.

*There can be no assurance that a third party, including, but not limited to, a university or other research institution that our founders were associated with in the past, will not make claims to ownership or other claims related to our technology.*

There can be no assurance that a third party, including but not limited to, a university or other research institution that our founders were associated with in the past, will not make claims to ownership or other claims related to our technology. We believe we have developed our technology outside of any institutions, but we cannot guarantee such institutions would not assert a claim to the contrary. Even if successful, litigation to enforce or defend our intellectual property rights could be expensive and time consuming, and could divert our management's attention. Further, bringing litigation to enforce our future patent(s) subjects us to the potential for counterclaims. If one or more of our future patents is challenged in U.S. or foreign courts or the United States Patent and Trademark Office ("USPTO") or foreign patent offices, the patent(s) may be found invalid or unenforceable, which could harm our competitive position. If any court or any patent office ultimately cancels or narrows the claims in any of our future patents through any pre- or post-grant patent proceedings, such an outcome could prevent or hinder us from being able to enforce the patent against competitors. Such adverse decisions could negatively affect our future revenue and results of operations.

***We may be subject to claims that our employees have wrongfully appropriated, used, or disclosed intellectual property of their former employers.***

We employ individuals who were previously employed by other companies, universities, or academic institutions. We may be subject to claims that we or our employees have inadvertently or otherwise used or disclosed intellectual property, including trade secrets or other proprietary information, of a prior employer. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel, which could adversely impact our business. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees. Any of the foregoing could have an adverse impact on our business, financial condition, results of operations, and cash flows.

We may be subject to claims that former or current employees, collaborators, or other third parties have an interest in our patents or other intellectual property as an inventor or co-inventor. Litigation may be necessary to defend against any claims challenging inventorship. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***If we are unable to protect the confidentiality of our proprietary information and know-how related to any of our product candidates, our competitive position would be impaired and our business, financial condition, and results of operations could be adversely affected.***

Some of our technology, including our knowledge regarding the processing of our product candidates, is unpatented and is maintained by us as trade secrets. To protect these trade secrets, the information is restricted to our employees, consultants, collaborators, and advisors on a need-to-know basis. In addition, we require our employees, consultants, collaborators and advisors to execute confidentiality agreements upon the commencement of their relationships with us. These agreements require that all confidential information developed by the individual or made known to the individual by us during the individual's relationship with us be kept confidential and not disclosed to third parties. These agreements, however, do not ensure protection against improper use or disclosure of confidential information, and these agreements may be breached. A breach of confidentiality could affect our competitive position. In addition, in some situations, these agreements and other obligations of our employees to assign intellectual property to the Company may conflict with, or be subject to, the rights of third parties with whom our employees, consultants, collaborators, or advisors have previous employment or consulting relationships. Also, others may independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets.

Adequate remedies may not exist in the event of unauthorized use or disclosure of our confidential information. The disclosure of our trade secrets could impair our competitive position and have a material adverse effect on our business, financial condition, and results of operations.

***We may become subject to claims of infringement of the intellectual property rights of others, which could prohibit us from developing our treatment, require us to obtain licenses from third parties, or to develop non-infringing alternatives, and subject us to substantial monetary damages. We have not obtained and do not intend to obtain any legal opinion regarding our freedom to practice our technology.***

Third parties could assert that our processes, product candidates, or technology infringe their patents or other intellectual property rights. Whether a process, product, or technology infringes a patent or other intellectual property involves complex legal and factual issues, the determination of which is often uncertain. We cannot be certain that we will not be found to have infringed the intellectual property rights of others. Because patent applications may remain unpublished for certain periods of time and may take years to be issued as patents, there may be applications now pending of which we are unaware or that do not currently contain claims of concern that may later result in issued patents that our product candidates, procedures, or processes will infringe. There may be existing patents that our product candidates, procedures, or processes infringe, of which infringement we are not aware. Third parties could also assert ownership over our intellectual property. Such an ownership claim could cause us to incur significant costs to litigate the ownership issues. If an ownership claim by a third party were upheld as valid, we may be unable to obtain a license from the third party on acceptable terms, to continue to make, use, or sell technology free from claims by that third party of infringement of the third party's intellectual property. We have not obtained, and do not have a present intention to obtain, any legal opinion regarding our freedom to practice our technology.

