# Exhibit 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-Q

**QUARTERLY REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended March 31, 2020**
**Commission File No. 000-51128**

# POLARITYTE, INC.

(Exact name of registrant as specified in its charter)

| DELAWARE | 06-1529524 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**123 Wright Brothers Drive**
**Salt Lake City, UT 84116**
(Address of principal executive offices)

Registrant's Telephone Number, Including Area Code: **(800) 560-3983**

(Former Name, Former Address and Former Fiscal Year, if Changed Since Last Report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, Par Value $0.001 | PTE | Nasdaq Capital Market |
| Preferred Stock Purchase Rights | | Nasdaq Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | [ ] | Accelerated filer | [X] |
| Non-accelerated filer | [ ] | Smaller reporting company | [X] |
| | | Emerging growth company | [ ] |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes [ ] No [X]

As of May 7, 2020, there were 38,463,599 shares of the Registrant's common stock outstanding.

*Commitments*

The Company has entered into employment agreements with key executives and adopted a change in control plan that contain severance terms and change of control provisions.

**13. CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

On August 21, 2019, the Company and Dr. Denver Lough, a principal shareholder and former officer and director, signed a settlement terms agreement that provides, in part, that the Company pay to Dr. Lough $1,500,000 in cash on October 1, 2019 and an additional $1,500,000 in cash in equal monthly installments beginning November 1, 2019 and ending April 1, 2021. In addition, the Company agreed to award to Dr. Lough 200,000 restricted stock units that vest in 18 equal monthly installments beginning October 1, 2019. The fair value of the restricted stock units was $0.8 million. The Company expensed the cash portion and equity portion of these awards upon Dr. Lough's termination. As of March 31, 2020, the Company has recorded a liability of $1.0 million related to future cash payments under the agreement.

In October 2018, the Company entered into an office lease covering approximately 7,250 square feet of rental space in the building located at 40 West 57th Street in New York City. The lease is for a term of three years. The annual lease rate is $60 per square foot. Initially the Company occupied and paid for only 3,275 square feet of space, and the Company is not obligated under the lease to pay for the remaining 3,975 square feet covered by the lease unless we elect to occupy that additional space. The Company believes the terms of the lease are very favorable to us, and the Company obtained these favorable terms through the assistance of Peter A. Cohen, a director, which he provided so that the company he owns, Peter A. Cohen, LLC ("Cohen LLC"), could sublease a portion of the office space.

During 2019, the Company increased the space leased from 3,275 square feet to 6,232 square feet. The Company is using 1,648 square feet, and Cohen LLC is using approximately 4,584 square feet as of March 31, 2020. The monthly lease payment for 6,232 square feet is $31,160. Of this amount $22,920 is charged pro rata to Cohen LLC based on square footage occupied. Additional lease charges for operating expenses and taxes are also charged under the sublease based on the ratio of rent paid by the Company and Cohen LLC to total rent. Once the space is fully occupied, the Company will reduce the overall annual lease rate for the Cohen LLC space to $58.60 per square foot. The Company recognized $69,000 and $51,000 of sublease income related to this agreement for the three months ended March 31, 2020 and 2019, respectively. The sublease income is included in other income, net in the statement of operations. As of March 31, 2020 and December 31, 2019, there were no amounts due from the related party under this agreement.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The discussion and analysis below includes certain forward-looking statements that are subject to risks, uncertainties and other factors, as described in "Risk Factors" in our Annual Report on Form 10-K and this report, that could cause our actual growth, results of operations, performance, financial position and business prospects and opportunities for this fiscal year and periods that follow to differ materially from those expressed in or implied by those forward-looking statements. Readers are cautioned that forward-looking statements contained in this Quarterly Report on Form 10-Q should be read in conjunction with our disclosure under the heading "Disclosure Regarding Forward-Looking Statements" below.*

**Overview**

We are a commercial-stage biotechnology and regenerative biomaterials company focused on transforming the lives of patients by discovering, designing and developing regenerative tissue products and biomaterials for the fields of medicine, biomedical engineering and material sciences. Historically, we have operated two segments: the regenerative medicine business segment and the contract research segment.

