Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email:  pkim@rosenlegal.com
       jstern@rosenlegal.com
       nmanningham@rosenlegal.com

*Counsel for Plaintiffs*

Mark F. James (5295)
Mitchell A. Stephens (11775)
**JAMES DODGE RUSSELL &
STEPHENS P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Fax: (801) 363-6666
Email: mjames@jdrslaw.com
      mstephens@jdrslaw.com

*Local Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| MARC RICHFIELD, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>v.<br><br>POLARITYTE, INC., DENVER LOUGH, DAVID SEABURG, JACOB PATTERSON, PAUL MANN, and RICHARD HAGUE,<br><br>          Defendants. | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Case No. Case No. 2:21-cv-00561-BSJ<br><br>Hon. Bruce S. Jenkins |

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................................................. 1

II.    FACTUAL BACKGROUND.................................................................................. 1

    A.    SkinTE ..................................................................................................... 1

    B.    Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products 2

    C.    PolarityTE Incorrectly Registers SkinTE as a 361 HCT/P.................................. 3

    D.    SkinTE Was Not a 361 HCT/P .......................................................... 4

    E.    Lough Silenced Discussions Regarding Risks ........................................ 5

    F.    Board of Directors Abruptly Removes CEO Lough............................................ 6

    G.    FDA's July 2018 Inspection of PolarityTE's Facility .......................................... 7

    H.    The Truth is Revealed .......................................................... 10

III.    ARGUMENT.......................................................................................... 12

    A.    LEGAL STANDARD .......................................................................... 12

    B.    THE COMPLAINT ALLEGES MATERIALLY FALSE STATEMENTS.... 12

      1.    The Complaint Alleges the Falsity of Defendants' Statements that SkinTE is not Properly Registered Under Section 361 ......................................................13

      2.    The Complaint Alleges the Falsity of the Form 483 Statements ......................14

        a.    Defendants Improperly Rely on Arbitrarily Redacted Documents Outside the Pleadings.......................................................................... 14

        b.    The Redacted Clinical Hold Letter Does Nothing to Undercut the Falsity of Defendants' Statements.......................................................... 15

        c.    Defendants' Statements of Opinion Were Actionable For Failing to Disclose the Deficiencies the FDA Identified................................................ 16

        d.    Defendants' Statements are not Puffery........................................ 17

      3.    Defendants' Statements Regarding the Termination of Enforcement Discretion Are Misleading..........................................................................18

4.      **Defendants' Statements Should not Be Dismissed as Forward Looking** ........19

C.      **THE COMPLAINT ALLEGES SCIENTER** ...................................................... 22

1.      **Defendants had Scienter With Respect to the 361 Statements and the 483 Statements** ..................................................................................................22

2.      **Defendants had Scienter for the Enforcement Discretion Statements** ............26

3.      **Confidential Witness Allegations Support Scienter** ..........................................26

4.      **The Form 483 Supports a Strong Inference of Scienter** ....................................27

5.      **Defendants had Motive to Commit Fraud** ........................................................28

6.      **The Fact that Lough was Warned that SkinTE was not Properly Registered under Section 361 Supports Scienter** ..................................................................29

7.      **The Fact that Lough Invented SkinTE Supports Scienter** ................................29

8.      **Defendants' Positions Support Scienter** ...........................................................30

9.      **Lough's Firing Supports Scienter** ....................................................................30

10.      **The Small Size of the Company Supports Scienter** ...........................................31

11.      **The Core Operations Doctrine Supports Scienter** ............................................32

12.      **The Allegations Taken Together Create a Strong Inference of Scienter** ........32

D.      **THE COMPLAINT ALLEGES LOSS CAUSATION** ...................................... 33

1.      **The Complaint Alleges that the Disclosures were Corrective** .........................33

2.      **The Complaint Alleges that the Fraud Caused the Loss** ..................................34

E.      **THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY** .............. 35

IV.      **CONCLUSION** .......................................................................................................... 35

**TABLE OF AUTHORITIES**     **Page(s)**

**Cases**

*Abrams v. MiMedx Grp., Inc.*,
   37 F. Supp. 3d 1271 (N.D. Ga. 2014) ................................................................................ 25

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ............................................................................. 13, 22, 30

*Angelos v. Tokai Pharms.*, Inc.,
   494 F. Supp. 3d 39 (D. Mass. 2020) ................................................................................. 24

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ............................................................................. 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................................ 12

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
   2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .................................................................. 34

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010) ............................................................................... 23

*Dura Pharm. Inc., v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................................... 33

*Exkae Ltd. v. Domo, Inc.*,
   2020 WL 7352735 (D. Utah Dec. 15, 2020) ..................................................................... 14

*FindWhat Inv. Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ......................................................................................... 18

*Fort Worth Employers' Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009) ............................................................................... 35

In re Able Lab'ys Sec. Litig,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008) ....................................................................... 28

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................... 23

*In re Amarin Corp. PLC.*,
   2015 WL 3954190 (D.N.J. June 29, 2015) ....................................................................... 31

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................................ 29

*In re Amylin Pharms., Inc. Sec. Litig.*,
   2003 WL 21500525, n3 (S.D. Cal. May 1, 2003) ............................................................ 19

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018) ............................................................................... 24

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
   2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) ................................................................. 24

*In re Atossa Genetics Inc Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ............................................................................................. 21

*In re Bristol-Myers Squibb Sec. Litig.*,
   2005 WL 2007004 (D.N.J. Aug. 17, 2005) ....................................................................... 29

*In re Cryolife, Inc.*,
   2003 WL 24015055 (N.D. Ga. May 27, 2003) .................................................................. 28

iii

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
  519 F. Supp. 3d 99 (E.D.N.Y. 2021) ................................................................. 18
*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .............................................................. 35
*In re Genzyme Corp. Sec. Litig.*,
  754 F.3d 31 (1st Cir. 2014) ............................................................................... 26
*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .......................................................................... 33
*In re Gold Res. Corp. Sec. Litig.*,
  776 F.3d 1103 (10th Cir. 2015) ........................................................................ 31
*In re Lattice Semiconductor Corp. Sec. Litig.*,
  *2006 WL 538756 (D. Or. Jan. 3, 2006)* .......................................................... 23
*In re Lernout & Hauspie Sec. Litig.*,
  208 F. Supp. 2d 74 (D. Mass. 2002) ................................................................. 27
*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ........................................................................ 17
*In re Mammoth Energy Servs., Inc. Sec. Litig.*,
  No. CIV-19-522-J, 2021 WL 1851037 (W.D. Okla. Jan. 26, 2021)..................... 30
*In re Molycorp, Inc. Sec. Litig..*,
  157 F. Supp. 3d 987 (D. Colo. 2016)................................................................. 32
*In re Myriad Genetics, Inc.*,
  2021 WL 977770 (D. Utah Mar. 16, 2021) ............................................. 25, 27, 29
*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. July 13, 2020)..................................................... 35
*In re NPS Pharms., Inc. Sec. Litig.*,
  2007 WL 1976589 (D. Utah July 3, 2007) ......................................................... 20
*In re PTC Therapeutics, Inc. Sec. Litig.*,
  2017 WL 3705801 (D.N.J. Aug. 28, 2017) ........................................................ 32
*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017) ..................................................................... 20, 21
*In re SemGroup Energy Partners, L.P.*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010), *on reconsideration in part* ............... 22, 32
*In re Sepracor, Inc. Sec. Litig.*,
  308 F. Supp. 2d 20 (D. Mass. 2004) ................................................................. 19
*In re Sprint Corp. Sec. Litig.*,
  232 F. Supp. 2d 1193 (D. Kan. 2002)................................................................ 21
*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010)................................................................ 32
*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 27
*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ..................................................... 31
*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996)................................................................................ 18
*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003).......................................................... 22, 29

