IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

_____
                                      )
MARC RICHFIELD, Individually and      )
on Behalf of All Others Similarly     )
Situated,                             )
                                      )
            Plaintiffs,               )
                                      )
        vs.                           ) Case No. 2:21-CV-561 BSJ
                                      )
POLARITY TE, INC., DENVER LOUGH,      )
DAVID SEABURG, JACOB PATTERSON,       )
PAUL MANN and RICHARD HAGUE,          )
                                      )
            Defendants.               )
_____)

BEFORE THE HONORABLE BRUCE S. JENKINS

DATE:  SEPTEMBER 8, 2022

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

Reporter:  REBECCA JANKE, CSR, RMR
           (801) 521-7238

2

A P P E A R A N C E S


FOR THE PLAINTIFF:        THE ROSEN LAW FIRM, P.A.
                          BY:  JONATHAN STERN, ESQ.
                          500 WEST SECOND STREET, SUITE 1800
                          AUSTIN, TEXAS  78701


                          JAMES, DODGE, RUSSELL & STEPHENS P.C.
                          BY:  MITCHELL A. STEPHENS, ESQ.
                          10 WEST BROADWAY, SUITE 400
                          SALT LAKE CITY, UTAH  84101


FOR THE DEFENDANT:        KING & SPALDING, LLP
                          BY:  MICHAEL BILES, ESQ.
                               FRANCES FINK, ESQ.
                          500 WEST SECOND STREET, SUITE 1800
                          AUSTIN, TEXAS  78701


                          PARSONS, BEHLE & LATIMER
                          BY:  JEFFREY C. COREY, ESQ.
                          201 SOUTH MAIN STREET, SUITE 1800
                          SALT LAKE CITY, UTAH  84145


FOR DENVER LOUGH:         CLYDE, SNOW & SESSIONS
                          BY:  KEITH M. WOODWELL, ESQ.
                          ONE UTAH CENTER
                          201 SOUTH MAIN STREET, SUITE 2200
                          SALT LAKE CITY, UTAH  84111

SEPTEMBER 8, 2022                        SALT LAKE CITY, UTAH

                      P R O C E E D I N G S

                              * * *

THE COURT:  Good morning.  And why don't we go ahead in Richfield vs. Polarityte and others.  It's 21-C-561, here today on a motion to dismiss, and if those of you who are here on the matter would be kind enough, if you'll make a record for us, tell us who are and whom you represent.

MR. STEPHENS:  Good morning, Your Honor, Mitch Stephens from James, Dodge, Russell & Stephens.  I'm also joined by Jonathan Stern on behalf of the plaintiffs.

MR. BILES:  Good morning, Your Honor, Michael Biles of King & Spalding, here with Frances Fink of King & Spalding and Mr. Jeff Corey of Parsons, Behle.  We're here on behalf of Polarityte and all the individual defendants except for defendant Dr. Lough.

THE COURT:  Fine.

MR. WOODWELL:  Good morning, Your Honor, Keith Woodwell from Clyde, Snow & Sessions representing defendant Denver Lough.

THE COURT:  Okay.  Anybody else?  Okay.  Let's go ahead on the motion to dismiss.  If you will be kind enough to use the lectern, we'll make sure that the court reporter makes a decent record.

MR. BILES:  May it please the Court.

THE COURT:  Use the mic so that we're able to hear.

MR. BILES:  Your Honor, plaintiffs' Complaint is precisely the type of abusive securities litigation that Congress targeted for early dismissal under the Private Securities Litigation Act of 1995.  Plaintiffs have not met the very high burden to plead a claim for securities fraud under the PSLRA for four reasons.

First.  They have not plead a material misstatement.  The company's statements about the regulatory status of its product were true when made and were statements of opinion or belief that were truly held at the time they were made.

Second.  Most of the statements that they challenge in the Complaint are forward-looking in nature and are protected by the PSLRA's safe harbor that protects forward-looking statements.

Third.  Plaintiffs have not raised the requisite strong inference of scienter.  This case does not involve insider sales.  Thus, plaintiffs' theory is that the executives at Polarityte piloted the plane and knowingly crashed it into the ground before exiting the plane with their parachutes.  This type of theory makes no sense, Your Honor.

Finally, there's no loss causation.  The press

releases that they say revealed the truth of an alleged fraud did no such thing. They disclosed known -- known risks that were disclosed to the market. And, Your Honor, we know that these allegations should be dismissed because they have been dismissed. Judge Nielsen of this district dismissed these very same allegations in a thorough, well-reasoned opinion. Plaintiffs' allegations here are nearly identical to those dismissed in Polarityte 1.

Naturally defendants' motion relied heavily on Judge Nielson's opinion in Polarityte 1, but plaintiffs' opposition, shockingly, doesn't discuss Polarityte 1 at all. They completely ignored it. Plaintiffs make no attempt to distinguish the facts here. In fact, they do not mention Polarityte 1 at all. Now, this isn't a careless oversight, Your Honor. Plaintiffs don't try to distinguish this case from Polarityte 1 because they can't. The facts are nearly the same. It would be a waste of judicial resources, Your Honor, for plaintiffs --

THE COURT: We do that every day, so I find that not persuasive. We waste judicial resources every day, so you don't have to worry about our welfare.

MR. BILES: Well, fair enough, Your Honor. This case only differs from Polarityte 1 by one new misstatement, and it really is plaintiffs' weakest claim. They allege that in July, 2021, Polarityte issued a press release

Case 2:21-cv-00561-BSJ    Document 75    Filed 09/27/22    PageID.1130    Page 6 of 53

6

announcing that it had filed an investigatory new drug application and that they would conduct clinical trials on their tissue product. Plaintiffs say that this press release was false because Polarityte knew that the FDA would deny or place a clinical hold on the clinical trial for the same reasons that an FDA inspector noted in what's called a form 483 report two years earlier in 2018.

This allegation is extraordinarily weak because Polarityte's July press release was not false at all. The company did in fact file a new drug application, and it warned investors in the press release that a clinical hold was one of the outcomes that could occur. In plaintiffs' allegation that the FDA placed a clinical hold for the same reasons as noted two years earlier in the form 483 report is simply not true.

Your Honor, we have submitted both those documents to this Court, and this Court can and should take judicial notice because plaintiffs specifically mentioned both documents in their Complaint. And Your Honor can look at these two documents itself and see that the observations in the form 483 report had nothing to do with the questions that the FDA raised in its clinical hold letter.

