Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
jstern@rosenlegal.com

*Counsel for Plaintiffs*

Mark F. James (5295)
Mitchell A. Stephens (11775)
**JAMES DODGE RUSSELL & STEPHENS P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Fax: (801) 363-6666
Email: mjames@jdrslaw.com
mstephens@jdrslaw.com

*Local Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| MARC RICHFIELD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br>POLARITYTE, INC., DENVER LOUGH, DAVID SEABURG, JACOB PATTERSON, PAUL MANN, and RICHARD HAGUE,<br><br>Defendants. | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Case No. Case No. 2:21-cv-00561-BSJ<br><br><u>JURY TRIAL DEMANDED</u><br><br>Hon. Bruce S. Jenkins |

## TABLE OF CONTENTS

I. NATURE AND SUMMARY OF THE ACTION ..................................................... 1

II. JURISDICTION AND VENUE ..................................................... 8

III. PARTIES ..................................................... 8

IV. BACKGROUND ..................................................... 10

A. Company Background ..................................................... 10

B. SkinTE ..................................................... 11

C. Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps) ..................................................... 12

D. PolarityTE Incorrectly Registers SkinTE as a 361 HCT/P ..................................................... 17

E. SkinTE Was Not a 361 HCT/P, and Defendants Knew It. ..................................................... 18

F. Lough Silenced Disclosure of the SkinTE's Mis-Registration ..................................................... 19

G. FDA's July 2018 Inspection of PolarityTE's Facility ..................................................... 21

H. Board of Directors Abruptly Removes CEO Lough, and Belatedly Begins Talks with the FDA ..................................................... 23

I. PolarityTE's Desperate Need for Cash ..................................................... 26

V. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT REGARDING THE COMPANY'S ABILITY TO MARKET AND SELL SKINTE AS A 361 HCT/P AND THE COMPANY'S MANUFACTURING FACILITY. ..................................................... 29

VI. THE TRUTH REGARDING SKINTE'S REGULATORY STATUS AND THE COMPANY'S ABILITY TO MARKET AND SELL SKINTE AS A 361 HCT/P IS PARTIALLY REVEALED ..................................................... 34

VII. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE SKINTE IND AND BLA, AND CONTINUED MAKING FALSE AND MISLEADING STATEMENTS REGARDING THE COMPANY'S ABILITY TO MARKET AND SELL SKINTE AS A 361 HCT/P ..................................................... 36

VIII. THE TRUTH REGARDING THE COMPANY'S ABILITY TO SELL SKINTE AS A 361 HCT/P IS REVEALED ..................................................... 39

IX. THE TRUTH REGARDING THE SKINTE IND AND BLA EMERGES ..... 39

X. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER ..................................................... 42

A. Additional Allegations Concerning Lough's Scienter ........ 42
B. Additional Allegations Concerning Seaburg's Scienter ........ 45
C. Additional Allegations Concerning Patterson's Scienter ........ 47
D. Additional Allegations Concerning Mann's Scienter ........ 49
E. Additional Allegations Concerning Hague's Scienter ........ 51
XI. PLAINTIFFS' CLASS ACTION ALLEGATIONS ........ 52
XII. NO SAFE HARBOR ........ 55
COUNT I ........ 56
COUNT II ........ 59
PRAYER FOR RELIEF ........ 60
JURY DEMAND ........ 61

Lead Plaintiff Christopher Evans and Named Plaintiff Janet Noel ("Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PolarityTE, Inc. ("PolarityTE" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees of PolarityTE by Plaintiffs' investigator, documents obtained from a Freedom of Information Act ("FOIA") request from the United States Food and Drug Administration ("FDA"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exists for the allegations set forth herein and will further be bolstered through discovery.

## I. NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of a class of all persons and entities other than Defendants that purchased or otherwise acquired PolarityTE common stock between January 30, 2018 and November 9, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. After going public via a reverse-merger with a failing video-gaming company led by serial pump-and-dump fraudsters, PolarityTE began promoting itself as a commercial stage biotechnology company. PolarityTE claimed that it could sell its first and then only product, SkinTE, without first receiving FDA premarket approval or enduring expensive and lengthy

clinical trials. In reality, PolarityTE improperly registered its product under a regulation for which it was not eligible. When the FDA discovered the Company was illegally selling its product and told the Company that they would have to stop selling SkinTE and first obtain premarket approval, Defendants misled investors about their ability to meet FDA requirements for approval. In truth, the company was unable to create a "potency assay" – a measure of the biological effectiveness of their product that is crucial both to FDA approval and to actually proving that their product is effective at recommended doses.

3. SkinTE is a Human Cell, Tissue, and Cellular and Tissue-Based Product ("HCT/P"). HCT/Ps consist of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer to a human recipient. SkinTE is intended to repair, reconstruct, replace, and supplement skin in patients who have wounds, burns, surgical reconstruction events, scar revision, or dysfunctional skin grafts.

4. The FDA sets the regulatory framework for HCT/Ps based on a risk-based approach. There are two regulatory pathways relevant to this case: (1) regulation under Section 361 of the Public Health Service Act (the "PHS Act") (the "Section 361 pathway"); or (2) regulation under Section 351 of the PHS Act (the "Section 351 pathway"). Whether a product qualifies for the Section 361 pathway or must proceed through the Section 351 pathway is a critical issue for investors.

5. The Section 361 pathway allows for immediate commercial use without FDA review for safety and effectiveness of the product. However, HCT/Ps only qualify for the Section 361 pathway if the HCT/P: (1) is minimally manipulated; (2) performs the same basic function as the cells or tissues that it is meant to repair or replace; and (3) does not involve cells and tissues combined with other articles (subject to certain exceptions not relevant here). These

"361 HCT/Ps" are exempt from premarket review and approval requirements because the FDA considers them low risk products. In short, the Section 361 pathway allows for immediate commercialization of a product.

6. The Section 351 pathway, on the other hand, requires a company to go through the laborious FDA approval process before any commercial use of a product. This typically means the 351 HCT/P manufacturer must submit an investigational new drug application ("IND" or "IND application"). Next, the manufacturer completes several clinical trials on humans. The clinical data gathered during this process is then used to support a Biologics License Application ("BLA"). The FDA will approve the BLA only after the manufacturer proves that the product meets FDA standards designed to ensure the "continued safety, purity, and potency" of the product. This process is many-years-long and very expensive.

7. Whether a product qualifies for Section 361 or must follow Section 351 is critical to investors because Section 361 allows a company to sell its product immediately. In contrast, an investment in a company going through the Section 351 process means years of delay for clinical trials, approval of chemistry, manufacturing, and control requirements, mountains of research, and the mere hope of eventual FDA approval – as FDA often denies approval.

8. Defendants understood the difference between the two pathways – and the delay, costs, and risks associated with the Section 351 pathway. To avoid the lengthy approval process under Section 351, Defendants registered SkinTE as a 361 HCT/P—without consulting the FDA or seeking independent expert advice—and began selling SkinTE immediately and marketing the Company to investors based on those improper sales.

9. But Defendants knew that SkinTE was not properly registered under Section 361.

10. For example, a product may only be registered under Section 361 if it is subject to "minimal manipulation," meaning "that the processing of the HCT/P does not alter the original relevant characteristics of the tissue." FDA Guidance for Industry and Food and Drug Administration Staff, July 2020, *citing* 21 CFR 1271.3(f)(1). SkinTE always failed that test. The process of creating SkinTE starts with a skin sample from a patient. Doctors who take the sample ship it to PolarityTE's manufacturing facility, where the company turns it into a white paste and send it back to the patient in a syringe. This process alters the original skin sample. The paste is no longer a protective layering like the original skin sample, nor does the paste retain skin's dense, strong, and flexible layer of tissue.

11. SkinTE also violated Section 361's requirement that the manufacturing of the 361 HCT/P "does not involve the combination of the cells or tissues with another article." FDA Guidance for Industry and Food and Drug Administration Staff, July 2020. During the SkinTE manufacturing process, the skin sample is mixed with other components such as scaffolding and growth factor receptor ligands. These additions are prohibited under the Section 361 pathway.

12. Despite knowing that SkinTE was not properly registered under Section 361, Defendants touted the Company's ability to market and sell SkinTE under the Section 361 pathway when interacting with investors. This allowed Defendants to portray the Company as a commercially viable and operational biotech company when, in reality, the Company was still a developmental stage company with only the hope of someday commercializing its product if and when it completed several successful clinical trials and obtained FDA approval.

13. Defendants touted their inaccurate Section 361 credentials as fundamental to the Company's value. Defendants repeatedly told investors that the Section 361 pathway was one of the Company's "competitive strengths" and that the immediate, commercial launch of SkinTE

was key to the Company's growth. Meanwhile, Defendants failed to disclose that they did not qualify for the Section 361 pathway necessary for immediate commercialization.

14. Behind the scenes, employees were not allowed to voice concerns about the Company's regulatory status. Defendant Lough, the CEO at the time, silenced and ignored anyone who pointed out that SkinTE did not qualify for the 361 pathway. Defendant Lough understood that if the market learned SkinTE did not qualify for the 361 pathway, the Company's stock price would plummet. Thus, according to one former employee, if anyone disagreed with Lough about the 361 registration, Lough would "chop their head off."

15. In August 2019, the Board abruptly removed Lough as CEO without any explanation. At that point, employees were finally able to openly discuss that SkinTE did not qualify for Section 361. Internal discussions among senior employees, including directors and vice presidents, took place throughout the summer and fall of 2019. By December 2019, the Company was transitioning to regulatory approval under the Section 351 pathway – the pathway that always applied to SkinTE.

16. However, Defendants continued misleading investors about the Company's ability to market and sell SkinTE as a 361 HCT/P.

17. On April 21, 2020, the FDA advised Defendants of the inevitable – that SkinTE was not properly registered under Section 361. This meant that the Company would have would have to successfully complete several clinical trials before it could seek FDA approval under the Section 351 pathway and continue selling it.

18. However, Defendants continued misleading investors. Defendants led investors to believe that the Company could continue selling SkinTE as a 361 HCT/P indefinitely. In truth, the Company was living on borrowed time because of an FDA grace period.

19. The FDA had an enforcement discretion policy in place for all HCT/P manufacturers. This grace period gave HCT/P manufacturers the ability to market their product while engaging with the FDA. If the product was a 351 HCT/P, this period gave manufacturers time to prepare for filing an IND and BLA. But all HCT/P manufacturers knew that the FDA's enforcement discretion period expired on May 31, 2021. As of that date, all 351 HCT/Ps – including SkinTE – would be subject to the full FDA approval requirements.

