Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
      jstern@rosenlegal.com


*Counsel for Plaintiffs*

Mark F. James (5295)
Mitchell A. Stephens (11775)
**JAMES DODGE RUSSELL &
STEPHENS P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Fax: (801) 363-6666
Email: mjames@jdrslaw.com
      mstephens@jdrslaw.com

*Local Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF UTAH**

| | |
|---|---|
| MARC RICHFIELD, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br> v.<br><br>POLARITYTE, INC., DENVER LOUGH, DAVID SEABURG, JACOB PATTERSON, PAUL MANN, and RICHARD HAGUE,<br><br>          Defendants. | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Case No. Case No. 2:21-cv-00561-BSJ<br><br>Hon. Bruce S. Jenkins |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. FACTUAL BACKGROUND .................................................................................. 1

III. ARGUMENT ......................................................................................................... 4

    A. LEGAL STANDARD ................................................................................... 4

    B. THE COMPLAINT ALLEGES MATERIALLY FALSE STATEMENTS .......... 5

      1. The Complaint Alleges the Falsity of the Section 361 Statements ......................... 5

        a. The Complaint Alleges the Falsity of Defendants' Statement that SkinTE was Regulated Under Section 361 ................................................................. 5

        b. The Complaint Alleges the Falsity of Defendants' Opinion Statements that SkinTE is not Properly Registered Under Section 361 ....................................... 8

      2. The Complaint Alleges the Falsity of the Potency Assay Statements ..................... 9

        a. The Potency Assay Statements Were Material ................................................... 10

        b. The Potency Assay Statements Were Misleading ............................................. 12

      3. Defendants' Statements Regarding the Termination of Enforcement Discretion Are Misleading ................................................................................................ 13

      4. Defendants' Statements Should not Be Dismissed as Forward Looking .............. 14

    C. THE COMPLAINT ALLEGES SCIENTER ................................................ 17

      1. Defendants' Financial Desperation Created a Motive to Commit Fraud .............. 17

      2. Defendants had Scienter For the 361 and Potency Assay Statements ................... 18

      3. Defendants had Scienter for the Enforcement Discretion Statements ................... 21

      4. Defendants' Positions Support Scienter ................................................................ 21

      5. Lough's Firing Supports Scienter ......................................................................... 22

      6. PolarityTE's Size Contributes to Scienter ............................................................ 22

      7. The Core Operations Doctrine Supports Scienter ................................................. 23

    D. THE COMPLAINT ALLEGES LOSS CAUSATION ................................... 23

    E. THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY ................. 25

IV. CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. MiMedx Grp., Inc.*,
37 F. Supp. 3d 1271 (N.D. Ga. 2014) ................................................................. 19

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ..................................................................... 5, 21

*Angelos v. Tokai Pharms.*, Inc.,
494 F. Supp. 3d 39 (D. Mass. 2020) .................................................................. 20

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ....................................................... 11

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ............................................................... 19

*Correa v. Liberty Oilfield Servs., Inc.*,
548 F. Supp. 3d 1069 (D. Colo. 2021) ............................................................... 10

*Exkae Ltd. v. Domo, Inc.*,
2020 WL 7352735 (D. Utah Dec. 15, 2020) ........................................................ 9

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ........................................................................ 13

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ................................................................. 17

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) ............................................................ 9, 20

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................... 19

*In re Amarin Corp. PLC.*,
2015 WL 3954190 (D.N.J. June 29, 2015) ......................................................... 22

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) .............................................. 19, 20

*In re Atossa Genetics Inc Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ............................................................................ 16

*In re Bristol-Myers Squibb Sec. Litig.*,
2005 WL 2007004 (D.N.J. Aug. 17, 2005) ................................................................. 18

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014) ...................................................................................... 21

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .................................................................................. 23

*In re Gold Res. Corp. Sec. Litig.*,
776 F.3d 1103 (10th Cir. 2015) ................................................................................ 23

*In re Ibis Tech. Sec. Litig.*,
422 F. Supp. 2d 294 (D. Mass. 2006) ....................................................................... 18

*In re Immucor, Inc. Sec. Litig.*,
2011 WL 2619092 (N.D. Ga. June 30, 2011) ............................................................ 11

*In re Key Energy Services, Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) ...................................................................... 24

*In re Mammoth Energy Servs., Inc. Sec. Litig.*,
No. CIV-19-522-J, 2021 WL 1851037 (W.D. Okla. Jan. 26, 2021) ........................... 22

*In re Myriad Genetics, Inc.*,
2021 WL 977770 (D. Utah Mar. 16, 2021) ............................................................... 18

*In re NPS Pharms., Inc. Sec. Litig.*,
2007 WL 1976589 (D. Utah July 3, 2007) ............................................................ 5, 15

*In re Ocular Therapeutix, Inc. Sec. Litig.*, No. CV 17-12146-GAO,
2019 WL 1950399 (D. Mass. Apr. 30, 2019) ............................................................ 12

*In re PolarityTE, Inc., Sec. Litig.*,
No. 2:18-CV-00510, 2020 WL 6873798 (D. Utah Nov. 22, 2020) ........................ 7, 10

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) ............................................................................ 15, 16

*In re SemGroup Energy Partners, L.P.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010) .................................................................. 23

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002) ................................................................. 10, 17

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) ........................................................................ 17

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ............................................................. 22

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996) ........................................................................................ 13

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ................................................................................... 5

*Johnson v. Pozen Inc.*,
  2009 WL 426235 (M.D.N.C. Feb. 19, 2009) ............................................................. 14

*Kessman v. Myriad Genetics, Inc.*,
  2019 WL 1330363 (D. Utah Mar. 25, 2019) ............................................................. 23

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................................ 16, 24

