IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

CENTRAL DIVISION


MARC RICHFIELD, Individually      )

and on Behalf of all Others       )

Similarly Situated,               )

           Plaintiffs,            )

vs.                               )   Case No. 2:21-CV-561BSJ

POLARITYTE, et al.,               )

           Defendants.            )

_____)


BEFORE THE HONORABLE BRUCE S. JENKINS
--------------------------------------

March 6, 2023


Motion Hearing

A P P E A R A N C E S

For Plaintiffs:                JONATHAN STERN
                               275 Madison Avenue
                               40th Floor
                               New York, New York

                               JORDAN PATE
                               10 West Broadway
                               Suite 400
                               Salt Lake City, Utah


For Defendants:                MICHAEL BILES
                               500 West Second Street
                               Suite 1800
                               Austin, Texas

                               JEFF COREY
                               201 South Main Street
                               Suite 1800
                               Salt Lake City, Utah


For Defendant:                 KEITH M. WOODWELL
Denver Lough                   One Utah Center
                               201 South Main Street
                               Suite 2200
                               Salt Lake City, Utah




Court Reporter:                Ed Young
                               351 South West Temple
                               Room 3.302
                               Salt Lake City, Utah 84101-2180
                               801-328-3202
                               ed_young@utd.uscourts.gov

March 6, 2023                                          1:30 p.m.

P R O C E E D I N G S

THE COURT:  Good afternoon.  Welcome.

Let's turn to Richfield versus PolarityTE and others.  It is 21-C-561, here today on a motion to dismiss.

Those who are making appearances, if you will be good enough to again note your presence for the record and tell us who you are and whom you represent.

MR. PATE:  This is Jordan Pate, James Dodge Russell & Stephens, for the plaintiff, with Jonathan Stern from the Rosen Law Firm as cocounsel.

THE COURT:  Thank you.

MR. BILES:  Good afternoon, Your Honor.

Mike Biles, King & Spalding, here on behalf of defendants PolarityTE and its current executive officers.

MR. WOODWELL:  Keith Woodwell, Your Honor, on behalf of defendant Denver Lough.

THE COURT:  Okay.

MR. COREY:  Your Honor, Jeff Corey, Parsons Behle & Latimer, also here for PolarityTE.

THE COURT:  Thank you.

Well, let's go ahead with your motion.

MR. BILES:  May it please the Court, Your Honor, back in September this Court granted the defendants' motion

to dismiss and directed the plaintiffs to specifically allege why the challenged statements were materially false when made.  The plaintiffs' second amended complaint fails to comply with this Court's directive.  The plaintiffs have not explained why PolarityTE's statements concerning the registration status of its SkinTE product were false and misleading.  For this reason the Court should grant the defendants' second motion to dismiss, this time with prejudice.

The Court should also grant our motion to dismiss for the additional reasons that the plaintiffs have not alleged facts that raise a strong inference of scienter as required in the Private Securities Litigation Reform Act and have not alleged the element of loss causation.

Your Honor, I would like to go into some background of our motion.  PolarityTE is a biotech company based here in Salt Lake City, Utah.  Its primary product is called SkinTE.  What SkinTE is is doctors take a small sample of a patient's skin, and that skin is sent to PolarityTE's labs and they are able to grow it to a larger size to treat open wounds and burns.

There are two regulatory pathways for companies to sell tissue products.  One is called Section 361.  If a company believes that its products meet the requirements of Section 361 it can self-register under that section.  It

does not need to seek the FDA's preapproval and it does not need the FDA's permission to do so.  It is a self-registration scheme.  But if the product does not meet these requirements, companies must register under Section 351, under biological agents which treats the product like any other drug and a company has to go through phase studies and get FDA approval.

Now, as the plaintiffs allege in their complaint, the benefits of registering under Section 361 are that a company can begin to sell the product quickly without spending millions of dollars in phase studies, but the downside of pursuing Section 361 is that you have to compete against other products that have gone through a Section 351 process which may be perceived as more safe and more reliable by doctors and their patients.

On August 14, 2017 PolarityTE self-registered SkinTE under Section 361.  Three months after this self-registration, in November of 2017, the FDA published new guidance for the registration of skin products under Sections 361 and 351.  Importantly, Your Honor, the FDA gave companies a grace period of three years to try to figure out if its products met the new criteria for Section 361 and 351.

As the plaintiffs admit in paragraph 65 of their complaint, the purpose of this three-year grace period was

to give companies adequate time to engage with the FDA on this complex and subjective issue.  PolarityTE complied with the letter and spirit of the new FDA's guidance.  PolarityTE told investors that it believed its product, SkinTE, qualified for Section 361 registration, but that it would engage with the FDA during the grace period, and it specifically warned that the FDA may disagree with its conclusion and that it may be forced to stop selling SkinTE after the end of the grace period.

In July of 2018 an FDA inspector inspected the manufacturing facilities of PolarityTE and issued what is called a Form 483 report.  The FDA inspector made eight observations of potential violations of the FDA's manufacturing guidelines.  The FDA did not order PolarityTE to stop producing and manufacturing SkinTE and did not issue a warning letter or a fine, all within its powers to do so. Instead, it issued what is called voluntary action indicated, and that allowed the company to continue to manufacture but also engaged in a dialogue with the FDA to make sure that it's fixing the manufacturing deficiencies noted.

Importantly, Your Honor, PolarityTE disclosed the Form 483 report, that it received the Form 483 report. After engaging in discussions with the FDA during the grace period, in April of 2020 PolarityTE reported to its

shareholders that it received preliminary guidance from the FDA, a preliminary opinion that the FDA believed that SkinTE did not qualify for Section 361 registration.  PolarityTE disclosed this information and told investors that while it disagreed with the FDA's preliminary findings and still believed that its product qualified under 361, it was going to change its business strategy and pursue clinical trials and registration under the longer process of 351.

The company also disclosed in April that it would seek permission from the FDA to allow it to continue to sell SkinTE under 361 while its application for 351 was pending, but it was unusual for the FDA to allow such sales to go forward.  It warned investors that it would seek permission, but it couldn't guarantee that the FDA would allow it to sell.