If we are unsuccessful in actions we bring against the patents of other parties, and it is determined that we infringe upon the patents of third parties, we may be subject to injunctions, or otherwise prevented from commercializing potential products or services in the relevant jurisdiction, or may be required to obtain licenses to those patents or develop or obtain alternative technologies, any of which could harm our business. Furthermore, if such challenges to our patent rights are not resolved in our favor, we could be delayed or prevented from entering into new collaborations or from commercializing certain product candidates or services, which could adversely affect our business and results of operations.

***If we are successful in obtaining patent protection, we may not be able to enforce those patent rights against third parties.***

Successful challenge of any future patents such as through opposition, reexamination, *inter partes* review, interference, or derivation proceedings could result in a loss of patent rights in the relevant jurisdiction. Furthermore, because of the substantial amount of discovery required relating to intellectual property litigation, there is a risk that some of our confidential or sensitive information could be compromised by disclosure in the event of litigation. In addition, during litigation there could be public announcements of the results of hearings, motions, or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a substantial adverse effect on the price of our common stock.

***We may not be able to protect our intellectual property in countries outside of the United States.***

Intellectual property law outside the United States is uncertain and, in many countries, is currently undergoing review and revisions. The laws of some countries do not protect patent and other intellectual property rights to the same extent as United States laws. Third parties may challenge our patents in foreign countries by initiating pre- and post-grant oppositions or invalidation proceedings. Developments during opposition or invalidation proceedings in one country may directly or indirectly affect a corresponding patent or patent application in another country in an adverse manner. It may be necessary or useful for us to participate in proceedings to determine the validity of our patents or our competitors' patents that have been issued in countries other than the United States. This could result in substantial costs, divert our efforts and attention from other aspects of our business, and could have a material adverse effect on our results of operations and financial condition.

**Risks Related to Registration or Regulatory Approval of Our Product Candidates and Other Government Regulations**

***Our business is subject to continuing regulatory oversight by the FDA and other authorities, whose requirements are costly to comply with, and our failure to comply could result in negative effects on our business.***

The FDA has specific regulations governing human cell, tissue, and cellular and tissue-based products, commonly known as "HCT/Ps". The FDA has broad post-market and regulatory and enforcement powers. The FDA's regulation of HCT/Ps includes requirements for registration and listing of products, donor screening and testing, processing and distribution ("Current Good Tissue Practices"), labeling, record keeping, adverse-reaction reporting, inspection, and enforcement.

We believe SkinTE and OsteoTE are appropriately regulated under Section 361 of the Public Health Service Act (so-called "361 HCT/Ps") and that, as a result, no premarket review or approval by the FDA is required. If the FDA does not agree that one or more of our HCT/P products meet its regulatory criteria for regulation solely as 361 HCT/Ps, our product candidates will be regulated as drugs, devices, or biological products, and we could be required to withdraw those products from the market until the required clinical trials are complete and the applicable premarket regulatory clearances or approvals are obtained.

Other products we develop may not be 361 HCT/Ps. As result, those product candidates would be subject to additional regulatory requirements, including premarket approval or clearance. Even if pre-market clearance or approval is obtained, the approval or clearance may place substantial restrictions on the indications for which the products may be marketed or to whom the products may be marketed, and may require warnings to accompany the product or impose additional restrictions on the sale or use of the product. In addition, regulatory approval is subject to continuing compliance with regulatory standards, including the FDA's current good manufacturing practice (cGMP) or quality system regulations and adverse event reporting regulations.

If we fail to comply with the FDA regulations regarding our products and manufacturing processes, the FDA could take enforcement action, including, without limitation, any of the following sanctions:

- Untitled letters, warning letters, fines, injunctions, consent decrees, product seizures, or civil penalties;
- Operating restrictions, partial suspension or total shutdown of clinical studies, manufacturing, marketing, or distribution;
- Refusing requests for clearance or approval of new products, processes, or procedures, or for certificates or approval to enable export of the same;
- Withdrawing or suspending current applications for approval or clearance, or any approvals or clearances already granted; and
- Civil or criminal prosecution.