*Segment Reporting*

The regenerative medicine business segment is engaged in the commercialization of SkinTE, our first commercial product, via a sales team, the pursuit of clinical studies of SkinTE, and working on the development of Skin TE Cryo (cryopreservation of SkinTE for multiple deployments on a single patient), SkinTE POC (point-of-care device for on-site SkinTE processing and deployment), and PTE 11000 (allogenic, biologically active dressing for use in wound care). Our commercial and development activity in the regenerative medicine business segment includes the maintenance and operation of manufacturing facilities, sales and marketing, and research and development.

The contract services segment operates a preclinical research and veterinary sciences business through our subsidiary, Ibex Preclinical Research, Inc. We also offer research services to unrelated third parties on a contract basis through our subsidiary, Arches Research, Inc.

*Change in Corporate Strategy*

We recently announced a change in our strategic focus and a planned change in the regulatory pathway for SkinTE. The change in strategy is the result of a combination of the following unexpected events.

FDA Developments

Following informal, voluntary discussions between us and the United States Food and Drug Administration (FDA), and preliminary views expressed by FDA received on April 21, 2020 regarding the regulatory pathway for SkinTE, the Company believes that it is prudent to submit an investigational new drug application (IND) and thereafter a biologics license application (BLA) for SkinTE. We are in the process of arranging meetings with FDA to determine the most appropriate development plan for a BLA submission. Since 2018 we have been actively engaged in a clinical development program, which includes a completed SkinTE study in burn wounds, ongoing randomized controlled trials (RCTs) in repairing diabetic foot ulcers (DFUs) and venous leg ulcers (VLUs), and outcomes data from many of the approximately 700 SkinTE clinical cases. We intend to submit these data to FDA as potential candidates for inclusion in a clinical data package to support a BLA.

FDA has not asked us to stop marketing SkinTE pending submission or approval of a BLA. We plan to discuss with FDA the possibility of continued marketing of SkinTE as a 361 HCT/P on a limited basis at a future meeting, both until November 2020, which marks the end of a 36-month period of enforcement discretion that the Agency announced in final Guidance issued in November 2017 that it would generally observe unless there are reported or potential significant safety concerns, and beyond November 2020. It is not customary for the FDA to allow wide-spread commercial sales of a product subject to a pending BLA.

22

*Impairment of Long-Lived Assets*

The Company reviews long-lived assets, including property and equipment, intangible assets and goodwill for impairment whenever events or changes in business circumstances indicate that the carrying amount of the assets may not be fully recoverable. Factors that the Company considers in deciding when to perform an impairment review include significant underperformance of the business in relation to expectations, significant negative industry or economic trends, and significant changes or planned changes in the use of the assets. If an impairment review is performed to evaluate a long-lived asset for recoverability, the Company compares forecasts of undiscounted cash flows expected to result from the use and eventual disposition of the long-lived asset to its carrying value. An impairment loss would be recognized when estimated undiscounted future cash flows expected to result from the use of an asset are less than its carrying amount. The impairment loss would be based on the excess of the carrying value of the impaired asset over its fair value, determined based on discounted cash flows. There were no impairments of long-lived assets for any of the periods presented.

*Common Stock and Warrant Transactions*

The Company issued units consisting of common stock and warrants and subsequently remeasured those warrants at fair value. Determining the fair value of the securities in these transactions requires significant judgment, including adjustments to quoted share prices and expected stock volatility. Such estimates may significantly impact our results of operations and losses applicable to common stockholders.

**Disclosure Regarding Forward-Looking Statements**

Statements that are not historical facts contained in or incorporated by reference into this Quarterly Report on Form 10-Q are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Forward-looking statements involve risks and uncertainties that could cause actual results to differ from projected results. The words "anticipate," "goal," "seek," "project," "strategy," "future," "likely," "may," "should," "will," "believe," "estimate," "expect," "plan," "intend" and similar expressions and references to future periods, as they relate to us, are intended to identify forward-looking statements. Forward-looking statements reflect our current views with respect to future events and are subject to certain risks, uncertainties and assumptions. We cannot assure you that any of our expectations will be realized. Forward-looking statements include, among others, statements we make regarding:

- the timing or success of obtaining regulatory licenses or approvals for marketing our products;
- the initiation, timing, progress, and results of our research and development programs;
- the initiation, timing, progress, and results of our clinical trials;
- the timing for the healthcare industry to resume performing elective procedures that may impact the timing and cost of clinical trials;
- the impact of new accounting pronouncements;
- size and growth of our target markets;
- sufficiency of our working capital to fund our operations for the next 12 months;
- infrastructure required to support operations in future periods, including the expected costs thereof;
- estimates associated with revenue recognition, asset impairments, and cash flows;
- variance in our estimates of future operating costs;
- future vesting and forfeitures of compensatory equity awards;
- the effectiveness of our disclosure controls and our internal control over financial reporting; and
- our plans to remediate material weaknesses in our internal control over financial reporting.