iv

*In re Williams Sec. litigation-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ......................................................................... 35
*Jacobsen v. Deseret Book Co.*,
    287 F.3d 936 (10th Cir. 2002) ........................................................................... 14
*Johnson v. Pozen Inc.*,
    2009 WL 426235 (M.D.N.C. Feb. 19, 2009) ..................................................... 19
*Kessman v. Myriad Genetics, Inc.*,
    2019 WL 1330363 (D. Utah Mar. 25, 2019) ..................................................... 33
*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ....................................................................... 21, 34
*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ............................................................................. 20
*Medina v. Clovis Oncology, Inc.*,
    215 F. Supp. 3d 1094 (D. Colo. 2017) ............................................. 21, 25, 29, 32
*Mishkin v. Zynex Inc.*,
    Civil Action No. 09-cv-00780-REB-KLM, 2011 U.S. Dist. LEXIS 34467 (D. Colo. Mar. 30,
    2011) ................................................................................................................. 21
*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ......................................................................... 33
*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................. 17
*Ok*emos Home, LLC v. LGF Produce, LLC,
    2019 WL 12248966 (D. Colo. Mar. 27, 2019) ................................................... 31
*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015) .................. 13, 16, 17, 30
*Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019) ............................................................... 29
*Ratner v. Ovascience, Inc.*,
    134 F. Supp. 3d 621 (D. Mass. 2015) ................................................................ 25
*Schaeffer v. Nabriva Therapeutics plc*,
    2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) .................................................... 28
*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ........................................................................... 21
*Solomon v. Sprint Corp.*,
    2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) ..................................................... 34
*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................... 22
*U.S. ex rel. Williams v. Renal Care Grp., Inc.*,
    696 F.3d 518 (6th Cir. 2012) ............................................................................. 23
*United States ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*,
    2020 WL 1322790 (S.D. Ohio Mar. 20, 2020) .................................................. 23

**Statutes**

15 U.S.C. § 78u–4 ..................................................................................................... 13
15 U.S.C. § 78u-5 ................................................................................................. 19, 20

## I.  INTRODUCTION

PolarityTE is a biotech startup that pinned its success on marketing its first product, SkinTE, directly to the public without first going through FDA approval by registering the product under a section of the regulations that it did not qualify for. Though it was widely known within the company that this was improper, their obstinate CEO refused to allow any discussion of correctly registering the product. When he was abruptly removed, the company changed course, but ultimately botched their new drug application with the FDA, failing to correct issues that the FDA identified years ago. All the while, they concealed this from investors. When, ultimately, the FDA issued a clinical hold letter, their fraud was revealed. Defendants' motion is without merit. They attempt to challenge falsity with matters outside the pleadings. They analyze scienter piecemeal, instead of holistically, and they demand that plaintiffs disaggregate loss causation at the pleading stage, something that the courts do not require. Their motion should be denied.

## II.  FACTUAL BACKGROUND

### A.  SkinTE

PolarityTE's first product is SkinTE, which is intended to repair, reconstruct, replace, and supplement skin in patients who need treatment for acute or chronic wounds, burns, surgical reconstruction events, scar revision, or removal of dysfunctional skin grafts. ¶53. SkinTE is meant primarily to replace the current standard of care: split-thickness skin grafts ("STSGs"). ¶55. PolarityTE claims that SkinTE produces results that are superior to STSGs. ¶56. The process for SkinTE starts with collection of a skin sample from the patient. ¶57. The sample is used to manufacture SkinTE into a white paste that goes back to the doctor in a syringe. *Id.* The doctor then spreads SkinTE evenly across the entire surface of the wound. SkinTE engrafts within the

1

wound, expands and regenerates skin across the entire surface. *Id.*

**B.       Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products**

The FDA regulates Human Cell, Tissue, and Cellular and Tissue-Based Products ("HCT/Ps") like SkinTE, under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") and the Public Health Service Act (the "PHS Act"). ¶59. HCT/Ps are subject to varying degrees of regulation, depending on if they fall within Section 361 of the PHS Act or if they fall under Section 351 of the PHS Act. ¶60. HCT/Ps regulated under Section 361 (a "361 HCT/P") are exempt from premarket review and approval by the FDA. ¶61. Manufacturers are not required to consult with the FDA and can market their products based on their conclusion that their product meets the criteria. ¶64. If the HCT/P does not meet the criteria, the FDA regulates the HCT/P as a drug, device, and/or biological product under Section 351 of the PHS Act (a "351 HCT/P"). ¶65.

To market a 351 HCT/P, company must obtain a biologics license, which the FDA only issues after it determines that the manufacturing facility and the biological products meet applicable requirements to ensure continued safety, purity, and potency of such products. ¶68. Manufacturers must demonstrate safety and potency through clinical trials. *Id.* Before commencing trials, the sponsor must have an Investigational New Drug ("IND") application approved. *Id.* Once an IND application is approved, the manufacturer may begin clinical testing. *Id.* If the testing shows the product is safe and effective, it is submitted as part of a Biologics License Application ("BLA"). ¶70. Only after the license is approved may the manufacturer market the product. *Id.*

In November 2017, the FDA announced a three-year period of enforcement discretion for all HCT/Ps. ¶71. This "grace period" was meant to give all manufacturers time to engage with the FDA to determine whether they met the Section 361 requirements, or if they needed to file an IND

2

application or marketing application with the FDA, and if so, time to prepare and submit an application. This grace period applied to all HCT/P manufacturers. *Id.* During this period, manufacturers could obtain a recommendation or decision from the FDA about the classification of an HCT/P by: requesting a recommendation from the Tissue Reference Group ("TRG"), submitting a Request for Designation ("RFD") to the Office of Combination Products ("OCP"), or submitting a Pre-RFD to OCP. The TRG recommendation process is informal and results in non-binding responses. ¶72. The Pre-RFD process also generates non-binding feedback. However, submitting a RFD results in a formal agency decision regarding the classification of the HCT/P. *Id.* The policy was initially to end in November 2020. However, on July 20, 2020, the FDA extended the enforcement discretion period to May 31, 2021, due to challenges presented by COVID-. ¶74.

### C.    PolarityTE Incorrectly Registers SkinTE as a 361 HCT/P

On August 14, 2017, PolarityTE registered SkinTE under 361. ¶75. PolarityTE launched a commercial rollout of SkinTE in November 2017. *Id.* PolarityTE did not consult the FDA when making its determination that SkinTE was properly registered as a 361 HCT/P. ¶76. Regulating SkinTE as a 361 HCT/P was crucial to PolarityTE's value proposition. ¶77. For example, in PolarityTE's Annual Report for the fiscal year ended October 31, 2017, (the "2017 10-K"), PolarityTE promoted the 361-pathway as a "competitive strength[]," stating, in pertinent part:

> ***Efficient Regulatory Pathway***. We believe our products and product candidates, including SkinTE, are appropriately regulated by the FDA as 361 HCT/Ps, which provides us with the potential to register and list products with the FDA, and begin commercializing quickly and efficiently.

Similarly, PolarityTE explained that "full commercial launch of SkinTE" was key to its growth strategy. ¶78.

3

**D.      SkinTE Was Not a 361 HCT/P**

However, SkinTE did not meet the requirements of Section 361. ¶79. The SkinTE manufacturing process involved manipulating the skin and combining it with other articles to create a paste that would be applied to a patient's wound. *Id.* The manipulation of the skin and addition of other articles are both prohibited under Section 361. *Id.* In order to qualify as a 361 HCT/P, a product must be "minimally manipulated." ¶80. Minimal manipulation means: "[f]or structural tissue, processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement…." *Id.* SkinTE does not meet the definition of "minimally manipulated" of structural tissue because the procedure behind SkinTE no longer allows the product to maintain "the original relevant characteristics." ¶81. During the manufacturing process, the skin is processed into a paste. Thus, it is no longer a protective covering, nor does the paste retain skin's dense, strong, and flexible layer of tissue. *Id.*

On November 16, 2017, the FDA issued guidance to HCT/Ps outlining the requirements for minimal manipulation and homologous use. ¶82. The guidance provided an example of processing skin that is more than minimal manipulation:

> A manufacturer processes skin by removing the epidermis and then grinding the dermis into particles. The HCT/P generally is considered more than minimally manipulated because the processing alters the original relevant characteristics of skin related to its utility as a protective covering.

Under this guidance, SkinTE is clearly more than minimally manipulated. SkinTE transforms a skin sample into a white paste. ¶83.

Lough published two papers that explained his invention uses growth factors. Both papers explain that the research behind the PolarityTE patents involve culturing with fetal bovin serum— which contains a collection of growth factors—as well as endothelial growth factor and basic

4

fibroblast growth factor. ¶86. Products similar to SkinTE are registered under Section 351. ¶87.