Finally, the statement or the information that we supposedly withheld about the form 483 report was immaterial as Judge Nielson found two years ago, Your Honor. A form

483 report is not a final regulatory decision by the FDA. It's the observations of an inspector. Moreover, in the report, the inspector designated it as a voluntary action -- voluntary action initiated. And what that means is that the FDA was going to allow Polarityte to continue to manufacture its product, and it wasn't going to bring an enforcement action. That is a designation of regulatory insignificance, Your Honor, and therefore is immaterial as Judge Nielson held.

Also, there's of course no scienter with the statement in July, 2021. It would make no sense for the company to apply for an investigative new drug application, knowing that the FDA would reject it a month later for reasons that the company could easily fix. That's essentially what plaintiffs allege here, and there's no scienter, no knowledge of an intent to defraud.

Your Honor, before I address the merits of each of our arguments, I want to give a little bit of background information if I may. Polarityte is a small biotechnology company based here in Salt Lake City. Its first product is called SkinTE, and SkinTE is a revolutionary technology in wound care. Dr. Lough invented this product and found that he was able to take small samples of a patient's skin, able to convert it into a paste in the laboratory and then apply that paste on complex wounds that had better efficacy and

8

better results than the traditional method of doing painful skin grafts that could cause deformation and scars on patients.

Now, because it's a skin tissue product, there are two regulatory pathways available for companies who manufacture skin products. One is through Section 361 of the Public Health Services Act. If a company believes that its tissue product meets the criteria laid out in Section 361, it can self-register under that provision without seeking the FDA guidance or without seeking the FDA approval. It's a self-designation procedure. But if the company determines that it doesn't meet the guidance, it has to register under Section 351. That means that its product is what's called a biological agent, and the company has to file an investigative new drug application and conduct years of clinical trials before it can get FDA approval.

In August of 2017, Polarityte self-registered SkinTE under Section 361. And when it did so, it warned in its SEC filings to investors that the criteria were subjective in nature and the FDA may ultimately disagree with the company's designation. It also warned about the adverse consequences that could happen to the company if the FDA concluded that the product should have been registered under 351.

Several months after the company self-registered

under 361, the FDA published guidance in November of 2017 about the criteria or examples the company could use to determine whether or not their product met either 361 or 351.  Importantly, Your Honor, the FDA gave companies three years, three years to determine whether or not their product should be registered under Section 361 or 351.  The fact that the FDA said that it would not conduct enforcement for three years was because -- it was an admission that this was a complex, subjective and evolving regulatory landscape, and it wanted to give companies like Polarityte the time necessary to evaluate whether or not their drug -- or their skin product, however, fit under 361 or 351.

Importantly, Your Honor, after the -- after the FDA announced the guidance, the company told investors in its SEC filings, again, that the FDA might disagree with its registration under 361 and that the company may be forced to stop selling SkinTE on the deadline imposed by the FDA which was originally November 2020.  It got extended to May, 2021 because of the Covid pandemic.

In July, 2018, the FDA conducted an inspection on Polarityte's manufacturing facilities and issued what's called a form 483 report.  The inspectors made eight observations of potential violations in the FDA's manufacturing protocols.  This was not a formal FDA decision.  It was the opinion of an inspector.  And,

moreover, the inspector gave a voluntary action indicated, meaning that the FDA did not initiate enforcement.  It did not give the company a warning letter, and it -- you know, it did not tell the company it had to stop manufacturing.

The company disclosed the form -- that it had received the Form 483 but considered the matter resolved because the company was allowed to continue to manufacture SkinTE.

Now, over the period, during the three-year period of enforcement discretion, the company had numerous informal discussions with the FDA on its registration status.  And in April, 2020, the company announced a change in strategy. Based on its formal discussions with the FDA, the company decided that it would in fact pursue registration under Section 351.  The company told investors that although it still believed that it was appropriate to register under 361, it was making the business decision to pursue registration under 351 because of the risks that could befall the company if the FDA ultimately disagreed.

And in July, 2021, the company announced it was filing for an investigation new drug application.  And in that press release, it warned investors that the FDA could have questions about its new drug application and place a temporary clinical hold.  And that is exactly what happened on August, 2021.  The FDA announced a clinical hold.

Immediately after that, plaintiffs filed their lawsuit in this case.  They didn't wait to see that the company had responded to the FDA in December of 2021, and the FDA quickly lifted the clinical hold in January, 2022, and the company is currently in clinical trials for its SkinTE product.

Your Honor, briefly, this case is not like your typical business dispute or tort case.  This is a securities fraud class action, and it's governed by very high pleading standards under the Private Securities Litigation Reform Act.  Not only does plaintiff have to identify with particularity that defendants made a false -- a material false statement or omission, they have to raise facts that demonstrate a strong inference of fraudulent intent.

Also, the PSLRA provides for a safe harbor for forward-looking statements.  This means that a company can talk about what might happen in the future and not be liable for those statements if they also are accompanied by cautionary language.  All right?  And that's the standard that applies here, Your Honor, and plaintiffs haven't met it.

First, I'd like to explain to the Court why they haven't plead any false or misleading statements.  First I'd like to address the first category of statements which, in our briefs, we called the Section 361 statements.  These are

12

statements by Polarityte that it believed its registration under 361 is proper.  Plaintiffs say that that was misleading because, in their opinion, the product should have been registered under 351.

First of all, Your Honor, these statements were absolutely true when made.  Remember, 361 is self-designating.  The company did in fact register its skin product under Section 361.  And there has never been a determination, an official determination by the FDA that this -- that it was improper for the company to register under 361.  And the company's statements that it believed -- it prefaced its statements with the word "believe," means that these are statements of opinion, and under the Supreme Court's opinion in Omnicare, and the Tenth Circuit's opinion in Hampton, the DR Root, statements of opinion or belief can only be actionable if plaintiffs plead facts that they weren't truly believed at the time, so -- or that there was absolutely no reasonable basis for the company to state its belief.

And there is no evidence of that, Your Honor.  There is no allegations.  Plaintiffs' allegations that this product should have been regulated under 351 are the exact same allegations that Judge Nielson dismissed in its prior order.  Plaintiffs do not plead with particularity about how SkinTE, the product at issue, failed to meet the criteria.

Instead, they merely cite to the company's patent and analyst reports that disagreed with the company's position, and, you know, without identifying the specifics about what was wrong with the manufacturing process that violated this provision.

And also they allege that we didn't make -- before we designated it under 361, we didn't conduct a meaningful inquiry.  Your Honor, there is no facts in the Complaint that supports that conclusory allegation that we did not conduct a material inquiry.  There is no facts that we didn't consult with experts, we didn't have law firms involved in the process, we didn't have scientists consulting.  There is no particulars about a process for determining the registration under 361.