20. Thus, Defendants knew that they would have to stop all commercial sales by May 31, 2021. The Company had no other products to sell. Thus, it was obvious that the Company's financial condition and value would be negatively and severely affected. However, Defendants continued misleading investors into believing that SkinTE qualified for the Section 361 pathway.

21. The truth was revealed on May 13, 2021 when—only three weeks before the enforcement discretion policy was set to expire—Defendants finally disclosed that the Company would have to stop all commercial sales of SkinTE. In other words, the Company would stop all commercial operations unless and until the Company obtained formal FDA approval for SkinTE.

22. Obviously, there is a significant difference between investing in a company with active sales and a commercialized product and investing in a company that merely hopes to sell a product in the future. The market reflects as much. On May 13, 2021, news that it would cease selling SkinTE and have to file for Section 351 approval caused PolarityTE's share price to plummet, declining 21% from the previous day.

23. PolarityTE then pivoted backwards to being a development stage company and told investors that the Company was in the process of preparing an IND application with the FDA for SkinTE. However, they still continued to mislead investors by repeatedly telling investors that they had everything they needed to prove that SkinTE was effective – an obvious

and important aspect of FDA approval. In reality, however, as the FDA repeatedly warned PolarityTE, the company lacked an appropriate potency assay and therefore could not design a clinical trial that could satisfy FDA requirements for approval. The FDA had warned PolarityTE as far back as 2018 that they lacked such a potency assay.

24. The truth was partially revealed on August 24, 2021, when the Company disclosed that the FDA placed the SkinTE IND on clinical hold because of Chemistry, Manufacturing and Controls ("CMC") regulatory items that needed to be addressed.[1] The Company did not disclose the specific CMC problems. On this news, the Company's stock fell again by 9.52%

25. On November 10, 2021, Defendants finally disclosed that one of the problems it needed to solve before the FDA would lift the clinical hold was the lack of an appropriate potency assay. Defendants disclosed that "[t]he clinical hold issues that must be resolved before the clinical hold can be lifted involve, our proposed potency assay; drug product dosage, storage, shipping, and release specifications; antibiotics residuals; bacteriostasis and fungistasis testing; and delivery device." On this news, the Company's stock fell by 10.45%. Through the FOIA request, Plaintiffs were able to determine the FDA raised this issue for the first time on July 13, 2018, meaning Defendants were aware of this specific issue for three years before the Company disclosed them to the public.

26. As a result of Defendants' false and misleading statements and omissions of material fact to investors causing the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class Members have suffered significant losses and damages.

---

[1] CMC are crucial activities when developing new pharmaceutical products. CMC involves defining proper manufacturing practices and product specifications that must be followed and met in order to ensure product safety and consistency between batches. Failure to meet CMC requirements is grounds for FDA to reject a new drug application.

## II. JURISDICTION AND VENUE

27. The claims assert herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

29. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), because many of the false and misleading statements were made in or issued from this District, and PolarityTE's principal executive offices are located within this Judicial District.

30. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

31. Plaintiffs acquired PolarityTE securities at artificially inflated prices during the Class Period and were damaged by Defendants' misleading statements. Lead Plaintiff Christopher Evans's PSLRA certification was previously filed with the Court (Dkt. No. 25-3) and is incorporated by reference. Named Plaintiff Janet Noel's PSLRA certification was attached to the First Amended Complaint. Together, they lost more than $340,000

32. Defendant PolarityTE is a Delaware corporation with principal executive offices located at 1960 S. 4250 West, Salt Lake City, Utah 84104. PolarityTE's common stock trades in an efficient market on the NASDAQ under the ticker symbol "PTE."

33. Defendant Denver Lough ("Lough") was the founder of PolarityTE and inventor of SkinTE. He served as the Company's Chief Executive Officer ("CEO") and Chairman from December 1, 2016 until August 2019.

34. Defendant David Seaburg ("Seaburg") joined PolarityTE in August 2018 as a director and subsequently joined the management team in January 2019, serving as President of Corporate Development until August 2019, when he joined the Office of the Chief Executive, before being named Chief Executive Officer in April 2020. He served as PolarityTE's CEO from April 2020 through August 2021, and currently serves as a Director and Chair of the Board's Strategic Review Committee.

35. Defendant Jacob Patterson ("Patterson") is the Company's Chief Financial Officer ("CFO"). He joined PolarityTE in January 2018 and served as Vice President of Finance. He then served as the Company's Interim CFO from March 31, 2020 until August 2021, when he assumed the role of CFO.

36. Defendant Paul Mann ("Mann") served as the Company's CFO from June 2018 until March 31, 2020.

37. Defendant Richard Hague ("Hague") is the Company's CEO and President. He joined PolarityTE in April 2019 as Chief Operating Officer ("COO") and served in the Office of the Chief Executive beginning in August 2019 until April 2020, when he began serving as the Company's President in addition to COO. He was appointed as the Company's CEO in August 2021.

38. Defendants Lough, Seaburg, Patterson, Mann, and Hague are sometimes referred to herein as the "Individual Defendants."

39. PolarityTE is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

40. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

41. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. BACKGROUND

### A. Company Background

42. PolarityTE is a biotechnology company that develops regenerative tissue products and biomaterials.

43. Defendant Lough founded the Company and invented the PolarityTE regenerative medicine and tissue engineering platform.

44. On December 1, 2016, the Company announced that it would go public via a reverse merger with Majesco Entertainment, a company that had previously created video games. At the time of the merger, Defendant Lough owned 100% of the issued and outstanding shares of capital stock of PolarityTE.

45. In January 2017, Majesco Entertainment changed its name to PolarityTE, Inc. On June 23, 2017, PolarityTE sold all the assets and liabilities of Majesco Entertainment's gaming business.

46. Following the merger, Defendant Lough replaced Barry Honig as the Company's CEO. Honig resigned as a member of the Board of Directors effective February 8, 2017. Michael Brauser was the Chairman of Majesco but also resigned as a director of PolarityTE on

February 8, 2017. John Stetson, who had been the CEO of Majesco, remained with PolarityTE in the same role.

47. In September 2018, the SEC charged Honig, Stetson, Brauser, and others for their role in pump-and-dump schemes of three public companies. SEC v. Honig, 18-cv-08175 (S.D.N.Y.). According to the SEC, Honig and his associates bought stock in three small companies, controlled the firm's managements, and planted promotional articles about them before unloading their shares. These schemes "generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock."

48. PolarityTE fired Stetson in response to the SEC charges, but Honig and Brauser remained as large stakeholders of the Company. According to the Company's Annual Report for the fiscal year ended December 31, 2019, the two controlled over 10% of the company's shares combined.

**B. SkinTE**

49. SkinTE is the Company's first and only regenerative tissue product. The core technology of SkinTE is minimally polarized functional units ("MPFUs"). MPFUs are multi-cellular segments created from a piece of the patient's healthy skin.

50. SkinTE is meant primarily to replace the current standard of care: split-thickness skin grafts ("STSGs"). During a STSG, the surgeon will remove a thin layer of skin from one part of the patient's body (known as the donor site) and use it to close the surgical site that needs to be covered (the recipient site).

51. PolarityTE claims that SkinTE produces results that are superior to STSGs and synthetic skin substitutes. According to the Company's 2020 Annual Report on Form 10-K, "SkinTE allows the patient to regenerate full-thickness, three-dimensional skin (similar to a

FTSG) by contributing a much smaller skin sample, while reducing the scarring and morbidities associated with STSGs." The Company claims that SkinTE can "provide[] complete and durable wound closure with the regenerated tissue having many of the important characteristics of native skin such as pliability, strength, sensation, ability to sweat, and hair growth."

52. The process for SkinTE starts with the collection of a skin sample from the patient. The skin sample is then shipped to the Company's manufacturing facility in Salt Lake City. There, the harvested skin sample is used to manufacture SkinTE, a white pasty medium that goes back to the doctor in a syringe. The doctor then prepares spreads SkinTE evenly across the entire surface of the wound.

### C. Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps)

53. In the United States, HCT/Ps, like SkinTE, are regulated by the FDA under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") and the Public Health Service Act (the "PHS Act").

54. HCT/Ps are defined in 21 CFR 1271.3(d) as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient."

55. HCT/Ps are subject to varying degrees of regulation by the FDA, depending on if they fall solely within the scope of Section 361 of the PHS Act (42 U.S.C. § 264) or if they are regulated as drugs, devices, or biological products under Section 351 of the PHS Act (42 U.S.C. § 262) or the FD&C Act.

*The 361 Pathway.*

56. HCT/Ps that are regulated *solely* under Section 361 (referred to herein as a "361 HCT/P" or a "361-product") are exempt from premarket review and approval by the FDA. In

other words, the Section 361 pathway allows a company to market and sell a product without the lengthy, formal FDA approval process.

57. The FDA applies a four-part test to determine if an HCT/P is an HCT/P regulated solely under Section 361, and thus exempt from the IND and premarket review and approval requirements of 351 HCT/Ps. An HCT/P is regulated solely under Section 361 of the PHS Act and 21 CFR 1271 if it meets all of the following criteria:

- The HCT/P is minimally manipulated;
- The HCT/P is intended for homologous use[2] only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
- The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
- Either:
  (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
  (ii) HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
    (a) Is for autologous use;
    (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
    (c) Is for reproductive use.

*See* 21 CFR 1271.10(a).

*The 351 Pathway*

[2] Homologous use means the repair, reconstruction, replacement, or supplementation of a. recipient's cells or tissues with an HCT/P that performs the same basic function or functions in. the recipient as in the donor.

58. If the HCT/P does not meet the criteria set out in 21 CFR 1271.10(a), the FDA will regulate the HCT/P as a drug, device, and/or biological product under Section 351 of the PHS Act or the FD&C Act (referred to herein as a "351 HCT/P" or a "351-product").

59. In guidance provided to HCT/P manufacturers, the FDA provides the following flowchart to illustrate how manufacturers and healthcare provides should apply the 21 CFR 1271.10(a) criteria to determine if their product meets the requirements of a 361 HCT/P or should be regulated as a 351 HCT/P:




60. The top box on the chart requires the company using it to first determine whether the regulations for HCT/Ps apply. The next box asks whether a surgical procedure exception not

relevant here applies. Then, the next step is to determine whether the criteria set forth in ¶57 apply.