*Medina v. Clovis Oncology, Inc.*,
  215 F. Supp. 3d 1094 (D. Colo. 2017) .................................................................. 16, 23

*Mishkin v. Zynex Inc.*,
  No. 09-cv-00780-REB-KLM, 2011 U.S. Dist. LEXIS 34467 (D. Colo. Mar. 30, 2011) ......... 16

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................ 11

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) ....................................................................... 5, 23, 24

*Nguyen v. Radient Pharm. Corp.*,
  No. SA CV 11-0406 DOC, 2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) .................... 17

*Okemos Home, LLC v. LGF Produce, LLC*,
  2019 WL 12248966 (D. Colo. Mar. 27, 2019) ......................................................... 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175, (2015) ................................................................................................ 6, 8

*Prissert v. EMCORE Corp.*,
  894 F. Supp. 2d 1361 (D.N.M. 2012) ....................................................................... 18

*Ratner v. Ovascience, Inc.*,
134 F. Supp. 3d 621 (D. Mass. 2015) ....................................................................... 20

*Rihn v. Acadia Pharms. Inc.*,
No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)......................... 15

*Schaeffer v. Nabriva Therapeutics plc*,
No. 19 CIV. 4183 (VM), 2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020).................................. 11

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) ................................................................................ 16

*Sood v. Catalyst Pharm. Partners Inc.*,
No. 13-CV-23878-UU, 2014 WL 1245271 (S.D. Fla. Mar. 26, 2014)............................... 20, 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)....................................... 17

## Statutes

15 U.S.C. § 78u–4.................................................................................................. 5

15 U.S.C. § 78u-5 .................................................................................................. 14

## Regulations

21 C.F.R. § 10.115 (d)(3)....................................................................................... 6

## I. INTRODUCTION

A biotech company, PolarityTE tied its success to marketing its first product, SkinTE, directly without first going through FDA approval. Unbeknownst to investors SkinTE did not—and Defendants knew it did not—qualify under the FDA loophole it was purportedly exploiting. Though it was widely known within the company that this was improper, their CEO berated employees who told him he was not correctly registering the product. When he was abruptly removed, PolarityTE sought FDA approval but failed to correct undisclosed issues the FDA had raised years before. When, ultimately, the FDA issued a clinical hold letter, their fraud was revealed. Defendants' motion is without merit. They attempt to challenge falsity with matters outside the pleadings. They analyze scienter piecemeal, instead of holistically, and they claim attempt to refute loss causation by referring back to their earlier inadequate disclosures. Their motion should be denied.

## II. FACTUAL BACKGROUND

PolarityTE's only product, SkinTE, is a Human Cell, Tissue, and Cellular and Tissue-Based Product ("HCT/P"). HCT/Ps consist of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer to a human recipient. ¶3. SkinTE is intended to repair damaged skin, serving a similar function to a skin graft. *Id.* The FDA bases the regulatory framework for HCT/Ps on a risk-based approach. ¶4.

There are two regulatory pathways relevant to this case: (1) regulation under Section 361 of the Public Health Service Act (the "PHS Act") (the "Section 361 pathway"); or (2) regulation under Section 351 of the PHS Act (the "Section 351 pathway"). The Section 361 pathway allows for immediate commercial use without FDA review for safety and effectiveness of the product. ¶5.

1

However, HCT/Ps only qualify for the Section 361 pathway if they are, among other things, "minimally manipulated", meaning "that the processing of the HCT/P does not alter the original relevant characteristics of the tissue." ¶¶9-10. To use the Section 351 pathway, the Company must complete the full FDA approval process before any marketing. ¶6. This typically means submitting an investigational new drug application ("IND" or "IND application"), completing several clinical trials, using the data to prepare a Biologics License Application ("BLA") that proves the "continued safety, purity, and potency" of the product, and obtaining the FDA's approval, which it might well deny. *Id.* The process takes years and many tens of millions of dollars at a minimum.

Defendants understood the difference between the two pathways and that the Section 351 pathway's delay, costs, and risks made it undesirable. ¶8. To avoid the Section 351 pathway, Defendants registered SkinTE as a 361 HCT/P—without consulting the FDA or seeking independent expert advice—and sold PolarityTE to investors as a commercial stage biotech company based on the improper registration. *Id.*

But Defendants knew that SkinTE was not properly registered under Section 361. ¶9. Among other things, SkinTE did not meet the "minimal manipulation" test. ¶10. SkinTE starts with a skin sample from a patient. *Id.* The sample is shipped to PolarityTE's manufacturing facility, where the company turns it into a white paste and sends it back to the patient in a syringe. *Id.* This process alters the original skin sample; skin does not naturally come as a paste in a syringe.

Though knowing that SkinTE was not properly registered under Section 361, Defendants made the Company's ability to market and sell SkinTE under the Section 361 pathway with a center of their pitch to investors. ¶12. As a purportedly commercially viable and operational

company, PolarityTE was far more attractive to investors than as one of the countless development-stage biotech companies who promise that they might, years later, after tens of millions of dollars of dilutive financing, sell their product. *Id.* Defendants accordingly repeatedly told that the Section 361 pathway was one of PolarityTE's "competitive strengths" and that the immediate commercial launch of SkinTE was key to the Company's growth. ¶13.

Even as Defendants told investors that PolarityTE qualified for the Section 361 pathway, its employees discussed that it did not. Understanding that PolarityTE's stock price would plummet if it could not sell SkinTE under Section 361, Defendant Lough, its then-CEO, would "chop the[] head off" the employees who told him that SkinTE did not qualify under that section. *Id.*

In August 2019, the Board removed Lough as CEO without any public explanation. ¶15. At that point, employees were finally able to openly discuss that SkinTE did not qualify for Section 361. *Id.* Senior employees, including directors and vice presidents, began discussions of re-registering throughout the summer and fall of 2019. By December 2019, the Company was transitioning to regulatory approval under Section 351. *Id.* However, Defendants continued to mislead investors about the Company's ability to market and sell SkinTE as a 361 HCT/P. ¶16.