In July of 2021 PolarityTE submitted a new drug application and disclosed to investors that the FDA may issue a clinical hold for its application if the FDA has questions about the application.  This is exactly what happened.  In August of 2021 the FDA placed a clinical hold. PolarityTE filed a response in December of 2021 which the FDA quickly accepted and lifted the clinical hold for SkinTE in January of 2022, one month later.  SkinTE is currently in phase trials as we speak.

Your honor, I want to discuss the legal standard

because this is a securities class action and the pleading rules are different than in ordinary business disputes. Under the PSLRA plaintiffs have to plead with heightened particularity.  First they have to identify not only the false statements, but explain in detail why the statements were false and misleading when made.

Second, the PSLRA provides a safe harbor for forward looking statements.  Third, the plaintiffs must plead facts that raise a strong inference of fraudulent intent.  Unlike in ordinary cases where the Court is required to grant all inferences toward the plaintiffs, that does not apply in securities class actions, Your Honor. Only compelling inferences that raise a strong inference of actual fraud comply with the standard.

I'm going to address the no false statement argument first.  The plaintiffs in their amended complaint allege three categories of misstatements.  The first statements are what we call the Section 361 statements. According to the plaintiffs, PolarityTE's statements concerning SkinTE's registration under Section 361 were false because SkinTE did not satisfy the FDA's guidance for 361 that were published in November after it had already registered the product.

The second category are what are called the Form 483 misstatements.  PolarityTE's statements concerning its

manufacturing process and the dosing for SkinTE were false because of certain observations made by the FDA inspector in the Form 483 report.

Finally, we have the FDA enforcement discretion statements. This is a statement that the company made in April of 2020 that it would continue to sell SkinTE subject to further discussions with the FDA, but it also warned that permission to continue to sell after the end of the grace period was unusual and not typically granted.

Your Honor, the Section 361 registration statements were not materially false and misleading. These statements alleged by the plaintiffs in the second amended complaint are identical to the statements made in a complaint filed in 2020 that were dismissed with prejudice by Judge Nielson of this district. Nothing has changed by the plaintiffs' allegations that would warrant this Court deviating from Judge Nielson's dismissal.

Second, the Section 361 statements were true. Most of the statements were statements of fact that SkinTE was registered under 361. That is a true statement because, as I explained, this is a self-registration process. PolarityTE did in fact register SkinTE under Section 361, so by disclosing that information to investors, that was a true statement of fact.

There has never been a decision or a formal ruling

by the FDA that SkinTE did not qualify for Section 361 registration status.  All we received in 2020 was a preliminary -- during our dialogue with the FDA, a preliminary conclusion by the FDA that it likely would find that it did not qualify, but there was never a formal finding.

The plaintiffs point to guidance issued by the FDA that states that generally when a manufacturer grinds a skin tissue product it does not qualify for 361 registration. Here there are no facts before Your Honor that demonstrate that PolarityTE grinded a patient's skin or pulverized it. There is nothing.  All that the plaintiffs point to is a picture from our 10-K that shows that SkinTE is delivered in a paste form.  There are no facts establishing that we have to grind a patient's skin to manufacture it in a paste form. That is just pure conjecture on the plaintiffs' part.

Finally, Your Honor, the FDA's guidance is just that, guidance, and it is equivocal in nature.  It says generally.  If you read the guidance, it says that a manufacturer that grinds a patient's skin generally wouldn't qualify.  That implies that there are exceptions to this rule, and there are no facts before the Court.  Even if the Court assumes that the plaintiffs are correct that we grinded the skin, there are no facts demonstrating that we didn't honestly believe that we could fit under the

exception noted in the FDA's guidance.

Third, Your Honor, most of the Section 361 statements were prefaced as opinions or statements of belief that we believe that we are appropriately registered under 361, or it is our opinion that we are appropriately registered under 361. The Supreme Court in the decision in Omnicare said that statements that are framed as statements of opinions or belief are only actionable if plaintiffs can demonstrate with facts that that opinion was not sincerely held or that there was no reasonable process to come to that conclusion.

The plaintiffs have no evidence or no facts that this opinion was not reasonably held by PolarityTE's executives. In fact, what they do allege demonstrates that it was sincerely held. They allege that Dr. Lough was adamant that SkinTE qualified for Section 361 registration, that he was headstrong in his opinion. Your Honor, these are facts that establish that Dr. Lough's belief was sincerely held, not that his opinion was not well founded and not sincerely held.

There are no facts, Your Honor, and this is really almost duplicative of the scienter element, but what this case is missing and the reason why it fails under the PSLRA is because there are no document or witness that the plaintiffs have identified that show that Dr. Lough or any

other executive were told that SkinTE does not qualify under 361. They have no evidence and no facts to establish that any executive believed that the product didn't qualify for 361. All they have are that we ultimately changed our business strategy.

Well, we did that because we were complying exactly with the guidance that the FDA announced. When it published the guidance in November of 2017 it gave companies three years to figure this out, which demonstrates that this is a complex subjective area.

I am going to turn now, Your Honor, to the Form 483 statements. This issue was also decided by Judge Nielson in his opinion. Judge Nielson concluded that Form 483 reports are not material because they are not final determinations by the FDA. They are the opinions of one FDA inspector. For that reason Judge Nielson concluded that it wasn't material and that there was not a duty to disclose it.

This Court should reach the same conclusion, because Form 483 reports that are issued with a voluntary action indicated are not material enough to require disclosure to investors. But, in any event, we did disclose that we received a Form 483 report so there is no issue there.

The plaintiffs' second amended complaint adds

additional facts about the lack of what is called a potency assay.  My understanding of that, Your Honor, is that this is a test that can demonstrate that our end product meets the characteristics that we say it will, that when we take a patient's skin, that once we manufacture it it will be of a certain standard size and range of characteristics.  The plaintiffs are alleging that the Form 483 report disclosed that we didn't have a potency assay.

That is simply not true, Your Honor.  The words potency assay are not mentioned at all in the Form 483 report.  This is an allegation that is manufactured by plaintiffs.  There is no indication in the Form 483 report that PolarityTE did not have a potency assay.

When they challenge the company's generalized statements about its manufacturing capabilities and that we have quality manufacturing capabilities, those are not rendered false because of a lack of a potency assay.  Those are statements of opinion that are puffery in nature and that are not rendered false and misleading by the lack of a potency assay.