It is likely that the FDA's regulation of 361 HCT/Ps and other types of products (e.g., drugs, devices, or biologics) will continue to evolve in the future. Complying with any such new regulatory requirements, guidance or statutes may entail significant time delays and expense, which could have a material adverse effect on our business. While the FDA may issue new or revised guidance or regulations for 361 HCT/Ps, we do not know whether or when such revised draft or final guidance or regulations (if any) will be issued, the scope of such guidance, any new rules or regulations, whether they will apply to our technologies or products, or whether they will be advantageous or disadvantageous to us. In addition, even if it does not issue new regulations or guidance, the FDA could in the future adopt more restrictive interpretations of existing regulations or increase its enforcement activity, which may adversely affect our business.

*We believe our FDA-registered SkinTE and OsteoTE products satisfy applicable criteria for regulation as a 361 HCT/P and are therefore exempt from FDA requirements for premarket approval or clinical studies. If the FDA disagrees with our interpretation of the relevant laws and regulations as they apply to these product candidates, and requires an Investigational New Drug application ("IND") or Investigational Device Exemption application ("IDE") for any of our product candidates, we may need to delay, abandon, or revise our current development plans, discontinue ongoing marketing, or recall products. The submission of an IND, Biologics License Applications ("BLA"), New Drug Application ("NDA"), or other medical device clearance or approval application would require us to compile significant amounts of data related to that regulatory process, as well as data from preclinical or clinical testing. We cannot guarantee that we will ever be able to secure such approvals, if required. Even if such approvals are obtained, regulation as a drug, biologic, or medical device would subject us to additional FDA post marketing requirements that are complex and involve substantial expense, such as compliance with drug, biologic, or medical device current Good Manufacturing Practice or quality system requirements.*

The FDA regulates HCT/Ps under a two-tiered framework. Certain higher risk HCT/Ps are regulated as new drugs, biologics, or medical devices. Manufacturers of new drugs, biologics, and some medical devices must complete extensive clinical trials, which must be conducted pursuant to an effective IND or IDE. In addition, the FDA must review and approve a BLA or NDA before a new drug or biologic may be marketed. For most medical devices, including novel or high-risk medical devices, the FDA must approve a premarket approval application ("PMA") or grant clearance to a premarket notification ("510(k)") application prior to marketing of the device.

By contrast, the FDA exempts 361 HCT/Ps from these requirements if they meet certain specified criteria. We believe that SkinTE and OsteoTE, meet the criteria for regulation as a 361 HCT/P rather than as a new drug or biologic or medical device and, therefore, we do not currently expect that these products will be subject to the requirement for an IND or IDE or FDA premarket review and approval. Thus, our financial and business plans assume that we will not need to seek or obtain premarket FDA approval or clearance for SkinTE or OsteoTE. Rather, we will have to comply with the requirements for 361 HCT/Ps set forth in FDA regulations and develop adequate substantiation to support marketing claims we plan to make. The FDA could disagree with our belief that our product candidates, including but not limited to SkinTE and OsteoTE, are 361 HCT/Ps. The FDA conducted an inspection of our Salt Lake City, UT manufacturing facility in July 2018, and issued certain inspectional observations on Form FDA 483. We responded to those observations and are continuing a productive dialog with the FDA.

The Tissue Reference Group ("TRG") is a body within the FDA designed to provide recommendations regarding whether a product candidate will be regulated as a 361 HCT/P. The Office of Combination Products ("OCP") at FDA provides informal and formal opinions regarding the classification of products as 361 HCT/Ps or drugs, biologics, or medical devices. Product manufacturers are not required to consult with the TRG or OCP and instead can market their products based on their own conclusion that the product meets the 361 HCT/P criteria. We have not consulted the TRG or sought a formal opinion from the OCP.

The regulatory pathway for cell and tissue-based products is subject to significant uncertainty. The FDA's criteria for regulation as a 361 HCT/P are complex, and the FDA has provided limited guidance on the meaning of certain terms used in the criteria, such as "minimal manipulation," "homologous," or "combination of the cells and tissues with another article." In addition, SkinTE and OsteoTE, use new technology that may present a matter of first impression for the FDA in determining whether to require premarket authorization. Further, our product candidates may receive a high degree of scrutiny from the FDA. The FDA or Congress could change the relevant criteria or interpretations for determining which products qualify as 361 HCT/Ps or the regulatory requirements for HCT/Ps.