Factors that may cause actual results to differ materially from those contemplated by such forward-looking statements include, without limitation:

- the ability to comply with regulations applicable to the manufacture, marketing, sale and distribution of our products;
- the ability to gain adoption by healthcare providers of our products for patient care;
- the ability to manufacture product to meet demand;
- the acceptance and level of reimbursement to healthcare providers for application of our products by public and private payors;

29

- the scope of protection we can establish and maintain for intellectual property rights covering our product candidates and technology;
- developments relating to our competitors and industry;
- the development of new therapies or new discoveries that render our products obsolete;
- outbreaks of disease, including the COVID-19 pandemic, and related stay-at-home orders, quarantine policies and restrictions on travel, trade and business operations;
- political and economic instability, whether resulting from natural disasters, wars, terrorism, pandemics or other sources;
- decisions made by healthcare providers regarding elective procedures and use of facilities and resources when there is a major outbreak of life-threatening infectious disease, such as COVID-19;
- the ability to pursue sales activity in the healthcare industry when there is a major outbreak of life-threatening infectious disease, such as COVID-19;
- the ability to manufacture and deliver our products if employees are quarantined due to the impact of the COVID-19;
- the ability to find and retain skilled personnel;
- the need for, and ability to obtain, additional financing in the future;
- general economic conditions;
- inaccuracies in estimates of our expenses, future revenues, and capital requirements;
- future accounting pronouncements;
- unauthorized access to confidential information and data on our information technology systems and security and data breaches; and
- factors described under "Risk Factors" in our 2019 Annual Report on Form 10-K and under Item 1A of this Quarterly Report on Form 10-Q.

We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. All forward-looking statements are expressly qualified by these cautionary statements.

**Item 3. Quantitative and Qualitative Disclosure about Market Risk**

Not applicable.

**Item 4. Controls and Procedures**

Our management, with the participation of our principal executive and financial officers, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on the evaluation of the effectiveness of our disclosure controls and procedures as of March 31, 2020, our principal executive and financial officers concluded that, as of such date, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting identified below. To address the material weakness, management performed additional analyses and other procedures to determine whether the financial statements included herein fairly present our financial results. Subject to the limitations above, management believes that the consolidated financial statements and other financial information contained in this report, fairly present in all material respects our financial condition, results of operations, and cash flows for the periods presented.

The material weakness previously identified as of December 31, 2019, continued to exist as of March 31, 2020. In 2019, we failed to execute controls relating to reconciliation procedures. In addition, we did not have a sufficient level of precision in our review procedures to detect potentially material errors in accrual and related accounts.

In the first quarter of 2020 management implemented a systemic tool to enhance the reconciliation and review procedures identified in the material weakness above. The tool has not been in operation for a sufficient period of time required for remediation. There were no other significant changes in the Company's internal control over financial reporting during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

As we continue to evaluate and work to improve our internal control over financial reporting, management may determine to take additional measures to address the material weakness. Until the remediation steps set forth above are fully implemented and operating for a sufficient period of time, the material weakness described above will continue to exist.

**PART II. OTHER INFORMATION**

**Item 1A. Risk Factors**

You should carefully consider the factors discussed in Part I, "Item 1A. Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019, which could materially affect our business, financial position, or future results of operations. The risks described in that Annual Report are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial position, or future results of operations. The risk factors set forth below update, and should be read together with, the risk factors described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

<u>Risks Related to Our Business</u>

*Public health crises, or the perception of their effects, have had and could continue to have a material adverse effect on our business and results of operations.*