Vericel's product Epicel is a close competitor to SkinTE and has been on the market for 20 years.

The process for Epicel is similar to SkinTE. *Id.* Epicel was approved under 351.

### E.    Defendant Lough Silenced Discussions Regarding Risks

Lough knew that SkinTE did not qualify as a 361 HCT/P. ¶88. As the inventor, he

understood that the manufacturing process manipulated the skin in a way that was not allowed

under Section 361. *Id.* However, Lough silenced any opposition, according to AW1.[1] AW1 was the

Senior Director of Clinical and Translational Science at PolarityTE from June 2018 until June

2020. ¶89. During her time at PolarityTE, she reported to the Chief Medical Officer, including Ned

Swanson. Dr. Swanson was the Co-Founder of PolarityTE, serving as PolarityTE's COO from

December 2016 to April 2019, the Chief Translational Medicine Officer from April 2019 to

January 2020, and the CMO from January 2020 to May 2021. *Id.* AW1 had a relationship with

Defendant Lough for years before PolarityTE, working together at Georgetown Medical Center. *Id.*

When Lough founded PolarityTE, he asked AW1 to join him at PolarityTE. *Id.* AW1 said that

Lough refused to consider the possibility that SkinTE was not properly registered as a 361 HCT/P.

*Id.* Lough was "pretty arrogant about what their regulatory status was." *Id.* One investor who "had

taken a massive position" tried to convince Lough to have PolarityTE conduct clinical trials for an

eventual BLA, just in case the FDA later disagreed with the 361 HCT/P classification." *Id.* Lough

did not like to hear anyone tell him the product did not fit the 361 category and, if anyone

disagreed with him, Defendant Lough would "chop their head off." *Id.* Lough was adamant that

SkinTE was a 361 HCT/P and "was very head strong from the very beginning about not pursuing

---

[1] All references to AW refer to anonymous witnesses contacted by Plaintiffs' investigator. All references to AW use the pronoun "she" regardless of gender to preserve anonymity.

the BLA, and sticking to their guns about being a 361 [HCT/P]." ¶90.

**F.      The Board of Directors Abruptly Removes Lough**

On May 31, 2019, independent members of the Board of Directors placed Lough on indefinite paid leave. ¶91. That day, PolarityTE established the Office of the Chief Executive, consisting of Richard Hague, Chief Operating Officer, Paul Mann, Chief Financial Officer, and David Seaburg, President of Corporate Development. ¶92. According to PolarityTE, "The Office of Chief Executive will address the immediate business needs of the Company as the Company transitions from product development of SkinTE™ to product commercialization." *Id.*

On August 12, 2019, Lough sent PolarityTE a demand claiming that actions taken by the Board to place him on leave was wrongful. ¶94. On August 21, 2019, PolarityTE and Lough settled, and on August 26, Lough resigned. That day, Seaburg was appointed President. ¶95. After Lough's abrupt firing, the SEC sent PolarityTE a subpoena for documents concerning the circumstances under which PolarityTE placed Lough on paid administrative leave. ¶97.

After Lough's termination, employees were able to openly discuss that SkinTE was improperly registered. ¶98. AW3, a Quality Engineer confirmed this. *Id.* AW3 reported to the Executive Director of Quality. AW3 stated that employees began discussing in summer or fall of 2019 that SkinTE might be registered under the "wrong section" and PolarityTE might need to submit to the FDA. According to AW3, these discussions occurred with directors and vice presidents in Regulatory, Quality, Manufacturing, and R&D, who attended meetings to discuss the regulatory change. *Id.* By December 2019, the conversation had moved to planning. *Id.* According to AW3, by this point, "it was not, 'we may have to do [it].' It was more to the side of, 'we will probably have to.'" *Id.* All the while, PolarityTE issued public statements touting its ability to

6

market and sell SkinTE under Section 361. ¶99.

On March 31, 2020, Defendant Seaburg became CEO, Defendant Hague remained as the COO, and Defendant Patterson, PolarityTE's VP of Finance, was appointed interim CFO. ¶101. Then, in April 2020, Defendants disclosed that the FDA advised PolarityTE that SkinTE was not properly registered under Section 361 and that PolarityTE should stop marketing SkinTE as a 361 HCT/P. ¶102. This meant that after enforcement discretion ended, PolarityTE would have to stop commercial sales of SkinTE until they submitted an IND application and BLA for SkinTE. *Id.*

### G.      FDA's July 2018 Inspection of PolarityTE's Facility

In July 2018, the FDA inspected PolarityTE's manufacturing facility. ¶102. The inspection analyzed conditions that are relevant under both the Section 361 pathway and the Section 351 pathway. ¶103. AW2, who from September 2018 to May 2021 was a Sales Manager and Director of Strategic Sales and reported to the Vice President of Sales, confirmed this. *Id.*

Following the inspection, the FDA issued a Form 483 noting several significant violations. ¶104. An FDA Form 483 "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts." *Id.* The violations noted in FDA Form 483s are important. *Id.* According to the FDA, "FDA investigators are trained to ensure that each observation noted on the FDA Form 483 is clear, specific and significant." *Id.*

Plaintiffs obtained the Form 483 as part of a FOIA request. ¶105. The form shows that the FDA observed several CMC violations during the inspection, including a lack of a potency assays to measure SkinTE's strength, purity, and quality, as well as violations related to PolarityTE's manufacturing, processing, packing, and holding procedures. The first violation from the Form 483

related to SkinTE's potency assay. ¶106. In particular, the FDA noted the following violation:

> There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess.
> …
> Your Director of Quality has stated the process "is more of an art than a science".

In other words, PolarityTE did not have an adequate proposed potency assay. ¶107. A potency assay is the quantitative measure of biological activity. *Id.* It measures the capacity of the product to effect a given result. *Id.* The traditional approach for assessing the potency of biological products is to develop a quantitative biological assay that measures the activity of the product related to its specific ability to effect a given result. *Id.* The FDA's observation that PolarityTE did not have procedures ensuring SkinTE had the "identity, strength, quality, and purity they purport or are represented to possess" meant that PolarityTE did not have an adequate potency assay. *Id.*

Defendants knew they needed a potency assay before submitting the SkinTE IND application and BLA. "Approval of a biologics license application or issuance of a biologics license shall constitute a determination that the establishment(s) and the product meet applicable requirements to ensure the continued safety, purity, and potency of such products." ¶108. Defendants ignored this and did not develop a potency assay before submitting the IND application in July 2021. ¶109. This decision would delay the IND and BLA process, as the FDA placed the SkinTE IND on clinical hold until PolarityTE developed an adequate potency assay. *Id.*

The second observation from the Form 483 explained that PolarityTE's manufacturing process and operations were deficient. ¶110. Specifically, the Form 483 noted: "Buildings used in the manufacture, processing, packing, or holding of a drug product do not have the suitable construction to facilitate cleaning, maintenance, and proper operations." *Id.* This was material to

8

the eventual SkinTE IND application and BLA because an application must contain manufacturing information related to controls used for manufacturing the product. *Id.* However, Defendants ignored this violation, which caused the clinical hold and delayed the IND and BLA process.