Plaintiffs say that the company's decision in April, 2020 to change its strategy somehow demonstrates that it should never have been registered under 361.  Your Honor, that's not true.  A company can make a business decision to change its designation because it doesn't want -- it doesn't have the resources to fight protracted litigation with the FDA.  It may be more acceptable in the marketplace if they go through a clinical trial process and get FDA approval. It may be easier for them to raise money.  There's a host of reasons why they might change their business strategy that are different than an admission that what they were doing

before was fraud.

Now plaintiffs cite three anonymous witnesses, witnesses 1, 2 and 3.  None of these individuals had a conversation with any defendant or shared a document with any defendant that indicated that the company was engaged in fraud or that the company's designation under 361 was somehow improper.  These -- these witnesses just provide their opinion which, when you have -- when you operate in a scientific environment, in a complex regulatory environment, you're always going to have disagreements within a company on which way to pursue.  That's all that these anonymous witnesses provide.  More importantly, they don't say that they even shared their opinions with Dr. Lough or any other executive.

Next I want to turn to the form 483 statements. Plaintiffs allege that Polarityte's statements about its manufacturing process and its decision to pursue an investigative drug application were false because they knew about the inspection observations in the form 483 report two days earlier.  Judge Nielson correctly held that the form 483 report was immaterial, Your Honor, and you should do the same.

Again, this report is not an official FDA pronouncement.  The FDA allowed the company to continue to manufacture after it issued its report when it could have

taken an enforcement action or stopped production of the product.  Moreover, there's no connection between the form 483 report and the clinical hold.  And, as I mentioned earlier, both documents are before Your Honor.  You can determine for yourself that the form 483 observations had nothing to do with the questions that the FDA raised in the clinical hold.

Finally, some of the statements are simply puffery, Your Honor, statements like:  Our manufacturing facility is state of the art.

Those are the type of immaterial statements that executives make all the time that investors don't rely upon when they make an investment decision.

Finally, the FDA enforcement statements. Plaintiffs claim that Polarityte gave shareholders the impression, when it announced its change of strategy in April 2020, that it would be able to continue to sell SkinTE after the deadline imposed by the FDA.  Plaintiffs say that they got this false impression because the company told investors that it would -- it would reach out to the FDA and inquire to see if it could continue to sell.  Okay?

Your Honor, that statement is not material because the company specifically warned investors that the FDA could -- could deny its request and that it wasn't customary for the FDA to allow companies to continue to sell.  All the

company told investors is that it would ask the FDA if it could continue to sell after the deadline.

So these are statements that are forward-looking in nature, contain cautionary language and are simply just not material. They were not worded as guarantees. Your Honor, quickly, on the forward-looking statements, the PSLRA has a safe harbor for forward-looking statements. We identified 22 of the statements that they challenged as forward-looking. We attached copious warnings, risk factors that were accompanied to each statement. Plaintiffs, in their opposition, only even address two of those. So for the other 20 it's an easy call, Your Honor. They are forward-looking statements, and they are not actionable.

For the two statements that plaintiffs do respond, these were statements by the company in paragraphs 138 and 149 of the Complaint. They both concern about what could happen if the FDA disagreed with the company. Statements that are contingent in nature about what could happen if the FDA disagreed, those are forward-looking, and plaintiffs' argument that they are actually statements of present fact is just incorrect. They are forward-looking and are entitled to the safe harbor protections.

Finally, Your Honor, scienter. The PSLRA requires facts that raise a strong inference of scienter. Okay? And the first -- the first issue is that this case is unique in

that the executives didn't take advantage of their fraudulent scheme.  None of the executives are alleged to have sold one share of Polarityte stock, which begs the question why they would engage in this fraud in the first place.  And Your Honor is allowed to weigh the inferences. In fact, the PSLRA requires the weighing of inferences at the pleading stage.  And here, not only is there no motive, there are no facts that -- that raise an inference that any defendant knew that a statement was false and misleading when made.

As I discussed, there is no document, contemporaneous document created during the class period that the defendants received that said:  Wait, our product is not appropriate for 361 registration.

Nothing like that.  They have three witnesses that have offered their opinion, but none of these witnesses relay a conversation with any defendant where they shared their opinion with a defendant.  In fact, the only details that an anonymous witness provides actually supports -- actually negates scienter.  Anonymous witness 1, is designated as AW-1, observes in the Complaint that Dr. Lough was adamant and head strong in his belief that registration under 361 was appropriate.  Your Honor, those are facts that demonstrate a sincerely held belief, not facts that raise an inference of fraud.

And, Your Honor, their other scienter arguments are the type that are routinely rejected by Courts in the Tenth Circuit and elsewhere. They say that Dr. Lough's termination should somehow raise an inference of scienter. It doesn't. Unfortunately companies make executive changes all the time for strategic reasons among many other reasons. It's not reasonable to infer fraud based on a determination, particularly under the facts here, because Lough was removed from his position in May of the 2019.

The company didn't change it's strategy to register under Section 351 until a year later in April, 2020. That's a full year. If the company had fired Dr. Lough because they felt like he was engaging in fraud with respect to the regulation, they wouldn't have waited a year to change their business strategy.

Next, plaintiffs make various allegations that scienter can be inferred based on the defendants' positions in the company or access to internal documents. They also say that the company's small size somehow creates an inference and that this was a very important product to the company. All those are too general, Your Honor, in that they could be plead against any company with those characteristics. There wouldn't be a pleading standard for companies if this -- if such allegations were sufficient to raise scienter.

And finally, Your Honor, the reasonable inferences in this case are simply in defendants' favor and are stronger than the inferences raised by plaintiffs' allegations. First, these are complex regulations that require subjective determinations. The FDA didn't pursue an enforcement or an injunction against Polarityte in connection with the form 483 report. The FDA provided companies three years to decide how it was going to register its products under the PSHA -- I'm sorry, the PHSA. Yes.

And, finally, why would Polarityte go through the trouble and expense of filing an expensive investigatory new drug application and design a study knowing that the FDA would simply put a clinical hold in place for reasons that the company quickly cured? Right? That doesn't make any sense, and Your Honor is allowed to weigh those inferences. And when you do, they come in defendants' favor.

Really briefly, loss causation is a very simple argument, Your Honor. Plaintiffs have the burden to prove a causal connection between their investment losses and the alleged misrepresentations, and here plaintiffs rely upon a corrective disclosure theory. They say that there are two press releases that revealed the fraud. One is the May 13, 2021 disclosure that the company would stop selling SkinTE on May 31. The second is an August 24 disclosure of a clinical hold. These are not curative statements under the

law in the Tenth Circuit because they disclose the materialization of known risks.