61. Manufactures of 351 HCT/Ps are subject to traditional FDA approval processes, and continued regulation after approval. Manufacturers of 351 HCT/Ps must complete extensive clinical trials, which must be conducted pursuant to an effective IND. In addition, these 351 HCT/Ps require approval of a biologic license application ("BLA"), and their manufacture must comply with current good manufacturing practices ("CGMPs"). The FDA issues such licenses only after a determination that the manufacturing facility and the biological product meet the applicable requirements to ensure the continued safety, purity, and potency of such products (21 CFR 601.2(d)).

62. To lawfully market a 351 HCT/P, a biologics license must be in effect (PHS Act 42 U.S.C. 262(a)). Such licenses are issued only after a determination by the FDA that the manufacturing facility and the biological products meet the applicable requirements to ensure the continued safety, purity, and potency of such products. *See* 21 CFR 601.2(d). Manufacturers must demonstrate to the FDA the safety and potency of their products through clinical trials. Before clinical trials can commence, the sponsor must have an Investigational New Drug ("IND") application in effect in accordance with the FD&C Act (21 U.S.C. 355(i)) and FDA regulations (21 CFR Part 312 and 21 CFR 601.21).

63. The IND application must contain information in three areas: (1) preclinical data to permit an assessment as to whether the product is reasonably safe for initial testing in humans; (2) manufacturing and CMC information required to assure product safety, identity, quality, and strength (including potency) of the investigational product; and (3) detailed protocols for proposed clinical studies to assess whether the initial-phase trials will expose subjects to

unnecessary risks. Once an IND application is approved, the manufacturer may begin clinical testing. These typically involve three phases of clinical trials. Phase 1 is designed to measure safety. Phase 2 trials provide information about adverse effects, dosing, and efficacy. Phase 3 typically requires two large, well-controlled clinical trials to determine efficacy. The entire process takes multiple years and typically costs tens or hundreds of millions of dollars, with costs in some cases exceeding a billion dollars.

64. If the data generated by the clinical studies demonstrates that the product is safe and effective for its intended use, it is submitted as part of a marketing application. A Biologics License Application ("BLA") is required for biological products like SkinTE. FDA approval of a BLA is granted by the issuance of a biologics license. Only after the biologics license is approved may the manufacturer market the new product.

*The FDA Grace Period & Recommendation Process*

65. In November 2017, the FDA announced a period of enforcement discretion for all HCT/Ps.[3] This "grace period" was meant to give manufacturers time to engage with the FDA to determine whether their products met the four requirements to be sold under Section 361, or if they are required to comply with Section 351.

66. During this grace period, manufacturers could obtain a recommendation or decision from the FDA regarding the classification of an HCT/P by either: (1) requesting a recommendation from the Tissue Reference Group ("TRG"); (2) submitting a Request for Designation ("RFD") to the Office of Combination Products ("OCP"); or (3) submitting a Pre-

[3] The enforcement discretion policy was initially planned to end in November 2020. However, on July 20, 2020, the FDA extended the enforcement discretion period to May 31, 2021 due to challenges presented by the COVID-19 public health emergency.

RFD to OCP. The TRG recommendation process is informal and results in non-binding responses. The Pre-RFD process also generates non-binding, preliminary feedback.

67. The Company did ***not*** seek a recommendation or decision from the FDA concerning the classification of SkinTE as a Section 361 HCT/P.

**D. PolarityTE Incorrectly Registers SkinTE as a 361 HCT/P**

68. On August 14, 2017, the Company registered SkinTE as a 361 HCT/P. Relying on the 361 pathway, the Company began selling SkinTE in November 2017.

69. Whether SkinTE qualified as a 361 HCT/P was vitally important to the Company and its market value. For example, in the Company's Annual Report for the fiscal year ended October 31, 2017, filed on Form 10-K with the SEC on January 30, 2018 (the "2017 10-K"), the Company promoted the 361-pathway as one of its "competitive strengths," stating, in pertinent part:

> ***Efficient Regulatory Pathway***. We believe our products and product candidates, including SkinTE, are appropriately regulated by the FDA ***as 361 HCT/Ps***, ***which provides us with*** the potential to register and list products with the FDA, and begin ***commercializing quickly*** and efficiently. Unlike products regulated by the FDA under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") and/or the Public Health Service Act as drugs, devices, or biologics, which require multi-phase clinical trials and premarket approvals, our SkinTE product is regulated by the FDA as human cells or tissues intended for implantation. We are developing our additional pipeline candidates to be regulated as 361 HCT/Ps as well. ***361 HCT/Ps do not require premarket approval or other premarket authorization*** and may be lawfully marketed for appropriate human use in the United States following registration with the FDA.

70. Similarly, in the 2017 Form 10-K, the Company explained that "the full commercial launch of SkinTE" was key to the Company's growth strategy. That full and immediate commercial launch relied on the Company improperly registering SkinTE as a Section 361 HCT/P.

### E. SkinTE Was Not a 361 HCT/P, and Defendants Knew It.

71. SkinTE never met the requirements to be regulated under Section 361.

72. In order to qualify as a 361 HCT/P, a product must be "minimally manipulated." As defined in 21 CFR 1271.3(f), minimal manipulation means:

> (1) For structural tissue, ***processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement***; and (2) For cells or nonstructural tissues, processing that does not alter the relevant biological characteristics of cells or tissues.

(Emphasis added).

73. SkinTE does not meet the definition of "minimally manipulated" because SkinTE no longer maintains "the original relevant characteristics" of a patient's skin. Instead, SkinTE is manufactured by taking a patient's skin and processing it into a paste. Thus, it is no longer a protective covering, nor does the paste retain skin's dense, strong, and flexible layer of tissue.

74. Notably, on November 16, 2017, the FDA issued guidance to HCT/Ps outlining the requirements for minimal manipulation and homologous use.[4] The FDA Guidance provided the following example of processing skin that disqualifies a product under Section 361:

> A manufacturer processes skin by removing the epidermis and then grinding the dermis into particles. The HCT/P generally is considered more than minimally manipulated because the processing alters the original relevant characteristics of skin related to its utility as a protective covering.

75. The FDA's guidance was available to the Company. It also clearly disqualified SkinTE from the Section 361 process. Just like the FDA example of "grinding the dermis into particles," SkinTE transforms a patient's solid skin into a white, liquid paste – as illustrated in the following image taken from the Company's 2018 10-K.

[4] Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use ("FDA Guidance"), *available at* https://www.fda.gov/media/109176/download.




Defendants' own illustration demonstrates that they knew SkinTE did not qualify for the 361 pathway.

76. Defendants further knew that products similar to SkinTE are registered under Section 351. According to an August 1, 2018 article from *Seeking Alpha* titled "PolarityTE: Paradigm Shift or Expensive Skin Graft?" Vericel's product Epicel is a close competitor to SkinTE and has been on the market for 20 years. The process for Epicel is similar to SkinTE: "With Epicel, a surgeon sends off two stamp size donor samples of the patient's skin. From this, Vericel can grow enough skin to cover an entire patient." The *Seeking Alpha* article explains that Epicel "went through the more stringent 351 process through the FDA, meaning it had to obtain PreMarket Approval and underwent series of clinical trials and human testing."

**F. Lough Silenced Disclosure of the SkinTE's Mis-Registration**

77. Defendant Lough knew that SkinTE did not qualify as a 361 HCT/P. However, Lough silenced any recognition or discussion of that fact. He intimidated employees who expressed concerns over SkinTE's registration status and refused to acknowledge that SkinTE was registered under the wrong section.

78. This was confirmed by AW1.[5] AW1 was the Senior Director of Clinical and Translational Science at PolarityTE from June 2018 until June 2020. AW1 has a PhD in Clinical and Translational science. AW1's job involved compiling data and information on retrospective case studies of patients who had received SkinTE treatment and then presenting it to the medical field. During her time at PolarityTE, she reported to the Chief Medical Officer, including Ned Swanson. Dr. Swanson was the Co-Founder of PolarityTE, serving as the Company's Chief Operating Officer from December 2016 to April 2019, the Chief Translational Medicine Officer from April 2019 to January 2020, and the Chief Medical Officer from January 2020 to May 2021. AW1 had a relationship with Defendant Lough for years before PolarityTE, working together at Georgetown Medical Center. When Lough founded PolarityTE, he asked AW1 to join him at the Company. AW1 said that Lough refused to discuss – or allow the Company to investigate – whether SkinTE was properly registered as a 361 HCT/P. According to AW1, Lough was "pretty arrogant about what their regulatory status was." She said that one investor who "had taken a massive position" and "had the ear of important people at the Company" tried to convince Lough to have the Company conduct clinical trials for an eventual BLA, just in case the FDA later disagreed with the 361 HCT/P classification." But Lough did not want to hear it. According to this AW1, Lough did not like to hear anyone tell him the product did not fit the 361 category and, if anyone disagreed with him, Defendant Lough would "chop their head off."

79. Thus, even though the Company publicly issued generic warnings that the FDA could "disagree[] with our interpretation," that SkinTE was a 361 HCT/P, the reality was that the Company did not take that risk seriously. AW1 said that Lough was adamant that SkinTE was a

[5] All references to AW refer to anonymous witnesses contacted by Plaintiffs' investigator. All references to AW use the pronoun "she" regardless of gender to preserve anonymity.

361 HCT/P and "was very head strong from the very beginning about not pursuing the BLA, and sticking to their guns about being a 361 [HCT/P]."

**G. FDA's July 2018 Inspection of PolarityTE's Facility**

80. In July 2018, the FDA inspected PolarityTE's manufacturing facility.

81. The inspection analyzed conditions that are relevant under both the Section 361 pathway and the Section 351 pathway. This fact was confirmed by AW2, who worked at the Company from September 2018 to May 2021 as a Sales Manager and Director of Strategic Sales and reported to the Vice President of Sales. AW2 heard from other employees that the FDA inspection was done "under both 361 and a BLA." AW2 said the inspection analyzed "everything for a BLA application and for a 361."

82. Following the inspection, the FDA issued a Form 483, which Plaintiffs obtained via FOIA request, noting several significant violations. An FDA Form 483 "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute ***violations of the Food Drug and Cosmetic (FD&C) Act and related Acts***."[6] (Emphasis added). The violations noted in FDA Form 483s are important. According to the FDA, "FDA investigators are trained to ensure that each observation noted on the FDA Form 483 is clear, specific and ***significant***."[7] (emphasis added).

83. The first violation from the Form 483 related to SkinTE's potency assay. In particular, the FDA noted the following violation:

> ***There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess***.