On April 21, 2020, the FDA advised Defendants that SkinTE was not properly registered under Section 361. ¶17. This meant that the Company must successfully complete several clinical trials before it could seek FDA approval under the Section 351 pathway. *Id.* Yet armed with the FDA's interpretation, Defendants knew that they could only market SkinTE until the end of a discretionary FDA grace period which allowed HCP/T to market their product while engaging with the FDA which would sunset on May 31, 2021. ¶¶18-19. At that time, all 351 HCT/Ps could no

longer sell their product without full FDA approval. ¶19. stop all commercial sales by May 31, 2021. ¶20.

The truth came out on May 13, 2021 when Defendants disclosed that the Company would have to stop marketing SkinTE as of May 31, only three weeks away. ¶21. In other words, the Company would stop all commercial operations unless and until the Company obtained formal FDA approval for SkinTE. *Id.* The disclosure caused PolarityTE's share price fall 21% in one day. ¶22.

Now a development-stage company, Defendants told investors PolarityTE was preparing an IND application for SkinTE. ¶23. Yet unbeknownst to investors, the FDA repeatedly warned PolarityTE, beginning in 2018, that the company lacked an appropriate potency assay and therefore could not design a clinical trial that could satisfy FDA requirements for approval. *Id.* Yet Defendants continued to tell investors they could measure the proper dosing of SkinTE, something they could not do without a potency assay. *Id.*

The truth was partially revealed on August 24, 2021, when the Company disclosed that the FDA placed the SkinTE IND on clinical hold because of undisclosed Chemistry, Manufacturing and Controls ("CMC") regulatory violations. ¶24. On this news, the Company's stock fell again by 9.52%. On November 10, 2021, Defendants disclosed that PolarityTE would have to develop an appropriate potency assay before the FDA lifted the hold. ¶25. On this news, the Company's stock fell by 10.45%. *Id.*

## III.   ARGUMENT

### A.   LEGAL STANDARD

On a motion to dismiss, the court "accept[s] the well-pleaded allegations of the complaint

and construe[s] them in the light most favorable to the plaintiff." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1247 (10th Cir. 2022). To state a claim for a violation of Section 10(b) and Rule 10b-5, a plaintiff must allege, as Plaintiff has: (1) a misrepresentation or omission of material fact in connection with the purchase or sale of a security; (2) Defendants' scienter; (3) reliance; and (4) resulting damage. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015).

## B.    THE COMPLAINT ALLEGES MATERIALLY FALSE STATEMENTS

To state a Rule 10b–5 claim, a plaintiff must plead that the defendant made an untrue or misleading statement of fact or failed to state a fact necessary to make a statement not misleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099–1100 (10th Cir. 2003). A plaintiff must "specify each statement alleged to have been misleading [and] the … reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1).  The Complaint must plead falsity with particularity, but the Court does not consider the defendants' competing inferences on this element. *In re NPS Pharms., Inc. Sec. Litig.*, 2007 WL 1976589, at *3 (D. Utah July 3, 2007).

### 1.    The Complaint Alleges the Falsity of the Section 361 Statements[1]

#### a.    The Complaint Alleges the Falsity of Defendants' Statement that SkinTE was Regulated Under Section 361

The Complaint alleges that, in their 10-K filed on January 30, 2018, Defendants claimed:

> Unlike products regulated by the FDA under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") and/or the Public Health Service Act as drugs, devices, or biologics, which require multi-phase clinical trials and premarket approvals, our SkinTE product is regulated by the FDA as human cells or tissues intended for implantation.

¶114. This statement says more than that SkinTE was registered under Section 361. By asserting that SkinTE was regulated under Section 361, unlike other products, Defendants stated

---

[1] For the Court's reference, Plaintiffs are appending hereto a table of false statements.

that SkinTE's Section 361 registration was ***proper***. Similarly, a sponsor who marketed a drug that had not been approved by the FDA might truthfully say the drug was not approved, but a sponsor's statement that the drug was not regulated by the FDA would be false. That is, a reasonable investor would have understood that Defendants were making the factual claim that SkinTE was eligible for registration under Section 361, not just that Defendants had so registered it.

The complaint raises a plausible inference that SkinTE was not actually regulated by Section 361. First, FDA guidance provides that a product is more than minimally manipulated where the manufacturer grinds dermis into particles. ¶74. Similarly, PolarityTE creates SkinTE by turning skin samples into a paste, showing that it does not meet the "minimally manipulated" standard. Defendants note that this guidance is not binding and therefore they had the right to take a contrary position. But while not binding, FDA guidance "represent[s] the agency's current thinking." 21 C.F.R. § 10.115 (d)(3). And the Supreme Court in *Omnicare* stated that it is misleading to make a statement of legal compliance with knowledge that the federal government has taken the opposite position. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188, (2015).

Defendants claim that this allegation is not well pled because Plaintiffs do not show exactly how PolarityTE manipulated skin into a paste, but PolarityTE's own 10-K confirms that the process involves turning skin into a paste, and even includes a picture. ¶75, Dkt. No. 54-5, p. 12. If it mattered whether a substance was ground, chopped, or pureed, then the FDA's guidance would have said as much. And one entity that *did* know the details of the SkinTE process was the FDA, and it concluded that SkinTE was not eligible. ¶96.

Denying the Complaint's allegations, Defendants assert that the FDA only provided a

preliminary assessment, and that they chose not to challenge the FDA's conclusion solely because it made more business sense to go through the FDA approval process. But in support of this claim Defendants offer nothing more than their own self-serving public statements that this was the reason for their decision. Dkt. 54-18 at 1.