Next, we have PolarityTE's statements in 2020 and 2021 concerning the dosing of its products.  The plaintiffs again say that this was rendered false because we didn't have a potency assay, but the only fact that plaintiffs allege that we didn't have a potency assay is the fact that

when the FDA issued its clinical hold letter in August of 2021, it said that it disagreed with our potency assay, that they felt like our potency assay was inadequate.

Your Honor, that demonstrates that we did in fact develop a potency assay, that we submitted one but that the FDA just disagreed with it.  That is an entirely different fact than what the defendants are alleging in their complaint, that we didn't have a potency assay.  Again, there are no facts before your Court that demonstrate that the potency assay didn't exist.

Your Honor, I'm going to turn next to the FDA's enforcement discretion allegation.  This is the claim that in April of 2020 that we disclosed that based on preliminary views expressed by the FDA that the company would seek 351 registration, but that it would ask the FDA for permission to continue to sell after the close of the option period or the period when it ended in May.  We were going to ask the FDA if we could continue to sell after that date.

The plaintiffs say that this statement was false because the FDA's views were not preliminary, they were final, and the plaintiffs say that our statements about continued sales gave investors the false hope that we would continue to be able to sell SkinTE after May of 2021, the end of the grace period.

First, Your Honor, there are no facts that the FDA

issued a formal determination, a formal and final determination that SkinTE did not qualify under Section 361. The plaintiffs have said in their complaint that they have issued FOIA requests to the FDA, and if a final determination letter existed they would have pled it in their complaint.  There are no allegations that we received a final order from the FDA that SkinTE didn't qualify for 361 registration.

Second, our statement that we would seek to continue to sell SkinTE after the grace period if the FDA gave us permission to do so, that was reasonable for us to make that statement because we had been selling SkinTE for three years without any evidence of there being a safety violation or any evidence that the product didn't work.  At the end of the day, Your Honor, the whole regulatory scheme behind the FDA is to ensure that products are safe and that they do what companies represent that they will do.

There is no allegation in this complaint that SkinTE didn't work or was unsafe.  I think that is an important fact when you're trying to plead a fraud case against a company that is allegedly trying to push a product without going through studies.  When we changed our business decision to seek 351 registration, we had been selling this product in the marketplace for three years.  So I submit it was reasonable for the executives to seek permission from

the FDA to continue to sell it while it was going the 351 registration route.

In any event, Your Honor, that is a classic forward-looking statement that we hoped we could continue to sell something, but it is up to the FDA and permission is rarely granted -- or we said it is unusual for them to grant that. It is a forward-looking statement. We submit to Your Honor in Exhibit B a plethora of warning statements that accompanied that forward-looking statement. It clearly falls into the PSLRA's safe harbor for forward-looking statements.

Even if the Court ignores the cautionary language, a forward-looking statement is never actionable unless the plaintiffs can demonstrate it was made with actual intent and knowledge of falsity. That leads into scienter which is the main -- the main pleading hurdle that Congress created in the PSLRA that unlike in other cases, the plaintiffs have to plead facts that demonstrate a strong inference of fraudulent intent. They simply do not do so here, Your Honor.

First, Your Honor, there are no allegations that any of the insiders sold stock. This raises an inference of an absence of scienter. If the individual defendants knew that their product didn't qualify for 361 registration, and that the FDA simply would issue a ban of us selling it,

executives with that knowledge would have sold their stock and gotten out of this company.  That is not what happened here.  All the executives held on to their stock, which is evidence that they believed that this product was properly registered under 361.

Now, the second amended complaint adds new allegations that PolarityTE engaged in fraud because it needed to raise capital, that it needed to hype this product falsely in order to raise capital.  But, Your Honor, the Tenth Circuit has held repeatedly that the need for a company to raise capital, which is almost universally true for any start-up company, is not particularized enough to raise a strong inference of scienter.  We cite the Prissert versus Emcore case and Anderson versus Spirit Aerosystems on page 19 of our motion.

The absence of a motive to commit fraud here means that the plaintiffs' evidence of fraudulent intent or severe recklessness has to be compelling.  Again, there are no facts that anybody knew that Section 361 registration was wrong or fraudulent.  There is no document, no witnesses.

THE COURT:  Was there a new issue?

MR. BILES:  Excuse me?

THE COURT:  Was there a new issue?  I understood we were not talking about anything but the secondary market.

MR. BILES:  No, Your Honor.  I'm not aware of any

new issue.  The plaintiffs' anonymous witnesses, all they say is that Dr. Lough was adamant in his opinion and would not consider other people's advice on this issue, but they don't identify a conversation.

THE COURT:  We're talking about raising new capital and I didn't understand where that fit in.

MR. BILES:  Okay.  I'm sorry, Your Honor.  Now I understand what you mean.

The plaintiffs' second amended complaint adds two or three pages of new allegations that PolarityTE had a motive to engage in fraud because it was raising capital during the class period.  It was raising capital from investors during the class period and plaintiffs' allegation is that that was our motive to engage in fraud.  Our argument there is that the overwhelming weight of authority holds that the need to raise capital and the need to raise funds is not particularized enough to raise a strong inference of scienter, because many companies raise money and --

THE COURT:  But there was no effort here to get new money?

MR. BILES:  There was, Your Honor.  PolarityTE was raising money and continues to raise money to this day.

THE COURT:  How does it raise money?

MR. BILES:  By selling stock and by selling --

THE COURT:  Was there a new issue?

MR. BILES:  There was not a new registration, Your Honor.  My understanding is they were selling already registered stock, so there wasn't a new registration statement filed.  This was continuing to raise capital in the marketplace, which is commonplace for small start-up companies.

The point here is that allegations of selling of stock usually only applies to insiders, not the company, that insiders sell their own personal holdings to get out of the stock and --

THE COURT:  Did the company have a reservoir of stock?

MR. BILES:  Yes, it did.

THE COURT:  Was it indeed raising money?

MR. BILES:  Yes, it was raising money.

THE COURT:  Was there a new registration at all?

MR. BILES:  No, Your Honor, there was not.

Going back to the actual allegations of scienter, which is really the crux of why this complaint is deficient, is that there are no facts that demonstrate that any executive received information that SkinTE would not qualify for registration under Section 361.  There is no document, there is no email, there is no witness, there is nothing.  Those are the type of facts that plaintiffs need to survive

a motion to dismiss in a securities class action.  The plaintiffs don't have it here.  All they have is a change in business strategy and plaintiffs saying, oh, that must mean that you knew it was not going to work out all along.  That is not enough, Your Honor.  The PSLRA requires more.