Additionally, it may be difficult to convince the courts to overturn any adverse decisions made against us by the FDA. Courts have recognized the longstanding principle that the FDA's decisions on scientific matters, including the agency's conclusion that a tissue processing procedure involves more than minimal manipulation, are entitled to substantial deference. This means that if the FDA disagrees with our conclusion that any of our product candidates should be regulated as a 361 HCT/P, and not as a new biologic, drug, or medical device, it may be very difficult to challenge the agency's position in court.

***Even if the FDA regulates our product candidates, including SkinTE or OsteoTE, as 361 HCT/Ps, we must still generate adequate substantiation for any claims we will make in our marketing. Failure to establish such adequate substantiation in the opinion of federal or state authorities could substantially impair our ability to generate revenue.***

Although as 361 HCT/Ps, we may not need to submit certain products to the FDA for premarket approval or be subject to FDA requirements for labeling or promotion of new drugs, biologics, or medical devices, we still must generate adequate substantiation for claims we make in our marketing materials. Both the Federal Trade Commission ("FTC") and the states retain jurisdiction over the marketing of 361 HCT/Ps (and other) products in commerce and require a reasonable basis for claims made in marketing materials. Through our planned preclinical and clinical studies, as well as other endeavors, we intend to generate such adequate substantiation for any claims we make about our products. If, however, after we commence marketing of any of our product candidates, including SkinTE or OsteoTE, the FTC or one or more states conclude that we lack adequate substantiation for our claims, we may be subject to significant penalties, or may be forced to alter our marketing of our product candidates in one or more jurisdictions. Any of this could materially harm our business. In addition, if our promotion of any of our product candidates suggests that the HCT/P is not intended for homologous use, the FDA might consider the product to be a new drug, biologic, or medical device. We will therefore be limited in the promotional claims that we can make about our product candidates.

35

*Any changes in the governmental regulatory classifications of our product candidates could prevent, limit, or delay our ability to market or develop our product candidates.*

The FDA establishes regulatory requirements based on the classification of a product. An HCT/P is a product containing or consisting of human cells or tissue intended for transplantation into a human patient. 361 HCT/Ps are not subject to any premarket clearance or approval requirements and are subject to less extensive post-market regulatory requirements. Because Several of our products are, or will be, designed to satisfy the standards applicable to 361 HCT/Ps, any change in the regulatory classification or designation of our products would affect our ability to obtain FDA approval or clearance for, and marketing of, those products.

If one of our products is deemed not to be a 361 HCT/P, FDA regulations will require premarket clearance or approval requirements that will involve significant time and cost investments by us. Further, there can be no assurance that the FDA will not, at some future point, change its position on current or future products' 361 HCT/P status, and any regulatory reclassification could have adverse consequences for us and make it substantially more difficult or expensive for us to conduct our business by requiring extensive clinical trials, premarket clearance, or approval, and compliance with additional post-market regulatory requirements with respect to those products. Moreover, increased regulatory scrutiny within the industry in which we operate could lead to increased regulation of HCT/Ps, including 361 HCT/Ps. We also cannot assure you that the FDA will not impose more stringent interpretations, restrictions, or requirements with respect to products that qualify as 361 HCT/Ps.

*Even if we successfully launch any product candidate, it will be subject to ongoing regulation. We could be subject to significant penalties if we fail to comply with these requirements, and we may be unable to commercialize our product candidates.*

Even if the FDA does not object to the marketing of any of our product candidates as a 361 HCT/P and, therefore, without an NDA, BLA, PMA, or 510(k), we will still be subject to numerous post-market requirements, including those related to registration and listing, record keeping, labeling, current good tissue practices ("cGTPs"), donor eligibility, deviation and adverse event reporting, and other activities. HCT/Ps that do not meet the definition of a 361 HCT/P and, therefore, are required to be approved or cleared via an NDA, BLA, PMA, or 510(k) are also subject to these or additional obligations. If we fail to comply with these requirements, we could be subject to, without limitation, warning letters, product seizures, injunctions, or civil and criminal penalties. We have established our own processing facility, which we believe is cGTP compliant. Any failure by us to maintain cGTP compliance would require remedial actions, which could potentially include actions such as product recalls or delays in distribution and sales of our products, as well as enforcement actions.