We could be negatively impacted by the widespread outbreak of an illness or any other communicable disease, such as the COVID-19 pandemic, or any other public health crisis that results in economic and healthcare industry disruptions. The COVID-19 pandemic has negatively impacted the global economy, disrupted supply chains and workforce participation due to "shelter-in-place" restrictions by various governments, and created significant volatility and disruption of financial markets. To date, COVID-19 has had, and may continue to have, an adverse impact on our product sales and commercial operations. We have experienced and may continue to experience significant and unpredictable reductions in the demand for our product as healthcare customers devote medical resources and priorities to the treatment of COVID-19. Our customers may delay their customary purchasing and contracting practices during the healthcare crisis, which could contribute to the reduction in demand for our product. In addition, the American College of Surgeons, U.S. surgeon general, and other public health bodies have recommended delaying elective surgeries during the COVID-19 pandemic, and surgeons and medical societies are evaluating the risks of minimally invasive surgeries in the presence of infectious diseases, which we expect will continue to negatively impact the sale of our product.

The extent of the impact of the COVID-19 pandemic on our operational and financial performance, including our ability to execute our business strategies and initiatives in the expected time frame, will depend on future developments, including the duration and spread of the pandemic and the effect on healthcare providers and the healthcare industry; our ability to travel, distribute, and deploy SkinTE, as well as reduction in access to our customers due to stay-at-home orders, quarantine policies and restrictions on travel, trade, and business operations. These unprecedented measures to slow the spread of the virus taken by local governments and health care authorities, including the deferral of elective medical procedures and social distancing measures, will adversely affect our operations and financial results.

In addition, the COVID-19 pandemic has adversely affected, and may continue to adversely affect, the economies and financial markets of many countries, which may result in a period of regional, national, and global economic slowdown or regional, national, or global recessions that could affect decisions on healthcare spending, adversely affect the healthcare industry, and adversely affect access to capital. COVID-19 and the current financial, economic, and capital markets environment, and future developments in these and other areas present material uncertainty and risk with respect to our performance, financial condition, volume of business, results of operations, and cash flows. Due to the uncertain scope and duration of the pandemic and uncertain timing of national recovery and economic normalization, we are unable to estimate the impact on our operations and financial condition.

31

*Our wholly owned subsidiary accepted a loan under the CARES Act pursuant to the Paycheck Protection Program, or the PPP, and the loan may not be forgiven or may subject us to challenges, audits, or investigations regarding qualification for the loan, any of which could reduce our liquidity and have a material adverse effect on our business, financial condition and results of operations.*

On April 12, 2020, our subsidiary PolarityTE MD, Inc. (the "Borrower") entered into a promissory note offered by a bank (the "Lender") evidencing an unsecured loan in the amount of $3,576,145 made to the Borrower under the PPP (the "Loan"). The PPP was established under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and is administered by the U.S. Small Business Administration (the "SBA"). The interest rate on the Loan is 1.00%. Beginning seven months from the date of the Loan the Borrower is required to make 24 monthly payments of principal and interest in the amount of $150,563. The promissory note evidencing the Loan contains customary events of default relating to, among other things, payment defaults, making materially false and misleading representations to the SBA or Lender, or breaching the terms of the Loan documents. The occurrence of an event of default may result in the repayment of all amounts outstanding, collection of all amounts owing from the Borrower, or filing suit and obtaining judgment against the Borrower. Under the terms of the CARES Act, PPP loan recipients can apply for and be granted forgiveness for all or a portion of a loan granted under the PPP. Such forgiveness will be determined, subject to limitations, based on the use of loan proceeds for payment of payroll costs and any payments of mortgage interest, rent, and utilities.

No assurance is provided that the Borrower will elect to pursue forgiveness of all or a portion of the Loan or be eligible for and obtain forgiveness of all or a portion of the Loan. If the Borrower elects not to pursue or is unable to qualify for or obtain forgiveness of all or a portion of the Loan, our liquidity could be reduced and our business, financial condition and results of operations may be adversely affected.

Pursuant to the requirements under the CARES Act, in connection with the Loan, the Borrower certified that current economic uncertainty makes the Loan request necessary to support the ongoing operations of the Borrower. We believe that the Borrower made such certification in a manner consistent with SBA guidance that borrowers must make the certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business. While we believe the Borrower's prior and future certifications were and will be well supported on the dates certified, in light of the understandings of the requirements and the assessment made on the certification date, we cannot be certain that SBA or any other governmental entity or third party will concur with the Borrower, especially in light of the press scrutiny and SBA's evolving guidance and views, our change in strategy triggered, in part, on regulatory developments occurring after the Loan was made, and the eventual extent of the impact of current economic uncertainties on Borrower's operations. Further, we cannot be certain that, as a subsidiary of a public company, the Borrower might not be deemed to have improperly made the required certifications, including that current economic uncertainty makes the loan request necessary to support the ongoing operations of the Borrower, taking into account the Borrower's current business activity and ability to access other sources of liquidity sufficient to support its ongoing operations in a manner that is not significantly detrimental to the business.