The third observation explained that PolarityTE's system for monitoring environmental conditions were deficient. ¶111. The FDA's clinical hold noted that PolarityTE's systems for monitoring environmental conditions were still deficient in 2021. ¶112. In issuing the hold, the FDA advised that PolarityTE needed to resolve issues related to "bacteriostasis and fungistasis testing". *Id.* These issues seem to be related to the FDA's 2018 observation that PolarityTE's "Aseptic processing areas are deficient." *Id.* Aseptic is defined as "free from contamination caused by harmful bacteria, viruses, or other microorganisms" whereas bacteriostasis is defined as "inhibition of the growth of bacteria without destruction" and fungistasis is defined as "inhibition of the growth and reproduction of fungi without destroying them." *Id.*

The fourth observation noted violations related to PolarityTE's processing and shipping of SkinTE. ¶113. The FDA's clinical hold letter noted that in 2021 PolarityTE still had issues related to SkinTE's "storage" and "delivery device." ¶114. This appears to be the same issue identified in July 2018 that PolarityTE did not have documentation related to SkinTE's "storage" or its "final package presentation or specifications." *Id.*

The seventh observation noted, "Aseptic processing areas are deficient regarding the system for cleaning and disinfecting the room to produce aseptic conditions. Specifically, cleaning is not performed for [redacted] processing SkinTE." ¶117. The seventh observation relates to the third, which noted that PolarityTE's system for monitoring environmental conditions were deficient. ¶118. In 2021, the clinical hold noted that PolarityTE had to resolve issues related to

9

"bacteriostasis and fungistasis testing" before the clinical hold could be lifted. *Id.* These issues seem to be related to the FDA's observation that PolarityTE's "Aseptic processing areas are deficient regarding the system for cleaning and disinfecting the room to produce aseptic conditions." *Id.* The July 2018 observations and 2021 clinical hold issues relate to PolarityTE's ability to stop the growth of bacteria and fungus in its manufacturing facility. *Id.*

The purpose of a Form 483 is to "notif[y] the company's management of objectionable conditions." ¶120. After the inspection, "the FDA Form 483 is presented and discussed with the company's senior management." The FDA discusses "[e]ach observation . . . so that there is a full understanding of what the observations are and what they mean." *Id.* Directly after the inspection, PolarityTE had a "big meeting" to discuss it and related issues. ¶121. Defendants knew that they needed adequate manufacturing controls and processes before submitting an IND application. ¶124. Because the FDA had already told Defendants about significant CMC issues, including the lack of potency assays for SkinTE and that PolarityTE's manufacturing controls and processes were deficient, Defendants should have resolved the CMC issues from July 2018 before submitting an IND application. *Id.* However, Defendants ignored the issues, despite public statements to the contrary, which ultimately caused the clinical hold and delayed the SkinTE IND and BLA. ¶125.

## H.    The Truth is Revealed

On April 21, 2020, the FDA informed PolarityTE that its preliminary assessment was that SkinTE did not meet the requirements of Section 361.  ¶142. As a result, in a press release dated April 30, 2020, PolarityTE told investors that it "has decided to pursue a plan to submit an investigational new drug application (IND) and thereafter a biologics license application (BLA) for SkinTE" based on "preliminary views expressed by FDA." *Id.* The press release further stated:

10

> FDA has not asked the Company to stop marketing SkinTE as a human cell, tissue, or cellular and tissue-based product regulated solely under Section 361 of the Public Health Service Act (i.e., a 361 HCT/P). SkinTE will remain available under a limited sales and marketing program, subject to the Company's future discussions with FDA. The decision to focus on a BLA for SkinTE and limit commercial operations proactively addresses FDA feedback on the regulatory pathway for SkinTE, the high costs associated with maintaining a commercial footprint, and the headwinds associated with the COVID-19 pandemic.

On this news, PolarityTE's stock fell by $0.06, or 5.50%. ¶143. The release concealed that the FDA did not only provide "feedback" but issued a preliminary assessment that SkinTE did not meet the requirements to be regulated solely under Section 361. ¶144.

On May 13, 2021, after market closed, PolarityTE issued a press release announcing first quarter 2021 results and providing a business update on PolarityTE's commercial operations. ¶188. The press release revealed that PolarityTE would be forced to cease *all* commercial sales of SkinTE by the end of the month after the FDA announced that it would not extend its enforcement discretion policy beyond May 31, 2021. *Id.* The press release stated in pertinent part:

> In connection with this transition to the BLA pathway and based on the FDA's recent announcement that enforcement discretion related to 361 HCT/P products will not be extended beyond May 31, 2021, the Company will cease commercial sales of SkinTE and wind down commercial operations.

On the same day, PolarityTE hosted a conference call with investors and analysts at 4:30 p.m. ET. ¶189. During that conference call, Defendant Seaburg reiterated PolarityTE's decision to cease all commercial sales, stating, "To be consistent with the FDA's enforcement discretion period ending on May 31, 2021, we will be winding down commercial sales of SkinTE." *Id.* On this news, PolarityTE's share price plummeted $0.26 per share, or approximately 21%. ¶190.

The truth regarding the SkinTE IND and BLA was partially revealed on August 24, 2021. ¶204. On that day, before market hours, PolarityTE issued a press release providing an update on

11

the SkinTE IND. *Id.* The release stated, in pertinent part:

> FDA provided feedback that certain [CMC] items need to be addressed prior to proceeding with a pivotal study. As a result, the study proposed in the IND has been placed on clinical hold.

On this news, Polarity TE's stock fell by $0.08 per share, or 9.52%, to close at $0.76. ¶205.

The truth regarding the SkinTE IND and BLA, and the deficient CMC procedures, was revealed on November 10, 2021. ¶206. That day, PolarityTE issued a press release. It stated, in pertinent part, "Based on recent informal interactions with FDA regarding certain chemistry, manufacturing, and control (CMC) issues related to the proposed potency assay for SkinTE®, PolarityTE believes that its complete response to FDA's clinical hold correspondence will be submitted by year end." *Id.* The same day, PolarityTE filed a quarterly report for the quarterly period ended September 30, 2021 with the SEC on Form 10-Q ("3Q21 10-Q"). ¶207. It stated:

> On September 17, 2021, we received the clinical hold letter from the FDA…. The … issues that must be resolved before [it] can be lifted involve, our proposed potency assay; drug product dosage, storage, shipping, and release specifications; antibiotics residuals; bacteriostasis and fungistasis testing; and delivery device.

On this news, PolarityTE's stock fell by $0.07 per share, or 10.45%. ¶209.

## III.   ARGUMENT

### A.   LEGAL STANDARD

To state a claim for a violation of Section 10(b) and Rule 10b-5, a plaintiff must allege, as Plaintiff has here: (1) a misrepresentation or omission of material fact in connection with the purchase or sale of a security; (2) Defendants' scienter; (3) reliance; and (4) resulting damage. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

### B.   THE COMPLAINT ALLEGES MATERIALLY FALSE STATEMENTS

To state a Rule 10b–5 claim, a plaintiff must plead that the defendant made an untrue or

misleading statement of fact or failed to state a fact necessary to make a statement not misleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099–1100 (10th Cir. 2003). A plaintiff must "specify each statement alleged to have been misleading [and] the … reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1). The Complaint identifies each false or misleading statement, who made it, and explains in detail how they misled investors.

### 1. The Complaint Alleges the Falsity of Defendants' Statements that SkinTE is not Properly Registered Under Section 361

Because the Complaint establishes that that Defendants' claims that SkinTE was properly registered under Section 361 were not based on a meaningful internal inquiry and ran counter to the inquiry that PolarityTE belatedly conducted, Defendants' statements that SkinTE was properly registered were false. In *Omnicare*, the Supreme Court held that "an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188, (2015). Investors in PolarityTE would have reasonably interpreted Defendants' statements that SkinTE was properly registered as resulting from a meaningful inquiry, and not merely Lough's intuition. But the Complaint alleges Lough blocked any inquiry until the board removed him. Thereafter, it belatedly undertook such an inquiry and concluded that SkinTE should not be registered under Section 361. AW1 stated that Lough refused to consider whether SkinTE was properly registered, even when a large outside investor pushed back, and that Lough would "chop the[] head off" of anyone who disagreed. ¶89. Then, around the time or after the board removed Lough, AW3 explained that employees began discussing the proper registration for SkinTE. ¶97. By December, they concluded that they would likely have to change SkinTE's registration. *Id.* Yet, throughout all of this,

Defendants continually reassured investors that SkinTE was properly registered.

This case is not analogous to one where plaintiffs claim falsity merely by showing internal disagreement. Defendants rely on *Exhae*, which holds that showing that employees disagreed with a corporate strategy is insufficient to establish that the statements were false. *Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at \*6 (D. Utah Dec. 15, 2020). But the statements here are not merely about optimal strategy, but regulatory compliance, which is not so subjective. More importantly, not only was there disagreement about the correct approach, but Lough prevented inquiry, and even after the company conducted a belated inquiry determining that it was the wrong approach, Defendants continued to claim that SkinTE was correctly registered under 361.