Polarityte disclosed that it could be forced to stop selling SkinTE upon the deadline.  That's what happened, so it's a materialization of that known risk.  And finally, Polarityte disclosed that the FDA could place a clinical hold when it announced it was filing for a new drug application, and unfortunately that's what happened.  These are materialization of known disclosed risks and therefore not cured.

And, Your Honor, I would like to reserve any time I have left in responding.  Thank you.

THE COURT:  Okay.

Counsel.

MR. WOODWELL:  Thank you, Your Honor.

THE COURT REPORTER:  Counsel, would you give me your appearance again.  I'm sorry.

MS. WOODWELL:  Yes.  Keith Woodwell, Clyde, Snow & Sessions, representing the individual defendant Denver Lough.

Your Honor, I will be very brief.  I just want to emphasize a couple of issues that apply directly to my client, Mr. Denver Lough, one of the individual defendants. We agree with all of the arguments made by Mr. Biles and agree that the entirety of the Amended Complaint should be

dismissed.

I want to just address two arguments that relate specifically to the defendant Dr. Lough.  One of those is res judicata, that the issues alleged, the violations alleged against Denver Lough have already been decided in the previous Polarityte case; and, second, that there are no adequate allegations of scienter, of any fraudulent intent on the part of Dr. Lough.

With respect to the res judicata argument, the PolarityTE-1 Amended Complaint already alleged the two issues that are in the current Amended Complaint filed by plaintiffs in this case that pertain to Denver Lough.  Importantly, Mr. Lough -- Dr. Lough was the founder of PolarityTE and the inventor of the product at issue here SkinTE.  However he was removed from his position as CEO of the company in May of 2019 and placed on administrative leave by the board of directors.  Later, through a settlement with the company, Dr. Lough agreed to permanently depart the company, and that happened in a few months later in August of 2019.

The two allegations that relate to Dr. Lough during the time he was still at the company are that the Section 361 registration of SkinTE was improper and that somehow the company and Dr. Lough knew that it was improperly registered under Section 361, and the allegations related to the FDA's

inspection of the manufacturing facility of the company and the resulting form 483 report that came from that inspection.

The other allegations in the Amended Complaint relate to allegations that happened after Dr. Lough's departure from the company. So, with respect to those two allegations that do pertain to Dr. Lough in particular, both of those allegations were already raised and already decided by another Judge in this district in the Polarity TE-1 case. Tellingly, the plaintiffs make no attempt in their memo in opposition to the motion to dismiss to distinguish in any way the argument that those issues have already been litigated and decided by the Court. There's simply no argument as to why this Court should reconsider those issues that have already been decided. So that alone should be a sufficient basis for dismissing any of the claims against Dr. Lough.

The second reason that I wanted to emphasize for dismissing the claims against Dr. Lough relate to scienter. As Mr. Biles mentioned, under the PSLRA the plaintiffs have a heavy burden to allege specific facts that create an inference of fraudulent intent on the part of the defendants. The allegations in the Amended Complaint related to Dr. Lough's scienter fall woefully short of that standard. There are general allegations that because he's

the inventor of the product and the CEO of the company that somehow he must have known that SkinTE did not qualify for Section 361 registration.

And yet the Amended Complaint tries to argue two things that are contrary to each other at the same time. While they say that he should have known that it was not eligible for Section 361, they also allege that he had a strongly held and adamant belief that it was properly registered under Section 361, and the first anonymous witness that they refer to in the Amended Complaint states that.  The specific quote was that Lough was adamant that SkinTE was a 361 HCT/P.

The anonymous witness 1 points to a couple of small allegations that the plaintiffs allege lead to a conclusion that somehow Dr. Lough knew that that belief was wrongly held.  They cite to the allegation by anonymous witness 1 that there was one investor who suggested to Dr. Lough that the company should at least consider Section 351 registration as a fall-back position.  There's not even an allegation that that investor argued that it was improperly registered under Section 361, simply that that investor argued to Dr. Lough that they should also seek Section 351 approval as a fall-black position in case at some point the FDA decided that the Section 361 registration was somehow improper.

There is also an allegation that has no specifics saying that there were employees at the company during Dr. Lough's tenure prior to May of 2019 who were not allowed to raise concerns regarding the proper status of the product as a Section 361 registered product.  There's no allegation as to who any of these employees were.  There is no specifics as to any specific conversations or even an allegation that any of those employees specifically raised this concern with Dr. Lough, just a generalized opinion statement that no one was allowed to question Dr. Lough's belief that it was properly registered under Section 361.

Those types of conclusory allegations don't meet the standard under the PSLRA.  For that reason, the scienter allegations in the Complaint should fail.

The one other issue that I wanted to address related to scienter is the allegation in the Amended Complaint that somehow because Dr. Lough was placed on administrative leave and later left the company in 2019, that that creates an inference that that was somehow related to improper registration under Section 361.  There are no specific allegations that the separation of Dr. Lough from the company had anything to do with Section 361 registration.  In fact, the plaintiffs acknowledge this in the Amended Complaint by acknowledging that the reasons for the separation are unknown to them.

They do cite to the fact that Dr. Lough's counsel filed a demand letter with the company in August of 2019 stating that the separation of Dr. Lough, placing him on administrative leave was unlawful and that later he settled that and agreed to depart completely from the company. They cite no allegations in that demand letter or the 8-K that was filed by the company explaining the reasons for the separation of Dr. Lough from the company. And the reason they don't cite that is because there is no basis to conclude it had anything to do with the Section 361 allegations.

There is no allegation that it did. There is simply this overarching suspicion that the plaintiffs raise that somehow it must have been related. As Mr. Biles already pointed out, it wasn't until a year later that the company decided to pursue perhaps a Section a 351 registration and start down that different strategy and different path.

In short, Your Honor, there is no reason for the Amended Complaint to name Denver Lough as a defendant. All of the claims alleged against Denver Lough in the Amended Complaint have already been adjudicated, and a Court already dismissed those claims with prejudice. It's improper to have to submit Denver Lough to a second time to litigate those same claims. And with that I would be open to any

questions that Your Honor may have.  Thank you.

THE COURT:  Thank you.

All right.  Counselor.

MR. STERNS:  Thank you, Your Honor.  Jonathan Stern for the plaintiffs.  I won't rehash everything that was in our opposition because we have already provided that to Your Honor, so I'm going to focus on some of the things that were raised in reply and in oral argument.  And what I want to start with is something that was raised for the first time just now, this issue of res judicata, which wasn't mentioned in the briefing.  And there is simple reason for that.  Res judicata does not apply here because plaintiffs weren't a party to the earlier PolarityTE action.