[6] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions

[7] *Id.*

> Specifically, your firm has not performed and documented quantitative data that validates your process for SkinTE product to show consistent aseptic processing, aseptic tissue washing, and other relevant characteristics such tissue size, cell counts, or relevant skin cell type identification.
>
> Your Director of Quality has stated the process "is more of an art than a science" . . . .

(Emphasis added).

84. In other words, the Company did not have any mechanism to detect the potency of its PolarityTE product, or what the industry refers to as a "potency assay.". A potency assay is the quantitative measure of biological activity. It measures the ability or capacity of the product to effect a given result. The traditional approach for assessing the potency of biological products is to develop a quantitative biological assay that measures the activity of the product related to its specific ability to effect a given result. In the case of something like SkinTE, a potency assay would be designed to detect not just the number of skin cells in a sample, but what proportion of those cells actually retain the biological properties necessary to provide the wound healing function that PolarityTE claims for the product. With a potency assay, PolarityTE could determine that it needs a sample of x number of milligrams of skin in order to harvest enough biologically active cells to be able to heal a wound of y size. Without a potency assay, it is impossible to determine scientifically the correct dosage for SkinTE. Thus, the FDA's observation that the Company did not have procedures in place to ensure SkinTE had the "identity, strength, quality, and purity they purport or are represented to possess" meant that the Company did not have a potency assay. A potency assay was absolutely necessary for FDA approval if PolarityTE was required to register under 361, and was also crucial to determine the proper dosage for SkinTE.

85. Defendants, as senior management of the Company, were aware of all the July 2018 violations. The purpose of an FDA Form 483 is to "notif[y] the company's management of objectionable conditions."[8] After the inspection, "the FDA Form 483 is ***presented and discussed with the company's senior management***."[9] (Emphasis added). The FDA reads and discusses with senior management "[e]ach observation . . . so that there is a ***full understanding of what the observations are and what they mean***."[10] (Emphasis added). Thus, Defendants, as senior managers of the Company, would have had read and discussed the Form 483 and been aware of the observations that were made during the inspection.

86. Moreover, according to AW1, directly after the FDA inspection, the Company had a "big meeting" to discuss the inspection and related issues.

87. Defendants also had a duty to address the violations. According to the FDA, a company is "responsible to take corrective action to address the cited objectionable conditions and any related non-cited objectionable conditions that might exist."[11] However, Defendants failed to address or fully disclose the violations for several years.

### H. Board of Directors Abruptly Removes CEO Lough, and Belatedly Begins Talks with the FDA

88. On May 31, 2019, the Company's Board of Directors placed Defendant Lough, the Company's founder, CEO, and Chief R&D Officer, on indefinite paid administrative leave. However, Lough continued to serve as Chairman of the Board and a director of the Company.

---

[8] FDA Form 483 Frequently Asked Questions, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions#:~:text=A%3A%20An%20FDA%20Form%20483,FD%26C)%20Act%20and%20related%20Acts.

[9] *Id.*

[10] *Id.*

[11] *Id.*

89. On August 12, 2019, Lough sent the Company a written demand claiming that actions taken by the Board of Directors to place him on administrative leave was wrongful and demanding that the Company rescind their actions within 30 days.

90. On August 21, 2019, the Company and Lough reached a settlement, and on August 26, 2019, Lough resigned from his position with the Company. On August 26, 2019, Seaburg was appointed to the position of President of PolarityTE.

91. The Board never disclosed why it removed Lough from his position as CEO or placed him on administrative leave.

92. After Lough's abrupt firing, the SEC sent the Company a subpoena for documents concerning the circumstances under which the Company placed Lough on paid administrative leave.

93. After Lough's termination, employees were finally able to openly express that SkinTE was registered under the wrong section. This was confirmed by AW3, who was a Quality Engineer at PolarityTE from January 2019 to March 2020 and worked at the company's headquarters in Salt Lake City. During her employment at PolarityTE, she reported to the Executive Director of Quality. AW3 stated that employees began having discussions sometime in the summer or fall of 2019 where employees were discussing that SkinTE's registration was under the "wrong section." According to AW3, these discussions included directors and vice presidents in Regulatory, Quality, Manufacturing, and R&D, who attended meetings to discuss the regulatory change. AW3 first heard about these discussions from Raymond Jessen, Executive Director of Quality Systems and Regulatory Affairs sometime between the third and fourth quarter of 2019. By December 2019, the conversation had moved into more distinct planning. According to this former employee, by this point, "it was not, 'we may have to do

[it].' It was more to the side of, 'we will probably have to.'" AW3 understood that Sunny Gill, the Executive Director of Quality, and Jessen attended those meetings.

94. All the while, the Company continued issuing public statements touting its ability to immediately market and sell SkinTE under Section 361.

95. In April 2020, PolarityTE first engaged in preliminary discussions with the FDA about whether SkinTE was properly registered under Section 361. At no point before then had PolarityTE sought guidance or an opinion from the FDA about whether SkinTE qualified under Section 361.

96. In April 2020, the FDA provided PolarityTE with its preliminary determination that SkinTE was not properly registered under Section 361 and that the Company should stop marketing SkinTE as a 361 HCT/P. In other words, after the FDA's temporary discretion policy ended in May of 2021, PolarityTE would have to stop all commercial sales of SkinTE until it had completed the Section 351 process.

97. This feedback from the FDA forced PolarityTE to admit to investors that it was now going to have to undertake the expense and challenge of the full FDA clinical approval process.

98. Over the following months, PolarityTE engaged in discussions with the FDA regarding the submission of the IND. Those discussions included discussions of CMC subjects, including the use of various assays. On a conference call on November 9, 2020, Hague told analysts that the FDA gave them guidance that was "consistent with industry guidance and confirmed our current strategy." And, according to the redacted clinical hold letter that PolarityTE filed in this action, (Dkt. No. 54-26, p. 1), the FDA twice during 2021 reiterated the need for a potency assay that could actually measure the biological activity of SkinTE, and the

inadequacy of PolarityTE's approach. That letter stated that the FDA told PolarityTE "in [the FDA's] Pre-IND correspondence (sent Feb 4, 2021) and IR comment (sent August 5, 2021), a potency assay should assess the biological function that is relevant to the mechanism of action (MOA) of your product."[12] The FDA went on to state that "[p]otency is a critical aspect of an adequate and well controlled study because conformance to established limits for potency is necessary to provide reasonable confidence that product lots will perform as expected at a given dose in patients." That is, without a potency assay, it is impossible to determine the correct dosage for SkinTE, and there is no possibility of FDA approval.

### I. PolarityTE's Desperate Need for Cash

99. Immediately following the merger with Majesco, PolarityTE began to run out of cash. Beginning in the 10-Q filed on September 14, 2017, PolarityTE issued a going concern warning,[13] stating that there was substantial doubt about their ability to fund their activities for another year. PolarityTE repeated this warning in its annual report dated January 30, 2018, and in quarterly reports dated March 19, 2018, and June 14, 2018.

100. PolarityTE responded to its cash crisis by conducting offerings of stock in 2018. On April 12, 2018, PolarityTE completed a public offering of 2,335,937 shares stock at $16.00 per share, generating $34.6 million after expenses.

101. On June 7, 2018, PolarityTE completed an underwritten offering of 2,455,882 shares of stock at $23.65 per share, generating $58.0 million after expenses. This stabilized

---

[12] The FDA first informed PolarityTE that it lacked an adequate potency assay in July of 2018, as discussed more fully in Paragraph 167.

[13] A going concern warning is issued by a company's auditors. The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited. AS 2415. In short, a going concern warning means a company may not have sufficient cash to stay afloat for another 12 months.

PolarityTE's finances in the short term, at least on paper, at least until PolarityTE needed to budget for a lengthy and expensive and lengthy FDA approval process.

102. The need to budget for the IND process quickly revealed the precarious financial condition of PolarityTE. On August 6, 2020, PolarityTE filed its 10-Q for the quarter ending June 30, 2020. That 10-Q disclosed that PolarityTE's existing funds would be insufficient to fund its current business plans into the second quarter of 2021, and therefore there was substantial doubt about the company's ability to continue as a going concern. This, just as PolarityTE was gearing up for the FDA approval process.

103. As a result, PolarityTE began engaging in dilutive, expensive fundraising that alienated its institutional investors. On December 23, 2020, PolarityTE completed a registered direct offering of stock and warrants that raised approximately $7.1 million. On January 14, 2021, PolarityTE completed a registered direct offering of shares and warrants for gross proceeds of approximately $10 million. On January 22, 2021, PolarityTe entered into a letter agreements with a holder of their warrants to purchase shares of PolarityTE stock. PolarityTE received approximately $7.67 million from this transaction. In November of 2021, the Company reduced the exercise of previously issued warrants from $2.80 to $0.10. Because of PolarityTE's fundraising activities, PolarityTE's shares outstanding were diluted more than two to one, with 39,241,323 shares outstanding as of November 5, 2020, going to 80,319,378 on March 25, 2019.

104. The Company's actions showed how desperate it had been for cash. It also alienated institutional investors. On December 28, 2020, Gatemore Capital Management demanded reforms in a letter it sent to the Board of Directors. It stated that "a series of highly dilutive financings over the past year demonstrate that the current board and management have

little regard for their fiduciary duty towards shareholders and have even cast doubts over whether they are fit to act in shareholders' interests" and accused the Board of acting in bad faith.

105. PolarityTE acknowledged that its fundraising activities, in particular it's reduction of the exercise price of its warrants, "had a chilling effect on our ability to attract institutional investors and depressed the public trading price of our common stock."

106. Again PolarityTE's cash grabs had extended its financial runway, but not by much, with PolarityTE disclosing in their 10-K filed March 12, 2020 that these fundraising activities allowed PolarityTE to fund its operations into the third quarter of 2022.

107. As a result, PolarityTE entered into an agreement with Cantor Fitzgerald & Co ("Cantor") that would allow PolarityTE to direct Cantor to sell shares previously registered under a "shelf" registration statement on the NASDAQ for the following year. However, the agreement with Cantor contained a representation by Polarity that the company was in compliance with all applicable listing requirements for the exchange on which PolarityTE common stock traded, NASDAQ. Cantor's obligations to sell stock under the agreement were "subject to the continuing accuracy and completeness of the representations and warranties" contained in the agreement – that is, among other things, PolarityTE could not, if it wished to raise funds, fall out of compliance with any NASDAQ listing requirement. That includes the requirement that PolarityTE's stock not trade for less than $1 per share for 30 days or more. On July 2, PolarityTE's stock fell below $1 per share and stayed there every day. On July 26, 2021, PolarityTE announced the filing of its IND, but it failed to move the needle.