Defendants therefore ask the court to impermissibly draw a contestable inference in favor of themselves at the pleading stage. Doing so is particularly inappropriate given that AW-2[2] undercuts Defendants' self-serving narrative. According to AW-3, by December 2019, PolarityTE's senior Executive Directors reached the conclusion that they would probably have to register under Section 351, which was *before* they approached the FDA. ¶93. Therefore, the Complaint plausibly alleges that PolarityTE went along with the FDA's conclusion not because as a business matter it was not worth fighting it, but because PolarityTE had already reached the same conclusion. In any case, it hardly matters what Defendants think. The FDA's finding that SkinTE is not eligible for Section 361, whether Defendants dispute it or not, conclusively shows that Defendants' factual statement to the contrary is false.

In their motion, Defendants claim that this statement is indistinguishable from statements that the court rejected in the previous securities fraud lawsuit against PolarityTE, but they ignore a crucial distinction. The allegations that the court rejected were "statements that SkinTE was *registered* under Section 361". *In re PolarityTE, Inc., Sec. Litig.*, No. 2:18-CV-00510, 2020 WL 6873798, at *8 (D. Utah Nov. 22, 2020) (emphasis added). The court found that the statement was not misleading because SkinTE was in fact registered under Section 361 at the time, whether appropriately or not. But, as more fully set out above, it is true that Defendants chose to register

---

[2] Plaintiffs are prepared to provide the identity of the Anonymous Witnesses at the Court's direction.

SkinTE under Section 361, whether properly or not, but the statement that SkinTE is regulated under Section 361 is only true if registration was proper.

**b.**     **The Complaint Alleges the Falsity of Defendants' Opinion Statements that SkinTE is not Properly Registered Under Section 361**

Because the Complaint establishes that that Defendants' claims that SkinTE was properly registered under Section 361 were not based on a meaningful internal inquiry and ran counter to the inquiry that PolarityTE belatedly conducted, Defendants' statements that SkinTE was properly registered were false. In *Omnicare*, the Supreme Court held that "an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere." *Omnicare, Inc.*, 575 U.S. at 188. Reasonable PolarityTE investors assumed that Defendants' statements were based on such an inquiry interpreted Defendants' statements that SkinTE was properly registered as resulting from a meaningful inquiry, and not merely Lough's intuition. But the Complaint alleges Lough blocked any inquiry until the board removed him. Thereafter, it belatedly undertook such an inquiry and concluded that SkinTE should not be registered under Section 361. Then, around the time or after the board removed Lough, AW3 explained that employees began discussing the proper registration for SkinTE. ¶97. By December, they concluded that they would likely have to change SkinTE's registration. *Id.* Yet, throughout all of this, Defendants continually reassured investors that SkinTE was properly registered.

Defendants' statements are also misleading because they were made "in the face of … contrary advice." *Id.* at 188.  PolarityTE employees and a large outside investor told Lough he was wrong. That he ignored their advice and "chop the[ir] head off" is not exculpatory. ¶89.This case is not a case of mere internal disagreement. Defendants rely on *Exkae*, which holds that showing that

8

employees disagreed with a corporate strategy is insufficient to establish that the statements were false. *Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *6 (D. Utah Dec. 15, 2020). But the statements here are not merely about optimal strategy, but whether SkinTE complied with regulatory requirements, a narrower question. Further, that Lough actively suppressed disagreement among employees regarding whether the company had properly registered SkinTE shows the decision resulted from Lough's personal whim. If, as Defendants now claim, PolarityTE chose to adopt the Section 361 pathway after meaningful consultation with experts, they could have simply told investors or employees that he had the benefit of expert guidance instead of "chop[ping] the[ir] head off." Lough's refusal to countenance expressions of disagreement raises a plausible inference that he knew his decision was not correct. In addition, after Lough left, months before they even contacted contacting the FDA, Defendants had already determined that they were probably not properly registered under Section 361. These same facts also distinguish this case from *QRX*, where a plaintiff alleges that an opinion was misleading solely because the FDA later disagreed. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 598 (S.D.N.Y. 2016). Instead, it alleges that the statement was misleading based on Defendants' own conduct, which shows both that their expressed opinions were not sincere, and that even if they were, they were not based on "mere intuition" or contradicted by facts Defendants suppressed.

### 2.     The Complaint Alleges the Falsity of the Potency Assay Statements

The Complaint alleges that several statements are misleading because they falsely touted PolarityTE's ability to conduct quality control and assurance, which they were unable to do because they lacked any potency assay. In their Motion, Defendants misleadingly refer to these statements as the "Form 483 Statements" which they claim were immaterial and not misleading.

9

Yet the Complaint does not allege that Defendants had a freestanding duty to disclose the contents of a Form 483. Rather, Defendants' statements are materially misleading because they did not disclose that PolarityTE had no potency assay and the Form 483 is one, though not the only, support for the allegation.

### a. The Potency Assay Statements Were Material

That SkinTE lacked a potency assay was material to investors because it prevented PolarityTE from properly performing quality control and assurance, and because, until they developed a potency assay, they would be unable to even begin FDA trials. "In the context of a Rule 12(b)(6) motion, the court is reminded that materiality is a mixed question of law and fact and ordinarily should be reserved for the trier of fact.…Only if defendants' statements are obviously immaterial may the court grant defendants' request for dismissal." *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1215–16 (D. Kan. 2002) (internal citation omitted); *see also Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1082 (D. Colo. 2021) (same). Defendants cannot seriously claim that the lack of a potency assay was immaterial to investors so instead they misleadingly quote case law to attack one of the sources that the Complaint relies on to assert that Defendants lacked a potency assay – the Form 483. But this argument lacks merit.