Finally, Your Honor, the loss causation argument, the plaintiffs allege two curative disclosures, one on May 13th of 2021 where the company disclosed that it would stop selling SkinTE on May 31st, the end of the grace period, but that is not a curative disclosure because it doesn't reveal any fraud.  We have always warned investors that we might have to stop selling SkinTE unless we got permission from the FDA.  There was no fraud revealed on that date that would qualify as a curative disclosure and loss causation.

The second curative disclosure is on August 24th, 2021, where we disclosed the clinical hold.  Again, Your Honor, we warned when we filed our new drug application that the FDA might place a hold on our application if it has questions.  That is a very common thing for companies that submit new drug applications.  The fact that this happened is not a revelation of fraud.  It is a materialization of a disclosed risk and, therefore, it does not qualify as loss causation under the law.

I'm happy to answer any questions Your Honor has,

but I will rest.

THE COURT:  Thank you.

MR. BILES:  Thank you.

THE COURT:  Counsel.

MR. STERN:  Thank you, Your Honor.

May it please the Court, the first thing I want to address is that there was a misstatement in the complaint that the defendants never brought up and that isn't a statement of opinion and doesn't merely state that PolarityTE was registered under Section 361, but that unlike other products which have to go through a lengthy FDA approval process, it was regulated by Section 361.  This wasn't a statement of opinion and it wasn't just saying their current registration status.  It says unlike other companies that have to go through the 351 process, we don't. We are registered under 361.  That statement was not a statement of opinion.  It was a statement of fact.

THE COURT:  Why is it a statement of fact rather than a statement of opinion?

MR. STERN:  Well, normally when people make statements of opinion they say we believe or it is our opinion that -- they never made that statement.  The Omnicare Supreme Court case made clear that statements of opinion are generally those that are prefaced with we believe or we understand.  They were merely saying this is

the registration that applies to us.

THE COURT:  What is the fact that we're talking about here?

MR. STERN:  The fact is that --

THE COURT:  Are we talking about belief or are we talking about something else?

MR. STERN:  The fact is what the law requires. The fact is what they are actually legally required to do.

THE COURT:  Well, tell me the fact that you say was misstated.

MR. STERN:  The fact that was misstated was that they didn't have to go through the 351 process, and that instead they didn't have to register because they were regulated by 361.

THE COURT:  Did they say that they didn't have to go through --

MR. STERN:  Let me read you the exact quote.  I'm going to pull it up so I don't get it wrong.

What they said is unlike products registered by the FDA under the Food and Drug and Cosmetics Act and/or the Public Health Services Act as drugs, devices or biologics, which require multiphased clinical trials and premarket approvals, our SkinTE product is regulated by the FDA as human cells or tissues intended for implantation.

So essentially they are saying unlike other

products that have to register, we are under a different regulation.

THE COURT:  It was self-registered.

MR. STERN:  Right.  That was telling investors that they didn't have to go through the process of going through multiphase clinical trials.

THE COURT:  Isn't there an --

MR. STERN:  Sorry?

THE COURT:  Isn't there an alternative process? There is a self-registration --

MR. STERN:  There is a self-registration process, but they didn't qualify for the process and they were making the false claim that they did qualify for the process.

THE COURT:  You say they didn't follow self-registration?

MR. STERN:  No, I am not saying that they didn't follow self-registration.  They did self-register.  What we're saying is that they claimed that it was appropriate for them to self-register and that they wouldn't have to go through the FDA approval process.

THE COURT:  Now, when did they say that?

MR. STERN:  They said that in October -- sorry, January 30th of 2018 in the 2017 10-K and it was signed by Denver Lough.

THE COURT:  What did they say again?

MR. STERN:  They said unlike products regulated by the FDA under the federal Food, Drug and Cosmetics Act and/or the Public Health Services Act as drugs, devices or biologics, which require multiphase clinical trials and premarket approvals, our SkinTE product is regulated by the FDA as human cells or tissues intended for implantation.

THE COURT:  They say we're going through 361?

MR. STERN:  Right, but they are not just saying that they are going through it.  They are saying they are not required to go through the other process.  They are saying unlike people who are required to do this, we are not.

THE COURT:  If you are self-registered appropriately, why do you have to do anything else?

MR. STERN:  Well, that is the question.  By saying this they were not just saying that they were self-registered, but they were saying that they were self-registered appropriately.

THE COURT:  Well, maybe they were.

MR. STERN:  Well, the FDA disagreed and we allege facts that we believe show that they were not registered. If you look at the MiMedix case, which is a case that we cited, the defendants never responded to it in their brief, and the court noted that the fact that they didn't obtain FDA -- they didn't immediately go for guidance to the FDA to

show that they were reckless in making their statement that they qualified under 361. Under Denver Lough's tenure the defendants never went to the FDA. In fact, they didn't go to the FDA for two years -- for more than two years after making this statement. That shows that they were reckless for saying that they didn't qualify when they could have easily gone to the FDA and cleared the thing up and provided real assurance to investors.

THE COURT: Is qualification a factual question?

MR. STERN: Sorry? Yes, I believe --

THE COURT: Is qualification a factual question?

MR. STERN: I believe it is a question of fact and, therefore, not appropriate to evaluate on a motion to dismiss.

THE COURT: It is not a question of opinion?

MR. STERN: Yes. It is question of fact, you know, the law applied to the facts. What is it that their product does and does it meet the criteria specified by the law? Is it minimally manipulated?

THE COURT: Okay. Now, you say you have been deceived in some way.

MR. STERN: Yes, Your Honor.

THE COURT: Okay.

MR. STERN: The investors believe that their product wouldn't have to go through this and, therefore, in

evaluating whether the company had sufficient money to continue as a going concern -- you know, therefore, whether they would ever be able to get a return on their investment bought into the company based on that valuation.

Now, throughout the class period they were continuing to raise money. They issued -- what they did was they did direct offerings based on previously registered registration statements.

THE COURT: Okay. Is there something wrong in that?