*We face significant uncertainty in the industry due to government healthcare reform.*

There have been and continue to be proposals by the federal government, state governments, regulators and third-party payers to control healthcare costs (including but not limited to capitation – the generalized cap on annual fees for a type of service or procedure such as burn or wound care or rehabilitation), and generally, to reform the healthcare system in the United States. There are many programs and requirements for which the details have not yet been fully established or the consequences are not fully understood. These proposals may affect aspects of our business. We also cannot predict what further reform proposals, if any, will be adopted, when they will be adopted, or what impact they may have on us.

### Risks Related to Our Manufacturing

*Our failure to comply with the regulatory guidelines set forth by the FDA with respect to our product candidates could delay or prevent the completion of market entry, clinical trials, the approval or registration of any product candidates, or the commercialization of our product candidates.*

We are subject to regulation and inspection by the FDA for cGTP, with respect to our 361 HCT/P products, and current Good Manufacturing Practice ("cGMP"), with respect to our product candidates that are not 361 HCT/Ps. Complying with cGTP or cGMP and will require that we expend time, money, and effort in production, recordkeeping, and quality control to assure that the product meets applicable specifications and other requirements. For any products for which we are required to obtain FDA pre-market approval, we, or our contracted manufacturing facility, must also pass a pre-approval inspection prior to FDA approval. Failure to pass a pre-approval inspection may significantly delay FDA approval of our product candidates. If we fail to comply with these requirements, we would be subject to possible regulatory action and may be limited in the jurisdictions in which we are permitted to sell our product candidates. As a result, our business, financial condition, and results of operations may be materially harmed.

We have limited experience in manufacturing products for commercial purposes and we cannot assure you that we will be able to successfully and efficiently manage the manufacturing of our product candidates, either ourselves or through third-party contractors with whom we may enter strategic relationships.

The manufacture of cell and tissue-based therapy products, such as our product candidates, is highly complex and is characterized by inherent risks and challenges such as autologous raw material inconsistencies, logistical challenges, significant quality control and assurance requirements, manufacturing complexity, and significant manual processing. Unlike products that rely on chemicals for efficacy, such as most pharmaceuticals, cell and tissue-based therapy products are difficult to characterize due to the inherent variability of biological input materials.

Additionally, we have limited experience in manufacturing products for commercial purposes and could experience difficulties in the continued manufacturing of our product candidates. Because our experience in manufacturing, sales, marketing, and distribution is limited, we may encounter unforeseen difficulties in our efforts to efficiently manage the manufacturing, sale, and distribution of our product candidates, or have to rely on third-party contractors, over which we may not have sole control, to manufacture our product candidates. Moreover, there can be no assurance that we or any third-party contractors with whom we enter strategic relationships will be successful in streamlining manufacturing operations and implementing efficient, low-cost manufacturing capabilities and processes that will enable us to meet the quality, price, and production standards or production volumes to achieve profitability. Our failure to develop these manufacturing processes and capabilities in a timely manner could prevent us from achieving positive results of operations and cash flows.

***Our manufacturing operations in the U.S. depend primarily on one facility. If this facility is destroyed or we experience any manufacturing difficulties, disruptions, or delays, this could limit supply of our product or adversely affect our ability to sell products or conduct our clinical trials, and our business would be adversely impacted.***

All the manufacturing of our product candidates takes place at our single U.S. facility. If regulatory, manufacturing, or other problems require us to discontinue production at this facility, we will not be able to supply our product candidates to patients or have supplies for any clinical trials, which would adversely impact our business. If this facility or the equipment in it is significantly damaged or destroyed by fire, flood, power loss, or similar events, we may not be able to quickly or inexpensively replace our manufacturing capacity or replace the facility at all. In the event of a temporary or protracted loss of this facility or equipment, we might not be able to transfer manufacturing to another third party. Even if we could transfer manufacturing from one facility to another, the shift would likely be expensive and time-consuming, particularly since an alternative facility would need to comply with the cGTP or cGMP (if applicable) regulatory and quality standard requirements and, if applicable, FDA approval would be required before any products manufactured at that facility could be made commercially available.