Subsequent to the Borrower's application for the loan, SBA issued various interpretive guidelines in connection with the PPP, including guidance on how SBA interprets certain of the certification requirements. One of the interpretations appears to be in response to various press reports that well-established or well capitalized private and public companies were able to secure PPP loans that were meant for smaller companies. SBA's interpretive guidelines published on April 23, 2020 set forth that public companies with substantial market value and access to capital markets would likely not qualify to participate in the PPP and SBA advised any such public company to be prepared to provide the basis for the certifications upon SBA request. Subsequently, on April 28, 2020 the Secretary of the Treasury and SBA announced that the government will conduct a full audit of all PPP loans of more than $2 million for which the borrower applies for forgiveness. As the Borrower expects it will be audited or reviewed by SBA or the U.S. Department of the Treasury if it files an application for forgiveness, and, whether or not it elects to seek forgiveness of all or part of the loan, it could be subject to investigation, audit or other review by governmental agencies or claims by third parties, with respect to whether it qualified for an SBA loan, or whether the certifications it made to obtain the Loan are accurate, or other matters. There is a risk that any such audit, review, investigation or claim could result in the diversion of our management's time and attention, the need to incur significant legal expenses and the possibility that we will sustain reputational injury. If the Borrower were to be audited, investigated, reviewed or subject to suit and if there is any adverse finding in such audit, investigation, review or suit or if the Borrower were alleged, or determined, not to qualify for the Loan or alleged, or found, to have made false certifications in connection with the Loan, the Borrower could be required to return the full amount of the Loan, which would reduce its liquidity, and would subject it to fines and penalties, and exclusion from government contracts. In particular, the Borrower may become subject to actions under the federal False Claims Act, or the FCA, including its qui tam provisions, which, among other things, prohibits persons from knowingly filing, or knowingly causing to be filed, a false statement, or knowingly using a false statement, to obtain payment from the federal government. Violations of the FCA are subject to treble damages and penalties. In the case of an SBA loan, the government could allege that single damages are the amount of the loan and interest thereon (or more), which under the FCA could then be trebled. Substantial penalties must also be imposed for each submitted false statement when a defendant loses an FCA trial. FCA cases may be initiated by the U.S. Department of Justice or by private persons or entities, often called "whistleblowers," who bring the action on behalf of the United States. The Borrower may also face enforcement arising under other federal statutes, including criminal laws, and administrative actions and investigations initiated by SBA or other governmental entities. Furthermore, if the Borrower is identified as an entity that the media, government officials or others seek to portray as a business that should not have availed itself of PPP funding, the Borrower may face negative publicity, which could have a materially adverse impact on its business and operations and on our business and operations as its parent.

**Risks Related to Registration or Regulatory Approval of Our Product Candidates and Other Government Regulations**

***Our business is subject to continuing regulatory oversight by the FDA and other authorities, whose requirements are costly to comply with, and our failure to comply could result in negative effects on our business.***

The FDA has specific regulations governing human cell, tissue, and cellular and tissue-based products, commonly known as "HCT/Ps". The FDA has broad post-market and regulatory and enforcement powers. The FDA's regulation of HCT/Ps includes requirements for registration and listing of products, donor screening and testing, processing and distribution ("Current Good Tissue Practices" or "cGTP"), labeling, record keeping, adverse-reaction reporting, inspection, and enforcement.