### 2. The Complaint Alleges the Falsity of the Form 483 Statements

#### a. Defendants Improperly Rely on an Arbitrarily Redacted Document Outside the Pleadings

Defendants' motion improperly relies on an alleged copy of the Clinical Hold Letter that was redacted. On a motion to dismiss, courts may not consider matters outside the complaint, with a few narrow exceptions. One such exception is that "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Here Defendants submitted a copy of the Clinical Hold Letter, a document that plaintiffs have not previously seen to be public, without providing any information as to its provenance. Worse, the documents contain redactions of important pieces of information, preventing Plaintiffs and the Court from fully evaluating the contents of the document. The Court should not consider Defendants' unverified and unilaterally redacted document.

14

**b.**     **The Redacted Clinical Hold Letter Does Nothing to Undercut the Falsity of Defendants' Statements**

The Complaint alleges that when the FDA stated in 2018 that "[t]here are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess" the FDA was stating, in effect, that the company lacked a potency assay for SkinTE. Defendants do not object to this characterization, but claim that the Clinical Hold Letter shows that PolarityTE did submit a proposed potency assay, just one that the FDA found to be inadequate. But that is not what the letter states. Instead, the letter reveals that PolarityTE *did not* submit an assay with its application in July of 2021, but instead only, at the 11th hour, submitted a potency assay in response to the FDA's information request dated August 5, 2021. The Clinical Hold Letter therefore reaffirms the accuracy of the Complaint's allegation that PolarityTE ignored the FDA's guidance from 2018 and "ignored this and did not develop a potency assay for SkinTE before submitting the IND application in July 2021." ¶109. Instead, they submitted a hastily prepared and inadequate proposed assay in August of 2021 after the FDA pointed out this obvious deficiency. It is little wonder that this last-minute effort did not meet the FDA's standards.

Next, Defendants claim that the reference in their 10-K to the Clinical Hold Letter's issues related to "bacteriostasis and fungistasis testing" refers to Item 5 of the Clinical Hold Letter, and this shows that the issue in the Clinical Hold Letter was not related to the issue in the Form 483. Yet, there is nothing in Item 5 of the letter that references bacteriostasis or fungistasis testing, or microbial testing at all, giving no reason to think that this is the item that PolarityTE was describing in the 10-K. Instead, Item 6 of the letter discusses microbial testing, but Defendants redacted part of that item, making it impossible to understand the FDA's concern. Given that there

15

is no reference in the unredacted portion of the letter that discusses bacteriostasis or fungistasis testing at all, it appears that Defendants must have redacted that portion of the document.

Finally, Defendants claim that the statements in Form 483 regarding the stability and storage of SkinTE are unrelated to the issues in the Clinical Hold Letter. But the limited information that Defendants left unredacted show the two issues are related. Form 483 stated that the testing program lacked any written testing program to assess the stability characteristics of drug products, and that there was a lack of data supporting expiration of the product. The Clinical Hold letter states that there is a lack of documentation regarding how storage time is calculated. Defendants, again, redacted crucial information that would have made the FDA concern clear, but what Defendants left from the selective redaction points to a connection between the two issues.

Finally, Defendants ignore the allegations in the complaint that PolarityTE failed to address the Form 483 item that stated "[b]uildings used in the manufacture, processing, packing, or holding of a drug product do not have the suitable construction to facilitate cleaning, maintenance, and proper operations." They have therefore conceded this point.

### c. Defendants' Statements of Opinion Were Actionable For Failing to Disclose the Deficiencies the FDA Identified

Defendants allege that because the 483 Statements were couched as opinion, they can only be misleading if Defendants subjectively disbelieved those statements. For this, Defendants rely on the Supreme Court's decision in *Omnicare*. But the *Onmicare* decision specifically *rejected* the assertion that an opinion statement can only be false if a Defendant subjectively disbelieves it. "Consider an unadorned statement of opinion about legal compliance: 'We believe our conduct is lawful.' … [I]f the issuer made the statement …with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the

16

issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188–89. *Omnicare* therefore addressed the exact issue present here – Defendants' statements of opinion were false because Defendants made statements of opinion regarding the state of SkinTE's regulatory compliance despite the Federal Government taking the opposite view. Therefore, Defendants' opinions, even if irrationally but sincerely believed, did not fairly align with the information in their possession at the time.

### d. Defendants' Statements are not Puffery

Defendants claim that several false statements are puffery. But a statement is not considered puffery when, in its full context, it is sufficiently concrete to be material to a reasonable investor. "We consider four of these statements to be particularly concrete, and thus potentially actionable. First, defendant O'Hara stated on October 17, 2006 that the majority of WilTel integration was complete, 'ahead of plan' and 'under budget.'" *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012). *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information."); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (materiality of statement was "illustrated by the frequency with which Defendants emphasized" it in "press releases and other public statements"). The statements that Defendants identify in the Complaint are not puffery because, in context, they made claims material to an ordinary investor. The statement at paragraph 165 of the Complaint, which Defendants call puffery, is material because in addition to stating that PolarityTE made progress towards preparing an IND, it provided specific details about that progress. The statement at Paragraph 184 included specific details about

17

PolarityTE's expected timeline. The statement at 191, in addition to referring to "strong progress" also reiteratres the expected timetable for an IND submission. And the Statement in 192 also concerns a specific timeline. Therefore, these statements, read in context, are not puffery.

### 3. Defendants' Statements Regarding the Termination of Enforcement Discretion Are Misleading

Defendants claim that their statements regarding the termination of enforcement discretion are not misleading because they warned investors of the possibility that the FDA may terminate enforcement discretion and require PolarityTE to register SkinTE under Section 351. But Defendants' statements expressing uncertainty over the need to register under Section 351 was misleading because by that time the FDA told PolarityTE that they *would* need to register under Section 351. Even before that, in December of 2019, PolarityTE internally had already concluded that they would be required to register under Section 351. Several courts have held that "to warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit". *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) (same). Therefore, Defendants' statements expressing uncertainty were misleading for failing to acknowledge that they were already aware that SkinTE would have to be registered under 351.

Defendants' authority is clearly distinguishable. In *Curaleaf*, the court rejected allegations because "the Company clearly disclosed the risk that the FDA could act against it and that the FDA had done so to other companies selling similar products. Describing this risk in terms of potentiality rather than certainty – when certainty of enforcement could not be known anyway – does not violate securities law." *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 108

18

(E.D.N.Y. 2021). Here, Defendants concealed the fact that the FDA gave  PolarityTE negative feedback, and that PolarityTE reached a conclusion that they would probably have to register under Section 351. *Pozen* did not, contrary to Defendants' claim, hold that a statement not worded as a guarantee and accompanied by cautionary language is per se inactionable. *Johnson v. Pozen Inc.*, 2009 WL 426235, at *20 (M.D.N.C. Feb. 19, 2009). Instead, it rejected allegations that defendants anticipated FDA approval by a certain time when there were no facts alleged that would make the defendants believe that the timetable was unlikely. Defendants' reliance on *Medimmune* ignores the fact that multiple district courts rejected its holding. *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *8, n3 (S.D. Cal. May 1, 2003) ("The Court is not bound by *Medimmune* and disagrees with this holding."); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34, n9 (D. Mass. 2004) (agreeing with *Amylin* and rejecting *Medimmune*).

Defendants claim the complaint does not show the statements were false when made because they do not allege that it was impossible that the FDA would either extend enforcement discretion for all manufacturers or for PolarityTE specifically. But what the Complaint does allege is that by December of 2019 PolarityTE had concluded that they would have to seek approval as a 351, and Defendants' statements were misleading for failing to disclose this.

### 4.    Defendants' Statements Should not Be Dismissed as Forward Looking

Defendants' reliance on the PSLRA Safe Harbor provision for several of the statements similarly fails. Defs. Br. at 20. The PSLRA precludes companies and individuals from being held liable for certain "forward-looking" statements that are "identified" as such ***and*** are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5. The term

"forward-looking statement" is defined as including future projections of revenue, plans for future operations, or statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). If the alleged misleading statement at issue is not identified as "forward-looking," or accompanied by meaningful cautionary language then the PSLRA's safe harbor provision does not apply.