This is something that actually defendants brought up with us in informal discussions about the Amended Complaint, and we pointed out to them that res judicata couldn't apply and that's why we assumed they didn't mention it.  Now they have raised it here for the first time, but I want to be clear about why this case, even though res judicata as a legal doctrine does not apply because, again, plaintiffs were not a party to the earlier action.

I want to discuss why this case is factually distinct because they claim that nothing has changed from Polarity TE-1.  First, the Complaint alleges -- the current Complaint alleges that PolarityTE failed to correct issues

that were identified.

THE COURT REPORTER:  Whoa, whoa.  Please slow down and speak more clearly if you could.

MR. STERNS:  Sorry about that.

The current Complaint alleges that PolarityTE failed to correct issues identified in the 2018, 483 report when it filed its investigational new drug application. That application had not been filed at the time that the Polarity TE-1 decision was issued, so it couldn't have been the subject of prior litigation.

THE COURT:  I'm really interested in the factual assertions that you say are false.  What factual assertions and where are they located that are factually false?  And there needs to be specificity as to the allegation of a factual error or a factual lie or a factual assertion as to a factual matter.  And I've had trouble, in looking at the documents, to try to distill what it is you folks are really talking about.  Tell me what was inappropriately stated as a fact, which wasn't, and where it was stated, to whom it was stated, when it was stated.

MR. STERNS:  Yes, Your Honor.  So there are -- so the -- as a general matter, the factual --

THE COURT:  I want specifics.

MR. STERNS:  Okay.

THE COURT:  I want you to say this is what was

said, where it was said, to whom it was said.

MR. STERNS:  Yes, Your Honor.  So, the first factual statement we allege to be misleading was in the 2017 10-K which the defendants filed on January 30, 2018.  And it states that PolarityTE is a commercial stage company and that SkinTE is commercially available.  This was materially misleading.

THE COURT:  Tell me that again.  I didn't pick that up.

MR. STERNS:  Sure.  The 10-K states PolarityTE is a commercial stage company.

THE COURT:  Is a what?

MR. STERNS:  Commercial stage company.

THE COURT:  So what?

MR. STERNS:  So that means that they basically have a product that they are ready to sell to the public.

THE COURT:  Where does it say that?  We have a product that is ready to sell to the public.

MR. STERNS:  They referred -- in the 2017 10-K, they state that SkinTE is commercially available.

THE COURT:  Okay.  Was it?

MR. STERNS:  It was commercially available, but we allege that even though that's literally true, it's misleading for failure to disclose that the only reason it was commercially available was because it was being

registered under Section 361.

THE COURT:  Well, tell me the statements that are untrue.

MR. STERNS:  Let me grab the Complaint.

So the first one is in paragraph 128 of the Amended Complaint.  We say that PolarityTE is a commercial stage biotechnology company and regenerative bio materials company.

THE COURT:  Well, what's wrong with that?

MR. STERNS:  Stating that it was a commercial stage company was misleading because it was only able to sell its product SkinTE by registering under the wrong section, and at that time defendant --

THE COURT:  Well, somebody made a judgment, a value judgment as to sections.

MR. STERNS:  Yes, Your Honor, but under --

THE COURT:  They filed what they filed.

MR. STERNS:  Yes, Your Honor, but if they didn't have a good faith belief that it was registered under the proper section, it was misleading.

THE COURT:  No.  Tell me what was said, what was said, and to whom it was said, and what was wrong with it.

MR. STERNS:  Yes, Your Honor.  So, in the 2017 10-K -- and this is on paragraph 130 of the Complaint -- they stated:  We believe our products and product candidate,

including SkinTE are appropriately regulated an by the FDA as 361's.

They are not just claiming they did registration under 361 but that they believe that that registration was appropriate.

THE COURT: That's fine. Tell me what's wrong with that. They either did or they didn't.

MR. STERNS: At that time, we know the defendant Lough had many people within the company and investors telling him that the product was not correctly registered under 361 and that there was a real risk.

THE COURT: Well, people made a value judgment and said that they said. So what?

MR. STERNS: Well, under the Omnicare decision --

THE COURT: We are talking about facts now. We are talking about a factual assertion that is false, not a judgment as to what section people are involved with, but a factual assertion that's false.

MR. STERNS: Well, under Omnicare, a statement of opinion can also be false.

THE COURT: I'm interested in facts. On occasion, an opinion can be false, but that's a different question, and we can focus on that when we get to it.

MR. STERNS: Yes, Your Honor, okay. Yes. So these --

THE COURT:  I want to know what statements were made that you're claiming were false and where?

MR. STERNS:  And, again, we do claim that this opinion was false, but I will move on to a different statement.

THE COURT:  They had a false opinion.

MR. STERNS:  It was a false statement of opinion.

THE COURT:  It's a false statement of their opinion.

MR. STERNS:  Yes, Your Honor.

THE COURT:  Okay.  What was false about it?

MR. STERNS:  At this stage -- so there's two different stages of when they were discussing the 361 registration.  At this stage, this is 2018 when Lough was still the CEO, it was false because Lough hadn't conducted a meaningful inquiry and was suppressing internal debate about what the correct section was.  Under Omnicare --

THE COURT:  Why do we know that?  How do we know that?

MR. STERNS:  Yes.  The former director of clinical and transitional sciences who spoke with plaintiffs' investigator told us that this happened, that when people raised the issue of 361 registration, he would shut it down, that a major investor brought it up, and we know from defendants that Lough was not an expert in FDA regulations,

and so if he was just using his own lay person's opinion to guide this belief, that would have mislead an ordinary investor who assumed --

THE COURT:  Well, what investigation was made? What experts were used?  What authorities were used?  What scientists were used?

MR. STERNS:  Based on the allegations that the former director gave us, there was no use of scientists.

THE COURT:  What did he say?

MR. STERNS:  Sorry?

THE COURT:  What did he say and when did he say it?

MR. STERNS:  Defendant Lough or --

THE COURT:  Well, you say the former director.

MR. STERNS:  Oh, yes.  The former director spoke to our investigator.

THE COURT:  And the former director's name is?

MR. STERNS:  We didn't put that in the Complaint because we generally don't include the names of the former employees.

THE COURT:  What's his name?

MR. STERNS:  I don't actually have that on hand.

THE COURT:  Okay.  And you're asserting based on an anonymous person?

MR. STERNS:  Yes, Your Honor.  And there is case law to support that confidential witnesses can be used in a

Complaint, and of course in discovery if defendants want to look into their identity and background, they can seek to do that.

THE COURT:  Yeah, but I'm interested, again, in identifying with specificity, with specificity and clarity, hopefully, and simplicity, the factual matters that you say were incorrect.  You need to identify those in order to have a lawsuit at all.