108. Ultimately, PolarityTE's IND filing was grossly premature. It failed to provide a potency assay that could measure the potency of its product. Even after the FDA gave it a second chance on August 5 to submit a new potency assay, it still could not satisfy the FDA.

109. The FDA therefore issued a clinical hold letter, not only expressing disagreement with PolarityTE's approach, but that its proposed clinical trials, including its deficient potency assay, was "***clearly deficient in design to meet its stated*** objectives." That is, it was not a close call, it was not a judgment call, it was an obvious failure.

## V. Defendants Made False and Misleading Statements and Omissions of Material Fact Regarding the Company's Ability to Market and Sell SkinTE as a 361 HCT/P and the Company's Manufacturing Facility.

110. This Class period begins on January 30, 2018. On that day, Defendant Lough signed PolarityTE's Annual Report for the fiscal year ended October 31, 2017 on Form 10-K with the SEC (the "2017 10-K"). PolarityTE filed that statement with the SEC on that same day and it appeared on the SEC's website. PolarityTE also made the 2017 10-K available on its own website.

111. The 2017 10-K promoted the Section 361 pathway as one of the Company's "competitive strengths," stating, in pertinent part:

> ***Efficient Regulatory Pathway***. We believe our products and product candidates, including ***SkinTE,*** are ***appropriately regulated by the FDA as 361 HCT/Ps,*** which provides us with the potential to register and list products with the FDA, and ***begin commercializing quickly*** and efficiently.

(Emphasis added).

112. The statement that "we believe our products and product candidates, including SkinTE, are appropriately regulated by the FDA as 361 HCT/Ps" was false and misleading. Lough, and therefore PolarityTE, did not actually believe SkinTE was properly registered under Section 361. PolarityTE knew that its product was not "minimally manipulated" – it turned solid skin into liquid, white paste. PolarityTE knew its product used growth factors. PolarityTE knew its SkinTE could not qualify for the Section 361 pathway.

113. Lough further suppressed discussion or disclosure regarding whether SkinTE was properly registered under Section 361. By including this misleading statement in the 2017 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2017 10-K on their website, Defendants Lough and PolarityTE made a false and misleading statement that misled the public.

114. The 2017 10-K also stated that:

> Unlike products regulated by the FDA under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") and/or the Public Health Service Act as drugs, devices, or biologics, which require multi-phase clinical trials and premarket approvals, our SkinTE product is regulated by the FDA as human cells or tissues intended for implantation.

115. The forgoing statement was false because SkinTE was regulated by FDA as a biologic and FDA ***did*** in fact require multi-phase clinical trial and pre-market approval. The statement further was false because SkinTE was ***not*** regulated by the FDA as human cells or tissues intended for implantation. By including this misleading statement in the 2017 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2017 10-K on their website, Defendants Lough and PolarityTE made a false and misleading statement that misled the public.

116. The 2017 10-K stated the following about the Company's manufacturing at its Salt Lake City facility:

> We have designed and developed manufacturing processes and quality systems that allow us to receive a specimen, qualify the incoming tissue, process and manufacture the cell/tissue product, and perform outgoing quality control and quality assurance work prior to shipping.

117. The foregoing statement was false and misleading because, as the FDA's 483 Report revealed, PolarityTE lacked any potency assay for the SkinTE manufacturing process, and therefore lacked "quality systems" that allowed PolarityTE to "perform outgoing quality

control and quality assurance work". By including this misleading statement in the 2017 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2017 10-K on their website, Defendants Lough and PolarityTE made a false and misleading statement that misled the public.

118. On January 14, 2019, Defendants Lough and Mann signed PolarityTE's Annual Report for the fiscal year ended October 31, 2018 on Form 10-K with the SEC (the "2018 10-K"). PolarityTE filed that statement with the SEC on that same day and it appeared on the SEC's website. PolarityTE also made the 2018 10-K available on its own website.

119. The 2018 10-K stated the following about the Company's manufacturing at its Salt Lake City facility:

> We have designed and developed manufacturing processes and quality systems that allow us to receive a specimen, qualify the incoming tissue, process and manufacture the cell/tissue product, and perform outgoing quality control and quality assurance work prior to shipping.

120. Again, that statement was false because, as the FDA's 483 Report revealed, PolarityTE lacked any potency assay for the SkinTE manufacturing process, and therefore lacked "quality systems" that allowed PolarityTE to "perform outgoing quality control and quality assurance work." By including this misleading statement in the 2018 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2018 10-K on their website, Defendants Lough, Mann and PolarityTE made a false and misleading statement that misled the public.

121. The 2018 10-K also contained false and misleading statements and omissions in its disclosure of Risk Factors. Specifically, the 2018 10-K stated in its Risk Factors section that:

> We believe our FDA-registered ***SkinTE*** and OsteoTE products ***satisfy applicable criteria for regulation as a 361 HCT/P and are therefore***

***exempt from FDA requirements for premarket approval or clinical studies***.

122. That statement was false and misleading. SkinTE did not qualify as a section 361 HCT/P. The Company also knew as much. For example, it knew its product was not minimally manipulated because during the manufacturing process it took solid skin and turned it into a liquid, white paste and combined it with a number of additives, including growth factors.

123. Not only did the Company mislead investors with its statement, but it continued to suppress any disclosure or efforts to proceed with the proper Section 361 pathway. Because Lough, and therefore PolarityTE, did not actually beileve SkinTE was properly registered under Section 361. Lough suppressed internal debate regarding whether SkinTE was properly registered. By including this misleading statement in the 2018 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2018 10-K on their website, Defendants Lough, Mann and PolarityTE made a false and misleading statement that misled the public.

124. On March 12, 2020, Defendants Seaburg, Hague, and Mann signed PolarityTE"s Annual Report for the fiscal year ended December 31, 2019 on Form 10-K with the SEC (the "2019 10-K"). PolarityTE filed that statement with the SEC on that same day and it appeared on the SEC's website. PolarityTE also made the 2019 10-K available on its own website.

125. The 2019 10-K again stated the following about the Company's manufacturing at its Salt Lake City facility:

> We have designed and developed manufacturing processes and quality systems that allow us to receive a specimen, qualify the incoming tissue, process and manufacture the tissue product, and perform outgoing quality control and quality assurance work prior to shipping.

126. Again, that statement was false and misleading because, as the FDA's 483 Report revealed, PolarityTE lacked any potency assay for the SkinTE manufacturing process, and therefore lacked "quality systems" that allowed PolarityTE to "perform outgoing quality control and quality assurance work."

127. By including this misleading statement in the 2019 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2019 10-K on their website, Defendants Defendants Seaburg, Hague, Mann and PolarityTE made a false and misleading statement that misled the public.

128. The 2019 10-K also again contained false and misleading statements and omissions in its disclosure of Risk Factors. Specifically, the 2019 10-K stated in its Risk Factors section that:

> We believe that ***SkinTE*** and OsteoTE ***qualify as 361 HCT/Ps***. Other products we are developing are being evaluated with respect to regulatory classification, and we will prepare for any pathway of manufacturing or regulation that is required.

(Emphasis added).

129. The statement that was false and misleading for the same reasons stated in paragraph 115.

130. In addition, because Seaburg, Hague, and Mann, and therefore PolarityTE, did not actually believe SkinTE was properly registered under Section 361. After terminating Lough in July 2019, PolarityTE began internally discussing whether SkinTE was properly registered under Section 361. By that time Defendants filed the 2019 10-K, Defendants had already determined they would probably have to register under 361. In addition, the statement "[o]ther products we are developing are being evaluated with respect to regulatory classification, and we will prepare for any pathway of manufacturing or regulation that is required" Defendants indicated that they

were not at that time re-evaluating SkinTE's regulatory classification, whereas in reality, they had already begun this re-evaluation in 2019, as evidenced by the fact that, just a month after the filing of the 10-K, PolarityTE held a meeting with the FDA to discuss SkinTE's regulatory classification. By including this misleading statement in the 2018 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2019 10-K on their website, Defendants Seaburg, Hague, Mann and PolarityTE made a false and misleading statement that misled the public.

131. The 2019 10-K also stated:

> The core technology of SkinTE is minimally polarized functional units ("MPFUs"). MPFUs are multi-cellular micro-aggregates that act as an intrinsic, regenerative bio-reactor capable of expanding, proliferating, and synthesizing cells, materials, factors, and systems necessary for regenerating full-thickness, three-dimensional tissue. **In the application of SkinTE to date we have been able, when applicable to a particular case, to collect from a patient a skin tissue sample 5 $cm^2$ in size or less and produce enough SkinTE to treat a wound 30x greater in size than the skin collected.** SkinTE allows the patient to regenerate full-thickness, three-dimensional skin (similar to a FTSG) by contributing a much smaller skin sample, while reducing the scarring and morbidities associated with STSGs, and producing results we believe to be superior to STSGs and synthetic skin substitutes.
>
> (emphasis added)

132. The bolded text was materially misleading for claiming that PolarityTE was able to determine that a 5 $cm^2$ or smaller sample was sufficient to produce enough SkinTE to treat a wound 30x greater in size than the skin collected, because PolarityTE lacked a potency assay for SkinTE, as the FDA informed PolarityTE after its inspection in July of 2018.

## VI. THE TRUTH REGARDING SKINTE'S REGULATORY STATUS AND THE COMPANY'S ABILITY TO MARKET AND SELL SKINTE AS A 361 HCT/P IS PARTIALLY REVEALED

133. PolarityTE finally asked FDA for guidance in 2020 as to whether SkinTE was properly registered under Section 361. Notably, the Company previously had avoided asking for

such guidance as it raised millions of dollars from investors based on incorrect statements about SkinTE's ability to proceed under the Section 361 pathway.

134. On April 21, 2020, the FDA told the Company what it knew – SkinTE did not meet the requirements to be regulated solely under Section 361.

135. In a press release dated April 30, 2020, the Company told investors that it "has decided to pursue a plan to submit an investigational new drug application (IND) and thereafter a biologics license application (BLA) for SkinTE" based on "preliminary views expressed by FDA."

136. On this news, the Company's stock fell by $0.06 per share, or 5.50%, to close at $1.03 per share on April 30, 2020. The next day, the stock fell an additional $0.10 per share, or 9.71%, to close at $0.93 per share on May 1, 2020.