Defendants assert that *PolarityTE* held that Forms 483 are immaterial, but that case found that specific statements Lough made on a call that touched on PolarityTE's manufacturing facility were immaterial puffery. It did not conclude that the facts Defendants concealed were not material, only that reasonable investors would not rely on the statements at issue. *In re PolarityTE, Inc., Sec. Litig.*, No. 2:18-CV-00510, 2020 WL 6873798, at *10 (D. Utah Nov. 22, 2020). Plaintiffs here do not allege those statements were misleading. Defendants also cite *Nabriva*, but misstate its holding,

10

as it found that "a Form 483 is likely ***not per se immaterial***". *Schaeffer v. Nabriva Therapeutics plc*, No. 19 CIV. 4183 (VM), 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020) (emphasis added) . Whether the deficiencies identified in a Form 483 are material is a question of fact. *Id.* at *10-11. Further, in *Nabriva*, as here, the question was not whether receipt of a Form 483 itself is an event that must be disclosed, but whether the Form 483 could render other statements misleading. *Id.*

Defendants also claim that their repeated statements that

> We have designed and developed manufacturing processes and quality systems that allow us to receive a specimen, qualify the incoming issue, process and manufacture the cell/tissue product, and perform ongoing quality control and assurance work prior to shipping.

Contradicting Defendants' assertion that "this is the type of statement that courts hold to be 'too vague and indefinite to give rise to a duty to disclose'" many cases found similar statements actionably misleading. In *Impax,* the court found that statements that a company made significant improvements to quality control after receiving a Form 483 were actionable misstatements. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014). In *Hospira*, the actionably misleading statement was that "Hospira believes that its facilities and equipment are in good operating condition and are well maintained". *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013). And *Immucor* held that statement that "manufacturing and on-going quality control procedures conform[ed] to the required statutes, regulations, and standards" was a material misrepresentation because it was "designed to reassure investors in light of the highly-regulated nature of the blood reagent industry". *In re Immucor, Inc. Sec. Litig.*, 2011 WL 2619092, at *3 (N.D. Ga. June 30, 2011).

Defendants also claim that the "final nail in the coffin" is that Defendants disclosed the Form 483 observations. But this is untrue. PolarityTE disclosed that their "Salt Lake City

11

manufacturing site was inspected in July 2018 and we received certain inspectional observations on Form FDA 483 following that inspection. We responded to those observations and engaged in a productive dialog with the FDA." Dkt. 54-5. Yet as Defendants themselves emphasize, the mere receipt of a Form 483 is not necessarily misleading, but the specific observations might be, and Defendants did not disclose the Form's contents. *Oracular Therapeutics* is inapposite for that very reason, as there the defendants had disclosed the general substance of the Form 483 observations. *In re Ocular Therapeutix, Inc. Sec. Litig.*, No. CV 17-12146-GAO, 2019 WL 1950399, at \*7 (D. Mass. Apr. 30, 2019). In addition, this case is distinguishable because the Clinical Hold Letter revealed that Defendants never corrected the problem.

### b.    The Potency Assay Statements Were Misleading

The Complaint alleges that in PolarityTE's 2019 10-K, dated March 12, 2020, Defendants claimed:

> In the application of SkinTE to date we have been able, when applicable to a particular case, to collect from a patient a skin tissue sample 5 $cm^2$ in size or less and produce enough SkinTE to treat a wound 30x greater in size than the skin collected.

The Complaint alleges that this statement is false because throughout the class period PolarityTE lacked an adequate potency assay. Defendants point out that the fact that SkinTE lacked a potency assay in 2018, as the Form 438 revealed, does not mean that they lacked a potency assay in 2020. But the clinical hold letter found the proposed potency assays "clearly deficient" in part because they "do not demonstrate the biological activity of" SkinTE, As the Complaint notes, "[a] potency assay is the quantitative measure of biological activity" and "without a potency assay, it is impossible to determine scientifically the correct dosage for SkinTE." ¶84. Therefore, given that PolarityTE lacked a potency assay for SkinTE in 2021, they

12

could not have possibly made a truthful statement about the proper dosage of SkinTE in 2020.

Defendants' assertion that their November 9, 2020 statement that PolarityTE had proven that SkinTE could take a small harvest to treat a large wound warned investors that work "on developing a potency assay to validate dosing" was ongoing misconstrues the term "validation." In clinical trials, "[a]nalytical validation involves documentation that the performance characteristics of the assay are reliable and suitable for the intended clinical use in the specimens of interest" and "clinical validation" refers to "correlation of the result of an assay with a clinical endpoint." Schlisky, et al, *Development and Use of Integral Assays in Clinical Trials*, Clin. Cancer Res. 2012 Mar 15; 18(6): 1540–1546, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3307146/. That is, the validation Defendants claimed was ongoing takes place *after* a potency assay has been selected in order to document the effectiveness of the assay. But the FDA instead found that PolarityTE had made a clearly deficient choice of assay in the first place, so Defendants never could get to validation. So while the conference call did not claim that PolarityTE's work in preparing for the FDA was complete, it described a state of affairs far more advanced than the reality.

### 3. Defendants' Statements Regarding the Termination of Enforcement Discretion Are Misleading

Defendants assert that their statements regarding the termination of enforcement discretion are not misleading because they warned investors of the possibility that the FDA may terminate enforcement discretion and require PolarityTE to register SkinTE under Section 351. "[T]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit". *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011); *see also In re*

*Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) (same). By December 2019, Defendants had already concluded that they would need to register under Section 351, Defendants' statements were themselves misleading for categorizing as uncertain a risk that had already transpired. It does not matter whether the FDA might extend the

*Pozen* did not, contrary to Defendants' assertion, hold that a statement not worded as a guarantee and accompanied by cautionary language is per se inactionable. *Johnson v. Pozen Inc.*, 2009 WL 426235, at *20 (M.D.N.C. Feb. 19, 2009). Instead, it rejected allegations that defendants anticipated FDA approval by a certain time when there were no facts alleged that would make the defendants believe that the timetable was unlikely.