MR. STERN: There is nothing inappropriate about doing it, but what they did was -- it was highly diluted to existing investors. So, for instance, they had issued warrants which investors could return for I believe it was $2.80, but then during the class period and desperate to raise money, they lowered the value of those warrants after the fact so that they could be purchased for ten cents. So they were selling to these warrant holders stock at a much below market value price just so they could get cash through the door, but this severely hurt existing investors who purchased at a higher price and had no reason to expect that because of their desperate need for cash they would be selling at fire sale prices to the warrant holders who they gave favorable treatment to. This really did harm investors.

In particular, and the fact that they were making these false statement when they were falling out of qualification under the NASDAQ, because their price had gone below a dollar and if the price stayed below a dollar they would be kicked off of NASDAQ, and that gives them a very strong motive to make false statements, because they want to stay on the NASDAQ because if they are not on NASDAQ it is going to be very difficult to raise money, and actually their underwriters could have refused to sell stock for them under their underwriting agreement.  That gives them a strong motive to mislead and sell investors these stocks and to --

THE COURT:  Well, I'm confused.  The initial registration --

MR. STERN:  Yes.

THE COURT:  -- you have no trouble with that.

MR. STERN:  I am not saying that it is per se inappropriate to register stock, but what we are saying is that the --

THE COURT:  You are not complaining about the initial registration?

THE COURT:  We are not saying that it was illegal or anything like that, of course.

THE COURT:  But you are not complaining about it?

MR. STERN:  We are saying it shows motive.

THE COURT:  But you are not complaining about anything in the way of misstatements in the initial registration?

MR. STERN:  No, Your Honor.

THE COURT:  Okay.  Now, tell me what you're asserting is a factual inaccuracy.

MR. STERN:  We are asserting that it is a factual inaccuracy to say that unlike products that are like drugs and medical devices that have to go through trials, they didn't have to go through those trials, because they were legally required to.

Then on the issue of -- there is a separate set of false statements, what they refer to as the 483 statements, where they made claims about -- they claimed that they had quality control processes in place and that they knew that they could create a specific sized -- basically by taking a specific size sample, they could treat a specific size wound.  Basically what we're alleging is that they didn't know that.  That statement was false because they had no way of knowing the appropriate sample size in order to heal a given wound size, because they didn't have what is called a potency assay.

A potency assay is a process by which you test not only how much stuff you have, but how much of it actually worked.  So essentially they couldn't measure the potency of

their product, and without the ability to measure the potency of your product you can't say, hey, we have quality control to make sure that we are giving you a good product, and you can't say we can, you know, use this much of our product to heal a wound of this size.

The reason we know they had no potency assay is because the FDA first in the Form 483 told them that they didn't have measures in place to figure out appropriate dosage, and then in the clinical hold letter they said that your proposed potency assay was clearly deficient.

Now, if they want to say, well, we had a potency assay and the FDA didn't like it, well, what the FDA told them was your potency assay can measure how much stuff you have, but not -- the thing you propose as a potency assay can measure how much stuff you have, but not how much of it actually works.

THE COURT:  Where do they say that?

MR. STERN:  They say that in the document -- the clinical hold letter.  Let me quote it.

THE COURT:  What does it say?

MR. STERN:  They say in response to our information request sent August 5th, 2021 -- which, by the way, indicates that their initial application didn't even include this, this was what was provided later -- you proposed a potency assay matrix that includes gene assays

that detect the presence of components found in epidermis -- then they redacted that part, so I don't know what is in there -- and dermis.  The two proposed gene assays are appropriate to identify epidermal and derma components in your drug product, i.e., identity testing, but did not demonstrate the biological activity of the product. Therefore, we do not agree that the proposed potency assay matrix provides an adequate potency assay for your product as you mentioned in our pre I and D correspondence.

In the introduction to this they note that one of the reasons they were denying it was that the plan or protocol for the investigation is clearly deficient in design to meet its stated objectives.

THE COURT:  Okay.  They shot them down then?

MR. STERN:  They shot them down and said it was clearly deficient.

THE COURT:  No.  Did they shut them down then?

MR. STERN:  Yes.

THE COURT:  That moment?

MR. STERN:  Yes.

At that moment they shut them down.  This was them saying you can't go forward with your trial until you give us a better potency assay.  Apparently they eventually did because they went forward.  This statement -- the FDA statement in September of 2021 indicates that they didn't

have -- that they had a clearly deficient potency assay at that time.  Then it has to also be true that in the earlier times when they made their false statement they also didn't have a remotely adequate potency assay.

THE COURT:  I thought they continued to sell.

MR. STERN:  They continued to sell, but this has to do with the -- they continued to sell for a period of time, but that is because the FDA -- because this clinical hold letter relates to not their ability to sell, but -- actually they had stopped selling by this time, but the clinical hold letter relates to their ability to conduct a phase three trial.

THE COURT:  But they still sold?

MR. STERN:  Not by this time.  Not at this time. By September of 2021 they were not selling.

THE COURT:  Okay.  And that is the '21 letter that you are referring to?

MR. STERN:  Yes, the clinical hold letter.

THE COURT:  Okay.

MR. STERN:  So they couldn't sell and they couldn't go forward at that time --

THE COURT:  At that point --

MR. STERN:  -- at that point with the clinical trial.

THE COURT:  Okay.

MR. STERN:  So if they didn't have a potency assay at that time --

THE COURT:  But prior to that they sold?

MR. STERN:  Prior to that they did sell because, again, if you register under 361 you don't -- the FDA doesn't check if you have a potency assay, does not check if you have those things.

THE COURT:  And in the findings they said they filed under 361?

MR. STERN:  Yes, they did, but this is a separate issue.

THE COURT:  In their filings they said they filed under 361?

MR. STERN:  Yes.

THE COURT:  And that is true, isn't it?

MR. STERN:  It is true that they filed under 361. We are not saying that that is not true.  What we are saying is not true with respect to 361 is that they claim that they wouldn't have to go through clinical trials, and that because they were not properly registered under 361 that that was untrue.

THE COURT:  But they did tell people they were under 361?

MR. STERN:  Yes, they did.

THE COURT:  Okay.  Your representative purchaser

could have read that, I suppose?