***Our financial condition may impair our ability to obtain credit terms with our suppliers.***

Our revenues may be dependent and our reimbursement arrangement may provide us with extended payment terms. However, our financial condition may make it difficult for us to continue to receive payment terms from our suppliers or vendors making demand for adequate assurance, which could include a demand for payment-in-advance. If we are unable to obtain reasonable payment terms or if any of our material vendors or suppliers were to successfully demand payment-in-advance, it could have a material adverse effect on our liquidity.

## Risks Related to Our Common Stock

***An active trading market for our common stock may not continue to develop or be sustained.***

Although our common stock is listed on the NASDAQ Capital Market, or NASDAQ, we cannot assure you that an active, liquid trading market for our shares will continue to develop or be sustained. If an active market for our common stock does not continue to develop or is not sustained, it may be difficult for you to sell shares quickly or without depressing the market price for the shares or to sell your shares at all.

***The trading price of the shares of our common stock has been and may continue to be volatile, and you may not be able to resell some or all your shares at a desired price.***

Our stock price has been highly volatile during the fiscal year ended October 31, 2018, with closing stock prices ranging from a high of $38.97 per share to a low of $12.11 per share. The stock market in general, and the market for biotech companies in particular, have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. Because of this volatility, investors in our stock may not be able to sell their common stock at or above the price paid for the shares. The market price for our common stock may be influenced by many factors, including:

- actual or anticipated variations in our operating results;
- changes in financial estimates by us or by any securities analysts who might cover our stock;
- the timing and results of our product development plans
- failure or discontinuation of any of our development programs;
- conditions or trends in our industry;
- stock market price and volume fluctuations of comparable companies and, in particular, those that operate in the biotech industry;
- announcements by us or our competitors of significant acquisitions, strategic partnerships, or divestitures;
- developments or disputes concerning patent applications, issued patents, or other proprietary rights;
- announcements of investigations or regulatory scrutiny of our operations or lawsuits filed against us;
- capital commitments;
- investors' general perception of our company and our business;
- recruitment or departure of key personnel;
- announcements and expectations of additional financing efforts; and
- sales of our common stock, including sales by our directors and officers or specific stockholders.

In addition, in the past, stockholders have initiated class action lawsuits against biotechnology companies following periods of volatility in the market prices of these companies' stock. We are currently a party to such litigation and may be in the future due to price volatility. Such litigation could cause us to incur substantial costs and divert management's attention and resources from the operation of our business.

***If equity research analysts do not continue to publish research or reports or publish unfavorable research or reports about us, our business or our industry, our stock price and trading volume could decline.***

The trading market for our common stock is influenced by the research and reports that equity research analysts publish about us and our business. Presently we have only limited research coverage by equity research analysts. Equity research analysts may elect not to initiate or continue to provide research coverage of our common stock, and such lack of research coverage may adversely affect the market price of our common stock. We have no control over the analysts or the content and opinions included in their reports. The price of our stock could decline if one or more equity research analysts downgrade our stock or issue other unfavorable commentary or research. If one or more equity research analysts ceases coverage of our company or fails to publish reports on us regularly, demand for our stock could decrease, which in turn could cause our stock price or trading volume to decline.

***Sales of a substantial number of shares of our common stock could cause the market price of our common stock to drop significantly, even if our business is doing well.***

Sales of a substantial number of shares of our common stock in the public market could occur at any time. If our stockholders sell, or the market perceives that our stockholders intend to sell, substantial amounts of our common stock in the public market, the market price of our common stock could decline significantly.

In addition, we have filed registration statements on Form S-8 registering the issuance of shares of common stock subject to options or other equity awards issued or reserved for future issuance under our equity incentive plans. Shares registered under these registration statements on Form S-8 are available for sale in the public market subject to vesting arrangements and exercise of existing options, the grant of new options in the future, and the restrictions of Rule 144 in the case of our affiliates.