When SkinTE was registered and listed with the FDA, we believed SkinTE was appropriately regulated solely under Section 361 of the Public Health Service Act and Part 1271 of Title 21 of the Code of Federal Regulations (i.e., as a so-called "361 HCT/P") and that, as a result, no premarket review or approval by the FDA was required. We still believe that SkinTE is appropriately regulated as a 361 HCT/P. However, following informal, voluntary discussions between FDA and the Company, and preliminary views expressed by FDA received on April 21, 2020, we believe that the FDA may disagree with our interpretation if we sought a formal designation of SkinTE's regulatory classification, and that it therefore is prudent to pursue a strategy to file an investigational new drug application ("IND") and thereafter a biologics license application ("BLA") for SkinTE. While we could pursue a formal designation, and we could potentially challenge FDA's formal designation administratively or in court if we disagreed with their interpretation of the regulations, that would be a lengthy and costly process that would put us in a highly adversarial position vis-à-vis the FDA. Moreover, courts give deference to administrative agencies' interpretations of governing regulations, and an adverse formal decision from either FDA or a federal court, or both, could have significant negative consequences on our ability to continue our collaborative relationship with the FDA.

FDA has not asked us to stop marketing SkinTE at this time, but we could be required to withdraw SkinTE from the market until the required clinical trials are complete and the applicable premarket regulatory clearances or approvals are obtained. Manufacturers of new drugs, biologics, and some medical devices must complete extensive clinical trials, which must be conducted pursuant to an effective IND or investigational device exemption (IDE). In addition, the FDA must review and approve a BLA or new drug application before a new drug or biologic may be marketed and must approve or clear most medical devices prior to marketing.

The preliminary assessment by the FDA that SkinTE appears to be a biological product that would be regulated under Section 351 of the Public Health Service Act will negatively impact our commercialization of the product and substantially increase the cost to us of regulatory compliance, all of which could adversely affect our results of operations and financial condition. This same risk applies to any other product we may develop that we believe should be regulated as a 361 HCT/P but where the FDA may disagree with our interpretation of the applicable regulations.

33

Some of the future new products and enhancements of existing products that we expect to develop and market may not be 361 HCT/Ps, and may require premarket approval or clearance from the FDA. As a result, those product candidates would be subject to additional regulatory requirements, including premarket approval or clearance. There can be no assurance, however, that approval or clearance will be granted with respect to SkinTE, any such products, or enhancements of existing products. Such products or enhancements may encounter significant delays during FDA's premarket review process that would adversely affect our ability to market such products or enhancements.

Even if premarket approval or clearance are obtained from the FDA, the approvals or clearances may contain substantial limitations on the indicated uses of such products and other uses may be prohibited. Product approvals by the FDA can also be withdrawn due to failure to comply with regulatory standards or the occurrence of unforeseen problems following initial approval. Furthermore, the FDA could limit or prevent the distribution of products, and the FDA has the power to require the recall of such products. FDA regulations depend heavily on administrative interpretation, and there can be no assurance that future interpretations made by the FDA or other regulatory bodies will not adversely affect our operations. In addition, regulatory clearance or approval is subject to continuing compliance with regulatory standards, including the FDA's current good manufacturing practice (cGMP) or quality system regulations and adverse event reporting regulations, and additional clearance, approval, or regulatory reporting may be needed for changes made to products following their initial clearance or approval.

If we fail to comply with the FDA regulations regarding our products and manufacturing processes, the FDA could initiate or take formal enforcement action or other actions, including, without limitation, any of the following:

- Untitled letters, warning letters, fines, injunctions, consent decrees, product seizures, or civil penalties;
- Operating restrictions, partial suspension or total shutdown of clinical studies, manufacturing, marketing, or distribution;
- Orders to recall or destroy products.
- Refusing requests for clearance or approval of new products, processes, or procedures, or for certificates or approval to enable export of the same;
- Withdrawing or suspending current applications for approval or clearance, or any approvals or clearances already granted; and
- Civil or criminal prosecution.

It is likely that the FDA's regulation of 361 HCT/Ps and other types of products (e.g., drugs, devices, or biologics) will continue to evolve in the future. Complying with any such new regulatory requirements, guidance or statutes may entail significant time delays and expense, which could have a material adverse effect on our business. While the FDA may issue new or revised guidance or regulations for 361 HCT/Ps, drugs, devices, or biologics, we do not know whether or when such revised draft or final guidance or regulations (if any) will be issued, the scope of such guidance, any new rules or regulations, whether they will apply to our technologies or products, or whether they will be advantageous or disadvantageous to us. In addition, even if it does not issue new regulations or guidance, the FDA could in the future adopt more restrictive interpretations of existing regulations or increase its enforcement activity, which may adversely affect our business.