Defendants claim that the statements that SkinTE is properly registered under Section 361 is forward looking because the statements warned that an adverse regulatory decision could cause them to change their registration. But the misstatements, by their terms, refer to Defendants' belief that that, at the time the statement was made, SkinTE met the criteria for Section 361 and was therefore properly registered. Because the falsity of these statements does not depend on a future contingency, these statements were not "forward-looking." *See*, *e.g.*, *In re Quality Sys.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017) (analyzing case law regarding "mixed statements" of present and future facts and holding that safe harbor does not apply when statements omit material facts about present conditions); *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."); *In re NPS Pharms., Inc. Sec. Litig.*, 2007 WL 1976589, at *4 (D. Utah July 3, 2007) (upholding complaint that alleged defendants misstated prospects of FDA approval and stating the PSLRA safe harbor does not "protect[] fraud…. [T]he statements were allegedly not forward-looking predictions but, rather, knowing falsifications of historical fact").

Defendants attempt to trigger the safe harbor by relying on the fact that the statements *also* discuss the fact that they may need to change their registration in the future if the FDA disagrees with their position. These statements, however, do not become "forward-looking" simply because, in addition to discussing present facts, they also make reference to future possible outcomes.

20

Plaintiffs alleged that these statements were materially misleading at the time they were made because they concealed and/or obscured the fact that SkinTE was not properly registered under Section 361. Therefore, as the falsity of these statements does not depend on a future contingency, these statements were not "forward-looking." *See*, *e.g.*, *In re Quality Sys.*, 865 F.3d at 1141-42 (analyzing circuit court case law regarding "mixed statements" of present and future facts and holding that safe harbor does not apply when statements omit material facts about present conditions); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1123-24 (D. Colo. 2017) (mere use of the words "could" and "potential" did not trigger safe harbor protection).

Moreover, forward-looking statements are not shielded by warnings that merely recite a "litany of generally applicable risk factors." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009). Here, the warnings Defendants cite could apply to any product registered under 361. Therefore, the warnings are not so clear that "'reasonable minds' could not disagree that the challenged statements were not misleading." *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017); *Mishkin v. Zynex Inc.*, Civil Action No. 09-cv-00780-REB-KLM, 2011 U.S. Dist. LEXIS 34467, at *15 (D. Colo. Mar. 30, 2011) ("[T]o the extent the defendants rely on cautionary language … that cautionary language likely does not shield the relevant statements, assuming the other factual allegations in the complaint to be true."); *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1222 (D. Kan. 2002) ("[T]he inclusion of general cautionary language … would not excuse the alleged failure to reveal known material, adverse facts.").

Similarly, courts have found that a risk statement itself is materially misleading if it "speaks about the risks . . . in the abstract, with no indication that the risk 'may already have come to fruition.'" *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), aff'd, 563

21

U.S. 27 (2011); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1232 (N.D. Okla. 2003) ("The generic warnings of problems that can affect the Company's revenues are insufficient because Defendants failed to disclose that these problems had already manifested themselves and were severely and adversely impacting the Company's viability."). Here, the risk warnings relate to the possibility that the FDA may change its position in the future. However, Defendants already knew that SkinTE was not properly registered. Accordingly, Defendants' arguments that the statements regarding SkinTE's registration under 361 are protected by the PSLRA safe harbor fail.

## C.   THE COMPLAINT ALLEGES SCIENTER

In assessing scienter, the Court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.

In the Tenth Circuit, a "strong inference" of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Adams*, 340 F.3d at 1105. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate." *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010).

### 1.   Defendants had Scienter With Respect to the 361 Statements and the 483 Statements

While Lough was at PolarityTE, the Complaint alleges that Lough, a medical doctor, not an expert in FDA regulations, refused to listen to advice from employees or investors that SkinTE was

22

not properly registered under Section 361. Lough's suppression of internal debate constitutes recklessness. The recklessness standard for scienter "target[s] that defendant who has 'buried his head in the sand' and failed to make some inquiry into the claim's validity." *United States ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*, 2020 WL 1322790, at *10 (S.D. Ohio Mar. 20, 2020) *quoting U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012); *see also In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 WL 538756, at *18 (D. Or. Jan. 3, 2006) (crediting plaintiffs' argument that "the Sarbanes–Oxley certification requirements were expressly intended to prevent top executives from using a 'head in the sand' defense to actions for securities fraud committed on their watch"). Lough's refusal to allow discussion by knowledgeable insiders about the possibility that SkinTE was improperly registered constitutes severe recklessness.

After Lough left PolarityTE, the company reached the conclusion that they needed to register SkinTE under Section 351, but nonetheless continued to tell investors that they believed that SkinTE was properly registered under Section 361, and that they disagreed with the FDA's assessment that SkinTE was not properly registered. Courts have found that confidential witnesses can establish that there was widespread knowledge within a company of concealed facts, and that this widespread knowledge can be sufficient to support scienter. *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010); *In re Alstom SA*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (same). AW3's statement that the company had reached the conclusion that they would have to re-register SkinTE therefore establishes scienter for this earlier period.

Defendants claim that plaintiffs' theory, that SkinTE was "improperly registered with the FDA and chose not to fix issues that would inevitably preclude proper registration of the product once the company began the IND application process" was "a common allegation levelled against

23

pharmaceutical companies" that courts routinely find implausible, citing *Arrowhead*. But the type of allegation that *Arrowhead* referred to is different than the allegations here. *Arrowhead* discussed complaints that allege that defendants were "deceiving the public in order to finance the testing of a drug it knew could never be approved by the FDA and thus never be brought to market." *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at \*12 (C.D. Cal. Sept. 20, 2017). Here, the problem was not that SkinTE could never be brought to market. SkinTE was already on the market. It could only continue to be on the market in the short term if PolarityTE maintained the fiction that it was properly registered under 361. Defendants therefore had every reason to maintain the fraud. *Angelos* dismissed a complaint that alleged that defendants failed to disclose that a trial, and therefore commercialization, was doomed to failure. *Angelos v. Tokai Pharms.*, Inc., 494 F. Supp. 3d 39, 60 (D. Mass. 2020). The holding in *Aratana* is even more irrelevant, because in that case the court found a lack of scienter not on the basis that plaintiffs' theory was implausible, but because the allegations to support plaintiffs' theory were, according to the court, conclusory, drawn entirely from Aratana's public filings, and undercut by other allegations that tend to suggest a lack of scienter. *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 766 (S.D.N.Y. 2018).

A more analogous case, that Defendants do not cite, is *Abrams v. MiMedx Group, Inc.*, where the district court denied a motion to dismiss allegations that MiMedx failed to disclose that its product was not properly registered under 361. The court found scienter based on three facts.

> First, the Plaintiffs allege that MiMedx never sought an initial or formal determination from the FDA concerning the exemptions. Next, the Defendants knew that the FDA was scrutinizing their products for Section 361 status following the 2012 inspection. The establishment inspection report issued following the inspection specifically stated that the FDA was sending information to the CBER to continue reviewing MiMedx's contentions that the products were 361 HCT/Ps. The "no action indicated" conclusion of the report should not have convinced the Defendants that the FDA would not continue scrutinizing Section

361 status because the "no action indicated" segment only addresses health and sanitation concerns. Finally, Defendant Taylor, after receiving the establishment inspection report, and in the month before September 3, 2013, sold a significant amount of MiMedx shares.

*Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014).

Here, Defendants did not consult the FDA when initially determining to register SkinTE as a 361. ¶76. Here, the FDA also conducted an inspection of PolarityTE's facilities, considering its eligibility for both a 361 registration and a BLA, and while there is no evidence of stock sales, the suspicious circumstances of Lough's firing also bolsters the inference of scienter. In addition, in this action, PolarityTE reached an internal determination that they would be required to register under Section 351 before the FDA even told them. ¶97. Defendants' citation to *Ovascience* is distinguishable. That court found a lack of scienter regarding the inappropriateness of a 361 registration because the product was particularly novel. *Ratner v. Ovascience, Inc.*, 134 F. Supp. 3d 621, 631 (D. Mass. 2015). Defendants have not shown that SkinTE is similarly novel.