MR. STERNS:  Yes, Your Honor, and we identified the former director's position and the conversation the former director had, to whom the former director reported, and so there is detailed information about the former employee's qualifications and ability to know, you know, ability to know the information.

THE COURT:  I'm just interested in your propositions.  Let's start with false proposition number 1.

MR. STERNS:  Yes.

THE COURT:  And then false proposition number 2 and on through.

MR. STERNS:  Yes, Your Honor, so false proposition number 1, again, would be we believe that Polarityte -- SkinTE is properly registered under Section 361, so that would be --

THE COURT:  And who is the "we" that says we believe?

MR. STERNS:  The statements were issued on behalf of the company, and when --

THE COURT:  Who said that?

MR. STERNS:  Well, they were in the company's 10-K's.  They were in the company's 10-K's, so the company said it.

THE COURT:  Okay.  When did they say it?

MR. STERNS:  So, they said it for the first time in January of 2018.  They said it again in 2019.

THE COURT:  Okay.  Now, were these in front of my colleague in the first case?

MR. STERNS:  I believe the statements were alleged to be false in the first case, yes.

THE COURT:  And were they concerned -- a concern in the first case?

MR. STERNS:  I believe they were, Your Honor.

THE COURT:  They were?

MR. STERNS:  Yes, they were.

THE COURT:  Then why are we doing anything at all with that?

MR. STERNS:  Well, because when we were investigating this case, we encountered former employees who told us about the internal processes at PolarityTE. First --

THE COURT:  After the fact?

MR. STERNS:  It's information that we learned in our investigation that led us to believe that there were -- that defendants didn't really believe that SkinTE was properly registered, and this information was not before --

THE COURT:  Did you make the same assertion in Polarityte-1?

MR. STERNS:  We didn't make any assertions in Polarityte-1.  We weren't counsel, but I don't believe anyone made -- I don't believe there were any confidential witness allegations in Polarityte-1.

THE COURT:  Was there an assertion that they didn't believe what their opinion was?

MR. STERNS:  Yes.  Or I -- well, I'm not sure if they actually asserted they didn't believe that it was their opinion, but they basically stated that the statements were false because it was not properly registered.

THE COURT:  Okay.  What's your second allegation of fact that you say is incorrect?

MR. STERNS:  Sorry.  Give me a moment to make sure I find the right section.

THE COURT:  Did you write the Complaint?

MR. STERNS:  I did, yes, Your Honor I edited the Complaint, Your Honor.

THE COURT:  Who did?

MR. STERNS:  Nick Manigan.  He is no longer with

the firm.

THE COURT:  Where is he?

MR. STERNS:  He is no longer with the firm.  He made a -- he went to another firm.

THE COURT:  Okay.

MR. STERNS:  The other false -- the other main type of false statement of fact, a good example of it is on May 11, 2020.  So, PolarityTE filed a quarterly report for the period ending March 31, 2020 with the SEC on form 10-Q.  It was signed by defendants Seaburg and Patterson, so the statement was made behalf of the company, but it was signed by those two defendants.  And it discussed the FDA's -- the company's plan to submit an investigational new drug application.  And it's somewhat lengthy, but I'll read it out:

Following informal voluntary discussions between us and the United States FDA, and preliminary views expressed by the FDA received in April 21, 2020 regarding the regulatory pathway for SkinTE, the company believed that it is prudent to submit an investigational new drug application and thereafter a biologics license application, BLA, for SkinTE.  We are in the process of arranging meetings with the FDA to determine the most appropriate development plan for BLA submission.

Since 2018, we have been actively engaged in a

clinical development program which includes a completed SkinTE study on burn wounds, ongoing randomized controlled trials in repairing diabetic foot ulcers and various -- I'm sorry -- venous leg ulcers and outcome data for many of the approximately 700 SkinTE clinical cases.  We intend to submit these data to the FDA as potential candidates for inclusion in a clinical data package to support a BLA.

THE COURT:  Okay.  Is that false?

MR. STERNS:  We believe it was misleading.

THE COURT:  No.  Is it false?

MR. STERNS:  We aren't claiming the statement was literally false, but misleading for failing to disclose material facts.

THE COURT:  Well, what facts should have been disclosed that weren't?

MR. STERNS:  The fact that they hadn't corrected the issues that the FDA identified in 2018 in that 483 report that we have been discussing.

THE COURT:  I'm interested in assertions that are factually untrue.  Do you have any more?

MR. STERNS:  Yeah.  I can -- there were more details provided about the forthcoming IND, so including on November 9, 2020, the company filed a quarterly report for the period ending September 30, 2020.  It was filed with the SEC on Form 10-Q.  It was signed by defendants Seaburg and

Patterson, and it discusses discussions with the FDA.  So it states that on August 2020, we submitted a Type B pre-IND meeting request to FDA regarding an indication for SkinTE to treat diabetic foot ulcers and received written responses to our meeting requests and questions in October, 2020.

FDA's responses included, among other things, feedback and recommendations on SkinTE manufacturing, pre-clinical studies and clinical data submitted in the company's briefing package and guidance on additional information for the company to include in its IND submission.

They also went on to say that in the coming months we will pursue the preparation of an IND file with the FDA which we believe we will be able to file in the second half of 2021.  This effort will include, among other things, the completion of CMC and pre-clinical work to satisfy FDA requirements, interaction with the FDA on additional indication, trial designs, preparation and submission of the IND and planning for clinical trial enrollment to begin as soon as we have an open IND.

And this statement was factually false because they state that they were going to undergo efforts to complete CMC and pre-clinical work.

THE COURT:  Okay, did they?

MR. STERNS:  Our allegation is that they did not,

that the FDA had warned them about CMC issues in 2018 and that they failed to correct those, and those were identified in the form 483.

THE COURT: Okay. How have you been hurt? Are those the factual allegations that we are talking about, then?

MR. STERNS: There are several -- there are other false statements we identify, but they are based on the same theory.

THE COURT: Uh-huh.

MR. STERNS: So, for instance, in another one, the PolarityTE hosted a conference call on -- I'm sorry -- on September 30, 2020, and during that call, they stated -- defendant Seaburg stated: Our team has made significant progress preparing for the BLA.

We believe that was false because, again, they hadn't corrected the issues identified in 2018.

THE COURT: Are these the eight observations that had been made?

MR. STERNS: Yes. This is the observations in that form 483.

THE COURT: Okay. Do they say they have corrected them?

MR. STERNS: They stated that they addressed CMC issues which were the sorts of issues addressed --

40

THE COURT:  Well, they addressed them, but did they correct them?  Did they say they corrected them?