137. However, the Company's press release still did not reveal the whole truth. The Company stated:

> To focus on pursuit of the BLA, the Company plans to substantially reduce commercial operations and other functions to conserve capital and significantly decrease cash burn. ***FDA has not asked the Company to stop marketing SkinTE as a human cell, tissue, or cellular and tissue-based product regulated solely under Section 361 of the Public Health Service Act (i.e., a 361 HCT/P). SkinTE will remain available under a limited sales and marketing program, subject to the Company's future discussions with FDA***. The decision to focus on a BLA for SkinTE and limit commercial operations proactively addresses FDA feedback on the regulatory pathway for SkinTE, the high costs associated with maintaining a commercial footprint, and the headwinds associated with the COVID-19 pandemic.

(Emphasis added).

138. The April 30, 2020 press release concealed that the FDA did not only provide "feedback," but in fact issued a preliminary assessment was that SkinTE did not meet Section 361's requirements. Moreover, the statement in ¶137 was misleading because Defendants did

not disclose that PolarityTE could ***only*** sell SkinTE going forward because of the FDA's temporary enforcement discretion policy. Defendants knew that that once the temporary policy ended, they would have to stop all commercial sales until they obtained a license under the 351 pathway. Despite this, Defendants continued misleading investors into believing that the Company could sell SkinTE as a 361 HCT/P indefinitely when, in truth, the Company could only sell SkinTE until the end of enforcement discretion the following year.

## VII. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE SKINTE IND AND BLA, AND CONTINUED MAKING FALSE AND MISLEADING STATEMENTS REGARDING THE COMPANY'S ABILITY TO MARKET AND SELL SKINTE AS A 361 HCT/P

139. On May 11, 2020, Defendants Seaburg and Patterson signed PolarityTE's quarterly report for the quarterly period ended March 31, 2020 on Form 10-Q ("1Q20 10-Q"). PolarityTE filed that statement with the SEC on that same day and it appeared on the SEC's website. PolarityTE also made the 1Q20 10-Q available on its own website.

140. The 1Q20 10-Q also contained false and misleading statements and omissions in its disclosure of Risk Factors. Specifically, the 1Q20 10-Q stated in its Risk Factors section that:

> When SkinTE was registered and listed with the FDA, we believed ***SkinTE was appropriately regulated solely under Section 361*** of the Public Health Service Act and Part 1271 of Title 21 of the Code of Federal Regulations (i.e., as a so-called "361 HCT/P") and that, as a result, no premarket review or approval by the FDA was required. ***We still believe that SkinTE is appropriately regulated as a 361 HCT/P***. However, following informal, voluntary discussions between FDA and the Company, and preliminary views expressed by FDA received on April 21, 2020, we believe that ***the FDA may disagree with our interpretation*** if we sought a formal designation of SkinTE's regulatory classification, and that it therefore is prudent to pursue a strategy to file an investigational new drug application ("IND") and thereafter a biologics license application ("BLA") for SkinTE.

(Emphasis added).

141. The foregoing statement was misleading because it claimed that PolarityTE still believed that SkinTE was appropriately registered under 361 and that therefore there continued to exist the prospect of convincing the FDA of that fact. Defendants knew otherwise. By including this misleading statement in the 1Q20 10-Q, and then causing the 1Q20 10-Q to be filed with the SEC for public viewing and releasing the 1Q20 10-Q on their website, Defendants Seaburg, Patterson and PolarityTE made a false and misleading statement that misled the public.

142. On November 9, 2020, PolarityTE hosted a conference call with investors and analysts. Transcripts of that call were published on SeekingAlpha, Bloomberg, and other sources. On that call, Defendant Hague responded to a question from an analyst regarding whether, in response to the FDA's feedback, PolarityTE would have to increase the size of SkinTE. Hague responded that:

> On the dosing side, the beauty of SkinTE has always been that we could take a relatively small harvest and treat significant open wound. We've proven that both in our real-world experience and pre-clinically, but we need to put just a little bit more work into categorizing that and validating that more specifically. So that ultimately, we can come to FDA and say that going forward, a harvest size of 'x' equates to a certain yield or dosage of product, which can then treat a certain wound size range of 'x' to 'y'. We need to do that a little bit more formally, as I've said, and to validate the work that we've done previously.

143. The foregoing statement was false and misleading because PolarityTE lacked any adequate potency assay and therefore could not prove the appropriate dosage of SkinTE for a wound of a specific size. As late as September of 2021, PolarityTE lacked a potency assay that was able to assess the actual biological function of the cells that compose SkinTE, and this lack of a potency assay, among other things, is what caused the FDA to find PolarityTE's IND application to be "clearly deficient." Defendant Hague, by making that statement on a public conference call, made a false and misleading statement that misled the public.

144. On March 30, 2021, Seaburg and Patterson signed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2020 ("2020 10-K"). PolarityTE filed that statement with the SEC on that same day and it appeared on the SEC's website. PolarityTE also made the 2017 10-K available on its own website.

145. The 2020 10-K stated the following about SkinTE sales activity:

> We continued to sell SkinTE as a 361 HCT/P in 2020 and into 2021 in reliance on our view that ***there is a reasonable basis for regulating SkinTE as a 361 HCT/P*** and also in reliance on the enforcement discretion position stated in the policy framework.

146. The foregoing statement was misleading because SkinTE did not qualify as a Section 361 HCT/P and PolarityTE did not and could not believe otherwise. By including this misleading statement in the 2020 10-K, and then causing the 2020 10-K to be filed with the SEC for public viewing and releasing the 2020 10-K on their website, Defendants Seaburg, Patterson and PolarityTE made a false and misleading statement that misled the public.

147. The 2020 10-K stated the following about the Company's manufacturing:

> Throughout 2020 we maintained at our facility in Salt Lake City, Utah, manufacturing processes and quality systems that allow us to receive a skin specimen, qualify the incoming tissue, process and manufacture the SkinTE tissue product, and perform outgoing quality control and quality assurance work prior to shipping.

(Emphasis added).

148. The foregoing statement was false and misleading because, as the FDA's 483 Report revealed, PolarityTE lacked any potency assay for the SkinTE manufacturing process, and therefore lacked "quality systems" that allowed PolarityTE to "perform outgoing quality control and quality assurance work." The FDA had additionally warned PolarityTE in February 2021 of PolarityTE's lack of an adequate potency assay. By including this misleading statement

in the 2020 10-K, and then causing the 10-K to be filed with the SEC for public viewing and releasing the 2020 10-K on their website, Defendants Defendants Seaburg, Patterson and PolarityTE made a false and misleading statement that misled the public.

## VIII. The Truth Regarding the Company's Ability to Sell SkinTE As a 361 HCT/P is Revealed

149. On May 13, 2021, after market close, the Company issued a press release announcing first quarter 2021 results and providing a business update on the Company's commercial operations. The press release revealed that the Company would be forced to cease ***all*** commercial sales of SkinTE by the end of the month. The press release stated in pertinent part:

> In connection with this transition to the BLA pathway and based on the FDA's recent announcement that enforcement discretion related to 361 HCT/P products will not be extended beyond May 31, 2021, the Company will cease commercial sales of SkinTE and wind down commercial operations. The Company is planning to make substantial reductions in the costs associated with its commercial operations, which will mitigate the effect on cash flow resulting from the loss of SkinTE revenues.

150. On the same day, PolarityTE hosted a conference call with investors and analysts at 4:30 p.m. ET. During that conference call, Defendant Seaburg reiterated the Company's decision to cease all commercial sales, stating, "To be consistent with the FDA's enforcement discretion period ending on May 31, 2021, we will be winding down commercial sales of SkinTE."

151. On this news, PolarityTE's share price plummeted $0.26 per share, or approximately 21%, to close at $0.98 per share on May 14, 2021.

## IX. The Truth Regarding the SkinTE IND and BLA Emerges

152. The truth regarding the SkinTE IND and BLA, as well as the Company's deficient CMC procedures, was partially revealed on August 24, 2021. On that day, before market hours,

PolarityTE issued a press release providing an update on the SkinTE IND. The press release stated, in pertinent part:

> FDA provided feedback that certain Chemistry, Manufacturing, and Control (CMC) items need to be addressed prior to proceeding with a pivotal study. As a result, the study proposed in the IND has been placed on clinical hold. In accordance with standard practice and regulations, the FDA has advised that it will issue a clinical hold letter providing details on the basis for the hold to the Company by September 21, 2021.
>
> PolarityTE previously disclosed that there was the potential for a wide range of outcomes with respect to its SkinTE IND submission, including but not limited to a clinical hold, and the Company is already formulating a plan to address the issues identified by the FDA. Based on FDA feedback the Company is confident that the modifications made to its proposed clinical trial protocol in Wagner Grade 2 diabetic foot ulcers will enable this pivotal study to begin enrolling once the CMC issues are resolved.
>
> David Seaburg, Chief Executive Officer, commented, "In our July 26, 2021, press release regarding the IND submission we described the FDA's well-established procedures for IND submissions and we believe that the CMC issues FDA has identified are not necessarily unusual for companies working diligently to transition their products from 361 HCT/Ps to 351 HCT/Ps. We are actively working to address the issues identified by the FDA and our team plans to respond to the Agency's feedback as expeditiously as possible, and we are hopeful that we will be able to resolve any open items. Chronic cutaneous ulcers represent a substantial unmet medical need with significant economic burden, and we are grateful for FDA's engagement and eager to advance SkinTE through clinical studies and the regulatory process towards an eventual BLA submission."

153. On this news, Polarity TE's stock fell by $0.08 per share, or 9.52%, to close at $0.76 per share on August 24, 2021.

154. The full truth regarding the SkinTE IND and BLA, as well as the Company's deficient CMC procedures, was revealed on November 10, 2021. On that day, before market hours, PolarityTE issued a press release updating investors on the SkinTE IND clinical hold. Specifically, the press release stated, in pertinent part, "Based on recent informal interactions with FDA regarding certain chemistry, manufacturing, and control (CMC) issues related to the

proposed potency assay for SkinTE®, the Company believes that its complete response to FDA's clinical hold correspondence will be submitted by year end."