Defendants claim the complaint does not show the statements were false when made because they do not allege that it was impossible that the FDA would either extend enforcement discretion for all manufacturers or for PolarityTE specifically. But what the Complaint does allege is that by December of 2019 PolarityTE had concluded that they would have to seek approval as a 351, and Defendants' statements were misleading for failing to disclose this.

**4.      Defendants' Statements Should not Be Dismissed as Forward Looking**

Defendants' reliance on the PSLRA Safe Harbor provision for several of the statements similarly fails. Defs. Br. at 17. The PSLRA precludes companies and individuals from being held liable for certain "forward-looking" statements that are "identified" as such ***and*** are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5. The term "forward-looking statement" is defined as including future projections of revenue, plans for future operations, or statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). If the alleged

misleading statement at issue is not identified as "forward-looking," or accompanied by meaningful cautionary language then the PSLRA's safe harbor provision does not apply. Statements are only forward-looking if their falsity depends on a future contingency. *See, e.g., In re Quality Sys.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017). Statements do not become "forward-looking" simply because, in addition to discussing present facts, they also make reference to future possible outcomes. *See Rihn v. Acadia Pharms. Inc.*, No. 15CV00575 BTM(DHB), 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) ("Defendants' statements that Acadia remained 'on track' to submit the NDA by the deadline do not … were representations about the current state of affairs with respect to the NDA process, which were within Defendants' knowledge and control."). Plaintiffs alleged that these statements were materially misleading at the time they were made because they concealed and/or obscured the fact that SkinTE was not properly registered under Section 361.

Defendants claim that the statements that SkinTE is properly registered under Section 361 is forward looking because the statements warned that an adverse regulatory decision could cause them to change their registration. ¶¶111, 128, 140. But the misstatements, by their terms, refer to Defendants' belief that that, at the time the statement was made, SkinTE met the criteria for Section 361 and was therefore properly registered. Because the falsity of these statements does not depend on a future contingency, they were not "forward-looking." *Quality Sys.*, 865 F.3d at 1141-42; *In re NPS Pharms., Inc. Sec. Litig.*, 2007 WL 1976589, at *4 (D. Utah July 3, 2007) (upholding complaint that alleged defendants misstated prospects of FDA approval and stating the PSLRA safe harbor does not "protect[] fraud…. [T]he statements were allegedly not forward-looking predictions but, rather, knowing falsifications of historical fact"). Similarly, the statements at ¶¶140

and 142 are not forward looking because the portion of the statement that is alleged to be misleading is a statement of present fact – that Defendants continued to believe that SkinTE was properly registered under 361 and that SkinTE had "proven" that they "could take a relatively small harvest and treat [a] significant open wound." And while Defendants also asserted that the FDA might not agree, determining whether Defendants truly believed that PolarityTE was properly registered is a question of then-present fact, not as future contingency. *See*, *e.g.*, *In re Quality Sys.*, 865 F.3d at 1141-42 (analyzing circuit court case law regarding "mixed statements" of present and future facts and holding that safe harbor does not apply when statements omit material facts about present conditions); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1123-24 (D. Colo. 2017) (mere use of the words "could" and "potential" did not trigger safe harbor protection).

Moreover, cautionary language is only effective if "'reasonable minds' could not disagree that the challenged statements were not misleading." *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017). In particular, forward-looking statements are not shielded by warnings that merely recite a "litany of generally applicable risk factors." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009). Here, the warnings Defendants cite could apply to any product registered under 361. ; *Mishkin v. Zynex Inc.*, Civil Action No. 09-cv-00780-REB-KLM, 2011 U.S. Dist. LEXIS 34467, at *15 (D. Colo. Mar. 30, 2011) ("[T]o the extent the defendants rely on cautionary language … that cautionary language likely does not shield the relevant statements, assuming the other factual allegations in the complaint to be true.");

Similarly, courts have found that a risk statement itself is materially misleading if it "speaks about the risks . . . in the abstract, with no indication that the risk 'may already have come to fruition.'" *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), aff'd, 563

U.S. 27 (2011); *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1222 (D. Kan. 2002) ("the inclusion of general cautionary language … would not excuse the alleged failure to reveal known material, adverse facts."). Though Defendants warned that the FDA may change its position, Defendants already knew that SkinTE was ineligible for Section 361 under current regulation. Thus, the PSLRA safe harbor provides no shelter to Defendants.

### C.    THE COMPLAINT ALLEGES SCIENTER

The Court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "The scienter analysis is holistic, requiring the court to analyze all allegations in the complaint and not view any particular allegation in isolation." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1187–88 (D.N.M. 2010).

### 1.    Defendants' Financial Desperation Created a Motive to Commit Fraud

Defendants had a motive to commit fraud. A plaintiff can plead scienter by alleging that a company needed to raise money to survive. *See Nguyen v. Radient Pharm. Corp.*, No. SA CV 11-0406 DOC, 2011 WL 5041959, at *2, 8-9 (C.D. Cal. Oct. 20, 2011) (scienter where company falsely claimed to be conducting a trial with Mayo Clinic and admitted ability to continue operating depended on raising money); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (motive where company was "sufficiently short on cash at the time of the alleged misrepresentations that it could not afford to finance an additional clinical trial …

heightening its need for a lucrative stock sale."); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 299 (D. Mass. 2006) (motive where the company "needed an immediate cash infusion to keep the business alive"). PolarityTE issued repeated "going concern" warnings indicating that, unless they received significant additional funds, they would be out of business. ¶¶ 161, 169. This was dire for PolarityTE, because its repeated, dilutive fundraising restricted their ability to raise funds from institutional investors and depressed PolarityTE's stock price. ¶¶104, 105. This situation created a motive for fraud. Defendants rely on *EMCORE* but it merely held that the abstract need to raise capital, which is common to all companies, is s too generalized to plead motive. *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1373 (D.N.M. 2012). But PolarityTE had an unusual need for capital - it would have gone out of business within a year without it.