MR. STERN:  Yes, but that is actually part of the problem.  Although, of course, it was not false to say they were under 361, but by saying that they were properly registered under 361, that meant that they wouldn't have to go through an expensive approval process and, therefore, the investors would have seen the company as much more available because you wouldn't have to spend tens of millions of dollars --

THE COURT:  Well, they know what 361 says, don't they?

MR. STERN:  They do know what 361 says, but they don't know all of the details of the product and they don't know the full amount, and they were trusting PolarityTE to honestly inform them if they really qualified under 361, and they were trusting them to go through a meaningful process.

THE COURT:  You say they were misled?

MR. STERN:  Yes.

THE COURT:  How were they misled?

MR. STERN:  Well, they were misled in two ways.  First, they were misled because they believed that PolarityTE wouldn't have to go through the FDA approval process because it was properly registered under 361.

Second, they were misled in believing that the product had a specific measurable potency that the company

could say we know if we take this much skin we can treat a wound of this size and, therefore, they believed that this was something that they could eventually -- if they had to they could prove to the FDA that it was effective, but because they didn't actually have a real potency assay -- they had something they called a potency assay, but the FDA said this is not really a potency assay, and because they didn't have that, investors were misled into believing that this product could perform a certain function.

There is nothing more basic in terms of a medical product than saying this dose gives you this result, and people bought the product believing that PolarityTE actually knew that dosing, but if they didn't have a potency assay, then they couldn't have known that and they were reckless for telling investors -- I could say if you drink this much water you'll be hydrated, but if I have no basis of knowing that, that is misleading.

THE COURT: Okay. Tell me your view of the potency assay. What are we talking about?

MR. STERN: We are talking about something to measure -- so, you know, what they say is they take a sample of someone's skin and they process it through their proprietary process and then they bring it back. Now, in order for that to work, you have to know, okay, to fix a wound of this size we need this much tissue. Otherwise you

are just shooting in the dark and you might have to take too much just to make sure that you have an adequate amount.

In order to do that, once they process the product they need to measure its potency, so how many of the skin cells are actually still alive and still able to work as a skin graft.

THE COURT:  Is that a function of size?

MR. STERN:  Well, it is not just a function of size.  The issue is once you go through your process what percentage of the stuff is still working?  You have no know what percentage of the stuff is still working in order to apply it to a wound of a specific size.  So it is like, you know, if we could use an analogy -- I know if I take -- say that there is caffeine in coffee, right, and I want to make caffeine -- I want to extract caffeine from pure coffee beans.  I need to know how much working caffeine I can get out of those coffee beans in order to say from this many coffee beans I can produce this much caffeine that will keep you awake this long.

So what they need is a mechanism to test after they have gone through their process, is this stuff that we have extracted actually working caffeine?  The analogy isn't perfect because, of course, you can't kill caffeine, but you can kill skin cells, and if they kill the skin cells in the process, then it is no good.  So what they need to do is

make sure that they have living skin cells at the end of the process, and a potency assay is what tests that, and it is what allows them to say from this size thing we can treat this size wound.  It was reckless to make statements about the size of the wound they could treat, which they made statements about, unless they had that potency assay in place.

THE COURT:  There is a suggestion that a small amount can cover a fairly extended surface.

MR. STERN:  Yes, which is a pretty great claim if it is true, and that is why investors are very excited about this product.  They could use a small amount of skin to cover a greatly sized wound, but if they don't have the ability to test that, then it is impossible for them to make that statement with any kind of -- you know, in a way that isn't completely reckless.

If you want to hear more about that I can address it, but I could also discuss these issues of loss causation with respect to these two types of statements.

THE COURT:  You go ahead.

MR. STERN:  Okay.  Sure.

Just to break it up, so first were the statements about Section 361.  On April 30th, 2020 PolarityTE said that they were going to pursue a BLA, which basically means they were going to do FDA trials based on the preliminary view of

the FDA, but they never admitted that the product -- they would have to stop marketing it as a 361.

It wasn't until May 13th, 2021 where the company completely made it clear that they were not going to be able to sell the product as a 361, that they were going to stop marketing and that they were going to go through the FDA approval process and that there would be no revenue essentially until that time.  They did nothing to warn investors of that.  So because they falsely claimed that they would never have to go through this process and could sell without going through that process, those misstatements misled investors and that is why these disclosures caused that loss.

I think it is pretty straightforward on the statements related to the potency assay where eventually what happened was they disclosed to investors the clinical hold letter.  That clinical hold letter was a direct result of the lack of a potency assay, so that was a direct result of the fraud and it was a risk -- it was a materialization of the concealed risk caused by the fraud, and the disclosure of the clinical hold letter was a direct consequence of their lack of an adequate potency assay which was misleading to investors.

Is there more that I -- thank you, Your Honor.  Then I reserve any right to respond to the defendant's

further comments.

THE COURT:  You are welcome to respond as long as you want.

MR. STERN:  Thank you.

I do want to reiterate, again, one thing that they never addressed in their motion -- so one thing that they said is why would we put out this statement -- sorry.  Why would we put out this statement -- you know, why would we put out the statement and apply prematurely for FDA approval?  Well, it just so happens that they announced they were applying for FDA approval just after their stock fell below a dollar, which is the thing that put them at risk of being out of NASDAQ and being totally unable to raise money. It creates a perfectly plausible motive for fraud.

Again, the MiMedx case really is all but indistinguishable from this case, and the court basically said that the failure -- failing to get an opinion on whether your 361 or 351 made it reckless to say that you qualified for 361, and that investors were harmed when the switch over from Section 361 -- when they announced that basically they would have to go through the FDA approval process.  That MiMedx case is exactly on point and it is not something that the defendants mentioned once in their brief, because they know they can't distinguish that case.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. BILES:  Thank you, Your Honor.

I would like to address some of the points raised by plaintiffs' counsel.  First is this notion that they are not challenging statements of opinion or belief.  That is demonstrably false.  If you turn to appendix A of our motion we identify each challenged statement and all but one or two of them are prefaced with words like we believe our products including SkinTE are appropriately regulated under Section 361.  We believe our FDA registered SkinTE product satisfy the requirements of 361.  Again, these are repeated.  Again, our view is that, you know, there is a reasonable basis for regulating SkinTE under 361.  There are at least 12 examples of the use of the words believe or our view, so we believe they fall squarely within Omnicare's protection.