***The issuance of additional stock in connection with financings, acquisitions, investments, our stock incentive plans or otherwise will dilute all other stockholders.***

Our amended and restated certificate of incorporation authorizes us to issue up to 250,000,000 shares of common stock and up to 25,000,000 shares of preferred stock with such rights and preferences as may be determined by our board of directors (the "Board"). Subject to compliance with applicable rules and regulations, we may issue our shares of common stock or securities convertible into our common stock from time to time in connection with a financing, acquisition, investment, our stock incentive plans or otherwise. Any such issuance could result in substantial dilution to our existing stockholders and cause the trading price of our common stock to decline.

***Our executive officers and directors and their affiliates own a significant percentage of our issued and outstanding common stock and can exercise significant influence over matters submitted to stockholders for approval.***

As of January 7, 2019, our executive officers and directors and their affiliates beneficially owned approximately 42.5% of our outstanding common stock. As a result, if these stockholders were to choose to act together, they could exert a significant degree of influence over matters submitted to our stockholders for approval, as well as our management and affairs. For example, these persons, if they choose to act together, could have significant influence on the election of directors and approval of any merger, consolidation, or sale of all or substantially all our assets, including a transaction on terms that other stockholders may desire.

***Our Restated Certificate of Incorporation, our Restated Bylaws, and Delaware law could deter a change of our management, which could discourage or delay offers to acquire us.***

Certain provisions of Delaware law and of our Restated Certificate of Incorporation, as amended, and by-laws, could discourage or make it more difficult to accomplish a proxy contest or other change in our management or the acquisition of control by a holder of a substantial amount of our voting stock. It is possible that these provisions could make it more difficult to accomplish, or could deter, transactions that stockholders may otherwise consider to be in their best interests or in our best interests. These provisions include:

- we have a classified Board requiring that members of the Board be elected in different years, which lengthens the time needed to elect a new majority of the Board;
- our Board is authorized to issue up to 25,000,000 shares of preferred stock without stockholder approval, which could be issued by our Board to increase the number of outstanding shares or change the balance of voting control and thwart a takeover attempt;
- stockholders are not entitled to remove directors other than by a two-thirds vote and only for cause;
- stockholders cannot call a special meeting of stockholders;
- we require all stockholder actions be taken at a meeting of our stockholders, and not by written consent; and
- stockholders must give advance notice to nominate directors or submit proposals for consideration at stockholder meetings.

In addition, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which regulates corporate acquisitions by prohibiting Delaware corporations from engaging in specified business combinations with particular stockholders of those companies. These provisions could discourage potential acquisition proposals and could delay or prevent a change in control transaction. They could also have the effect of discouraging others from making tender offers for our common stock, including transactions that may be in your best interests. These provisions may also prevent changes in our management or limit the price that investors are willing to pay for our stock.

*A material weakness in internal control over financial reporting could have a material adverse effect on our business, results of operations, financial condition and liquidity.*

As discussed in Item 9A - *Controls and Procedures*, we have identified material weaknesses in internal control over financial reporting through our evaluation of our controls at October 31, 2018. Our material weaknesses consist of:

- insufficient internal controls related to information technology general controls in the areas of user access, user provisioning, and change management over certain systems that support the financial reporting process;
- inadequate documentation of period end financial disclosure and reporting processes;
- ineffective controls related to the documentation and completeness of the Company's stock-based compensation expense; and
- inadequate review procedures and segregation of duties over processing sales invoices.

A material weakness could result in a material misstatement of our annual or interim financial statements requiring a restatement of the affected financial statements. A material misstatement and resulting restatement entail numerous risks, including the following:

- We could be subject to civil litigation, including class action shareholder actions arising out of or relating to a restatement, which litigation, if decided against us, could require us to pay substantial judgments, settlements or other penalties;
- Negative publicity relating to a restatement may adversely affect our business and the market price of our common stock;
- Management's focus on achieving our business objectives may be diverted to addressing (i) the restatement (ii) customers', employees', investors' and regulators' questions and concerns regarding the restatement (iii) any negative impact on the Company's public image with our customers and in the financial market caused by the restatement, and (iv) any subsequent litigation that may result from the restatement;
- The SEC may review a restatement and require further amendment of our public filings; and
- We may incur significant expenses associated with preparing and filing a restatement.