***Our failure to comply with the regulatory guidelines set forth by the FDA with respect to our product candidates could delay or prevent the completion of market entry, clinical trials, the approval or registration of any product candidates, or the commercialization of our product candidates.***

We are subject to regulation and inspection by the FDA for cGTP compliance with respect to our 361 HCT/P products, and we will need to transition to cGMP manufacturing for SkinTE as we pursue a BLA. To the extent that products we develop are not regulated as 361 HCT/Ps, in addition to cGTP, we will be subject to regulation under cGMP as well as to FDA premarket approval or clearance requirements. Complying with cGTP and cGMP requires that we expend time, money, and effort in production, recordkeeping, and quality control to assure that the product meets applicable specifications and other requirements. For any products for which we are required to obtain FDA premarket approval, we must also pass a pre-approval inspection prior to FDA approval or clearance. Failure to pass a pre-approval inspection may significantly delay FDA approval of our product candidates. If we fail to comply with these requirements, we would be subject to possible regulatory action and may be limited in the jurisdictions in which we are permitted to sell our product candidates. As a result, our business, financial condition, and results of operations may be materially harmed.

The manufacture of cell and tissue-based therapy products, such as our product candidates, is highly complex and is characterized by inherent risks and challenges such as autologous raw material inconsistencies, logistical challenges, significant quality control and assurance requirements, manufacturing complexity, and significant manual processing. Unlike products that rely on chemicals for efficacy, such as most pharmaceuticals, cell and tissue-based therapy products are difficult to characterize due to the inherent variability of biological input materials.

Additionally, we have limited experience in manufacturing products for commercial purposes and could experience difficulties in the continued manufacturing of our product candidates, either ourselves or through third-party contractors with whom we may enter strategic relationships. Because our experience in manufacturing, sales, marketing, and distribution is limited, we may encounter unforeseen difficulties in our efforts to efficiently manage the manufacturing, sale, and distribution of our product candidates, or have to rely on third-party contractors, over which we may not have sole control, to manufacture our product candidates. Moreover, there can be no assurance that we or any third-party contractors with whom we enter strategic relationships will be successful in streamlining manufacturing operations and implementing efficient, low-cost manufacturing capabilities and processes that will enable us to meet the quality, price, and production standards or production volumes necessary to achieve profitability. Our failure to develop these manufacturing processes and capabilities in a timely manner could prevent us from achieving positive results of operations and cash flows.

***Even if the FDA regulates any of our products as 361 HCT/P, we must still generate adequate substantiation for any claims we will make in our marketing. Failure to establish such adequate substantiation in the opinion of federal or state authorities could substantially impair our ability to generate revenue.***

Even if we are permitted to continue marketing SkinTE for some period of time before making a submission to the FDA for premarket approval, we still must generate adequate substantiation for claims we make in our marketing materials. Both the Federal Trade Commission ("FTC") and the states retain jurisdiction over the marketing of 361 HCT/Ps (and other) products in commerce and require a reasonable basis for claims made in marketing materials, and FDA has similar requirements for the labeling and promotion of HCT/Ps that are also considered drugs, biologics, or medical devices. Through clinical use, case studies, clinical studies, as well as other endeavors, we intend to generate such adequate substantiation for any claims we make about our products. If, however, after we commence marketing of any of our products, including SkinTE, the FTC, FDA or one or more states conclude that we lack adequate substantiation for our claims, we may be subject to significant penalties, or may be forced to alter our marketing approach in one or more jurisdictions. Any of this could materially harm our business.

***Even if any of our products meet the criteria for a 361 HCT/P, they will be subject to ongoing regulation. We could be subject to significant penalties if we fail to comply with these requirements, which would adversely affect our results of operations.***

If one or more of our products meets the criteria for a 361 HCT/P or we are able to continue marketing SkinTE before receiving BLA approval, we would still be subject to numerous post-market requirements, including those related to registration and listing, record keeping, labeling, cGTP, donor eligibility, deviation and adverse event reporting, and other activities. HCT/Ps that do not meet the definition of a 361 HCT/P are also subject to these or additional obligations. If we fail to comply with these requirements, we could be subject to, without limitation, warning letters, product seizures, injunctions, or civil and criminal penalties. We have established our own processing facility, which we believe is cGTP compliant. Any failure by us to maintain cGTP compliance would require remedial actions, which could potentially include actions such as delays in distribution and sales of our product, as well as enforcement actions.