With respect to the 483 allegations, Defendants claim it is implausible that Defendants would ignore FDA guidance and file a BLA while not addressing the issues the FDA identified. But courts in this circuit have found that a complaint can allege scienter based on allegations that a company seeking FDA approvals ignored FDA guidance. *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *19 (D. Utah Mar. 16, 2021) ("sufficient to support an inference of scienter at the pleadings stage" where, plaintiffs alleged that defendants "understood that a multiplicity correction was required, failed to perform the adjustment, and knew that performing the adjustment would result in a lack of statistical significance"); *Clovis*, 215 F. Supp. 3d at 1127 (finding that fact that defendants disregarded FDA guidance supported scienter). And here, there is no need to speculate – there is evidence that Defendants blatantly disregarded feedback from the FDA and the FDA's

25

own rules by not including a potency assay with their initial IND submission, but instead only provided it in August of 2021. Def. Ex. 24. This shows why Defendants' reliance on *Genzyme* is misplaced – *Genzyme* held that because there was no reason to think the information on the Form 483 had anything to do with the drug that was the subject of defendants' public statements, there was no reason to mention the concerns in the 483 in connection with those public statements. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014). But Defendants do not contest that the Form 483 expressed FDA concerns specifically related to the manufacture of PolarityTE.

### 2.    Defendants had Scienter for the Enforcement Discretion Statements

Defendants had scienter for their statements about the end of enforcement discretion because, by end of 2019, they already concluded that they needed to register SkinTE under 351. Therefore, their statements that they believed it was possible to convince the FDA to allow PolarityTE to continue to be sold under Section 361 after the end of enforcement discretion was knowingly misleading, because Defendants did not themselves believe that SkinTE should be sold under Section 361 after the end of enforcement discretion. In their motion, Defendants claim that neither they nor anyone else could have known whether the FDA might have extended enforcement discretion beyond May 2021. Even if that is true, Defendants did not merely note that if the FDA decides to extend enforcement discretion, they would be able to extend their sales of SkinTE. They instead claimed that they would attempt to convince the FDA of something that, secretly, they did not believe themselves – that SkinTE was properly registered under Section 361.

### 3.    Confidential Witness Allegations Support Scienter

Defendants claim that none of the confidential witness allegations should be credited because none of the confidential witnesses identify a meeting or report that would demonstrate

26

that Defendants knew that one of their statements were false. This argument is faulty for two reasons. As to Lough, AW 1 stated that employees of PolarityTE and a major shareholder repeatedly raised the issue of SkinTE's registration under Section 361 with Defendant Lough. This supports a strong inference of scienter. *Myriad*, 2021 WL 977770, at *18 (CW statement that an employee informed an executive that "data was lacking" to support defendants' position supported scienter of that executive). In addition, even in the absence of allegations that confidential witnesses had or witnessed direct conversations with executives regarding the misleading statements, confidential witness allegations that facts undercutting the truth of the allegations were widely known within the company support a strong inference of sceinter. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (allegations that revenue recognition issues "were well known throughout the Company" support strong inference of scienter); *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 87 (D. Mass. 2002) (same; collecting cases). Further, AW3, who worked in Quality Control and reported to the Executive Director of Quality, stated that during the summer or fall of 2019, directors and vice presidents in Regulatory, Quality, Manufacturing, and R&D met to discuss the need to submit an IND, and that by December of 2019, they had reached a conclusion that they would probably have to submit an IND. ¶97. This shows that it was widely understood within the company that PolarityTE would have to register SkinTE under Section 351.

### 4. The Form 483 Supports a Strong Inference of Scienter

Defendants claim that Plaintiffs fail to identify facts that show how, why, or when Defendants possessed knowledge that the forward looking statements in the Compliant were false. First, as set forth in Section III.B.4 above, several of their statements were not forward-looking.

But even for statements that are forward looking, the Complaint alleges sufficient facts to establish scienter. The case Defendants cite, *Schaeffer*, outlines the problem with their arguments. While *Schaeffer* found that under the circumstances, the existence of a Form 483 was insufficient to show scienter, under other circumstances it can support scienter. For instance, *Schaeffer* found that repeated "regulatory feedback could … suggest that a reasonable defendant would have appreciated the gravity of the concerns raised" in a Form 483. *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *13 (S.D.N.Y. Apr. 28, 2020) *citing In re Cryolife, Inc.,* 2003 WL 24015055, at *12-13 (N.D. Ga. May 27, 2003). Here, Defendants exchanged extensive correspondence and had multiple meetings with the FDA. ¶¶140, 145, 163, 165, 169, 184. And the redacted letter from the FDA that defendants submitted itself confirms that PolarityTE did not submit a potency assay with its initial IND. *Schaeffer* noted that "[m]ultiple courts have found recklessness adequately pled based on alleged failures to investigate issues identified by the FDA" *Schaeffer*, 2020 WL 7701463, at *13; citing *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *15 (D.N.J. Mar. 24, 2008). Under *Schaeffer* failure to correct the lack of a potency assay in an initial IND constitutes recklessness. Because the Complaint includes many of the allegations that Defendants' own authority identifies as sufficient, the complaint should be sustained.

### 5.     Defendants had Motive to Commit Fraud

Defendants claim there is no plausible motive for them to falsely claim that they believed SkinTE was subject to Section 361. But Defendants disclosed a motive in their 2020 10-K, where Defendants stated that "[w]e continued to sell SkinTE as a 361 HCT/P in 2020 and into 2021 in reliance on our view that there is a reasonable basis for regulating SkinTE as a 361 HCT/P." ¶172. If Defendants admitted that they did not believe that SkinTE was properly registered, they could

28

not justify continuing to sell SkinTE. And during the class period, PolarityTE had success selling SkinTE, with net revenues increasing by 79% in 2020. ¶173. Defendants also disclosed the importance of SkinTE to the company, admitting they would need to downsize if they could not sell SkinTE. ¶174. The importance of SkinTE to PolarityTE supports an inference that Defendants had motive for fraud. *Clovis*, 215 F. Supp. 3d at 1128 (motive to misstate trial results where "Clovis had only three drugs under development, and Clovis' most important drug was rociletinib").

### 6.     The Fact that Lough was Warned that SkinTE was not Properly Registered under Section 361 Supports Scienter

The Complaint alleges that employees of PolarityTE and a large investor warned Lough that SkinTE was not properly registered under Section 361. Other courts have found that internal warnings are sufficient to establish scienter. *Myriad*, 2021 WL 977770, at *17 (scienter where defendants were warned of lack of scientific basis for claims); *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *30–32 (D.N.J. Aug. 17, 2005) (cienter where drug company management failed to perform analyses employees urged them to perform in order to resolve internal safety concerns); *see also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1029 (C.D. Cal. 2008) (failure to conduct trials the FDA recommended to resolve drug's safety yielded strong inference of scienter); *Williams*, 339 F. Supp. 2d at 1241 (scienter where defendant "egregious[ly] refus[ed] to see the obvious, or to investigate the doubtful"). AW1 confirms employees and an outside investor warned Lough that SkinTE was improperly registered, but instead of investigating, he suppressed discussion or analysis. ¶89.

### 7.     The Fact that Lough Invented SkinTE Supports Scienter

Lough's status as the inventor of SkinTE supports a strong inference of scienter. *Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154 (D. Colo.

29

2019) (finding scienter where plaintiffs alleged executives were personally involved in "reporting of dialysis revenues, revenue per treatment, and other key metrics, and that they closely tracked the dialysis businesses financial metrics"). As the inventor of SkinTE, Lough was intimately familiar with the way it works, which supports a strong inference of scienter. Lough's joinder to the motion to dismiss protests that there is no reason to think Lough, though the inventor of SkinTE, had any intimate understanding of FDA regulations and the standards for registration. But this cuts both ways. If Lough lacked competence to evaluate whether SkinTE was properly registered under Section 361, his refusal to listen to the protests of his more knowledgeable employees and investors was all the more reckless. Investors have a right to expect that company's statements are not based on uninformed executives' intuitions. *Omnicare*, 575 U.S. at 188.

### 8. Defendants' Positions Support Scienter

While an executive's position at a company cannot, standing alone, establish scienter, with the other allegations in the Complaint, Defendants' positions as CEO and CFO add support to a strong inference of scienter. *Adams*, 340 F.3d at 1106.