MR. STERNS:  They stated that they would complete the CMC work, so I think that would -- any ordinary investor would think that completing it would mean correcting the issue.

THE COURT:  Either that or they have been abandoned by the SEC or someone else.

MR. STERNS:  Right.  But there is no -- there is no indication that the FDA abandoned the issue, so --

THE COURT:  Okay.  Well, again, how have you been hurt?  Did you rely on that?

MR. STERNS:  Well, investors relied on the integrity of the market price.  Generally speaking, the market for securities, including this security --

THE COURT:  Did you folks rely on the general integrity of the market?

MR. STERNS:  Our clients relied on the market price and reasonably assumed that the information that led to that market price was all truthful information.

THE COURT:  What did they lose?

MR. STERNS:  We submitted a loss chart.  I can pull that up and see what we did.  We submitted that in our --

THE COURT:  I'm interested in how much.

MR. STERNS:  I can find that out.  So, I'm just

pulling up the motion -- I'm just pulling up the loss chart that we submitted.

THE COURT:  I've got all your submissions here.  We print them out for the benefit of an old-fashioned Judge, but I'm interested in your telling me.

MR. STERNS:  Yes, Your Honor.  Our client lost approximately $339,911.11 in connection with this case.

THE COURT:  Okay.  Any more factual assertions that are false?

MR. STERNS:  Your Honor, there is additional instances where, for instance, in a -- on a conference -- on a conference call dated September 30, 2020 -- actually, I'm sorry.  I'm referring to the wrong thing.  There are additional instances where defendants claimed that they were making significant progress towards completion of the BLA or said that they had addressed the CMC issues.  And, again, we believe those to be factually false and misleading.

THE COURT:  Okay.  I don't know who made those statements.

MR. STERNS:  By this time, it was typically defendants Seaburg and Patterson because they were in charge at that point.

THE COURT:  Okay.  Anything else you want to tell me?

MR. STERNS:  Yes, Your Honor.  I do want to address

the fact that defendants submitted what they claim is a copy of a clinical hold letter and why we believe that that was improper. So first, that document has never been made public prior to now, so we have no way of verifying its authenticity. And second, and I think more disconcertingly, they redacted portions of the document. They didn't submit -- and I understand some of it might be information that they don't want public, but they didn't contact us to say that we would like to file this under seal, which we would have worked with them on. They didn't ask the Court to file under seal. They just redacted documents and decided that we and the Court shouldn't have access to that information.

And then they claim that if you compare the two documents, you'll see that the issues raised in the first don't appear in the second. But how can we know that when material portions of the second document were redacted?

THE COURT: Okay. Well, ordinarily if matters are put under seal, they are furnished in full to everybody.

MR. STERNS: Yes. But that didn't happen in this case, and I think that would have -- and I frankly think that if the full document would have supported them, I can't help but wondering.

THE COURT: Okay. Thank you.

MR. STERNS: Thank you.

THE COURT:  Counselor?

MR. BILES:  Your Honor, we have nothing further unless you have questions.  I'd be happy to address them.

THE COURT:  In your view, in your view, are the items identified by counsel the only assertions of factual inaccuracy in the Complaint?  Are there other assertions of factual inaccuracy?  I have been trying to understand the Complaint and the factual assertions.  I'm curious as to identifying with specificity what's said to be inaccurate, and I've had trouble doing that.

MR. BILES:  Well, Your Honor, I share your frustrations because we struggled with that as well.  We believe that the statements they identify -- and they identify numerous -- are all --

THE COURT:  Talking back and forth, were there experts consulted?

MR. BILES:  Absolutely.  Well --

THE COURT:  Were there opinions written upon people -- what people relied upon?

MR. BILES:  Your Honor, this is going beyond the pleadings.

THE COURT:  It is the beyond the pleadings.  I'm trying to ascertain in my own head what people are talking about.

MR. BILES:  PolarityTE is a publicly traded company

with a board of directors.

THE COURT:   How much money did they raise to begin with?

MR. BILES:   I don't have an exact figure for you, Your Honor.

THE COURT:   What's the approximate figure?

MR. BILES:   I mean, I believe it's in the tens of millions of dollars.  I don't believe it's hundreds of millions of dollars.

11:08:59   THE COURT:   Have they raised money since?

MR. BILES:   The company is right now focused on getting through the clinical trials, and that's the most important thing for the company right now.

THE COURT:   Did they raise money beyond the initial public offering?

MR. BILES:   Your Honor, I don't want to provide false information.  I do not know.

11:09:27   THE COURT:   Okay.  They have filed the required forms.  What does one do if you choose the 361 approach? You could put anything down there, I suppose, couldn't you? Do you have to qualify to file a 361?

11:09:59   MR. BILES:   Your Honor, it's important to note it's self-designating.  The FDA gave it up to the companies to make the decision.

THE COURT:   I understand that.  What advantage is

45

there for me qualifying for that if I have a product that's a complex product, a scientific product, and I simply register it? So what? How does that help anybody?

MR. BILES: Well, there are benefits to both business decisions here. Registration under 361 is more efficient because you don't have to go through clinical trials.

THE COURT: Well, I understand that. But I'm wondering, so what? What's your advantage? Do you tell people, we have registered under 361.

MR. BILES: That's exactly what we did. We told investors we registered under 361.

THE COURT: Okay.

MR. BILES: And investors knew that there was significant risk to that decision. They knew there was significant risk because we warned them of the risk, and this risk was discussed in every SEC filing, every analyst conference call, and there were plenty of analysts out there who disagreed with the company's position. And as plaintiffs cite, there was one investor who raised concern well, maybe it would be prudent to also pursue registration under 351.

That may be a good business decision, and it's one that the company ultimately made, but it's not securities fraud. If you disclose the risks, it's not securities

fraud.

THE COURT: Okay. What's required under 361? What do you have to tell people or have to tell the agency?

MR. BILES: You don't. You register under 361, and there's -- I believe there's four or five criteria, and one of them is that the product has to be minimally manipulated. Another is it can't contain a list of prohibited articles. We believed we satisfied those and the other criteria.

THE COURT: Yeah. Who in your company made that decision?

MR. BILES: We made that decision in August, 2017. And it's important, before the FDA gave guidance, the guidance that they say we --

THE COURT: Who in your company made that decision, if you know?

MR. BILES: A group of -- it was a group of scientists.

THE COURT: Name one.

MR. BILES: Your Honor, I cannot name the scientists. I don't have the list. But it was not dictated by Dr. Lough. It was a -- it was a group decision with scientists.

THE COURT: And were minutes kept?

MR. BILES: I would have to get back to you on that. I'm certain there were.