155. The same day, PolarityTE filed a quarterly report for the quarterly period ended September 30, 2021 with the SEC on Form 10-Q ("3Q21 10-Q"). The 3Q21 10-Q revealed, for the first time, the specific CMC issues that needed to be addressed before the FDA would life the clinical hold. The 3Q21 stated, in pertinent part:

> On August 20, 2021, we were advised by the FDA that certain chemistry, manufacturing, and control ("CMC") items need to be addressed prior to proceeding with a pivotal study and, therefore, the FDA was placing the study on clinical hold and planned to issue a clinical hold letter to the Company by September 21, 2021. A clinical hold means that the pivotal study may not begin unless and until the clinical hold is lifted. On September 17, 2021, we received the clinical hold letter from the FDA, which described the FDA's request for information and modifications to the IND that are necessary for the clinical hold to be lifted, as well as non-clinical hold comments. ***The clinical hold issues that must be resolved before the clinical hold can be lifted involve, our proposed potency assay;*** drug product dosage, storage, shipping, and release specifications; antibiotics residuals; bacteriostasis and fungistasis testing; and delivery device. Since our receipt of the clinical hold letter, we have engaged informally with the FDA regarding certain items, most notably the proposed potency assay for SkinTE. We have received helpful feedback from the FDA and are currently preparing a complete response to the clinical hold letter.

(Emphasis added).

156. Defendants did not mention in the 10-Q that the FDA had warned PolarityTE on multiple occasions that they lacked a potency assay.

157. During a conference call, which was held on November 10, 2021 at 8:30 a.m. ET, Defendant Hague answered a question about the SkinTE IND process, stating, in pertinent part:

> So the way this process unfolded is that, we submitted our IND on the 23rd of July. And then at that point, FDA had 30 days to come back to us with various questions, which they did do. So these information requests, we responded to those in detail, to provide clarity to the FDA. And

> ultimately, those responses were utilized as part of their review of our entire IND package.
>
> At the end of that 30-day period, they ultimately informed us that while, many of the issues that they had presented to us were addressed, they still had other key issues that they felt were not sufficiently addressed. And so that was what led to the clinical hold communication. We were communicated to verbally with regards to that, and then, ultimately, the final clinical hold letter was received on September 17th. And in that letter, they identified a list of specific hold issues that we needed to address.

158. On this news, the Company's stock fell by $0.07 per share, or 10.45%, to close at $0.60 per share on November 10, 2021.

159. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class Members have suffered significant losses and damages.

## X. Additional Allegations Supporting Scienter

### A. Additional Allegations Concerning Lough's Scienter

160. The inordinate compensation Lough awarded to himself and to his small executive team in 2018 gave Lough a strong motive to commit fraud. After taking over the company in 2017, in 2018 Lough awarded to himself and to Edward Swanson and Defendant Mann a total of $32,102,891 in compensation, with $13,714,337 to himself, including $448,462 cash in salary, a $1,010,000 cash bonus, a $2,395,050 stock award. , and $9,860,825 worth of options, and $13,862,967 to Mann. In addition, the company awarded $4,389,967 in compensation to PolarityTE's board of directors, including $1,347,600 to Defendant Seaburg. This accounted for more than 52% of PolarityTE's total expenses in 2018, according to PolarityTE's 2019 10-K. Justifying this massive financial windfall to corporate insiders gave Lough a motive to commit fraud. Obtaining funds from investors gave him the opportunity to enrich himself.

161. PolarityTE's desperate financial condition in 2018 also gave Lough motive to commit fraud. PolarityTE's 2018 10-K warned that there was substantial doubt as to whether PolarityTE could continue to exist as a going concern beyond October of 2018 if PolarityTE could not raise additional funds. The company repeated this warning in its 10-Q filed March 19, 2018. The company was able to secure additional funding by issuing an offering of shares with net proceeds of $58 million. The desperate need for cash gave Lough a strong motive to secure investment by falsely claiming that SkinTE was properly registered under 361. Without raising additional money, the company would have faced bankruptcy before the end of the year – and Lough's absurdly large paychecks would have stopped. Lough knew that – regardless of whether it was true or false – presenting SkinTE as a Section 361 product would allow PolarityTE to raise significant additional funds from the investing public.

162. Lough's scienter can be inferred from the fact that SkinTE was the Company's only commercially available product and represented a significant portion of the Company's total revenue, accounting for 43.75% of net revenues in 2018.

163. The fact that Defendant Lough invented SkinTE supports a strong inference of scienter. As the inventor, Lough understood the technology better than anyone. Specifically, he knew that SkinTE was never appropriately registered as a 361 HCT/P because the manufacturing process—which he developed—involved manipulating the skin and adding growth factors to create a liquid paste that no longer possesses the relevant characteristics of skin. The addition of growth factors and manipulation of the skin into a paste were clearly prohibited under Section 361. Thus, Lough knew that the product did not meet the requirements under Section 361.

164. Lough's scienter can also be inferred from the fact that he suppressed any mention that SkinTE was registered under the wrong section. According to AW1, Lough "was

very head strong from the very beginning about not pursuing the BLA, and sticking to their guns about being a 361 [HCT/P].” According to this AW1, Lough did not like to hear anyone tell him the product did not fit the 361 category and, if anyone disagreed with him, Defendant Lough would “chop their head off.”

165. Lough’s scienter can be inferred from his position as CEO. Lough was the Company’s CEO during the FDA’s inspection of the Salt Lake City facility in July 2018. Thus, he was aware of the CMC problems identified by the FDA in the Form 483, specifically the lack of an adequate potency assay. The purpose of an FDA Form 483 is to “notif[y] the company’s management of objectionable conditions.” After an inspection, “the FDA Form 483 is presented and discussed with the company’s senior management.” The FDA reads and discusses with senior management “[e]ach observation . . . so that there is a full understanding of what the observations are and what they mean.” Thus, as CEO, Lough would have discussed each observation with the FDA and had a full understanding of each violation. He also would have understood that the Company would have to resolve these issues before successfully submitting an IND application or BLA.

166. Lough’s scienter can also be inferred from the Board’s abrupt decision to place him on administrative leave and thereafter remove him from the Company. This abrupt firing, which the Company never fully explained to investors, caused the SEC to issue a subpoena for documents concerning the unusual circumstances under which the Company placed Lough on paid administrative leave. Only after Lough’s firing were employees able to openly discuss that SkinTE was registered under the wrong section. Thus, it can be inferred that Lough was aware of that SkinTE was registered under the wrong section.

167. Lough's scienter can be inferred from the small size of the Company. As of December 31, 2020, PolarityTE had approximately 80 full-time employees and five part-time employees, all of whom are in the United States. Due to the small size of the company, Lough was aware of SkinTE's registration status and the Company's CMC issues.

**B. Additional Allegations Concerning Seaburg's Scienter**

168. The inordinate compensation Seaburg received in 2018 gave Seaburg a strong motive to commit fraud. After taking over the company in 2017, in 2018 Lough awarded to himself and to Edward Swanson and Defendant Mann a total of $32,102,891 in compensation, with $13,714,337 to himself and $13,862,967 to Mann. In addition, the company awarded $4,389,967 in compensation to PolarityTE's board of directors, including $1,347,600 to Defendant Seaburg, all in stock awards. This accounted for more than 52% of PolarityTE's total expenses in 2018, according to PolarityTE's 2019 10-K. Justifying this massive financial windfall to corporate insiders gave Seaburg a motive to commit fraud.

169. PolarityTE's desperate financial condition in 2020 and 2021 gave Seaburg motive to commit fraud. In PolarityTE's 10-Q filed August 6, 2020, PolarityTE disclosed that there was substantial doubt that the company could continue as a going concern if the company could not raise additional funds within the year. The company repeated this warning in its 10-Qs filed November 10, 2020, and August 12, 2021. Given the need to raise additional financing to continue the company as a going concern, Seaburg had a strong motive to misrepresent the level of progress PolarityTE had made with its IND application and the prospects of quick approval by the FDA.

170. Seaburg's scienter can be inferred from the small size of the Company. As of December 31, 2020, PolarityTE had approximately 80 full-time employees and five part-time

employees, all of whom are in the United States. Due to the small size of the company, Seaburg was aware of SkinTE's registration status and the Company's CMC issues.

171. Seaburg's scienter can also be inferred from the fact that SkinTE was the Company's only commercially available product and represented a significant portion of the Company's total revenue.

172. Seaburg's role as a member of the Office of the Chief Executive supports a strong inference of scienter. In August 2019, the Board appointed Seaburg to serve as a member of the Office of Chief Executive after removing Lough as CEO. The Company stated that the purpose of the Office of Chief Executive was to address the immediate business needs of the Company as the Company transitions from product development of SkinTE to product commercialization. At that time, the "immediate business need" of the Company involved determining how to transition from a 361 HCT/P to a 351 HCT/P. As AW3 stated, in the summer and fall of 2019, there were ongoing discussions within the Company that SkinTE was registered under the wrong section and that the Company would have to change its regulatory path. By December 2019, the conversation had moved into more distinct planning. Thus, as the de facto CEO, Seaburg knew, or was severely reckless in not knowing, SkinTE was not properly registered under Section 361 and that the Company would have to change regulatory paths.

173. Searburg's role as CEO also supports a strong inference of scienter. Seaburg was the Company's CEO from March 31, 2020 until August 2021. As the CEO, Seaburg was responsible for, among other things, making major corporate decisions and managing the overall operations and resources of the Company. During that time, the Company was transitioning away from a commercial stage company after the FDA advised it that SkinTE was not properly registered as a 361 HCT/P. This was the most important issue facing the Company at the time,

since SkinTE was the Company's most important and only commercially available product. Thus, Seaburg's main job was managing the successful submission of the SkinTE IND application. As such, Seaburg knew, or was severely reckless in not knowing, the CMC issues that the Company needed to resolve before submitting the SkinTE IND application.

174. There's a strong inference of scienter because Seaburg was aware of red flags showing that the Company had significant CMC problems to resolve before it could obtain FDA approval. As CEO, Seaburg had access to correspondence with the FDA, including the Form 483, which clearly identified CMC issues that would need to be addressed before any successful IND application or BLA. Seaburg was aware of these CMC problems but did nothing, supporting a strong inference of scienter.

### C. Additional Allegations Concerning Patterson's Scienter

175. PolarityTE's desperate financial condition in 2020 and 2021 gave Patterson motive to commit fraud. In PolarityTE's 10-Q filed August 6, 2020, PolarityTE disclosed that there was substantial doubt that the company could continue as a going concern if the company could not raise additional funds within the year. The company repeated this warning in its 10-Qs filed November 10, 2020, and August 12, 2021. Given the need to raise additional financing to continue the company as a going concern, Patterson had a strong motive to misrepresent the level of progress PolarityTE had made with its IND application and the prospects of quick approval by the FDA.