**2.      Defendants had Scienter For the 361 and Potency Assay Statements**

While Lough was at PolarityTE, he, a medical doctor, not an expert in FDA regulations, attacked employees and investors who told him that SkinTE was not properly registered under Section 361. Lough's suppression of internal debate constitutes recklessness. *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *17 (D. Utah Mar. 16, 2021) (scienter where defendants warned of lack of scientific basis for claims); *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *30–32 (D.N.J. Aug. 17, 2005) (scienter where drug company management failed to perform analyses employees urged to resolve internal safety concerns). Lough's refusal to allow knowledgeable insiders to tell him that SkinTE was improperly registered is classic evidence of willful blindness.

Courts have found that confidential witnesses can establish that there was widespread knowledge within a company of concealed facts, and that this widespread knowledge can be

sufficient to support scienter. *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010); *In re Alstom SA*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (same). AW3's statement that the company concluded that they would have to re-register SkinTE establishes scienter for this period. When Lough was terminated, having concluded that it needed to register under Section 351, the company *still* told investors it believed that SkinTE was properly registered under Section 361 and disagreed with the FDA's assessment. The Company's false exculpatory statement that it disagreed with the FDA supports scienter.

Defendants call Plaintiffs' theory implausible, analogizing it to cases where companies made optimistic statements in advance of an application they knew the FDA was bound to reject, but in those cases, the products could never make it into the market. *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *12 (C.D. Cal. Sept. 20, 2017). Here, SkinTE was a Tinkerbell product: it was already on the market and would continue to generate revenues so long as PolarityTE maintained that it was properly registered under Section 361.

*MiMedx* denied a motion to dismiss on similar facts. *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). There, too, a company had improperly registered a product under 361. The Court found scienter based on three grounds: The company's failure to seek a determination from the FDA, the knowledge that the FDA was scrutinizing the 361 registration, and insider stock sales. Defendants here knew it was at least doubtful whether SkinTE was eligible for Section 361, yet never sought the FDA's input until they had concluded SkinTE was ineligible. As set out above, Defendants here also had a motive. And the FDA conducted an inspection of PolarityTE's facilities, considering its eligibility for both a 361 registration and a BLA.

*Angelos* related to a clinical trial and therefore is distinguishable for the same reason as

*Arrowhead. Angelos v. Tokai Pharms.*, Inc., 494 F. Supp. 3d 39, 60 (D. Mass. 2020). And Defendants selectively quote Gillis, concealing that it, too, rejected allegations that the company was conducting trials that were doomed to fail. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016). (plaintiffs' theory that "QRX continued to invest substantial time and resources *in clinical studies* and NDA submissions that it knew were doomed to fail, all the while misrepresenting to the public that approval was likely.") (ephasis added). And *Ovascience* found lack of scienter regarding a 361 registration because the product was particularly novel. *Ratner v. Ovascience, Inc.*, 134 F. Supp. 3d 621, 631 (D. Mass. 2015). The FDA issued precise guidance that showed SkinTE was not eligible under Section 361.

Defendants claim that the Complaint alleges no plausible reason why Defendants would have filed the IND prematurely but Defendants' motive to make false statements to secure funding was particularly pressing in July 2021. PolarityTE's stock price fell below $1 on July 2, 2021. ¶107. If it remained there for 30 days, it would fall out of compliance with a Nasdaq listing requirement, relieving Cantor Fitzgerald of its obligation to sell PolarityTE shares. *Id.* The company was under huge financial pressure to announce good news within 30 days. Sure enough, PolarityTE prematurely filed its IND and on July 26, announced the filing. *Id.* Another court, addressing similar facts, found motive where "the misrepresentation came at a time when Defendants had heightened incentives to inflate the value of Catalyst's stock." *Sood v. Catalyst Pharm. Partners Inc.*, No. 13-CV-23878-UU, 2014 WL 1245271, at *7 (S.D. Fla. Mar. 26, 2014). This was because the company "had very recently encountered difficulties meeting the NASDAQ's minimum stock value requirement, and [its] remaining listed on the public exchange was essential to its survival." *Id.* In addition, "because Catalyst was actively selling shares of its stock, Catalyst

had an incentive to inflate the value of its stock as much as possible." *Id.*

*Genzyme* merely held that because there was no reason to think the information on the Form 483 had anything to do with the drug that was the subject of defendants' public statements, there was no reason to mention the concerns in the 483 in connection with those public statements. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014). But Defendants do not contest that the Form 483 expressed FDA concerns specifically related to SkinTE's potency assay.

### 3. Defendants had Scienter for the Enforcement Discretion Statements

By the end of 2019, Defendants had already concluded that PolarityTE must register SkinTE under Section 351. As Defendants did not themselves believe that SkinTE could be sold under Section 361, their statements that the FDA might allow continued sales after the end of enforcement discretion were knowingly misleading. In their motion, Defendants claim that neither they nor anyone else could have known whether the FDA might have extended enforcement discretion beyond May 2021. Even if true, Defendants did not merely note that if the FDA decides to extend enforcement discretion, they would be able to extend their sales of SkinTE. They instead asserted that they would attempt to convince the FDA of something that, secretly, they did not believe themselves – that SkinTE was properly registered under Section 361 and that they could therefore continue to sell SkinTE *after the end of enforcement discretion*.