THE COURT:  The suggestion is, as I understand the argument, that you didn't believe and that nowhere is that explicit in the pleadings as I look at them.

MR. BILES:  It is not there, Your Honor.  That is exactly the point.  To establish that someone didn't believe something you would need to point to a document that that person had contemporaneously when he made the statement or a conversation that they had with a witness.  I mean the plaintiffs have identified three confidential, anonymous witnesses, but they don't provide that link.  All they say

is that Dr. Lough was adamant and that his views were strongly held.  They don't provide the link that the PSLRA requires to show someone's intent.  It has to be established by facts.  You can't do it by hindsight.

You can't say that the FDA told PolarityTE that its potency assay was insufficient in August of 2021 and say, oh, they must have known it was deficient all along. That is fraud by hindsight, Your Honor.  The FDA made its opinion in 2021 and we didn't know that until they delivered it.  To say that we knew about this years before is inappropriate under the pleading standards required under the Reform Act.

One point that counsel made is that we didn't warn investors that we might be forced to conduct clinical trials.  Again, that is not true.  If you look at appendix B and the risk disclosures that we identified, Your Honor, it is on page 12, our risk factor could not have been more explicit in warning investors that while we believe our products satisfy the regulation under 361 and, therefore, are exempt from the FDA requirements for premarket approval of clinical studies, and if the FDA disagrees with our interpretation of the relevant laws and regulations that apply to our candidates, it requires a new drug application and we may need to delay, abandon or revise our current development plans and conduct clinical trials, et cetera, et

cetera.  We couldn't have been clearer to investors of this risk.

It bears repeating, Your Honor, that when this new guidance came out the FDA gave companies like PolarityTE three years to figure it out.  We figured it out within two years and told investors, do you know what, we don't think the FDA is going to agree with our position and we're going to change our business strategy and go the 351 route.  That was a year before the end of the grace period, so we complied with what the FDA put out there.

I want to address the plaintiffs' claim that the lack of a potency assay rendered our statements about the size and being able to treat larger wounds.  If you look at the actual statement, Your Honor, it is clear that the plaintiffs' allegations are not true.  It is in paragraph 131 of their complaint.  They challenge a statement in PolarityTE's 2019 10-K that PolarityTE was able to treat a wound 30 times larger than the skin sample taken in one particular case.  This is not rendered false by the fact that we didn't have a potency assay.

The plaintiffs may have a point.  If we made the statement we are able to treat wounds 30 times larger in all cases for all patients, then they may have a point here, but we were explicit that we were able to treat it, and I quote, in one particular case.  Therefore, there was no sweeping

statement that our product could always treat wounds 30 times greater than the skin sample.

Also, Your Honor, we never represented to shareholders at any time during the class period that we had a potency assay. That statement was never made in any 10-K at all. What we did disclose to investors on November 9th, 2020, and this is in paragraph 137 of the amended complaint, we disclosed that PolarityTE -- that we needed to put in, quote, more work into validating the relevant sizes more specifically. This was in response to an analyst's question -- or it was in response to a question about our ability to satisfy the FDA rules. We were explicit that PolarityTE needed to put in more work and to validate the relevant sizes. Specifically, PolarityTE told investors that it was not yet prepared in November of 2020 to come to the FDA and say that going forward a harvest size of X equates to a certain yield or dosage of the product, which could then treat certain wound sizes ranging from X to Y.

Investors understood that PolarityTE needed to do more work on its potency assay. Your Honor, this is the opposite of fraud. This is PolarityTE disclosing to its investors that it needed to do more work on its potency assay in November of 2020 during the class period. This completely negates the plaintiffs' theory that we were hiding problems with our potency assay.

Finally, plaintiffs said that we cannot distinguish the MiMedx case and that it is not distinguishable.  That is not true.  I will tell Your Honor why that case is completely distinguishable.  There the product at issue involved an injectable fluid manufactured by grinding or pulverizing embryonic membranes.  That is obtained through women and pregnancy.

In contrast, SkinTE is made from a sample of a patient's own skin.  It is not taken by a third party's embryonic membrane that is then injected into patients.

Second, in the MiMedx case the FDA issued explicit guidance that products from embryonic membranes do not qualify for Section 361 registration.  It is very crystal clear guidance in that case that is simply not present in ours.

Third, MiMedx never registered its products under Section 361.  It said that its products qualified for 361, but never registered it.  In contrast we actually registered our product under 361.

Finally, Your Honor, the MiMedx case involved that the insiders sold a substantial amount of their personal holdings of MiMedx stock during the class period.  Here there are no allegations of insider selling so the case really is completely distinguishable from this one.

Thank you, Your Honor.

THE COURT: You tell me that the insiders of this company hung onto their stock?

MR. BILES: That is right, Your Honor.

THE COURT: Okay. Did the company as a company sell shares?

MR. BILES: Yes, Your Honor. It sold shares --

THE COURT: Where did they acquire the shares that it sold?

MR. BILES: My understanding is that when it did its first registration statement it registered more shares than it sold in that registration and it had shares in its treasury stock. Your Honor, I am not a corporate lawyer, so I don't want to say anything that is wrong, but my understanding is that it did not need to do anything to sell that stock in its treasury other than file what is called a shelf registration, which is a very short form registration. But, again, if there are specifics about that, I would like to defer to my corporate counsel to make sure that I'm getting it right for Your Honor.

Thank you.

THE COURT: Anything else?

MR. STERN: Yes, Your Honor.

Your Honor, so there are just a few issues I want to address. So you said that it is not explicit why they didn't believe -- why we didn't allege that they didn't

believe that it was properly registered.  There are a few instances I can point to that I believe show that they did.

First, they could have gone to the FDA as early as 2017 and just asked the FDA is this properly registered under 361?  If they really believed it, then the FDA would have said yes and they would be able to go to investors and say there is no problem and there is no risk that we'll ever have to do FDA trials, and yet they didn't do that.

That is actually in the MiMedx case what the judge found to be reckless.  The defendants said that MiMedx is different because they never registered under 361.  That is not what MiMedx said.  What MiMedx said was they never went to the FDA to ask if their registration under 361 was proper.  The defendants waited until near the end of the grace period to actually ask, and they said they had a whole other year, but what they left out is that fact that they only had another year because the FDA extended the grace period because of COVID-19, and they realized -- they basically gave people extra time because, you know, biotech companies were busy during the pandemic.  That is a big distinguishing factor.