Each of these risks described above could have a material adverse effect on our business, results of operations, financial condition, and liquidity.

*Because we do not anticipate paying any cash dividends on our common stock in the foreseeable future, capital appreciation, if any, will be your sole source of gains and you may never receive a return on your investment.*

You should not rely on an investment in our common stock to provide dividend income. We have not declared or paid cash dividends on our common stock to date and have no plans to pay cash dividends in the foreseeable future. We currently intend to retain our future earnings, if any, to fund the development and growth of our business. As a result, capital appreciation, if any, of our common stock will be your sole source of gain for the foreseeable future. Investors seeking cash dividends should not purchase our common stock.

*We incur costs and demands upon management because of being a public company.*

As a public company listed in the United States, we are incurring, and will continue to incur, significant legal, accounting and other costs. These costs could negatively affect our financial results. In addition, changing laws, regulations and standards relating to corporate governance and public disclosure, including regulations implemented by the SEC and stock exchanges, may increase legal and financial compliance costs and make some activities more time consuming. These laws, regulations and standards are subject to varying interpretations and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If, notwithstanding our efforts to comply with new laws, regulations and standards, we fail to comply, regulatory authorities may initiate legal proceedings against us and our business may be harmed.

Failure to comply with these rules also might make it more difficult for us to obtain some types of insurance, including directors' and officers' liability insurance, and we might be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. The impact of these events could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, on committees of our board of directors or as members of senior management

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Effective July 15, 2018, we entered into a commercial lease agreement with Salt Lake City Corporation, pursuant to which we leased approximately 44,695 rentable square feet of office space at 123 Wright Brothers Drive in Salt Lake City, Utah. The initial term of the lease is two years, and may be extended for an additional term of five years by agreement of the parties. The base rent plus maintenance fees over the two-year term of the lease is $469,288 per year, or $39,108 per month.

On December 27, 2017, we entered into a commercial lease agreement with Adcomp LLC, a Utah limited liability company, pursuant to which we leased approximately 178,528 rentable square feet of warehouse, manufacturing, office, and lab space at 1960 S. 4250 West, Salt Lake City, UT. The initial term of the lease is five years and it expires on November 30, 2022. We have a one-time option to renew for an additional five years. The initial base rent under this lease is $98,190 per month ($0.55 per sq. ft.) for the first year of the initial lease term and increases 3.0% per annum thereafter.

In May 2018, we purchased two parcels of real property in Cache County, Utah, consisting of approximately 1.75 combined gross acres of land, together with the buildings, structures, fixtures, and personal property located at 1072 West RSI Drive, Logan, Utah. This facility is used for the operation of our pre-clinical contract services business.

On October 19, 2018, we entered into an office lease with Lefrak SBN Limited Partnership, a Georgia limited partnership, covering approximately 7,250 square feet of space in the building located at 40 West 57th Street, New York, New York City. The lease is for a term of three years. The annual lease rate is $60 per square foot. Initially we will occupy and pay for only 3,275 square feet of space, and we are not obligated under the lease to pay for the remaining 3,975 square feet covered by the lease unless we elect to occupy that additional space. We have a sublease with the affiliate of one of our directors pursuant to which said affiliate will sublease 1,220 square feet at the same lease rate we pay to the landlord, and an option to expand the space occupied to an additional 2,753 square feet, which means we would be leasing 6,028 square feet from the landlord and subleasing 3,972 square feet to the affiliate of our director.

We lease office space in Hazlet, New Jersey at a cost of approximately $1,100 per month under a month to month lease agreement.

We expect that we will require additional facilities to continue our research and development program and commercialization efforts, and are actively seeking suitable locations.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**POLARITYE, INC. AND SUBSIDIARIES**

| | |
|---|---|
| By: | */s/ Denver Lough* |
| | Chief Executive Officer (Principal Executive Officer) |
| Date: | January 14, 2018 |
| By: | */s/ Paul Mann* |
| | Chief Financial Officer (Principal Financial and Accounting Officer) |
| Date: | January 14, 2019 |

68