35

***Clinical trials can be long and expensive, and results are ultimately uncertain, which could jeopardize PolarityTE's ability to obtain regulatory approval for its SkinTE product.***

PolarityTE will likely be required to perform one or more clinical trials for SkinTE under FDA's statutory requirements to obtain approval of a BLA for the product. Clinical trials can be expensive, can take several years to execute, and are subject to factors within and outside of PolarityTE's control. The outcomes of clinical trials are uncertain. PolarityTE has not yet submitted an IND to FDA to conduct clinical trials to support a BLA for SkinTE. PolarityTE has two ongoing randomized controlled clinical trials—one in diabetic foot ulcers (DFUs) and one in venous leg ulcers (VLUs)—that were being conducted with SkinTE as a 361 HCT/P. While those trials are being conducted pursuant to protocols approved by an institutional review board (IRB), we do not know whether data from those trials or other clinical investigations previously conducted with SkinTE will be able to be used as part of a clinical data package for a SkinTE BLA submission.

PolarityTE will likely need to ensure compliance with applicable regulations for a BLA submission by transitioning its quality system to 21 CFR Parts 210/211 and 600-610 regulations with the FDA. Final determination of regulatory compliance with 21 CFR Parts 210/211 and 600-610 would be made during FDA's pre-license inspection as part of the BLA review. If the FDA is unable to agree with PolarityTE, or PolarityTE is unable to meet the standards required of it by the FDA, regarding preclinical studies, clinical studies and chemistry, manufacturing and controls, the approval of any BLA would not occur or would be delayed.

The results of non-clinical studies do not necessarily predict future clinical trial results and predecessor clinical trial results may not be repeated in subsequent clinical trials. Additionally, the FDA may disagree with PolarityTE's interpretation of the data from its non-clinical studies and clinical trials, and may require the company to pursue additional non-clinical studies or clinical trials, or not approve any BLA that PolarityTE may submit. If PolarityTE is unable to demonstrate the safety and efficacy of its product through its clinical trials, it will be unable to obtain regulatory approval to market SkinTE as a licensed biologic.

***PolarityTE will rely on third parties to conduct its clinical trial and they may not perform as contractually required or expected.***

PolarityTE may rely on third parties, such as contract research organizations ("CROs"), medical institutions, clinical investigators and contract laboratories to conduct its clinical trials and potentially certain nonclinical studies to support a BLA for SkinTE. PolarityTE and its CROs are also required to comply with all applicable regulations governing nonclinical and clinical research, including good laboratory practice ("GLP") and good clinical practice ("GCP"). The FDA enforces these regulations through periodic inspections of trial sponsors, principal investigators, CROs and trial sites. If PolarityTE or its CROs fail to comply with applicable FDA regulations, the data generated in clinical trials may be deemed unreliable and the FDA may require PolarityTE to perform additional clinical trials before approving its applications. PolarityTE cannot be certain that, upon inspection, the FDA and similar foreign regulatory authorities will determine that PolarityTE's clinical trials comply or complied with clinical trial regulations, including GCP. In addition, PolarityTE's clinical trials in support of a BLA may need to be conducted with product produced under applicable cGMP regulations. Failure to comply with the clinical trial regulations may require PolarityTE to repeat clinical trials, which would delay the regulatory approval process. If these third parties do not successfully carry out their contractual duties or regulatory obligations or meet expected deadlines, if these third parties need to be replaced, or if the quality or accuracy of the data they obtain is compromised due to the failure to adhere to PolarityTE's clinical protocols or regulatory requirements or for other reasons, PolarityTE's non-clinical development activities or clinical trials may be extended, delayed, suspended or terminated, and it would not be able to obtain regulatory approval for its products on a timely basis, if at all, and its business, results of operations, financial condition and growth prospects would be adversely affected. Furthermore, PolarityTE's third party clinical trial investigators may be delayed in conducting its clinical trials for reasons outside of their control.

36

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**POLARITYTE, INC.**

Date: May 11, 2020

/s/ David Seaburg

David Seaburg
Chief Executive Officer
Duly Authorized Officer

Date: May 11, 2020

/s/ Jacob Patterson

Jacob Patterson
Interim Chief Financial Officer
Chief Accounting Officer

38