### 9. Lough's Firing Supports Scienter

Lough's termination supports a strong inference of scienter. Courts often consider the termination of a senior executive as supportive of scienter. *In re Mammoth Energy Servs., Inc. Sec. Litig.*, No. CIV-19-522-J, 2021 WL 1851037, at *4 (W.D. Okla. Jan. 26, 2021) (firing of president contributes to scienter inference). Some courts state that the resignation of an executive will be indicative of scienter where "the resignations at issue [are] 'uncharacteristic' or 'accompanied by suspicious circumstances,' so as to lead to the inference that 'defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent

representations.'" *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020). Here, Lough was abruptly placed on administrative leave, attempted to resist his termination, and later settled with the company, agreeing to resign. The circumstances of his termination were sufficiently suspicious to trigger an SEC investigation. Therefore, under the circumstances, Lough's termination supports a strong inference of scienter. *Amarin*, the case that Defendants rely on, is distinguishable. In *Amarin*, plaintiffs attempted to allege scienter based on the fact that two executives resigned shortly before the company published adverse information. *In re Amarin Corp. PLC.*, 2015 WL 3954190, at *13 (D.N.J. June 29, 2015). The complaint alleged that the timing of the resignations suggested that they left because they were fearful of the fallout. *Id.* The court found the inference to be insufficient, since there was nothing to suggest that the resignations were suspicious. *Id.* Here, Lough did not simply resign. He was suspended, against his will, attempted to contest his suspension, and then quickly relented. These suspicious circumstances are a far cry from the entirely ordinary departures depicted in *Amarin*.

### 10.    The Small Size of the Company Supports Scienter

PolarityTE's small size supports scienter. *Okemos Home, LLC v. LGF Produce, LLC*, 2019 WL 12248966, at *9 (D. Colo. Mar. 27, 2019) (small company size supports scienter). *Gold* is not to the contrary. *Gold* held that, under the circumstances there, including the fact that the company, though small, had operations that were geographically dispersed, the size of the company was insufficient to establish scienter. *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015). But the Tenth Circuit did not question that a company's small size could *contribute* to an inference of scienter, or that they could be sufficient under other circumstances.

31

### 11. The Core Operations Doctrine Supports Scienter

The importance of misstated information to company operations adds to scienter. *SemGroup*, 729 F. Supp. 2d at 1298; *see also In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017) ("It seems implausible that [defendants] were not paying close attention to the results of the company's most critical clinical trial for their most important drug" or to interactions with the FDA about it); *Clovis*, 215 F. Supp. 3d at 1127–28 (scienter where misstatements concerned "the company's most important product" and, because it had few others, defendants "should not have been distracted by myriad other product trials"). PolarityTE's entire focus was on selling SkinTE. Their ability to sell SkinTE was crucial to PolarityTE's operations. Defendants "were in a position to know this information, understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors." *SemGroup*, 729 F. Supp. 2d at 1298; *In re Molycorp, Inc. Sec. Litig..*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016). This supports scienter.

### 12. The Allegations Taken Together Create a Strong Inference of Scienter

Defendants discuss each scienter allegation in isolation, despite the fact that "[t]he scienter analysis is holistic, requiring the court to analyze all allegations in the complaint and not view any particular allegation in isolation." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1187–88 (D.N.M. 2010), *on reconsideration in part,* 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013). Together, the allegations paint a picture, that PolarityTE, a small company, considered it crucial that SkinTE be sold immediately and therefore registered it under Section 361, despite knowledgeable employees

32

and investors warning that SkinTE should be registered under 351. Though after the termination of Lough they concluded that they would have to register SkinTE under the correct regulation, they refused to come clean with investors, dissembling about feedback they received from the FDA. And when it came time to submit an IND, they were unprepared, failing to correct issues the FDA identified years ago. All of these allegations taken together create a strong inference of scienter.

### D.     THE COMPLAINT ALLEGES LOSS CAUSATION

To plead loss causation, a plaintiff need only allege a "short and plain statement" (*Dura Pharm. Inc., v. Broudo*, 544 U.S. 336, 346 (2005)) of a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Loss causation can be alleged through "a corrective disclosure" that "reveals the fraud to the public" or through "a theory of materialization of a concealed risk." *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019). Arguments over "loss causation" are "normally inappropriate to rule on . . . at the pleading stage." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

#### 1.     The Complaint Alleges that the Disclosures were Corrective

Defendants argue that several of disclosures in the complaint are not corrective and could not have caused Plaintiffs' losses. As an initial matter, Defendants do not contest, and therefore concede, that several disclosures are corrective. Defendants have not contested the disclosures at ¶¶142, 208. Therefore, the Court should not dismiss the Complaint on the basis of loss causation.

Respecting the May 13, 2021 corrective disclosure announcing that PolarityTE was ceasing to market SkinTE due to the end of enforcement discretion, the statement was corrective because Defendants previously claimed that they were in talks to continue to market SkinTE beyond the

33

end of enforcement discretion. ¶¶147, 163. In the exhibits that Defendants claim are corrective, they again claimed that they intended to discuss the extension of marketing SkinTE past the end of enforcement discretion, Def. Ex. 9, at 22, Ex. 19, Nov. 9, 2020 10-Q at 24–25, or claimed that it was possible they could continue marketing SkinTE during the pendency of the BLA, Aug. 6, 2020 10-Q at 23–24. Therefore, the May 13, 2021 corrective disclosure revealed new information.

Respecting the August 24, 2021 disclosure of the forthcoming hold, Defendants argue it is not corrective because they already disclosed that a hold was possible. But the August 24 statement revealed not merely that the FDA *may* issue a hold, but that it *would* issue a hold. And while the disclosure did not reveal that the hold was connected to Defendants' prior omission of their failure to correct the problems associated with the Form 483, taken together with the subsequent November disclosure of the contents of the letter, the two collectively revealed the fraud. Courts have routinely held that a complaint can show loss causation through a series of partial corrective disclosures. *Lormand*, 565 F.3d at 261, n. 31 (collecting cases). That is what happened here.

### 2. The Complaint Alleges that the Fraud Caused the Loss

Defendants argue that Plaintiffs failed to show that the fraud, as opposed to some other bad news, caused Plaintiffs' loss. But there is no requirement to show this at the pleading stage. "[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes." *Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018); *see also Solomon v. Sprint Corp.*, 2022 WL 889897, at *10 (S.D.N.Y. Mar. 25, 2022) ("Defendants' argument[] … that Plaintiffs must disaggregate their losses [is] inapplicable … on a motion to dismiss."). Defendants' argument, therefore, has no merit

The cases Defendants cite do not support them. *Williams* is irrelevant because it pertains to

summary judgment, not pleading, and held only that an expert who failed to consider other potential causes could not defeat summary judgment. *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1142 (10th Cir. 2009). *Gentiva* held that a disclosure need not definitively reveal the fraud, and even the announcement of a government investigation can be sufficient to reveal the fraud. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388 (E.D.N.Y. 2013). The court did find that certain poor earnings were not corrective, but only because it also found that any connection between the poor earnings and fraud was speculative. In *Biovail*, the court found that plaintiffs had not pled a loss where plaintiffs alleged that defendants knew that their NDA was doomed to be rejected because it was only based on a multi dose study instead of a single dose study. The court found that plaintiffs had not alleged a loss where, although the FDA rejected the NDA, there was no indication that it was because of a lack of a single dose study, and the FDA ultimately approved an NDA that did not include a single dose study. *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009). *Nektar* also is inapposite because there, the corrective disclosure related to mid-stage data from a clinical trial, whereas the alleged misstatements related to early stage data, and for a second disclosure, the misstatements related to a different study. *In re Nektar Therapeutics*, 2020 WL 3962004, at *17 (N.D. Cal. July 13, 2020).

## E.   THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

Defendants do not contest that, if Plaintiffs establish primary liability, they establish control liability. Because the Complaint properly alleges primary liability, it alleges control liability.

## IV.   CONCLUSION

The motion to dismiss should be denied. If granted, Plaintiffs seek leave to replead.

Dated: July 18, 2022

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email:  pkim@rosenlegal.com
            jstern@rosenlegal.com


**JAMES DODGE RUSSELL & STEPHENS P.C.**

By: */s/ Mitchell A. Stephens*
Mark F. James (5295)
Mitchell A. Stephens (11775)
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Fax: (801) 363-6666
Email: mjames@jdrslaw.com
            mstephens@jdrslaw.com

*Local Counsel for Plaintiffs*

36