THE COURT:  I'm wondering what useful public purpose is served by 361?  Don't you have to qualify in some way?

MR. BILES:  Well, the company has to have a -- make a good faith determination that they meet the criteria.  And we did that.  And briefly, Your Honor, plaintiffs claim that we did not make a reasonable inquiry, and Your Honor's questions go to that, I believe.  There are no facts in the Complaint that demonstrate we did not make a reasonable inquiry.

THE COURT:  I understand.

MR. BILES:  Right?  So that's just --

THE COURT:  We are not talking about the Complaint. We're talking about the adequacy of the Complaint.  I'm looking at the alternatives.  If anybody can purportedly meet the criteria of 361 in good faith and all of that, but the agency does nothing, apparently, except that they did inspect.  They did inspect the manufacturing facility?

MR. BILES:  That is true.

THE COURT:  And they made eight observations, and the observations were for what purpose, if you can just register and go on your way?

MR. BILES:  I believe the form 483 goes more to the manufacturing set up of the manufacturing facility about whether or not the company's following certain microbial

protocols in creating adequate clean rooms and things of that nature.  The clinical hold letter --

THE COURT:  You described the product.  The product apparently is a mix.

MR. BILES:  It is -- it is a -- primarily the patient's own skin is the main ingredient, and we believe that we did not -- well, we know that we did not include any of the prohibited articles that are listed under 361. Really the gray area, Your Honor, is whether or not the product was minimally manipulated.  And we believed that simply turning it into a paste was not substantial manipulation.  Others disagreed in the marketplace, and --

THE COURT:  Apparently some, it is suggested, disagreed within the company itself.  But the decision was a company decision.

MR. BILES:  That is correct, Your Honor.

THE COURT:  It did what it did.  Okay.  Has it since complied and been authorized under the 351 matter?

MR. BILES:  Not yet, Your Honor.  The investigation --

THE COURT:  It's in process?

MR. BILES:  It's a multi-year process of clinical trials.

THE COURT:  And are you still selling the product?

MR. BILES:  No, Your Honor.  As we announced, we

ceased selling SkinTE on May 31, 2001(as spoken).  That was the deadline imposed by the FDA.

THE COURT:  Okay.  That was the three-year window?

MR. BILES:  Yes, Your Honor.

THE COURT:  Okay.  And the company hasn't sold the product at all since then?

MR. BILES:  That is my understanding, Your Honor, yes.

THE COURT:  I always enjoy attorneys that tell me that's their understanding, which is a nice hedge if people want to hedge, and I understand that.  But I'm trying to see if they've got anything in the Complaint that justifies denying your motion.  Tell me again why I should deny -- in a brief fashion why I should grant your motion.

MR. BILES:  Your Honor, the simplest reason is they haven't identified a false and misleading statement.  All right?  The statements that they challenge were true, and they were statements of opinion or belief, and they haven't established that the speaker didn't hold that belief.

Also, 22 of the statements are clearly forward-looking, and they had -- we attached in Appendix C dozens of risk factors that are on point and meaningful.  They fall into -- under the safe harbor.

Finally, Your Honor, they don't even come close to scienter.  They don't have a credible theory of fraud here.

None of these executives sold their stock at inflated prices.  They held their stock and suffered damages just like the shareholders.  They were losers as well.

This fraud theory makes no economic sense.  More importantly, there is no link to show that they didn't hold the belief that the product was properly registered under 361.

THE COURT:  Okay.  Anything else?

Anything else?

MR. STERNS:  Yes, Your Honor.  So just taking a step back to the factual allegations, and we do want to point out, and it sort of relates to what you discussed with defense counsel about why the statement that they believed SkinTE was registered under 361 was a false statement.  So, as they discussed, SkinTE involves taking skin and grinding it into a paste.  Now, one of the regulations for 361 is it has to be minimally manipulated.  And on November 16, 2017, which is after defendants made the initial designation but before the class period and therefore before all of their statements that we have referenced, the FDA put out guidance that says a manufacturing process -- I'm sorry -- manufacturing processes -- a manufacturer processes skin by removing the epidermis and then grinding the dermis into particles.  The HCT/P generally is considered more than minimally manipulated because the processing alters the

original relevant characteristics of the skin related to its utility as a protective covering.

I'm not sure what grinding something into a paste is if it's not grinding it into particles. I think that's -- and defendants want to claim this was a complicated regulation and there was a lot of subjectivity, but they had guidance well before they made any other statements.

I also wanted to address that defendants said -- claimed there was a process that they underwent, and I think one of the questions that they didn't address when he said that there was a process and they consulted scientists is when they did that because the allegation is that while Lough was present he inhibited that process, but then eventually, after he left, they did undergo a more rigorous process, but in 2019 where they determined they would have to register as a 351. But then they just didn't tell investors that they had already reached that conclusion, and that is misleading to investors when they continued to say they believed that they were properly registered under 361, when they already determined that they would likely have to register under 351.

So the issue is not just, did they undergo a process, but, when did they undergo the process and what conclusion did they reach, and were they honest with

52

investors about what conclusion they had reached?

THE COURT:  Okay.

MR. STERNS:  Thank you, Your Honor.

THE COURT:  Thank you.  I'm going to grant the motion to dismiss, but I'm going to give you 20 days to amend, in the event that you're capable of amending and amending in such a fashion that you set forth with specificity and simplicity, identity of the false statements made; by whom and to whom, and where and when.

I will ask counsel for the moving party to prepare and submit a simple form of order embracing what we have done here today, with leave to amend within 20 days after the entry of the order.  If you'll do that, if you'll get that to me within ten days, I'd appreciate it.  And run it by counsel so that he knows what we're talking about.  Appreciate your help.  Thank you very much.

MR. STERNS:  Thank you, Your Honor.

THE COURT:  Okay.  We'll be in recess until 11:30.

(Whereupon the proceedings were concluded.)

53

REPORTER'S CERTIFICATE

STATE OF UTAH            )

                         ) ss.

COUNTY OF SALT LAKE      )


         I, REBECCA JANKE, do hereby certify that I am a Certified Court Reporter for the State of Utah;

         That as such Reporter I attended the hearing of the foregoing matter on September 8, 2022, and thereat reported in Stenotype all of the testimony and proceedings had, and caused said notes to be transcribed into typewriting, and the foregoing pages numbered 1 through 52 constitute a full, true and correct record of the proceedings transcribed.

         That I am not of kin to any of the parties and have no interest in the outcome of the matter;

         And hereby set my hand and seal this 23rd day of September, 2022.




                         _____
                         REBECCA JANKE, CSR, RPR, RMR