176. Patterson's scienter can be inferred from his position as Vice President of Finance during the FDA's inspection of the Salt Lake City facility in July 2018. As a member of senior management, Patterson would have discussed each observation with the FDA and had a full understanding of each violation. He also would have understood that the Company would have to resolve these failings before successfully submitting an IND application or BLA. The purpose

of an FDA Form 483 is to "notif[y] the company's management of objectionable conditions." After an inspection, "the FDA Form 483 is presented and discussed with the company's senior management." The FDA reads and discusses with senior management "[e]ach observation . . . so that there is a full understanding of what the observations are and what they mean." Thus, as senior management, Patterson was aware of the CMC problems.

177. Patterson's role as Vice President of Finance also supports a strong inference that he was aware that SkinTE was registered under the wrong section. Patterson was the Vice President of Finance in the summer and fall of 2019, when there were ongoing discussions within the Company that SkinTE was registered under the wrong section and that the Company would have to change its regulatory path. As VP of Finance understanding how the Company would be able to fund the necessary clinical trials and to develop a reliable assay were within his responsibility. These discussions were going on amongst directors and vice presidents in Regulatory, Quality, Manufacturing, and R&D, who attended meetings to discuss the regulatory change. By December 2019, the conversation had moved into more distinct planning. As Vice President of Finance, Patterson knew, or was severely reckless in not knowing, that SkinTE was not properly registered under Section 361 and that the Company would have to change regulatory paths. This change would severely affect the Company's finances since SkinTE was the Company's only commercially available product and contributed a material amount to the Company's net revenue.

178. Patterson's scienter can be inferred from the small size of the Company. As of December 31, 2020, PolarityTE had approximately 80 full-time employees and five part-time employees, all of whom are in the United States. Due to the small size of the company, Patterson was aware of SkinTE's registration status and the Company's CMC issues.

179. Patterson's scienter can also be inferred from the fact that SkinTE was the Company's only commercially available product and represented a significant portion of the Company's total revenue. For the fiscal year ended December 31, 2020, SkinTE sales accounted for 37% of the Company's total net revenues. For the fiscal year ended December 31, 2019, SkinTE sales accounted for 42% of the Company's total net revenue.

**D. Additional Allegations Concerning Mann's Scienter**

180. The inordinate compensation Mann received in 2018 gave Mann a strong motive to commit fraud. After taking over the company in 2017, in 2018 Lough awarded to himself and to Edward Swanson and Defendant Mann a total of $32,102,891 in compensation, with $13,714,337 to himself and $13,862,967 to Mann. In addition, the company awarded $4,389,967 in compensation to PolarityTE's board of directors, including $1,347,600 to Defendant Seaburg. This accounted for more than 52% of PolarityTE's total expenses in 2018, according to PolarityTE's 2019 10-K. Justifying this massive financial windfall to corporate insiders gave Mann a motive to commit fraud.

181. Mann was the Company's CFO during the FDA's inspection of the Salt Lake City facility in July 2018. Thus, Mann was aware of the CMC problems identified by the FDA in the Form 483. The purpose of an FDA Form 483 is to "notif[y] the company's management of objectionable conditions." After an inspection, "the FDA Form 483 is presented and discussed with the company's senior management." The FDA reads and discusses with senior management "[e]ach observation . . . so that there is a full understanding of what the observations are and what they mean." Thus, as senior management, Mann would have discussed each observation with the FDA and had a full understanding of each violation. He also would have understood that the Company would have to resolve these issues before successfully submitting an IND application or BLA.

182. Mann's scienter can be inferred from his role as CFO in the summer and fall of 2019, when there were ongoing discussions within the Company that SkinTE was registered under the wrong section and that the Company would have to change its regulatory path. These discussions were going on amongst directors and vice presidents in Regulatory, Quality, Manufacturing, and R&D, who attended meetings to discuss the regulatory change. By December 2019, the conversation had moved into more distinct planning. As CFO, Mann knew, or was severely reckless in not knowing, that SkinTE was not properly registered under Section 361 and that the Company would have to change regulatory paths. This change would severely affect the Company's finances since SkinTE was the Company's only commercially available product and contributed a material amount to the Company's net revenue.

183. As CFO Mann was responsible for identifying and obtaining financing sources to fund the necessary clinical trials and to develop a reliable assay. The clinical trials would cost millions of dollars and he was the person responsible to make sure the Company obtained these necessary funds.

184. Mann's scienter can be inferred from the small size of the Company. As of December 31, 2020, PolarityTE had approximately 80 full-time employees and five part-time employees, all of whom are in the United States. Due to the small size of the company, Mann was aware of SkinTE's registration status and the Company's CMC issues.

185. Mann's scienter can also be inferred from the fact that SkinTE was the Company's only commercially available product and represented a significant portion of the Company's total revenue. For the fiscal year ended December 31, 2020, SkinTE sales accounted for 37% of the Company's total net revenues. For the fiscal year ended December 31, 2019, SkinTE sales accounted for 42% of the Company's total net revenue

### E. Additional Allegations Concerning Hague's Scienter

186. PolarityTE's desperate financial condition in 2020 and 2021 gave Hague motive to commit fraud. In PolarityTE's 10-Q filed August 6, 2020, PolarityTE disclosed that there was substantial doubt that the company could continue as a going concern if the company could not raise additional funds within the year. The company repeated this warning in its 10-Qs filed November 10, 2020, and August 12, 2021. Given the need to raise additional financing to continue the company as a going concern, Hague had a strong motive to misrepresent the level of progress PolarityTE had made with its IND application and the prospects of quick approval by the FDA.

187. Hague's scienter can be inferred from his role as a member of the Office of the Chief Executive. In August 2019, the Board appointed Hague to serve as a member of the Office of Chief Executive after removing Lough as CEO. The Company stated that the purpose of the Office of Chief Executive was to address the immediate business needs of the Company as the Company transitions from product development of SkinTE to product commercialization. At that time, the "immediate business need" of the Company involved determining how to transition from a 361 HCT/P to a 351 HCT/P. As AW3 stated, in the summer and fall of 2019, there were ongoing discussions within the Company that SkinTE was registered under the wrong section and that the Company would have to change its regulatory path. These discussions were going on amongst directors and vice presidents in Regulatory, Quality, Manufacturing, and R&D, who attended meetings to discuss the regulatory change. By December 2019, the conversation had moved into more distinct planning. Thus, as the de facto CEO, Hague knew, or was severely reckless in not knowing, SkinTE was not properly registered under Section 361 and that the Company would have to change regulatory paths.

188. Hague's scienter can also be inferred from his role as COO and CEO. Hague was the Company's COO from April 2019 until August 2021, when he assumed the role of CEO. As the COO, Hague was responsible for, among other things, overseeing the operational functions of the Company. During that time, the Company was transitioning to a commercial stage company after the FDA advised it that SkinTE was not properly registered as a 361 HCT/P. This was the most important operational function for the Company at the time, as SkinTE was the Company's most important and only commercially available product. Thus, Hague would have been responsible for ensuring that the Company's operations were up to FDA standards before submitting the SkinTE IND application. As such, Hague knew, or was severely reckless in not knowing, the CMC issues that the Company needed to resolve before submitting the SkinTE IND application.

189. Hague's scienter can be inferred from the small size of the Company. As of December 31, 2020, PolarityTE had approximately 80 full-time employees and five part-time employees, all of whom are in the United States. Due to the small size of the company, Hague was aware of SkinTE's registration status and the Company's CMC issues.

190. Hague's scienter can also be inferred from the fact that SkinTE was the Company's only commercially available product and represented a significant portion of the Company's total revenue.

## XI. PLAINTIFFS' CLASS ACTION ALLEGATIONS

191. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired PolarityTE securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate

families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

192. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PolarityTE securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PolarityTE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

193. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

194. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

195. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;
- Whether statements or omissions made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of PolarityTE;

- Whether the Individual Defendants caused PolarityTE to issue false and misleading financial statements during the Class Period;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- Whether the prices of PolarityTE during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

196. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

197. Plaintiffs and the Class are entitled to a presumption of reliance pursuant to the fraud-on-the-market doctrine because the Company's common stock traded in an efficient market during the Class Period, in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The Company's common stock met the requirements for listing, and was listed and actively traded, on NASDAQ, a highly efficient, electronic stock market;

- As a regulated issuer, the Company filed periodic public reports with the SEC;

- The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

- The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 6,680,201 million shares of the Company's common stock, or roughly 17.41% of the Company's total

shares outstanding, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

- The Company traded on NASDAQ and was covered by at least 10 securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace;

- The Company traded on NASDAQ and there are at least 26 market makers that make a market in PolarityTE's stock;

- Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period;

- PolarityTE was eligible to file and did file a Registration Statement under Form S-3; and

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities.

198. Based on the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

199. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII. NO SAFE HARBOR

200. The statutory safe harbor provision for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

201. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

203. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PolarityTE securities; and (iii) cause Plaintiffs and other members of the Class to purchase or

otherwise acquire PolarityTE securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

204. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PolarityTE securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PolarityTE's finances and business prospects.

205. By virtue of their positions at PolarityTE, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

206. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of PolarityTE, the Individual Defendants had knowledge of the details of PolarityTE's internal affairs.

207. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PolarityTE. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PolarityTE's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of PolarityTE securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning PolarityTE's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired PolarityTE securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

208. During the Class Period, PolarityTE securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PolarityTE securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of PolarityTE securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of PolarityTE securities

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

209. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly, or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

210. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

211. Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

212. During the Class Period, the Individual Defendants participated in the operation and management of PolarityTE, and conducted and participated, directly and indirectly, in the conduct of PolarityTE's business affairs.

213. Because of their positions of control and authority as senior officers and/or directors of the Company, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which PolarityTE disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PolarityTE to engage in the wrongful acts complained of herein. Therefore, the Individual Defendants were "controlling persons" of

PolarityTE within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PolarityTE securities during the Class Period.

214. Each of the Individual Defendants acted as a controlling person of PolarityTE. By reason of their senior management positions and/or being directors of PolarityTE, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PolarityTE to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of PolarityTE and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

215. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for violations committed by PolarityTE.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 3, 2022

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Jonathan Stern*
Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
jstern@rosenlegal.com

*Lead Counsel for Plaintiffs*

**JAMES DODGE RUSSELL & STEPHENS P.C.**

By: */s/ Mitchell A. Stephens*
Mark F. James (5295)
Mitchell A. Stephens (11775)
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Fax: (801) 363-6666
Email: mjames@jdrslaw.com
mstephens@jdrslaw.com

*Local Counsel for Plaintiffs*