### 4. Defendants' Positions Support Scienter

While an executive's position cannot, standing alone, establish scienter, with the other allegations in the Complaint, Defendants' positions as CEO and CFO contribute to a strong inference of scienter. *Adams*, 340 F.3d at 1106.

**5. Lough's Firing Supports Scienter**

Termination of a senior executive may support scienter. *In re Mammoth Energy Servs., Inc. Sec. Litig.*, No. CIV-19-522-J, 2021 WL 1851037, at *4 (W.D. Okla. Jan. 26, 2021) (firing president supports scienter). Resignation of an executive is indicative of scienter where "the resignations at issue [are] 'uncharacteristic' or 'accompanied by suspicious circumstances,' so as to lead to the inference that 'defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations.'" *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020). Here, Lough was abruptly placed on leave, attempted to resist his termination, but quickly settled, agreeing to resign. The circumstances of his termination were suspicious enough to trigger an SEC investigation; they are suspicious enough for a motion to dismiss. In contrast, in *Amarin*, the plaintiffs did not point to any punitive actions taken against the executives or allege anything else to contradict they "resigned … to pursue other opportunities, for family reasons, etc." *In re Amarin Corp. PLC.*, 2015 WL 3954190, at *13 (D.N.J. June 29, 2015). Defendants also argue that the timing of Lough's termination undercuts scienter because the remaining defendants did not change SkinTE's registration immediately. But Defendants ***did*** determine by the winter of 2019 that they were not properly registered, but failed to tell investors for months, allowing them to profit from SkinTE, and fundraise based on an inflated valuation.

**6. PolarityTE's Size Contributes to Scienter**

In small companies, there is less for executives to keep track of. *Okemos Home, LLC v. LGF Produce, LLC*, 2019 WL 12248966, at *9 (D. Colo. Mar. 27, 2019) (small company supports scienter). In *Gold*, the company was small, but the executives who made the false statements and

the employees who might have received information that would show the statements were false were "separated by nearly 2,000 miles and international borders." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015). *Gold* questioned neither that a company's small size could *contribute* to an inference of scienter, nor that size might suffice by itself in other circumstances.

### 7.       The Core Operations Doctrine Supports Scienter

The importance of misstated information to company operations adds to scienter. *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1298 (N.D. Okla. 2010); *see also Clovis*, 215 F. Supp. 3d at 1127–28 (scienter where statements concerned "company's most important product" and, because it had few others, defendants "should not have been distracted by myriad other product trials"). PolarityTE's focus was selling SkinTE. Their ability to do so was crucial. This supports scienter.

### D.       THE COMPLAINT ALLEGES LOSS CAUSATION

To plead loss causation, a plaintiff need only allege a "short and plain statement" of a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Loss causation can be alleged through "a corrective disclosure" that "reveals the fraud to the public" or through "a theory of materialization of a concealed risk." *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019). Arguments over "loss causation" are "normally inappropriate to rule on … at the pleading stage." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

The May 13, 2021 announcement that PolarityTE was ceasing to market SkinTE because of the end of enforcement discretion was corrective because Defendants had previously asserted that they were in talks to continue to market SkinTE beyond the end of enforcement discretion.

¶¶147, 163. In the earlier disclosures Defendants assert are corrective, they still maintained that PolarityTE would discuss extending marketing SkinTE past the end of enforcement discretion, Def. Ex. 9, at 22, Ex. 19, Nov. 9, 2020 10-Q at 24–25, or stated that they might continue marketing SkinTE during the pendency of the BLA. Aug. 6, 2020 10-Q at 23–24. Therefore, the May 13 disclosure revealed new information.

The August 24, 2021, disclosure of the hold revealed not merely that the FDA *may* issue a hold but that it *would* do so. This was significant new information to investors, who Defendants had previously disclosed a hold was possible. And while the disclosure did not reveal that the hold was connected to Defendants' prior omission of their failure to adopt an appropriate assay, taken with the November disclosure of the contents of the letter, the two revealed the fraud. Courts have held that a complaint can show loss causation through a series of partial disclosures. *Lormand*, 565 F.3d at 261, n. 31 (collecting cases). That is what happened here. In addition, while Defendants disclosed the risk of a clinical hold letter, they did not disclose that this could come about due to their failure to find an adequate potency assay. Defendants had concealed the risk that the lack of an adequate potency assay would cause the issuance of a clinical hold letter. "Under a theory of materialization of a concealed risk, a plaintiff alleges loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Defendants concealed the risks caused by the lack of a potency assay, and that risk, which was foreseeable to Defendants, caused investor losses

Defendants' reliance on *Key Energy* is misplaced. *In re Key Energy Services, Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 865 (S.D. Tex. 2016). There, the ruled that the disclosures were not

corrective because there was nothing to correct. The court had already found that the statements were generic forward looking statements which were adequately addressed by defendants' risk disclosures.

### E. THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

Defendants do not contest that, if Plaintiffs establish primary liability, they establish control liability. Because the Complaint properly alleges primary liability, it alleges control liability.

### IV. CONCLUSION

The motion to dismiss should be denied. If granted, Plaintiffs seek leave to replead.

Dated: December 2nd, 2022

THE ROSEN LAW FIRM, P.A.
Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
       jstern@rosenlegal.com


JAMES DODGE RUSSELL & STEPHENS P.C.

By: */s/ Mitchell A. Stephens*
Mark F. James (5295)
Mitchell A. Stephens (11775)
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Fax: (801) 363-6666
Email: mjames@jdrslaw.com
      mstephens@jdrslaw.com

*Local Counsel for Plaintiffs*