We also have the fact that by December of 2019 there were discussions among senior vice presidents saying we'll probably have to go through these FDA trials and then they waited until April to actually approach the FDA.  You

know, even if you don't find the individual defendants liable --

THE COURT:  Did somebody buy anything in that time gap?

MR. STERN:  I'm sure many investors did buy during that time gap.  Our client did not buy during that time gap I don't believe, but I would have to double-check all of the trades.  But people, of course, were purchasing stock during that time gap.

The fact that while it was repeatedly told by knowledgeable individuals in the company that, hey, we should really re-register this thing under 351, and then he told them basically to be quiet, that also suggests scienter because he could have said, okay, fine, if you're so confident let's go to FDA and we'll ask them, and then the FDA is going to tell me I'm right, and then we'll never have to register and then we can stop having this conversation.

So we think those facts really do indicate that they didn't believe that their statements were true because, again, if they were so confident, why not go to the F.D.A. in 2017 and then never have to talk to investors and say maybe the FDA might agree with us.  It would boost the price of the company's stock.

THE COURT:  Perhaps the problem is the nature of the reg --

MR. STERN:  Well --

THE COURT:  -- 361 versus 351.  The reg says what it says.

MR. STERN:  The reg says what it says, but it does give them the option to just go to the FDA and get clarification.

THE COURT:  But it says what it says.

MR. STERN:  It does, and it is probably not the most prudent approach in my opinion, but I guess that is not the issue.

THE COURT:  You know, you work with what is there.

MR. STERN:  Yes.  But, again, I do think under MiMedx the fact that they didn't go and approach the FDA in, you know, 2017 or 2018 suggests that they didn't believe that the FDA was going to come back with a positive response, and that shows that they didn't really -- if you have confidence in your product, why not go to the FDA and say, hey, just tell us we're right about this.

Then on the issue about the potency assay, they said we made it clear in our statement that we are only talking about one particular case.  That is not what their registration -- that is not what their statements in the 10-K said.

THE COURT:  What does it say?

MR. STERN:  What it says is in the application of

SkinTE to date we have been able, when applicable to a particular case, to collect from a patient a skin tissue sample five centimeter square inches size or less and produce enough SkinTE to treat a wound greater than 30-X -- sorry, treat a wound 30-X greater in size than the skin collected.

So when they say a particular case, what I read that as and what I say most investors would read that as is a particular kind of case, because they talk about five centimeters or less which means that they are talking about a few different instances but just in a particular type of case. They are not saying they can do that in all cases, but they are saying there is a type of case, a particular type of case where they can do that. They never said it was only one particular patient. If they wanted to say we have done this with one particular patient, great, then say we have done it with one particular patient, but they didn't say that.

THE COURT: Okay. I will let counselor respond.

MR. BILES: First, Your Honor, I take issue with counsel's statement that multiple people told Dr. Lough that registration under 361 was improper. That is not true. There is not one example mentioned in the complaint of any conversation between any employee and Dr. Lough saying that registration under 361 was improper. That is the main

thrust of our motion to dismiss and why --

THE COURT: Was the good doctor the decision maker on using 361?

MR. BILES: He was one of many, Your Honor.

There is this insinuation in the second amended complaint that PolarityTE was a one-man show dominated by Dr. Lough. That is not the case. This was a company who had qualified executives with doctorates in the executive ranks and on the board, multiple highly trained professionals. To say Dr. Lough crammed this down without any input from all of the other qualified executives and board members and, you know, ignoring the advice of regulatory counsel is implausible, Your Honor.

Your Honor, I mean counsel was quibbling with the use of what the meaning of one particular case is. I mean I read it to mean one case. I just direct Your Honor to paragraph 131. You can read it.

THE COURT: Read it to me.

MR. BILES: Okay. In the 2019 10-K it provides that the core technology of SkinTE is minimally polarized functional units, MPFUs. MPFUs are multicellular micro aggregates that act as an intrinsic regenerative bio reactor capable of expanding, proliferating and synthesizing cells, materials, factors and systems necessary for regenerating full thickness, three-dimensional tissue. In the

application of SkinTe to date we have been able, when applicable to a particular case, to collect from a patient's skin a tissue sample of five square centimeters in size or less and produce enough skin to treat a wound 30 times greater in size than the skin collected.

I mean I read that to mean in one particular case they were able to achieve that.

THE COURT:  Okay.

MR. BILES:  Thank you, Your Honor.

THE COURT:  Thank you then.

Anything else?

MR. STERN:  Yes, Your Honor, a couple of things.

First, I would note that the complaint does allege that people pushed back against Denver Lough and he, quote, chopped their head off when he brought up 351.  Second, I would also note that their argument -- again, the defendants said one particular case, but, again, the documents never say one particular case.  They say a particular case.

THE COURT:  A?

MR. STERN:  A particular case.  This is not an argument that they raise in their motion to dismiss, and that is another thing I would point out, to my knowledge, unless I missed it somehow.

Finally, I did want to address that they talked about -- there was another false statement or a statement to

allegedly be false basically saying on the dosing side the beauty of SkinTE has always been that we can take a relatively small harvest and treat a significant open wound. We have proven that both in our real world experience and preclinically, but we need to put a little more work into categorizing that and validating it more specifically.

They point to the fact that they said validating it more specifically as indicating that maybe the potency assay was not adequate at that time, but that is not what validation means. Under the rules validation refers to something much more specific, and we outline it more fully in our motion to dismiss opposition, but it really has to do with basically providing documentation and proof, not with the basic principle of how do you measure this thing. So that is something that we would point out that that is not really what was said.

Thank you.

THE COURT: Thank you.

I am always interested in the interrelationship of science and the regulation of securities which is an interesting relationship. I pondered some on this particular matter, because I have been concerned with the nature, as I have expressed before, the nature of the assertions as to factual inaccuracy and the use of opinion, qualification, warnings, and all of that lead me to believe

that I should grant the motion which I will do, and ask counsel for the moving party to prepare and submit a suggested form of order with specific citations to the record.  If you will do that within 20 days I would appreciate it.

          If there is nothing else that we can talk about, we'll be in recess and you may be excused.

          We'll be in recess until tomorrow.

          (Proceedings concluded.)